Celebrity Cruises

‹ Go Back

# Cruise / Cruisetour Ticket Contract - Canada

**IMPORTANT NOTICE TO GUESTS**

**THIS CRUISE/CRUISETOUR TICKET CONTRACT IS APPLICABLE ONLY TO GUESTS WHOSE PRIMARY COUNTRY OF RESIDENCE IS CANADA. IF YOUR PRIMARY COUNTRY OF RESIDENCE IS NOT CANADA, THEN PLEASE VISIT https://www.CelebrityCruises.com/guest-terms/ TO DETERMINE THE CRUISE/CRUISETOUR TICKET CONTRACT OR BOOKING TERMS AND CONDITIONS THAT APPLY TO YOU. PLEASE REFER TO SECTION 2.i BELOW FOR THE DEFINITION OF "PRIMARY COUNTRY OF RESIDENCE."**

**THIS CRUISE/CRUISETOUR TICKET CONTRACT CONTAINS IMPORTANT LIMITATIONS ON THE RIGHTS OF GUESTS. IT IS IMPORTANT THAT YOU CAREFULLY READ ALL TERMS OF THIS TICKET CONTRACT. YOU EXPRESSLY AGREE TO THE TERMS HEREIN, AND AGREE AND UNDERSTAND THAT YOU ARE BOUND BY THE PROVISIONS OF THIS AGREEMENT FROM THE TIME OF BOOKING AND AFTER THE CRUISE TERMINATES. YOU AGREE THAT CARRIER MAY CHANGE, MODIFY, AND UPDATE THE TERMS OF THIS TICKET CONTRACT, THAT NOTICE OF SUCH CHANGE MAY OR MAY NOT BE GIVEN, AND THAT YOU NONETHELESS AGREE TO BE BOUND BY ANY SUCH CHANGE OR MODIFICATION.**

**YOU ARE ESPECIALLY DIRECTED TO CAREFULLY READ AND UNDERSTAND SECTIONS 3, AND 10 THROUGH 12, AS THEY CONTAIN SIGNIFICANT LIMITATIONS ON YOUR RIGHTS TO ASSERT CLAIMS FOR PERSONAL INJURIES, ILLNESS OR DEATH, AND BAGGAGE AND PERSONAL PROPERTY LOSS OR DAMAGE, AGAINST CARRIER, THE VESSEL, RELATED ENTITIES AND THEIR OFFICERS, AGENTS AND EMPLOYEES AND OTHER THIRD PARTIES, INCLUDING TIME LIMITS AND FORUM FOR CLAIMS AND SUITS, APPLICABLE LAW, ARBITRATION, AND IN REM PROCEEDINGS.**

**GUESTS SAILING TO THE GALAPAGOS ISLANDS SHOULD REFER TO SECTIONS 5.b AND 13.e FOR NOTICES SPECIFIC TO GALAPAGOS CRUISES.**

**IF YOU ARE THE PERSON MAKING A BOOKING YOU ARE ALSO DIRECTED TO CAREFULLY READ AND UNDERSTAND SECTION 16.a TO UNDERSTAND YOUR RESPONSIBLITIES AS THE LEAD GUEST.**

1. INTRODUCTION:

This Cruise/CruiseTour Ticket Contract ("Ticket Contract" or "Agreement") describes the terms and conditions that will apply to the relationship between Guest and Carrier for the Cruise or CruiseTour covered by this Ticket Contract. The terms and conditions set forth in this Ticket Contract, together with the Cruise Fare due for Your Cruise or CruiseTour, constitutes the entire agreement between Carrier and Guest. Except as otherwise expressly provided herein, this Agreement supersedes any other representations or agreements that may have been made relating to the subject matter of this Agreement, the Cruise or the CruiseTour, including but not limited to anything stated in brochures, advertisements, and other promotional materials, by Carrier, its parent, subsidiary or affiliated companies, or any of their respective employees, or third persons such as travel agents, but excluding the terms of the Cruise Lines International Association ("CLIA") Passenger Bill of Rights that the Vessel's Operator has adopted as a requirement of being a member of CLIA. In the event of a direct conflict between a provision of this Ticket Contract and a provision of the CLIA Passenger Bill of Rights in effect at the time of booking (the "CLIA Passenger Bill of Rights"), the CLIA Passenger Bill of Rights controls.

Purchase or use of this Ticket Contract, whether or not signed by Guest, shall constitute the agreement by Guest, on behalf of himself and all other persons traveling under this Ticket Contract (including any accompanying minors or other persons for whom the Ticket Contract was purchased), to be bound by the terms and conditions of this Ticket Contract. In addition, Guest acknowledges the availability of and Guest agrees to abide by the terms and conditions, including but not limited to certain payment terms such as minimum deposit requirements and payment due dates, which appear in the applicable Carrier brochure or online at https://www.CelebrityCruises.com. In the event of any conflict between such other brochure or website materials and this Ticket Contract, the terms of this Ticket Contract shall prevail.

2. DEFINITIONS:

a. "Agreement" shall have the meaning given to it in Section 1 above.

b. "Carrier" shall include: (i) the Vessel, or any substituted ship; its launches or crafts; and (ii) the Vessel's Operator, owner, manager and charterer.

c. "Cruise" means the specific cruise covered by this Ticket Contract, as the same may be modified and shall include those periods during which Guest is embarking or disembarking the Vessel and those periods when Guest is on land while the Vessel is in port.

d. "CruiseTour" means the combined vacation package officially published and offered by Carrier, which includes the applicable Cruise and associated Land Tour.

e. "Operator" means the entity identified in Section 20 below.

f. "Guest" or "Your" means all persons traveling under this Ticket Contract and persons in their care, together with their respective heirs and representatives. "Guest" shall include the plural and the use of the masculine shall include the feminine. Notwithstanding, other policies referenced herein, communications from Carrier, and other posted notices may interchangeably use the term "Passengers" as well when referring to Guests.

g. "Land Tour" means the land tour component of a CruiseTour to be provided either prior to the initial embarkation on the Cruise or after the final debarkation from the Cruise. "LTO" means to operator of the Land Tour portion of any CruiseTour.

h. "Lead Guest" means the Guest who initiated the Cruise or Cruise Tour booking for themselves, and/or for one or more other Guests named on the booking, whether the booking was made by Lead Guest directly with Carrier or through a travel agent. The Lead Guest is usually the first Guest named on the booking.

i. "Primary Country of Residence" means the country where you primarily reside at the time of booking the Cruise. This should be indicated by you, the Lead Guest, or another agent or representative of yours at the time of booking the Cruise or at online check-in.

j. "Transport" means the railcars, buses and other modes of transportation or accommodation provided by a LTO in connection with a Land Tour.

k. "Vessel" means the ship owned or chartered or operated by Operator on which Guest may be traveling or against which Guest may assert a claim, as well as any substituted ship used in the performance of this Ticket Contract.

3. CRUISE FARE TERMS:

**a. Cruise Fare.** "Cruise Fare" means the amount paid and/or due from Guest for the Cruise or CruiseTour which includes carriage onboard the Vessel, full board, and ordinary Vessel food and entertainment. The Cruise Fare does not include alcoholic beverages, specialized tea and coffee beverages, fresh or cold press juices, energy drinks, spa treatments and salon services, exercise classes, select premium dining and entertainment, internet access, casino and gambling activities, shore excursions, photographs, video arcade, phone calls, laundry services, satellite connection for mobile phones, travel insurance, medical insurance, baggage insurance, medical services, shoreside expenses or transfers, airfare, or hotel accommodations (unless included in a CruiseTour), or any other incidental charge or expense that you incur. Also excluded from the Cruise Fare are: (i) Taxes and Fees; and (ii) any Fuel Supplement, which, subject to applicable law and the terms of this Agreement, Carrier expressly reserves the right to impose or pass along with no right of cancellation by Guest implied. This listing is not intended to be exhaustive and additional exclusions or fees may apply.

**b. Taxes, Fees, and Port Expenses.** Taxes, fees, and port expenses (collectively, "Taxes and Fees") include fees, charges, costs and taxes imposed on Carrier, by governmental or quasi-governmental authorities, as well as third party fees and charges relating to the Vessel's navigation, operations or presence in a port or harbor. By way of example, and not limitation, Taxes and Fees may include immigration-related fees, passenger head taxes, dockage fees, wharfage fees, inspection fees, pilotage, canal tolls, navigation fees, environmental impact fees, charges relating to the cost of acquiring government-mandated carbon emission allowances, or charges related to berthing, stevedoring, baggage handling or storage, and security services. Guest acknowledges that Taxes and Fees are estimated by Carrier at the time of booking and subject to change. Carrier may pass through any increases to applicable Taxes and Fees at any time after booking. Carrier may, in its sole discretion, require Guest to prepay such increase in Taxes and Fees prior to boarding the Vessel or apply such increase to Guest's onboard folio at the time of sailing. Guest's refusal or failure to prepay any such increase may be deemed a cancellation by Guest.

**c. Fuel Supplement.** Subject to the terms of this Section, Carrier reserves the right, without prior notice to Guest, to impose a fuel supplement charge (the "Fuel Supplement"). Carrier may impose such Fuel Supplement either at the time of booking or thereafter at any time prior to sailing. If the Fuel Supplement is imposed at the time of booking, Carrier will display the amount and frequency (or a fixed price representing the same) together with the Cruise Fare, Taxes and Fees, and Gratuities on Carrier's website and Guest's booking confirmation. If at any time after booking, the closing price of: (i) West Texas Intermediate Fuel exceeds US$65.00 per barrel; or (ii) Henry Hub Natural Gas Spot Price exceeds US$3.00 per Metric Million British Thermal Unit on the New York Mercantile Stock Exchange, Carrier may impose a Fuel Supplement of up to US$12.00 (or its equivalent in the currency of the booking) per Guest, per day. Carrier may, in its sole discretion, require Guest to prepay the Fuel Supplement prior to boarding the Vessel or apply such charge to Guest's onboard folio at the time of sailing. Guest's refusal or failure to prepay any Fuel Supplement may be deemed as a cancellation by Guest.

**d. Gratuities.** For Guest's convenience, a discretionary service gratuity ("Gratuities") will be automatically added daily to the onboard account of each Guest, except as otherwise provided below. Gratuities are subject to adjustment, at Guest's discretion, onboard the Vessel until the morning of disembarkation. Gratuities will not be automatically added to the Guest's onboard account if they are included in the Cruise Fare, as reflected in the Guest's booking confirmation, if the Guest pre-pays them, or if the laws of the Guest's primary country of residence do not permit them to be added automatically.

**e. Correction of Errors.** In the event that a Cruise or CruiseTour is booked but the Cruise Fare listed, quoted or advertised through any website, Carrier sales person, travel agent or any other source is inaccurate or unavailable due to an electronic error, typographical error, human error or any other error causing the Cruise or CruiseTour to be sold, or listed for sale, quoted or advertised, in a quantity or for an amount not intended by Carrier, Carrier reserves the right to correct the erroneous fare by requesting Guest to pay the correct amount intended, re-berthing Guest in other accommodations onboard the Vessel, or by canceling this Agreement in exchange for a full refund. For the avoidance of doubt, in no event shall Carrier be obligated to honor any such booking resulting from the error or otherwise be liable in such circumstances.

**f. Promotional Cruise Fares.** Carrier offers promotional Cruise Fares (or other offers) that may modify the cancellation terms set forth in Section 8, impose a minimum stateroom occupancy requirement, require payment of a non-refundable deposit, or accelerate the Cruise Fare payment schedule. With respect to Cruise Fares which are contingent on minimum occupancy requirements, cancellation by one or more Guests in a stateroom may result an adjustment to the remaining Guests' Cruise Fare based on the prevailing rates at the time of cancellation, plus any single supplements (if applicable), with no right of cancellation by Guest(s) implied. With respect to Cruise Fares which require payment of a non-refundable deposit, such deposit shall be become immediately due and payable at the time of booking and will not be refunded at any time after paid by Guest. Change fees also apply.

**g. Payment and Refunds of the Cruise Fare.** Guest agrees to pay, and Carrier reserves the right to collect, the Cruise Fare due for the accommodations booked. Failure to make timely final payment in full of the Cruise Fares due for all Guests in a stateroom may result in cancellation of the reservation for the entire stateroom. Guest agrees that the Carrier shall not be liable to make any refund to Guest for Ticket Contracts that are wholly or partially unused by Guest except as otherwise expressly stated herein.

**h. Payment for Onboard Charges.** Guest further agrees to pay in full before the end of the Cruise, and Carrier reserves the right to collect, all charges for entertainment, goods and services incurred by Guest, or incurred by Carrier on Guest's behalf.

4. BAGGAGE, PROPERTY AND LIMITATIONS OF LIABILITY:

**a. Baggage Limits and Prohibited Items.** Each adult Guest is permitted to carry onboard the Vessel or check-in only the wearing apparel and personal effects reasonably necessary for the Cruise, including suitcases, trunks, valises, satchels, bags, hangers containing clothing, toiletries and similar items. In no event shall any Guest bring on board the Vessel or check-in, or in connection with the Land Tour, any illegal controlled substances (including medical marijuana), fireworks, live animals (except under the terms of Section 13.e below), weapons, firearms, explosives or other hazardous materials, or any other items prohibited by applicable law or Carrier policy. Marijuana possession and/or use, including medical marijuana, and possession or use of any illegal drugs, is strictly prohibited in many jurisdictions visited and on the Vessel at all times, as well as in terminals, during shore excursions or any other part of the Cruise, regardless of any local, state, or other laws which might permit use or possession of marijuana. Guests who violate the laws of any jurisdiction are subject to being reported to law enforcement or customs authorities, arrest and prosecution. Guests who bring on board dangerous items, marijuana in any form, or any illegal drugs or controlled substances are also subject to immediate disembarkation or denial of boarding. Guests shall have no claim for refund, loss, damage, inconvenience, or compensation whatsoever under any of these circumstances. Guest shall be responsible to notify Carrier in advance of the Cruise if there is any question as to the permissibility of taking any item or substance onboard the Vessel. Carrier reserves the right to refuse to permit any Guest to take on board the Vessel or on any mode of Transport any item Carrier deems inappropriate.

**b. Liability for Loss of or Damage to Baggage.** Unless negligent, Carrier is neither responsible nor liable for any loss of or damage to Guest's property, whether contained in luggage or otherwise. Liability for loss of or damage to Guest's property in connection with any air or ground transportation shall be the sole responsibility of the provider of the service and in accordance with applicable limitations.

**c. Limitation of Liability for Lost or Damaged Property.** Notwithstanding any other provision of law or this Agreement, Carrier's liability for loss or damage to property during the Land Tour portion of a CruiseTour is limited to $300.00 per Guest. Notwithstanding any other provision of law or this Agreement, Carrier's liability for loss or damage to property for the cruise (or for the cruise only portion of a CruiseTour) shall be limited to $300.00 per Guest, unless Guest declares the true value of such property in writing to the Carrier at the address specified below in Section 10.b.i, and pays Carrier within 10 days of final payment for the Cruise, a fee of five percent (5%) of the amount that such value exceeds $300.00. In such event, Carrier's liability shall be limited to its true declared value, but not exceeding $5,000.

**d. Limited Carriage.** Carrier does not undertake to carry as baggage any tools of trade, household goods (including but not limited to appliances and furniture) fragile or valuable items, precious metals, jewelry, documents, negotiable instruments or other valuables, including but not limited to those specified in Title 46 of the United States Code, Appendix Section 181. Each Guest warrants that no such item will be presented to Carrier within any receptacle or container as baggage, and hereby releases Carrier from any liability whatsoever for loss of or damage to such items when presented to Carrier in breach of this warranty. In no event shall Carrier be liable for normal wear or tear of luggage or property, or loss of or damage to jewelry, cash, negotiable paper, photographic/electronic, medical or recreational equipment, dental hardware, eyewear, medications or other valuables unless they are deposited with Carrier on the Vessel for safekeeping against receipt (LTOs do not accept valuables for deposit). Carrier's liability, if any, for loss of or damage to valuables so deposited shall not exceed the amounts indicated in Section 4.c above.

5. PUBLIC HEALTH; MEDICAL CARE; OTHER PERSONAL SERVICES; KNOWING ACCEPTANCE OF THE RISKS:

**a. Recommended Consultation with Personal Physician.** Guests are encouraged to discuss the advisability of travel and participation in onboard and shoreside activities with their personal physicians.

**b. Availability of Medical Care.** Due to the nature of travel by sea and the ports visited, the availability of medical care onboard the Vessel and in ports of call may be limited or delayed and medical evacuation may not be possible from the Vessel while at sea or from every location to which the Vessel sails. Medical facilities and physicians are not available on all vessels sailing to the Galapagos Islands.

**c. Relationship with Service Providers.** To the extent Guests retain the services of medical personnel or independent contractors on or off the Vessel, Guests do so at their sole risk. Any medical personnel attending to a Guest on or off the Vessel, if arranged by Carrier, are provided solely for the convenience of the Guest, work directly for the Guest, and shall not be deemed to be acting under the control or supervision of Carrier, as Carrier is not a medical provider. Likewise, any onboard concessions (including but not limited to the gift shops, spas, beauty salon, art program, photography, formalwear concessions) are either operated by or are independent contractors on board the Vessel, on Transport or elsewhere and are provided solely for the convenience of the Guest. Even though the Carrier shall be entitled to charge a fee and earn a profit for arranging such services, all such persons or entities shall be deemed independent contractors and not acting as agents or representatives of Carrier. Carrier assumes no liability whatsoever for any treatment, failure to treat, diagnosis, misdiagnosis, actual or alleged malpractice, advice, examination or other services provided by such persons or entities. Guest acknowledges that the Vessel's hairdresser, manicurist, art auctioneer, gift shop personnel, spa personnel, wedding planners and other providers of merchandise and personal services are employees of independent contractors and that Carrier is not responsible for their actions.

**d. Payment for Medical or Personal Care Services.** Guest shall pay for all medical care or other personal services requested or required, whether onboard or ashore, including the cost of any emergency medical care or transportation incurred by Carrier and any costs associated with the provision of medical services as referenced in the CLIA Passenger Bill of Rights. If Guest is unable to pay and the Carrier pays for such expenses, then Guest shall reimburse Carrier for those expenses.

**e. Health, Travel and Risk Acknowledgement.** GUEST ACKNOWLEDGES, UNDERSTANDS AND ACCEPTS THAT WHILE ABOARD THE VESSEL, IN TERMINALS AND BOARDING AREAS, OR DURING ACTIVITIES ASHORE AND/ OR WHILE TRAVELING TO OR FROM THE VESSEL, GUEST OR OTHER GUESTS MAY BE EXPOSED TO COMMUNICABLE ILLNESSES, INCLUDING BUT NOT LIMITED TO AIRBONE DISEASES LIKE INFLUENZA, COVID-19, COLDS AND NOROVIRUS. GUEST FURTHER UNDERSTANDS AND ACCEPTS THAT THE RISK OF EXPOSURES TO THESE COMMUNICABLE ILLNESSES AND OTHERS IS INHERENT IN MOST ACTIVITIES WHERE PEOPLE INTERACT OR SHARE COMMON FACILITIES, IS BEYOND CARRIER'S CONTROL, AND CANNOT BE ELIMINATED UNDER ANY CIRCUMSTANCES. GUEST KNOWINGLY AND VOLUNTARILY ACCEPTS THESE RISKS AS PART OF THIS TICKET CONTRACT, INCLUDING THE RISK OF SERIOUS ILLNESS OR DEATH ARISING FROM SUCH EXPOSURES, AND/OR ALL RELATED DAMAGES, LOSS, COSTS AND EXPENSES OF ANY NATURE WHATSOEVER.

6. SHORE EXCURSIONS, TOURS, FACILITIES OR OTHER TRANSPORTATION:

All arrangements made for or by Guest for transportation (other than on the Vessel) before, during or after the Cruise or CruiseTour of any kind whatsoever, as well as air arrangements, shore excursions, tours, hotels, restaurants, attractions and other similar activities or services, including all related conveyances, products or facilities, are made solely for Guest's convenience and are at Guest's risk. The providers, owners and operators of such services, conveyances, products and facilities are independent contractors and are not acting as agents or representatives of Carrier. Even though Carrier may collect a fee for, or otherwise profit from, making such arrangements and offers for sale shore excursions, tours, hotels, restaurants, attractions, the Land Tour and other similar activities or services taking place off the Vessel for a profit, Carrier does not undertake to supervise or control such independent contractors or their employees, nor maintain their conveyances or facilities, and makes no representation, whether express or implied, regarding their suitability or safety. In no event shall Carrier be liable for any loss, delay, disappointment, damage, injury, death or other harm whatsoever to Guest which occurs on or off the Vessel or the Transport as a result of any acts, omissions or negligence of any independent contractors. See also Section 19 below.

Guest acknowledges that the Vessel will be sailing to foreign countries where the laws, regulations, customs and business practices may vary greatly from those of Guest's home country. As a result, there may be significant differences in modes of transportation mode and their quality, infrastructure (e.g., poorly maintained roads), regulations, and driving practices in the countries visited during the Cruise. Guests are responsible for familiarizing themselves with the associated risks and travel warnings at www.travel.state.gov, or the equivalent travel advisory system in Guest's country, prior to sailing.

7. CANCELLATION, DEVIATION, OR SUBSTITUTION BY CARRIER:

**a. Cancellation by Carrier Generally.** Carrier has the right, without prior to notice to Guest, to cancel all or any portion of this Agreement at any time prior to Guest boarding the Vessel for the Cruise or commencing a Land Tour, whichever occurs first. In such case, Guest's sole and exclusive remedy shall be for the issuance of a refund or future cruise credit for all or the proportionate value of the cancelled Cruise or CruiseTour. Unless otherwise provided herein, Guest agrees that a refund or future cruise credit shall be Guest's sole and exclusive remedy and Carrier shall have no further liability for damages or compensation of any kind. Carrier's right to cancel this Agreement shall be in addition to Carrier's right to cancel the Cruise or CruiseTour.

**b. Deviations by Carrier.** Carrier may for any reason at any time and without prior notice, cancel, advance, postpone or deviate from any scheduled sailing, port of call, destination, lodging or any activity on or off the Vessel, or substitute another vessel or port of call, destination, lodging or activity. Carrier shall not be liable for any claim whatsoever by Guest, including but not limited to loss, compensation or refund, by reason of such cancellation, advancement, postponement, or deviation, except as provided in Section 7.d below with respect to mechanical failures or as otherwise required by applicable law. For the avoidance of doubt, the terms of this Section 7.b apply equally with respect to either a Cruise or CruiseTour.

**c. Cancellation or Deviation by Carrier Caused by Circumstances Beyond Carrier's Control.** If Carrier's performance hereunder is, hindered or adversely affected, or in the opinion of Carrier or the Master is likely to be hindered or adversely affected, in whole or in part, as a result of war, hostilities, blockages, prevailing weather conditions (e.g., tropical cyclones or the presence of ice), labor conflicts, strikes onboard or ashore, breakdown of Vessel, congestion, docking difficulties, medical or lifesaving emergencies, declared pandemics, public health emergencies or outbreak of communicable disease, quarantines, national or regional emergencies, seizure under legal process or any other cause whatsoever, or if Carrier or the Master considers that for any reason whatsoever, proceeding to, attempting to enter, or entering or remaining at the port on an itinerary may expose the Vessel to risk or loss or damage or delay, Guest and her baggage may be landed at any port, or if the Guest has not embarked on the Cruise or commenced the Land Tour the entire Cruise may be canceled, at which time the responsibility of Carrier shall cease.

**d. Early Termination Due to Mechanical Failures.** In the event that a Cruise (or the cruise component of a CruiseTour) is canceled or terminated early due to mechanical failures, Guest shall have a right to: (i) a full refund of the Cruise Fare if the entire Cruise is canceled, or a partial refund if the Cruise is terminated early; (ii) transportation selected by Carrier to the Vessel's scheduled port of disembarkation or the Guest's home city (as determined by Carrier), if Guest has travelled to the Vessel; and (iii) lodging selected by Carrier, if disembarkation and an overnight stay in an unscheduled port are required due to the Cruise or cruise component of a CruiseTour being cancelled or terminated early because of such mechanical failures.

**e. Substitution and Transfers.** Carrier has the right to substitute the Vessel for any other vessel or means of transportation, regardless of whether owned or operated by the Carrier, and to re-berth Guest thereon, without liability or compensation to Guest of any kind. Carrier shall further have the right to transfer Guest and/or Guest's luggage to other carriers, whether by air, land or sea toward the final port of disembarkation. Transfers for the convenience of Guest, or in compliance with a government order pursuant to Section 7.f, shall be at the sole and exclusive cost to Guest.

**f. Compliance with Government Orders.** Carrier shall have the right to comply with any orders, recommendations, or directions whatsoever given by any governmental entity or by persons purporting to act with such authority, without liability for loss, compensation of any kind whatsoever or refund to Guest, unless otherwise required by applicable law.

8. CANCELLATION BY GUEST; EARLY DISEMBARKATION:

**a. General.** Except as otherwise provided in this Section 8, Guest is not entitled to any refund, payment, compensation or credit for any cancellation initiated by Guest.

**b. Cancellation of Cruise or CruiseTour Reservation**. Cruise reservations that are cancelled by Guest prior to the sail date, and CruiseTour reservations that are cancelled by Guest prior to the first day of the CruiseTour, may be subject to a cancellation charge. The amount of the cancellation charge shall be determined as shown in the table below and shall vary depending on how far in advance of the sail date (or first day of the CruiseTour) the Operator receives notice of cancellation.

| **Cruise Length:** | **Days to Sailing*:** | **Cancellation Charge (Per Guest):** |
|---|---|---|
| 1 – 4 nights | 75+ days | No charge (except for non-refundable deposit amounts) |
| | 74 – 61 days | 50% of total price |
| | 60 – 31 days | 75% of total price |
| | 30 days or less | 100% of total price |
| 5 – 14 nights | 90+ days | No charge (except for non-refundable deposit amounts) |
| | 89 – 75 days | 25% of total price |
| | 74 – 61 days | 50% of total price |
| | 60 – 31 days | 75% of total price |
| | 30 days or less | 100% of total price |
| 15+ nights | 120+ days | No charge (except for non-refundable deposit amounts) |
| | 119 – 75 days | 25% of total price |
| | 74 – 61 days | 50% of total price |
| | 60 – 31 days | 75% of total price |
| | 30 days or less | 100% of total price |
| **All Galapagos Cruises, regardless of length:** | | |
| | 150+ days | No charge |
| | 149 – 121 days | 10% of total price |
| | 120 – 91 days | 25% of total price |
| | 90 – 61 days | 50% of total price |
| | 60 – 31 days | 75% of total price |
| | 30 days or less | 100% of total price |

*Or number of days prior to the first day of the CruiseTour, if the associated Land Tour is scheduled to begin prior to the Cruise. For bookings made outside of Canada, a different cancellation policy may apply. Contact your local office or travel agent for details.

**c. Cancellation of a Land Tour.** For Guests who have booked a CruiseTour and desire to cancel their Land Tour segment while retaining the Cruise, refunds of the Cruise Fare (including any applicable Fuel Supplement) for the Land Tour segment shall be made in accordance with the following cancellation policy: Guests who convert their CruiseTour to a cruise-only booking within forty-two (42) days of the start date of the Land Tour segment will be subject to a cancellation charge. The amount of that charge varies depending on the location of the CruiseTour and/or its length. For the specific amount of the charge, visit https://www.CelebrityCruises.com.

**d. Refunds.** If a Cruise or CruiseTour reservation is cancelled and all cancellation charges have been paid to Carrier, any prepaid Taxes and Fees, Gratuities and Fuel Supplement shall be refunded. Otherwise, the balance of any prepaid Taxes and Fees, Gratuities and Fuel Supplement shall be refunded, after deducting any cancellation charges that apply. Cancellation by Guest after the Cruise or CruiseTour has begun, early disembarkation of Guest for any reason, including pursuant to any provision of this Agreement, or "no-shows," shall be without refund, compensation, or liability on the part of Carrier whatsoever. If Carrier received payment via credit card and a refund is owed, the refund will be made to that credit card. If Carrier received payment from your travel agent and a refund is owed, the refund will be provided back to that travel agent.

**e. Cancellation Policy for Single and Higher Occupancy Staterooms.** The cancellation charges set forth above are based on double occupancy staterooms. Cancellation charges will be assessed on a per-Guest basis. Cancellation charges may vary for single occupancy staterooms, or for third, fourth or fifth Guests booked in a single stateroom. Consult your travel agent or call Celebrity Cruises for further details.

**f. Other Cancellation Charges.** For cancellations of air arrangements, shore excursions, tours, hotels, restaurants, attractions and other similar activities or services, travel insurance, pre-booked onboard services (e.g., spa, photography or wedding services) and pre-booked arrangements (e.g., specialty dining), see the applicable terms and conditions for any applicable cancellation charges.

9. GUEST'S OBLIGATION TO COMPLY WITH AGREEMENT, APPLICABLE LAWS, AND RULES OF CARRIER; INDEMNIFICATION:

a. Guest shall at all times comply with the provisions of this Agreement, all applicable laws, and rules, policies and regulations of Carrier, the Vessel and the Transport (as the same may be changed from time to time with or without notice). Guest agrees not to enter any areas of the Vessel designated for crew only, including crew quarters, under any circumstances whatsoever. Guest further agrees that Carrier may prohibit or restrict Guest from bringing any alcoholic beverages for consumption onboard the Vessel and agrees to comply with any Carrier policy covering such matters. Nothing in this Agreement shall grant to Guest any right to market, advertise, promote, provide or sell products or services to other guests onboard the Cruise or CruiseTour and Guest shall be prohibited from doing so.

b. Guests are solely responsible to maintain in their possession all passports, visas and other travel documents required for embarkation, travel and disembarkation at all ports of call. Guests assume full responsibility to determine through their travel agent or the appropriate government authority the necessary documents. Guest agrees to provide to Carrier (at Carrier's reasonable request) any travel documents. Carrier shall return such travel documents to Guest by no later than the end of the Cruise.

c. Guest understands and agrees that Carrier has a zero tolerance policy for illegal activity and shall report such activity to the appropriate authorities.

d. Each adult Guest undertakes and agrees to supervise at all times any accompanying minors to ensure compliance with the provisions of this Section 9.

e. Carrier may also change accommodations, alter or cancel any activities of, deny service of alcohol to, confine to a stateroom or quarantine, search the stateroom, property or baggage of any Guest, change a Guest's Land Tour, disembark or refuse to embark the Guest and/or any Guest responsible for any minor Guest, or restrain any Guest at any time, without liability, at the risk and expense of the Guest when, in the sole opinion of Carrier or the Master, the Guest's conduct or presence, or that of any minor for whom the Guest is responsible, is believed to present a possible danger, security risk or be detrimental to himself or the health, welfare, comfort or enjoyment of others, or is in violation of any provision of this Agreement.

f. Guest, or if a minor, his parent or guardian, shall be liable for and indemnify Carrier, the Vessel and the Transport from any civil liability, fines, penalties, costs or expenses incurred by or imposed on the Vessel, the Transport or Carrier arising from or related to Guest's conduct or failure to comply with any provisions of this Section 9, including but not limited to: (i) any purchases by or credit extended to the Guest; (ii) requirements relating to immigration, customs or excise; or (iii) any personal injury, death or damage to persons or property caused directly or indirectly, in whole or in part, by any willful or negligent act or omission on the part of the Guest.

g. Carrier shall not be required to refund any portion of the Cruise or CruiseTour Fare paid by any Guest who fails for any reason, to be onboard the Vessel or Transport by the embarkation cut-off time applicable to the specific Cruise or CruiseTour or the boarding cut-off time applicable at any port of call or destination or point of departure as the case may be, and shall not be responsible for lodging, meals, transportation or other expenses incurred by Guest as a result thereof. Embarkation procedures and cut-off times for cruises are available at https://www.CelebrityCruises.com. Boarding procedure cut-off times for any port of call or destination or point of departure are as announced on the applicable Cruise or CruiseTour. Carrier shall have no obligation to any Guest to deviate from any scheduled sailing or port of call or destination.

h. Guest acknowledges that for certain voyages, such as a round-trip voyage commencing in a United States port, the Guest must complete the entire voyage and that failure to do so may result in a fine or other penalty being assessed by one or more governmental agencies. Guest hereby agrees to pay any such fine or penalty imposed because Guest failed to complete the entire voyage and to reimburse Carrier in the event it pays such fine or penalty.

i. Carrier may refuse to transport any Guest, and may remove any Guest from the Vessel or Transport at any time, for any of the following reasons: (i) whenever such action is necessary to comply with any government regulations, directives or instructions; (ii) when a Guest refuses to permit search of his person or property for explosives, weapons, dangerous materials or other stolen, illegal or prohibited items; (iii) when a Guest refuses upon request to produce positive identification; or (iv) for failure to comply with Carrier's rules and procedures, including, for example, Carrier's Guest Health, Safety and Conduct Policy or Carrier's policies against fraternization with crew; or (v) Guest's passage is denied by Carrier pursuant to its Refusal to Transport Policy. Carrier's Guest Health, Safety and Conduct Policy and Refusal to Transport Policy are available online at https://www.CelebrityCruises.com.

j. In the interests of safety and security, Guests and their baggage are subject to inspection, including but not limited to monitoring electronically, with or without the Guest's consent or knowledge.

k. If Carrier exercises its rights under this Section 9, Guest shall have no claim against Carrier whatsoever and Carrier shall have no liability for refund, compensation, loss or damages of Guest, including but not limited to any expenses incurred by Guest for accommodations or repatriation, unless otherwise provided in Carrier's refund policy or provided herein.

10. FORUM SELECTION; GOVERNING LAW; TIME LIMITS TO BRING SUIT; ARBITRATION:

## a. FORUM SELECTION & GOVERNING LAW:

(i) EXCEPT AS PROVIDED IN SECTION 10.c. BELOW, ALL DISPUTES, CLAIMS OR OTHER MATTER OF ANY DESCRIPTION ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY RELATED OR INCIDENT TO THIS AGREEMENT, THE CRUISE, CRUISETOUR, LAND TOUR OR TRANSPORT (INCLUDING A CLAIM FOR PERSONAL INJURY, ILLNESS OR DEATH OF A GUEST) MUST BE LITIGATED, IF AT ALL, IN AND BEFORE THE COURTS OF ENGLAND AND WALES, TO THE EXCLUSION OF ALL OTHER COURTS OR TRIBUNALS. GUEST HEREBY CONSENTS TO JURISDICTION AND WAIVES ANY VENUE OR OTHER OBJECTION THAT GUEST MAY HAVE TO ANY SUCH ACTION OR PROCEEDING BEING BROUGHT IN THE COURTS OF ENGLAND AND WALES.

(ii) THIS AGREEMENT AND ALL DISPUTES OR CLAIMS WHATSOEVER BY GUEST ARISING FROM OR RELATED TO THIS AGREEMENT SHALL IN ALL RESPECTS, AND WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES, BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW. FOR THE AVOIDANCE OF DOUBT, THIS SECTION 10.a.ii APPLIES TO ALL DISPUTES AND CLAIMS WHETHER RESOLVED IN COURT OR IN ARBITRATION. EXCEPT AS OTHERWISE EXPRESSLY SPECIFIED IN THIS AGREEMENT, GUEST AGREES THIS CHOICE OF LAW SUPERSEDES AND PREEMPTS ANY PROVISION OF LAW OF ANY OTHER COUNTRY, STATE, OR TERRITORY.

**b. TIME LIMITS TO PROVIDE NOTICE AND FILE A CLAIM:**

**(i) FOR PERSONAL INJURY/ILLNESS/DEATH CLAIMS:** NO SUIT SHALL BE MAINTAINABLE AGAINST THE CARRIER, THE VESSEL OR THE TRANSPORT FOR PERSONAL INJURY, ILLNESS OR DEATH OF ANY GUEST UNLESS WRITTEN NOTICE OF THE CLAIM, WITH FULL PARTICULARS, IS DELIVERED TO CARRIER AT THE FOLLOWING ADDRESS, C/O RCL CRUISES LTD., BUILDING 7, THE HEIGHTS, BROOKLANDS, WEYBRIDGE, SURREY, ENGLAND, KT13 0XW OR VIA EMAIL TO claims.intl@rccl.com, WITHIN SIX (6) MONTHS FROM THE DATE OF THE INJURY, ILLNESS OR DEATH AND SUIT IS COMMENCED (FILED) WITHIN ONE (1) YEAR FROM THE DATE OF SUCH INJURY, ILLNESS OR DEATH AND PROCESS SERVED WITHIN 120 DAYS AFTER FILING, NOTWITHSTANDING ANY PROVISION OF LAW OF ANY STATE, TERRITORY OR COUNTRY TO THE CONTRARY.

**(ii) FOR ALL OTHER CLAIMS:** NO SUIT SHALL BE MAINTAINABLE AGAINST THE CARRIER, THE VESSEL OR THE TRANSPORT FOR ANY CAUSE OF ACTION ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE CRUISE, CRUISETOUR, LAND TOUR OR TRANSPORT, UNLESS ARBITRATION IS COMMENCED WITHIN ONE (1) YEAR FROM THE DATE SUCH CAUSE AROSE OR BE FOREVER BARRED, NOTWITHSTANDING ANY PROVISION OF LAW OF ANY STATE, TERRITORY OR COUNTRY TO THE CONTRARY.

**c. MANDATORY ARBITRATION OF CERTAIN CLAIMS:** PLEASE READ THIS SECTION 10.c CAREFULLY. IT AFFECTS YOUR AND OUR RIGHTS IF THERE IS A DISPUTE. It requires you and us to resolve most disputes in arbitration after first trying to work them out between you and us. Arbitration is less formal than a lawsuit in court and uses a neutral arbitrator instead of a judge or jury. Discovery is more limited in arbitration than in court. Arbitrators can award the same individualized remedies that a court can award. Their rulings are legally binding and subject to very limited review by courts. Arbitration will take place on an individual basis. Class and representative proceedings are not allowed, and you and we cannot seek, and arbitrators cannot award, relief on behalf of others.

In this Section 10.c only, references to "we" "us", and "our" include Carrier's and/or Operator's past, present, and future parents, subsidiaries, affiliates and joint venturers, as well as our and each of those entities' agents, employees, predecessors, successors, and assigns. In this Section 10.c only, references to "you" and "your" includes Guest, as well as your and each of those person's assignees, heirs, trustees, agents, or other representatives. This Section 10.c does not preclude you or us from bringing issues to the attention of federal, state, or local agencies. Such agencies can, if the law allows, seek relief against you or us on the other's behalf. BY AGREEING TO ARBITRATE, YOU AND WE EACH WAIVE THE RIGHT TO SUE IN COURT, TO TRIAL BY JURY, OR TO PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION. This Section 10.c shall survive termination of this Agreement or any other agreement between you and us.

(i) **Claims Subject to Arbitration:** Except as otherwise provided in Section 10.c.ii below, any dispute or claim between you and us must be arbitrated. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:

- claims arising out of or relating to this Agreement and/or the Cruise, purchases of other goods or services, or any other aspect of the relationship between you and us, whether based in contract, tort, fraud, misrepresentation, or any other statutory or common-law legal theory;

- claims that arose before this Agreement or any prior agreement between you and us (including, but not limited to, claims relating to advertising or disclosures for any of our products or services);

- claims for mental or emotional distress or injury not arising out of bodily injury;

- claims relating to the retention, protection, use, or transfer of information about you or any of your reservations for any of our products or services;

- claims relating to communications with you, regardless of sender, concerning any of our products or services, including emails and automatically dialed telephone calls and text messages; and

- claims that may arise after the termination of this Agreement and/or the Cruise.

(ii) **Claims Not Subject to Arbitration:** You and we agree that the following disputes or claims cannot be arbitrated:

- claims arising from personal injury, illness or death; and

- disputes over the scope and enforceability of this Section 10.c, whether a dispute or claim can or must be brought in arbitration, or whether Sections 10.c.iv, 10.c.vii, or 10.c.viii have been violated.

These exclusions from arbitration are intended to be interpreted narrowly.

(iii) **Pre-Arbitration Notice of Disputes and Informal Resolution:** Before either you or we commence arbitration, the claimant must first send a written Notice of Dispute to the other ("Notice"). Any such Notice to Carrier must be sent by U.S. mail or professional courier service to Carrier c/o: Legal Department, Royal Caribbean Cruises Ltd., 1050 Caribbean Way, Miami, Florida 33132 ("Notice Address"). Any such Notice to you will be sent to your address on file with your reservation for the Cruise. The Notice must include: (a) the claimant's name, mailing address, email address, and phone number; (b) the claimant's loyalty number (if applicable); (c) reservation number for the Cruise; and (d) onboard folio number (if applicable); (e) a description of the nature and basis of the claim or dispute; and (f) the specific relief sought. The Notice must be personally signed by you (if you are the claimant) or by our business representative (if we are the claimant). Please be advised that we cannot disclose information about your reservation to anyone but you, the Lead Guest or your travel agent (if you or the Lead Guest used a travel agent to book or service your Cruise reservation), unless you provided us with signed, written permission to do so. Accordingly, if you retained an attorney to submit your Notice, please also provide signed written authorization for us to discuss your reservation and share our records regarding you with your attorney.

After the Notice containing all of the information above has been received, within 60 days, either you or we may request an individualized discussion (by telephone or videoconference) regarding settlement ("Informal Settlement Conference"). You and we must work together in good faith to select a mutually agreeable time during business hours for the Informal Settlement Conference (which can be after the 60-day period). You and our business representative must both personally participate in the Informal Settlement Conference, unless otherwise agreed in writing. Your and our lawyers (if any) may also participate.

Any applicable statute of limitations or contractual limitations periods will be tolled during the "Informal Resolution Period," which is the period between the date that a fully complete Notice is received by either you or us and the later of: (i) 60 days later; or (ii) the date an Informal Settlement Conference is completed, if timely requested.

(iv) **Commencing Arbitration:** An arbitration proceeding cannot be commenced until after the Informal Resolution Period has ended. Any court of competent jurisdiction will have authority to enforce this Section 10.c.iv, including the power to enjoin the filing or prosecution of arbitrations without first providing a fully complete Notice and participating in a timely requested Informal Settlement Conference. Any court of competent jurisdiction also may enjoin the assessment or collection of arbitration fees incurred as a result of such arbitrations. Further, unless prohibited by applicable law, the arbitrator shall not accept nor administer any arbitration unless the claimant has complied with the Notice and Informal Settlement Conference requirements of Section 10.c.iii.

(v) **Arbitration Procedure:** The arbitration will be governed by the Consumer Arbitration Rules ("AAA Rules") of the American Arbitration Association ("AAA"), as modified by Section 10.c.iv, and will be administered by the AAA. (If the AAA is unavailable or unwilling to administer arbitrations consistent with this Section 10.c, another arbitration provider shall be selected by mutual agreement or by the court.) The AAA Rules are available online at www.adr.org or by writing to the Notice Address. As in court, you and we agree that any counsel representing someone in arbitration certifies that they will comply with the requirements of Federal Rule of Civil Procedure 11(b), including a certification that the claim or the relief sought is neither frivolous nor brought for an improper purpose. The arbitrator is authorized to impose any sanctions available under that rule, the AAA Rules, or applicable federal or state law against all appropriate represented parties and counsel. The arbitrator may consider rulings in arbitrations involving different claimants against us, but an arbitrator's ruling is not binding in other proceedings. Except as provided in Section 10.c.vii below, the arbitrator shall apply the substantive law that governs this Agreement, set forth in Section 10.a.ii, and can award the same individualized remedies (including punitive and statutory damages and statutory attorney's fees and costs) that a court could award under applicable law. Unless you and we agree otherwise, the arbitration will be decided based on papers submitted by you and us. The arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based.

During the arbitration, the amount of any settlement offer shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which either you or we are entitled.

(vi) **Arbitration Fees:** We will pay all AAA filing, administration, case-management, hearing, and arbitrator fees ("AAA Fees") if we initiate an arbitration. If the aggregate value of your claims is US$750 or less, we will pay all AAA Fees, so long as you have fully complied with the Notice and Informal Settlement Conference requirements in Section 10.c.iii. In such cases, we will pay the filing fee directly to the AAA upon receiving a written request at the Notice Address that you have commenced arbitration or, if the AAA makes you pay the filing fee, we will send that amount to the AAA and request that the AAA reimburse you. If, however, the arbitrator finds that either the substance of your claim or the relief you seek is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the payment of all such fees will be governed by the AAA Rules. If the aggregate value of your claims is US$750 or more, you will pay all AAA Fees. In such cases, you agree to reimburse us for all monies previously disbursed that are otherwise your obligation to pay under the AAA Rules or this Section 10.c.vi. For mass arbitration filings, you agree to pay all administrative fees for AAA to initiate the mediation process for the mass arbitration filings.

(vii) **Requirement of Individual Arbitration:** The arbitrator may award declaratory or injunctive relief only in favor of the individual claimant seeking relief and only to the extent necessary to provide relief warranted by that claimant's individual claim. YOU AND WE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR OUR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING. Further, unless both you and we agree otherwise, the arbitrator may not consolidate the claims of more than one person, and may not otherwise preside over any form of a representative, class, or private attorney general proceeding. If, after exhaustion of all appeals, any of these prohibitions on non-individualized declaratory or injunctive relief; class, representative, and private attorney general proceedings; and consolidation are found to be unenforceable with respect to a particular claim or with respect to a particular request for relief (such as a request for injunctive relief), then that claim or request for relief shall be severed and decided by a court after all other claims and requests for relief have been arbitrated.

(viii) **Mass Arbitrations:** If 25 or more claimants submit Notices or seek to file arbitrations raising similar claims and are represented by the same or coordinated counsel (whether such cases are pursued simultaneously or not), all the cases must be resolved in staged proceedings. You agree to this process even though it may delay the arbitration of your claim. In the first stage, we and claimants' counsel will each select up to 25 cases (50 cases total) to be filed in arbitration and resolved individually by different arbitrators. In the meantime, no other cases may be filed or proceed in arbitration, and the AAA must not assess or demand payment of fees for the remaining cases or administer or accept them.

The arbitrators are encouraged to resolve the cases within 120 days of appointment or as swiftly as possible thereafter, consistent with fairness to the parties. After the first stage is completed, the claimants must engage in a single mediation of all remaining cases, and we will pay the mediation fee. If the remaining claimants and we cannot agree how to resolve the remaining cases after mediation, we and claimants' counsel will repeat the process of selecting and filing up to 50 cases to be resolved individually by different arbitrators, followed by mediation.

If any claims remain after the second stage, the process will be repeated until all claims are resolved, with four differences. First, a total of 100 cases may be filed in the third and later stages. Second, the cases will be randomly selected. Third, arbitrators who decided cases in the first two stages may be appointed in later stages if different arbitrators are not available. Fourth, mediation is optional at the election of counsel for the claimants.

Between stages, counsel will meet and confer regarding ways to improve the efficiency of the staged proceedings, including whether to increase the number of cases filed in each stage. Either party may also negotiate with AAA regarding the amount or timing of AAA fees.

If this Section 10.c.viii applies to a Notice, the Informal Resolution Period for the claims and relief set forth in that Notice will be extended (including the tolling of any applicable statute of limitations or contractual limitations period for the claims and requested relief) until that Notice is selected for a staged proceeding, withdrawn, or otherwise resolved. A court will have the authority to enforce this Section 10.c.viii, including by enjoining the mass filing, the prosecution or administration of arbitrations, or the assessment or collection of AAA fees.

This Section 10.c.viii and each of its requirements are intended to be severable from the rest of Section 10.c.viii. If after exhaustion of all appeals a court decides that the staging process in this Section 10.c.viii is not enforceable, then the cases may be filed in arbitration and the payment of AAA filing, administration, case-management, hearing, and arbitrator fees will be assessed as the arbitrations advance and arbitrators are appointed rather than when the arbitrations are initiated.

(ix) **Future Changes to this Section:** Notwithstanding any provision in this Agreement to the contrary, you and we agree that if we make any future change to this Section 10.c (other than a change to the Notice Address), you may reject that change by sending us written notice within thirty (30) days of the first notice of the change to the Notice Address provided above. To be effective, your rejection must include your name, mailing address, email address, phone number, booking reference, and a statement personally signed by you that you wish to reject the change to this Section 10.c. By rejecting that future change, you are agreeing that you will arbitrate any dispute or claim between you and us in accordance with the language of this provision, as amended by any changes that you did not timely reject.

11. SECURITY:

IN THE EVENT OF AN IN REM PROCEEDING AGAINST THE VESSEL, GUEST HEREBY IRREVOCABLY AGREES THAT THE POSTING OF A LETTER OF UNDERTAKING FROM ANY OF CARRIER'S INSURERS SHALL CONSTITUTE AN ADEQUATE AND APPROPRIATE FORM OF SECURITY FOR THE IMMEDIATE RELEASE OF THE VESSEL IN LIEU OF ARREST.

12. LIMITATIONS OF LIABILITY:

a. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, CARRIER SHALL NOT BE LIABLE FOR INJURY, DEATH, ILLNESS, DAMAGE, DELAY OR OTHER LOSS TO PERSON OR PROPERTY, OR ANY OTHER CLAIM BY ANY GUEST CAUSED BY ACT OF GOD, WAR, TERRORISM, CIVIL COMMOTION, LABOR TROUBLE, GOVERNMENT INTERFERENCE, PERILS OF THE SEA, FIRE, ORDERS BY GOVERNMENT AGENCIES RESTRICTING TRAVEL FOR ANY REASON, PUBLIC HEALTH EMERGENCY, OR OUTBREAKS OF COMMUNICABLE DISEASE, INFLUENZA, COVID-19, COLDS AND NOROVIRUS, QUARANTINES, NATIONAL OR REGIONAL EMERGENCIES, THEFTS OR ANY OTHER CAUSE BEYOND CARRIER'S REASONABLE CONTROL, OR ANY ACT NOT SHOWN TO BE CAUSED BY CARRIER'S NEGLIGENCE.

b. GUEST AGREES TO SOLELY ASSUME THE RISK OF INJURY, DEATH, ILLNESS OR OTHER LOSS, AND CARRIER IS NOT RESPONSIBLE FOR GUEST'S USE OF ANY ATHLETIC OR RECREATIONAL EQUIPMENT; OR FOR THE NEGLIGENCE OR WRONGDOING OF ANY INDEPENDENT CONTRACTORS, INCLUDING BUT NOT LIMITED TO PHOTOGRAPHERS, SPA PERSONNEL OR ENTERTAINERS; OR FOR EVENTS TAKING PLACE OFF THE CARRIER'S VESSELS, LAUNCHES OR TRANSPORTS, OR AS PART OF ANY SHORE EXCURSION, TOUR OR ACTIVITY.

c. CARRIER HEREBY DISCLAIMS ALL LIABILITY TO THE GUEST FOR DAMAGES FOR EMOTIONAL DISTRESS, MENTAL SUFFERING OR PSYCHOLOGICAL INJURY OF ANY KIND UNDER ANY CIRCUMSTANCES, WHEN SUCH DAMAGES WERE NEITHER THE RESULT OF A PHYSICAL INJURY TO THE GUEST, NOR THE RESULT OF GUEST HAVING BEEN AT ACTUAL RISK OF PHYSICAL INJURY, NOR WERE INTENTIONALLY INFLICTED BY THE CARRIER. WITHOUT LIMITING THE PRECEDING SENTENCE, IN NO EVENT WILL CARRIER BE LIABLE TO GUEST FOR ANY CONSEQUENTIAL, INCIDENTAL, EXEMPLARY OR PUNITIVE DAMAGES.

d. ON INTERNATIONAL VOYAGES THAT EMBARK OR DISEMBARK IN A PORT OF A EUROPEAN UNION MEMBER STATE AND DO NOT EMBARK, DISEMBARK OR CALL AT ANY U.S. PORT, CARRIER SHALL BE ENTITLED TO ANY AND ALL LIABILITY LIMITATIONS AND IMMUNITIES FOR DEATH AND/OR PERSONAL INJURY AS PROVIDED UNDER EU REGULATION 392/2009 ON THE LIABILITY OF CARRIERS TO GUESTS IN THE EVENT OF ACCIDENTS. ON INTERNATIONAL CRUISES THAT DO NOT EMBARK OR DISEMBARK IN EITHER A PORT IN A EUROPEAN UNION MEMBER STATE OR A U.S. PORT, AND WHICH DO NOT CALL AT ANY U.S. PORT, CARRIER SHALL BE ENTITLED TO ANY AND ALL LIABILITY LIMITATIONS AND IMMUNITIES FOR DEATH AND/OR PERSONAL INJURY AS PROVIDED IN THE ATHENS CONVENTION RELATING TO THE CARRIAGE OF GUESTS AND THEIR LUGGAGE BY SEA, 1974 AND THE PROTOCOL OF 2002 TO THAT CONVENTION (TOGETHER, THE "ATHENS CONVENTION") ON THE LIABILITY OF CARRIERS TO GUESTS IN THE EVENT OF ACCIDENTS. UNDER BOTH EU REGULATION 392/2009 AND THE ATHENS CONVENTION, CARRIER'S LIABILITY IS LIMITED TO NO MORE THAN 400,000 SPECIAL DRAWING RIGHTS ("SDR") PER GUEST (APPROXIMATELY U.S. $552,000) IF THE GUEST PROVES THAT THE INCIDENT WAS A RESULT OF CARRIER'S FAULT OR NEGLECT. AN SDR IS AN INTERNATIONALLY RECOGNIZED MONETARY MEASUREMENT WHOSE VALUE FLUCTUATES DEPENDING ON THE DAILY EXCHANGE RATE AS PUBLISHED BY THE INTERNATIONAL MONETARY FUND AT WWW.IMF.ORG OR IN THE WALL STREET JOURNAL. IF THE LOSS OR DAMAGE WAS CAUSED BY A SHIPPING INCIDENT, DEFINED AS A SHIPWRECK, CAPSIZING, COLLISION OR STRANDING OF THE SHIP, EXPLOSION OR FIRE IN THE SHIP, OR DEFECT IN THE SHIP (AS DEFINED BY THE EU REGULATION AND ATHENS CONVENTION), CARRIER'S LIABILITY IS LIMITED TO NO MORE THAN 250,000 SDRS PER GUEST (APPROXIMATELY U.S. $345,000). COMPENSATION FOR LOSS CAUSED BY A SHIPPING INCIDENT CAN INCREASE TO A MAXIMUM OF 400,000 SDRS PER GUEST (APPROXIMATELY U.S. $552,000) UNLESS CARRIER PROVES THAT THE SHIPPING INCIDENT OCCURRED WITHOUT CARRIER'S FAULT OR NEGLECT. SHIPPING INCIDENTS DO NOT INCLUDE ACTS OF WAR, HOSTILITIES, CIVIL WAR, INSURRECTION, NATURAL DISASTERS, OR INTENTIONAL ACTS OR OMISSIONS OF THIRD PARTIES. IN CASES WHERE THE LOSS OR DAMAGE WAS CAUSED IN CONNECTION WITH WAR OR TERRORISM, CARRIER'S LIABILITY FOR ANY PERSONAL INJURY OR DEATH (WHETHER OCCURRING DURING A SHIPPING INCIDENT OR A NON-SHIPPING INCIDENT) IS LIMITED TO THE LOWER OF 250,000 SDRS PER GUEST (APPROXIMATELY U.S. $345,000) OR 340 MILLION SDRS (APPROXIMATELY U.S. $469,200,000) PER SHIP PER INCIDENT. PUNITIVE DAMAGES ARE NOT RECOVERABLE FOR CRUISES COVERED BY EU REGULATION 392/2009 OR THE ATHENS CONVENTION.

UNDER BOTH EU REGULATION 392/2009 AND THE ATHENS CONVENTION, CARRIER'S LIABILITY FOR LOSS OR DAMAGE TO CABIN LUGGAGE IS LIMITED TO 2,250 SDR (APPROXIMATELY U.S. $3,181).

IN ADDITION, GUESTS EMBARKING A CRUISE IN A EUROPEAN MEMBER STATE PORT ARE AFFORDED RIGHTS UNDER EU REGULATION 1177/2010.

FOR A COPY OF EU REGULATION 392/2009, VISIT HTTPS://EUR-LEX.EUROPA.EU/LEGAL-CONTENT/EN/TXT/PDF/?URI=CELEX:32009R0392&FROM=EN . FOR A COPY OF THE ATHENS CONVENTION AND THE 2002 PROTOCOL THERETO, VISIT HTTPS://TREATIES.UN.ORG/DOC/PUBLICATION/UNTS/VOLUME%201463/VOLUME-1463-I-24817-ENGLISH.PDF AND HTTPS://TREATIES.UN.ORG/DOC/PUBLICATION/UNTS/NO%20VOLUME/24817/A-24817-080000028053BF55.PDF (FULL TEXT IN ENGLISH BEGINS AT PAGE 40). FOR A COPY OF EU REGULATION 1177/2010, VISIT HTTPS://EUR-LEX.EUROPA.EU/LEGAL-CONTENT/EN/TXT/PDF/?URI=CELEX:32010R1177&QID=1643770111876&FROM=EN.

e. INTENTIONALLY OMITTED.

f. EXCEPT IN THE CASE OF PERSONAL INJURY, ILLNESS OR DEATH OF A GUEST, OR WHERE THIS AGREEMENT EXPRESSLY PROVIDES OTHERWISE, GUEST AGREES THAT, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, CARRIER'S AGGREGATE LIABILTY TO GUEST SHALL BE LIMITED TO A FUTURE CRUISE CREDIT NOT TO EXCEED THE VALUE OF THE CRUISE FARE PAID TO CARRIER FOR THE CRUISE OR CRUISETOUR ASSOCIATED WITH SUCH CLAIM.

g. THIRD PARTY BENEFICIARIES

The exclusions and limitations of liability of Carrier set forth in the provisions of this Ticket Contract (including, but not limited to, those contained in this Section 12) as well as all rights, defenses and immunities set forth in this Agreement (including, but not limited to, the forum selection, time limitation, and governing law provisions contained in Section 10) shall also apply to and be for the benefit of certain designated third party beneficiaries which include the parent, subsidiary, affiliate, and successor companies and assigns of all the entities described in Section 2.b above or in this Section 12.g; the officers, directors, employees, agents, crew and pilots of all the entities described in Section 2.b above or in this Section 12.g, and all agents, independent contractors, suppliers, and concessionaires, physicians and medical personnel, retail shop personnel, health and beauty staff, fitness staff, shore excursion providers, tour operators (including, but not limited to, the LTO), shipbuilders, manufacturers and designers of the Vessel or Transport, and/or suppliers and installers of all component parts, launches, appurtenances, craft or facilities, whether provided at sea or on shore, belonging to the Vessel or any substituted ship or Transport, or owned or operated by its owners, operators, managers, agents, charterers, contractors, concessionaires or others; as well as owners and operators of all shoreside properties at which the Vessel or any substituted ship or the Transport may call.

13. FITNESS TO TRAVEL; DENIAL OF BOARDING; MINORS:

**a. Fitness to Travel.** Guest warrants that he and those traveling with him are fit for travel and that such travel will not endanger themselves or others.

**b. Minors.** Any Guest under the age of eighteen (18) shall be considered a minor and must travel with a parent or legal guardian or such other person as may be permitted by Carrier's policies.

**c. Minimum Age.** No Guest under the age of twenty-one (21) will consume any alcoholic beverages while on board the Vessel or Transport except as may be permitted by Carrier's policy. No Guest under the age of twenty-one (21) will be booked in a stateroom unless accompanied by an adult twenty-one (21) years of age or older, except for minors sailing with their parents or guardians in adjacent staterooms, or for under-aged married couples (proof of marriage is required) or except as otherwise permitted by Carrier's policy. Carrier reserves the right to request proof of age at any time and Guest's age on the date of sailing determines his or her status for the entire cruise vacation. The accompanying adult Guest also agrees that, under no circumstances will a minor be left aboard the Vessel, except in the supervision of a Vessel-organized minor care program, while the adult Guest leaves the Vessel.

**d. Pregnancy and Infants.** Pregnant women who will enter the twenty-fourth (24th) week or more of estimated fetal gestational age at any time during the Cruise or CruiseTour will be ineligible to sail, and agree not to book the cruise or board the Vessel or Transport under any circumstances. No infants under a specific age (at least six (6) months for most cruises but twelve (12) months for other cruises) shall be booked on a cruise or CruiseTour, nor brought onboard the Vessel or Transport by any Guest under any circumstances. The most current minimum age requirements are available online at https://www.CelebrityCruises.com.

**e. Special Needs.** Any Guest with mobility, communication or other impairments, or other special or medical needs that may require medical care or special accommodations during the cruise or CruiseTour, is strongly advised to notify Carrier of any such condition at the time of booking. Any Guest using a service animal must notify the Carrier at the time of booking. Guest agrees to accept responsibility and reimburse Carrier for any loss, damage or expense whatsoever related to the presence of any service animal brought on board the Vessel or Transport. Guests acknowledge and understand that certain international safety requirements, shipbuilding standards, and/or applicable regulations involving design, construction or operation of the Vessel may restrict access to facilities or activities for persons with mobility, communication or other impairments

or special needs. Guests requiring the use of a wheelchair must provide their own wheelchair (that must be of a size and type that can be accommodated on the Vessel) as wheelchairs carried on board are for emergency use only.

Carrier's ability to accommodate Guests with special needs or medical needs onboard Vessels sailing in the Galapagos Islands is very limited. These vessels do not offer accessible staterooms, they cannot accommodate wheelchair-bound Guests, and service animals are not permitted onboard. Animals, including service animals, are not permitted in the Galapagos Islands.

**f. Policy Violations.** Carrier shall have the right to deny boarding for violations of Carrier's Refusal to Transport Policy, Carrier's Guest Health, Safety and Conduct Policy or any of the policies set forth in this Section 13. If Carrier exercises its rights under this Section 13 for violations of policy, Guest shall have no claim against Carrier whatsoever and Carrier shall have no liability for refund, compensation loss or damages of Guest, including but not limited to any expenses incurred by Guest for accommodations or repatriation.

**g. Recreational Water Facilities.** Our recreational water facilities do not have a lifeguard on duty. Children must be supervised by a parent or legal guardian at all times while in the pools, whirlpools and other recreational water feature areas.

14. ONBOARD ACTIVITIES RISK DISCLOSURE AND ACKNOWLEDGMENT:

Guest agrees to read the descriptions below of activities onboard the Vessel before boarding the Vessel. Participation in the onboard activities is voluntary. Not all activities are available on all vessels. Guest agrees and acknowledges there may be a risk when participating in the activities described below. In addition to reading the warning and acknowledgement of risk below, Guest agrees to read warning signs onboard the Vessel and convey both the warning and acknowledgment of risk below and warning signs onboard to every Guest named in their booking, including minors.

Guests may engage in supervised or unsupervised sporting activities including but not limited to, basketball, volleyball, soccer, and pickleball. Guests must consider their own physical fitness and ability before participating. Guests must wear footwear and clothing appropriate for the activity and follow posted rules or direction of staff. Rules, equipment, and activity areas may not be regulation. Age restrictions may apply for certain activities or competitions.

<u>WARNING/ACKNOWLEDGMNENT OF RISK</u>: THE ACTIVITIES LISTED ABOVE ARE ALL VOLUNTARY AND ARE NOT SUITABLE FOR ALL GUESTS. YOU OR YOUR CHILDREN MAY SUFFER MINOR OR SERIOUS PHYSICAL INJUR(IES) OR DEATH. THE RISKS OF INJURY INCLUDE (BUT ARE NOT LIMITED TO): BROKEN BONES, FRACTURES, CONCUSSIONS, DIZZINESS, MOTION SICKNESS, DISLOCATIONS, CONTUSIONS, TORN LIGAMENTS AND TENDONS, SPRAINS AND STRAINS, CUTS TO THE HEAD, BODY AND/OR LIMBS, BUMPS AND BRUISES, PROPERTY LOSS OR DAMAGE, ABRASIONS AND/OR LACERATIONS. ALTHOUGH RARE, CATASTROPHIC INJURIES MAY OCCUR, AND COULD INCLUDE PERMANENT DISABILITY, SPINAL INJURY, PARALYSIS, OR DEATH. PARTICIPANTS ELECT TO VOLUNTARILY PARTICIPATE IN THE ACTIVITY(IES) WITH FULL KNOWLEDGE AND ACCEPTANCE OF ANY AND ALL RISKS ASSOCIATED WITH THE ACTIVITY AND IDENTIFIED ABOVE. PARENTS AND LEGAL GUARDIANS TRAVELLING WITH MINOR CHILDREN WHO ENGAGE IN THE ACTIVITY ARE DEEMED TO HAVE WARNED THE CHILDREN OF THESE RISKS AND ASSUMED THE RISK ON THE CHILD'S BEHALF.

15. USE OF PHOTOS, VIDEOS OR RECORDINGS:

**a. Capture and Use of Likeness.** Guest hereby grants to Carrier, and others working for Carrier or on its behalf, the unrestricted right and permission to visually and audiovisually record, capture, photograph Guest's name, likeness, silhouette, photograph, picture, voice, actions, conversations, statements, appearances, biographical data, monikers, signature, endorsement, social media handles, any performance of any musical compositions, and/or other distinctive attributes of any kind related to Guest and certain other intellectual property rights and characteristics and so-called publicity rights (collectively, "Likeness") and any result of Guest's appearance in any manner that Carrier desires, including but not limited to during or in connection with the Cruise or CruiseTour. Guest further grants Carrier, its parent, subsidiary and affiliated companies, and their respective agents, affiliates, legal representatives, and others working for them or on their behalf, and their respective licensors, licensees, successors or assigns (collectively with Carrier the "Grantees") the full, irrevocable, exclusive and unrestricted right to use, print, produce, publish, copy, display, perform, exhibit, transmit, broadcast, disseminate, market, advertise, sell, lease, license (with the right to sublicense), transfer, create derivative works from, publicly display and otherwise exploit Guest's Likeness, in whole or in part, severally or in connection with any and all photographs, films, and/or other recordings taken and/or made of or by me in connection with the Cruise or CruiseTour (the "Materials") on a perpetual, worldwide, royalty-free basis, in any and all media now known or hereinafter devised, for any lawful purpose whatsoever including but not limited to in connection with the advertising, promotion, marketing and publicity of the Grantees, and to permit others to do the same, which right shall include the full right and permission to edit, change or substitute any and all captions or photos Guest may use, take or post in connection with this Agreement.

**b. Ownership of Materials.** Carrier shall exclusively own all now known or hereafter existing intellectual property rights and interests (including the copyright, and all other allied and/or ancillary rights and interests) of every kind throughout the universe, in perpetuity and in all languages, pertaining to the Materials and any other results and proceeds hereunder (such "Results and Proceeds", including, without limitation, all copyrights and renewals and extensions thereof). If under applicable law the foregoing is not effective to place authorship and ownership thereof and all rights in the Results and Proceeds in Carrier, then by way of assignment and transfer of present and future copyright and otherwise, Guest hereby irrevocably grants, transfers, sells, and assigns to Carrier, all right, title and interest therein, whether now in existence or hereafter created, including, without limitation, all rights of ownership and authorship in and to the Results and Proceeds and all versions thereof throughout the universe and in perpetuity to Carrier (or its designee). Without limiting the generality of the foregoing, Guest hereby grants Carrier the right to change, add to, take from, translate, reformat, or reprocess the Results and Proceeds in any manner Carrier may in its sole discretion determine.

**c. Carrier Consent Required.** Guest hereby agrees that any recording (whether audio or video or otherwise) or photograph of Guest, other guests, crew or third parties created or made during or in connection with the Cruise or CruiseTour, or depicting the Vessel, its design, equipment or otherwise, shall not be used for any commercial purpose, in any media broadcast or for any other nonprivate use without the express prior written consent of Carrier in each instance.

16. LEAD GUEST; YOUR TRAVEL AGENT:

**a. Lead Guest.** Lead Guest shall be responsible for the administration of, and correspondence with respect to, the Cruise or CruiseTour booking for all purposes, whether communicating with Carrier directly or through a travel agent. Lead Guest represents and warrants to Cruise Line that they have the requisite authority to make the booking, including any amendments and/or cancellations thereto, on behalf of each Guest named in the booking. By making a Cruise or CruiseTour booking, Lead Guest is deemed to have read, understood and agreed to this Agreement on behalf of themselves and each Guest named in the booking. The Lead Guest shall be responsible and liable for the: (a) full payment of any deposits and balances due; (b) confirmation and provision of details for each Guest named in the booking (including anyone who is later added or substituted); and (c) the prompt communication to each Guest named in the booking of any information issued by Cruise Line, including, without limitation, a copy of any booking confirmations, invoices and this Agreement. If Lead Guest utilizes a travel agent in connection with the Cruise booking, Lead Guest's travel agent shall undertake the foregoing on Lead Guest's behalf.

**b. Travel Agent.** Guest acknowledges and confirms that any travel agent utilized by themselves or by the Lead Guest in connection with booking the Cruise and/or issuance of this Ticket Contract is, for all purposes, Guest's agent and Carrier shall not be liable for any representation made by said travel agent. Guest shall remain liable at all times to Carrier for the price of passage. Guest understands and agrees that receipt of this Ticket Contract or any other information or notices by Guest's travel agent or the Lead Guest shall be deemed receipt by Guest as of the date of receipt by the travel agent or Lead Guest. Guest acknowledges that Carrier is not responsible for the financial condition or integrity of any travel agent.

17. SEVERABILITY:

Any provision of this Agreement that is determined in any jurisdiction to be unenforceable for any reason shall be deemed severed from this Agreement in that jurisdiction only and all remaining provisions shall remain in full force and effect.

18. TRANSFERS AND ASSIGNMENTS:

This Ticket Contract may not be assigned, sold or otherwise transferred by the Guest. Among other things, this means that the Guest cannot sell or transfer this Ticket Contract to someone else, and Carrier shall not be liable to the Guest or any other person in possession of a Ticket Contract for honoring or refunding such Ticket Contract when presented by such other person. Carrier may assign, convey or transfer its rights in this Agreement to any parent, subsidiary or affiliate of Carrier who is scheduled to operate the Vessel at the time of the Cruise.

19. RELATIONSHIP TO OTHER PURCHASES; GLOBAL PURCHASE TERMS AND CONDITIONS:

To the extent permitted or required by law, this Agreement also covers Carrier's CruiseCare® travel protection products, and any shore excursions, land and hotel packages purchased through Celebrity Cruises Inc., or RCL Cruises Ltd.

Please note that the purchase of any goods or services, other than the Cruise or CruiseTour, whether purchased on the Vessel or off, made through Celebrity Cruises Inc., or RCL Cruises Ltd., are also subject to Celebrity Cruises' Global Purchase Terms and Conditions. Such goods and services include, but are not limited to, shore excursions, transportation, air arrangements, tours, hotels, restaurants, attractions and other similar activities or services. Any dispute or claim arising out of the purchase of, or participation in, such goods or services must be brought against the independent contractor providing, owning and/or operating such services, conveyances, products or facilities. For a copy of the Global Purchase Terms and Conditions please visit https://www.celebritycruises.com/guest-terms/. NOTWITHSTANDING ANY PROVISIONS OF THE GLOBAL PURCHASE TERMS AND CONDITIONS, ANY AND ALL DISPUTES OR CLAIMS MADE AGAINST CARRIER MUST BE BROUGHT IN ACCORDANCE WITH THE FORUM SELECTION, GOVERNING LAW, AND OTHER LIMITATION PROVISIONS SET FORTH IN THIS AGREEMENT.

20. OPERATOR

Depending upon the Cruise, the Operator for a Celebrity Cruises sailing shall be one of the following entities:

- Celebrity Cruises Inc., 1050 Caribbean Way, Miami, Florida, U.S.A., 33132
- RCL Cruises Ltd., Building 7, The Heights, Brooklands, Weybridge, Surrey, England, KT13 0XW
- Islas Galapagos Turismo y Vapores C.A., Av. Naciones Unidas E2-30 y Nuñez de Vela, edificio Metropolitan, Office 14-04, Quito, Ecuador
- Oceanadventures S.A., Av. Naciones Unidas E2-30 y Nuñez de Vela, edificio Metropolitan, Office 14-04, Quito, Ecuador

The Operator of your Cruise will be indicated on your booking invoice.

C(CAN)DEC2023

© 2025 Celebrity Cruises®