**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.: 25-cv-25500-KMW**

LISE GILBERT,
a citizen and resident of Canada,

Plaintiff,

v.

CELEBRITY CRUISES, INC., a
Liberian Corporation,

Defendant.
_______________________________/

# DECLARATION OF GARETH THOMAS

I, **GARETH LEWIS THOMAS** of DWF Law LLP, 20 Fenchurch Street, London, EC3M 3AG, **STATE AS FOLLOWS:**

## Introduction

1. I am a solicitor in England and Wales (admitted on 17 September 2012). I am a partner in the firm of DWF Law LLP, of the above address, a position which I have held since 15 September 2025. Prior to that, I was a Partner at another firm, Kennedys Law LLP, since May 2020. I have a LLB (Hons) Degree in Law and passed the Law Society LPC from Cardiff University. I specialise in travel law, including but not limited to personal injury litigation arising from incidents at sea.

2. I am a resident of the United Kingdom and over the age of 18. I am in all respects competent, qualified and duly authorised by the Defendant, Celebrity Cruises, Inc. ("**Celebrity**") to make this declaration on their behalf, in support of the Motion to Dismiss the Plaintiff's Complaint ("**Motion to Dismiss**"). All statements made in this Declaration are based on my personal knowledge and/or information made available to me.

3. Insofar as the facts and matters stated herein are within my own personal knowledge, being based upon my involvement in this matter and my study of the documents, as well as my experience as a lawyer practising in England and Wales, they are true. Alternatively, they are true to the best of my belief, being based upon information and instructions derived from individuals whom I shall identify from the Defendant and/or by the law firm of Hamilton, Miller & Birthisel ("**HMB**") who represent Celebrity.

4. Attached as exhibits to this declaration are true and correct copies of referenced documents.

**Background to the Motion to Dismiss**

5. I understand that the Plaintiff, Ms. Lise Gilbert ("**Plaintiff**' or "**Ms. Gilbert**"), is attempting to bring claims for Negligent Maintenance, Negligent Failure to Correct, Negligent Failure to Warn, and for damages in the Southern District of Florida, Miami Division. This is in relation to an alleged incident whilst the Plaintiff was travelling as a passenger onboard the "CELEBRITY ECLIPSE" (IMO No. 9404314) (the "Vessel") whereby the Plaintiff alleges to have sustained bodily and extremity injuries, including a fractured right femur, and resulting pain and suffering, mental anguish, disfigurement, disability, aggravation or acceleration of preexisting conditions, the inability to lead a normal life, along with medical, hospital, out of pocket, and health care expenses (past and future), and damages that are permanent or continuing in nature. (the "US Proceedings").

6. The relevant contract of carriage pursuant to which the Plaintiff was on board the Vessel was entered into with Celebrity as operators and managers of the Vessel (the "**ticket contract**"). Exhibit "A".

7. I understand that the Plaintiff is a Canadian citizen and note that her ticket was purchased in Canada.

8. Celebrity's terms and conditions are dictated by the Primary Country of Residence of its guests, as set out on Celebrity's website. I exhibit a screenshot from Celebrity's website at Exhibit "B", relating to Primary Country of

Residence. Drop down boxes give access to different terms and conditions dependent upon the Primary Country of Residence. In this case I believe that the relevant terms and conditions are those which relate to Canada. Upon clicking "Canada" in the drop down, the guest is redirected to the "Cruise Ticket Contract" webpage for Canada exhibited at Exhibit "C". This webpage provides for the Canada Cruise Ticket Contract in both English and French via clickable links, which are portrayed in the following:




9. The importance of reading Celebrity's terms and conditions are highlighted to its guests on the "Cruise Ticket Contract" webpage for Canada, in bold, capitalized, red font, which is portrayed in the following:

**IMPORTANT NOTICE TO GUESTS:** The Cruise Ticket Contract or Booking Conditions contain important limitations on the rights of passengers, including provisions relating to limitation of liability, forum selection, governing law, and the use of alternative dispute resolution to resolve certain types of disputes. Any dispute or claim that is related to your cruise must be brought in the venue and under the law as stated in the Cruise Ticket Contract or Booking Conditions.

Please read the applicable Cruise Ticket Contract or Booking Conditions carefully and download and save a copy to retain for your records. If you have questions about which Cruise Ticket Contract or Booking Conditions apply to your booking or if you have questions about translations, please speak to your travel agent or your local RCG representative.

10. The ticket contract was subject to an exclusive English law and jurisdiction of the Courts of England and Wales clause (the "**EJC**") - otherwise known as a forum selection and choice of law clause. *See* Exhibit "A" at ¶10

11. The US Proceedings have been initiated contrary to the EJC in the ticket contract. The EJC was contained in Clause 10a. to 10b. inclusive of the ticket contract in the following terms:

"10. FORUM SELECTION; GOVERNING LAW; TIME LIMITS TO BRING SUIT; ARBITRATION:

a. **FORUM SELECTION & GOVERNING LAW:**

(i.) EXCEPT AS PROVIDED IN SECTION 10.c. BELOW, ALL DISPUTES, CLAIMS OR OTHER MATTER OF ANY DESCRIPTION ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY RELATED OR INCIDENT TO THIS AGREEMENT, THE CRUISE, CRUISETOUR, LAND TOUR OR TRANSPORT (INCLUDING A CLAIM FOR PERSONAL INJURY, ILLNESS OR DEATH OF A GUEST) MUST BE LITIGATED, IF AT ALL, IN AND BEFORE THE COURTS OF ENGLAND AND WALES, TO THE EXCLUSION OF ALL OTHER COURTS OR TRIBUNALS. GUEST HEREBY CONSENTS TO JURISDICTION AND WAIVES ANY VENUE OR OTHER OBJECTION THAT GUEST MAY HAVE TO ANY SUCH ACTION OR PROCEEDING BEING BROUGHT IN THE COURTS OF ENGLAND AND WALES.

(ii.) THIS AGREEMENT AND ALL DISPUTES OR CLAIMS WHATSOEVER BY GUEST ARISING FROM OR RELATED TO THIS AGREEMENT SHALL IN ALL RESPECTS, AND WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES, BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW. FOR THE AVOIDANCE OF DOUBT, THIS SECTION 10.a.ii APPLIES TO ALL DISPUTES AND CLAIMS WHETHER RESOLVED IN COURT OR IN ARBITRATION. EXCEPT AS OTHERWISE EXPRESSLY SPECIFIED IN THIS AGREEMENT, GUEST AGREES THIS CHOICE OF LAW SUPERSEDES AND PREEMPTS ANY PROVISION OF LAW OF ANY OTHER COUNTRY, STATE, OR TERRITORY.

**b. TIME LIMITS TO PROVIDE NOTICE AND FILE A CLAIM:**

**(i) FOR PERSONAL INJURY/ILLNESS/DEATH CLAIMS:** NO SUIT SHALL BE MAINTAINABLE AGAINST THE CARRIER, THE VESSEL OR THE TRANSPORT FOR PERSONAL INJURY, ILLNESS OR DEATH OF ANY GUEST UNLESS WRITTEN NOTICE OF THE CLAIM, WITH FULL PARTICULARS, IS DELIVERED TO CARRIER AT THE FOLLOWING ADDRESS, C/O RCL CRUISES LTD., BUILDING 7, THE HEIGHTS, BROOKLANDS, WEYBRIDGE, SURREY, ENGLAND, KT13 0XW OR VIA EMAIL TO claims.intl@rccl.com, WITHIN SIX (6) MONTHS FROM THE DATE OF THE INJURY, ILLNESS OR DEATH AND SUIT IS COMMENCED (FILED) WITHIN ONE (1) YEAR FROM THE DATE OF SUCH INJURY, ILLNESS OR DEATH AND PROCESS SERVED WITHIN 120 DAYS AFTER FILING, NOTWITHSTANDING ANY PROVISION

OF LAW OF ANY STATE, TERRITORY OR COUNTRY TO THE CONTRARY.
*Id.*

12. Furthermore, on page 1 of the terms and conditions, the below language appeared at the top of the page in red and **bold** font:

" **IMPORTANT NOTICE TO GUESTS**

**THIS CRUISE/CRUISETOUR TICKET CONTRACT IS APPLICABLE ONLY TO GUESTS WHOSE PRIMARY COUNTRY OF RESIDENCE IS CANADA. IF YOUR PRIMARY COUNTRY OF RESIDENCE IS NOT CANADA, THEN PLEASE VISIT https://www.CelebrityCruises.com/guest-terms/ TO DETERMINE THE CRUISE/CRUISETOUR TICKET CONTRACT OR BOOKING TERMS AND CONDITIONS THAT APPLY TO YOU. PLEASE REFER TO SECTION 2.i BELOW FOR THE DEFINITION OF "PRIMARY COUNTRY OF RESIDENCE."**

**THIS CRUISE/CRUISETOUR TICKET CONTRACT CONTAINS IMPORTANT LIMITATIONS ON THE RIGHTS OF GUESTS. IT IS IMPORTANT THAT YOU CAREFULLY READ ALL TERMS OF THIS TICKET CONTRACT. YOU EXPRESSLY AGREE TO THE TERMS HEREIN, AND AGREE AND UNDERSTAND THAT YOU ARE BOUND BY THE PROVISIONS OF THIS AGREEMENT FROM THE TIME OF BOOKING AND AFTER THE CRUISE TERMINATES. YOU AGREE THAT CARRIER MAY CHANGE, MODIFY, AND UPDATE THE TERMS OF THIS TICKET CONTRACT, THAT NOTICE OF SUCH CHANGE MAY OR MAY NOT BE GIVEN, AND THAT YOU NONETHELESS AGREE TO BE BOUND BY ANY SUCH CHANGE OR MODIFICATION.**

**YOU ARE ESPECIALLY DIRECTED TO CAREFULLY READ AND UNDERSTAND SECTIONS 3, AND 10 THROUGH 12, AS THEY CONTAIN SIGNIFICANT LIMITATIONS ON YOUR RIGHTS TO ASSERT CLAIMS FOR PERSONAL INJURIES, ILLNESS OR DEATH, AND BAGGAGE AND PERSONAL PROPERTY LOSS OR DAMAGE, AGAINST CARRIER, THE VESSEL, RELATED ENTITIES AND THEIR OFFICERS, AGENTS AND EMPLOYEES AND OTHER THIRD PARTIES,**

**INCLUDING TIME LIMITS AND FORUM FOR CLAIMS AND SUITS, APPLICABLE LAW, ARBITRATION, AND IN REM PROCEEDINGS.**
**GUESTS SAILING TO THE GALAPAGOS ISLANDS SHOULD REFER TO SECTIONS 5.b AND 13.e FOR NOTICES SPECIFIC TO GALAPAGOS CRUISES.**

**IF YOU ARE THE PERSON MAKING A BOOKING YOU ARE ALSO DIRECTED TO CAREFULLY READ AND UNDERSTAND SECTION 16.a TO UNDERSTAND YOUR RESPONSIBLITIES AS THE LEAD GUEST."**
*Id.*

13. I have been provided by HMB with copies of the Plaintiff's Complaint dated 24 November 2025, and the Declaration of Karen Blanchette dated 11 February 2026.

14. I make this declaration in support of the Motion on grounds of improper venue and *forum non conveniens*.

**Personal Injury Claims in England and Wales**

*The Courts of England and Wales*

15. Excluding specialist tribunals and courts, which do not deal with personal injury claims, in England and Wales, a claim will either be commenced in a County Court (which are located throughout England and Wales) or the High Court located in London, England. Cases involving incidents at sea are often heard in the Admiralty Court in London.

16. In certain circumstances, a plaintiff (who would be referred to as a "*claimant*" as a matter of procedural law in this jurisdiction) may have a right to appeal a decision made in the County Court (to the High Court or Court of Appeal) or in the High Court (to the Court of Appeal). In exceptional circumstances, there may be a right to appeal a decision made by the Court of Appeal to the Supreme Court, which is the highest court of appeal in the United Kingdom.

*The Judiciary*

17. England and Wales operates on an adversarial court system. The judge's role in this system is to hear and determine issues of fact and law raised by the parties.

18. With few exceptions (e.g. claims for libel and slander), trials of civil claims in England and Wales, including personal injury claims, take place before a judge sitting without a jury. If a claimant (i.e. a plaintiff) was to bring a claim in England and Wales, it would be heard by a single judge in the first instance (regardless of whether the claim was commenced in a County Court or the High Court). There is, therefore, no question of members of a jury in England and Wales being burdened with any claim that may be commenced by a personal injury claimant.

19. Further, all judicial appointments in England and Wales are made by open competition. Following qualifying tests, independent assessment, and fulfilment of eligibility and good character requirements, the Judicial Appointment Commission will recommend judicial candidates to the Lord Chancellor (who has a very limited power of veto).

*Common Law*

20. England and Wales is a common law jurisdiction. Accordingly, the courts of England and Wales have a duty to abide by the doctrine of *stare decisis* and are required to apply English law in alignment with previous precedent cases (save to the extent that a superior court may disregard, and is not bound by, a precedent of an inferior court).

21. However, in addition to English common law, the courts of England and Wales will also consider primary legislation (Acts of Parliament), secondary legislation (Codes, Orders, Regulations and Rules), and quasi legislation (e.g. Government Circulars). A judge (or judges) will not be able to apply or interpret English common law in a way that conflicts with the aforementioned statutes and statutory instruments.

**The Plaintiff's Personal Injury Claim**

*The Jurisdiction of the Courts of England and Wales*

22. Where there is an exclusive jurisdiction clause in a contract providing for the Courts of England and Wales, the default position is that they will have jurisdiction over any claims which arise out of that contract given the parties intended as such.

23. As a matter of English law, exclusive jurisdiction and choice of law provisions similar to the EJC in the ticket contract are routinely found to be valid and enforceable. Given (i) the red, **bold** language at the top of the terms and conditions drawing the reader's attention to Clause 10 of the ticket contract (**YOU ARE ESPECIALLY DIRECTED TO CAREFULLY READ AND UNDERSTAND SECTIONS … 10 THROUGH 12, AS THEY CONTAIN SIGNIFICANT LIMITATIONS ON YOUR RIGHTS TO ASSERT CLAIMS FOR PERSONAL INJURIES …**) which contains the EJC; (ii) the plain and unambiguous language set forth in Clause 10 of the ticket contract; and (iii) the numerous notifications given to Ms. Gilbert and her agents with ample time before the sailing, as set forth in the Declaration of Karen Blanchette dated 11 February 2026 in support of the Motion to Dismiss, it is my opinion that the EJC is likely to be valid and enforceable as a matter of English law.

*The Plaintiff's Claim*

24. The Plaintiff's Complaint sets forth claims for claims for Negligent Maintenance, Negligent Failure to Correct, Negligent Failure to Warn, and for damages under US law. The claims set forth by the Plaintiff in the US Proceedings could be brought pursuant to English law in the courts of England and Wales under the tort of negligence.

25. Under English law, to succeed with a claim in tort a claimant has to prove (on the balance of probabilities) that (i) a defendant owed a duty of care to them; (ii) the defendant breached that duty of care, (iii) this breach was the proximate cause of the loss and damages claimed by the claimant, and (iv) the damages and/or loss was a foreseeable consequence of the breach of that duty. If the Plaintiff were to establish the aforementioned, then she would in principle be entitled to recover damages including pecuniary and non-pecuniary damages, to be assessed in accordance with English law principles. In addition to the above,

any contractual rights and obligations between the parties may need to be examined.

26. Further, save in very limited circumstances (e.g. in the event of fundamental dishonesty), successful personal injury claimants (i.e. a plaintiff) in the courts of England and Wales can expect to be awarded the majority of their costs from the defendant, without running the risk of being responsible for the defendant's costs if they are unsuccessful, pursuant to the Qualified One-Way Costs Shifting principle, making England and Wales a favourable jurisdiction for such claims.

27. The statute of limitations in personal injury claims in England and Wales is generally three (3) years from the date on which the relevant incident occurred, or from the date of "knowledge" of damage, whichever is later. However, we note that Clause 10(b) of the ticket contract (see above) contains a time limit for personal injury claims of (i) six (6) months from the date of injury for a plaintiff/claimant to provide written notice of the claim, and (ii) one (1) year from the date of injury to commence suit against the defendant, and a further one-hundred-and-twenty (120) day period to effect service of the claim on the defendant.

*Bringing a Personal Injury Claim in England and Wales*

28. Based on the quantum and nature of the claim asserted by the Plaintiff, if an equivalent claim was commenced in England and Wales, it would likely be started in the High Court (King's Bench Division).[1]

29. Proceedings are commenced by the issue of a claim form filed with the relevant court by the Claimant (i.e. the County Court or the High Court). The claim form provides a high-level overview of the claim and will either (i) include the "particulars of claim" setting out the details of the claim in more detail, or (ii) be accompanied by a separate document setting out the "particulars of claim" (which will be served on the defendant(s) at the same time as the claim form is served, or after service of the claim form). The claim form, and the particulars of claim

---

[1] The High Court has three divisions: the King's Bench Division, the Chancery Division, and the Family Division.

(if not contained within the claim form), can be filed through the court's electronic filing system (the CE-Filing system) 24 hours a day, 7 days a week.

30. Depending on the value and complexity of a claim (including any international aspects), and the availability of a judge in the relevant court, it will generally take between one (1) year to two (2) years from the issue of the claim form, for the merits of the claim to be heard and determined.

**No Fundamental Unfairness to the Plaintiff**

31. Without prejudice to the fact that England and Wales is the correct jurisdiction for the Plaintiff to bring her claim, there is no fundamental unfairness to the Plaintiff, in having to litigate in the courts of England and Wales. Indeed, England and Wales is both a convenient and appropriate jurisdiction for the Plaintiff to bring her claim.

*England and Wales as a Convenient Jurisdiction for the Plaintiff*

32. There is no requirement on parties litigating in the Courts of England and Wales to be physically present at interim hearings. Indeed, they would not normally attend but be represented by English lawyers. In the event that their claim proceeded to a trial, there is no reason why remote access would not be provided for. As a result of technological developments and particularly since the COVID-19 pandemic, it has become increasingly commonplace for the Courts of England and Wales to conduct hearings either fully or partially remotely, incorporating hybrid arrangements as necessary. In fact, since 15 September 2021, the default position is that all hearings listed for under half a day will take place remotely. *See* Remote hearings guidance to help the Business and Property Courts - Courts and Tribunals Judiciary, attached as Exhibit "D" (also available at https://www.judiciary.uk/remote-hearings-guidance-to-help-the-business-and-property-courts-2/) (last visited 11 February 2026).

33. Further, as a matter of English procedural law, it is entirely possible, for the Plaintiff, or any of the Plaintiff's fact or expert witnesses (if necessary) to give their evidence in chief remotely, should they wish to do so and provided the procedural requirements are met. The English Civil Procedure Rules, which

govern the procedure for handling civil cases in England and Wales, specifically provide for this (see, for example, Civil Procedure Rules r. 32.3, attached as Exhibit "E" and Annex 3 to Practice Direction 32 of the Civil Procedure Rules which deals with the use of video conferencing in civil proceedings attached as Exhibit "F").

34. In practice, the necessary information relating to the giving of fact and/or expert evidence virtually from abroad and any other remote hearing requirements is completed in the Case Management Information Sheet (Section H), and Pre-Trial Checklist (Question 2 and 3) attached as Exhibit "G", which are completed by each of the parties in the period leading up to the trial in accordance with the Commercial Court Guide, extract attached as Exhibit "H," so that the necessary arrangements can be made.

35. Notwithstanding the aforementioned, the Plaintiff is always welcome to give evidence in-person, if desired and therefore, in these circumstances, there is no potential for the Plaintiff to be '*deprived of their day in court*' on the basis of an in-person attendance either.

*England and Wales as an Appropriate Jurisdiction*

36. More generally, the Courts of England and Wales are independent, fair and impartial, and highly experienced in dealing with complex international disputes, including those involving conflict of law and jurisdiction issues and the application of foreign laws. As such (and as touched upon above), the Courts of England and Wales have a variety of protocols and procedures in place which can be used to obtain testimony, documents, or other evidence from parties and non-parties which may be abroad.

37. In respect of maritime disputes, many contracts of affreightment / carriage provide for English law and the jurisdiction of the Courts of England and Wales in spite of the parties having no connection with England and Wales. Further, many parties to maritime disputes choose to litigate in England and Wales as a neutral jurisdiction with a specialist Admiralty Court, and the Courts of England and Wales will have jurisdiction over the parties and the dispute where a valid

EJC exists consenting to such jurisdiction. As a result, a vast number of personal injury disputes arising from onboard ships have been heard in the Courts of England and Wales over the years.

38. Without waiving any defenses or admissions as to jurisdiction, Celebrity has instructed me to state for the record that it would not seek to enforce the one-year suit limitations period set forth in Clause 10(b) of the applicable ticket contract provided the Plaintiff re-files the matter in the Courts of England and Wales within six (6) months of any Order granting Defendant's Motion to Dismiss in these proceedings. This position is adopted solely to mitigate any procedural prejudice that may result from the Plaintiff having first initiated proceedings in the United States, and to reinforce the fairness and viability of enforcing the exclusive jurisdiction clause under the present circumstances.

**Statement of Truth**

Under penalties of perjury under the laws of the United States of America and the State of Florida, I declare that I have read the foregoing Declaration and the facts stated in it are true.

Dated: 11 February 2026



Gareth Thomas

# EXHIBIT "A"

Celebrity Cruises®

‹ Go Back

# Cruise / Cruisetour Ticket Contract - Canada

**IMPORTANT NOTICE TO GUESTS**

**THIS CRUISE/CRUISETOUR TICKET CONTRACT IS APPLICABLE ONLY TO GUESTS WHOSE PRIMARY COUNTRY OF RESIDENCE IS CANADA. IF YOUR PRIMARY COUNTRY OF RESIDENCE IS NOT CANADA, THEN PLEASE VISIT https://www.CelebrityCruises.com/guest-terms/ TO DETERMINE THE CRUISE/CRUISETOUR TICKET CONTRACT OR BOOKING TERMS AND CONDITIONS THAT APPLY TO YOU. PLEASE REFER TO SECTION 2.i BELOW FOR THE DEFINITION OF "PRIMARY COUNTRY OF RESIDENCE."**

**THIS CRUISE/CRUISETOUR TICKET CONTRACT CONTAINS IMPORTANT LIMITATIONS ON THE RIGHTS OF GUESTS. IT IS IMPORTANT THAT YOU CAREFULLY READ ALL TERMS OF THIS TICKET CONTRACT. YOU EXPRESSLY AGREE TO THE TERMS HEREIN, AND AGREE AND UNDERSTAND THAT YOU ARE BOUND BY THE PROVISIONS OF THIS AGREEMENT FROM THE TIME OF BOOKING AND AFTER THE CRUISE TERMINATES. YOU AGREE THAT CARRIER MAY CHANGE, MODIFY, AND UPDATE THE TERMS OF THIS TICKET CONTRACT, THAT NOTICE OF SUCH CHANGE MAY OR MAY NOT BE GIVEN, AND THAT YOU NONETHELESS AGREE TO BE BOUND BY ANY SUCH CHANGE OR MODIFICATION.**

**YOU ARE ESPECIALLY DIRECTED TO CAREFULLY READ AND UNDERSTAND SECTIONS 3, AND 10 THROUGH 12, AS THEY CONTAIN SIGNIFICANT LIMITATIONS ON YOUR RIGHTS TO ASSERT CLAIMS FOR PERSONAL INJURIES, ILLNESS OR DEATH, AND BAGGAGE AND PERSONAL PROPERTY LOSS OR DAMAGE, AGAINST CARRIER, THE VESSEL, RELATED ENTITIES AND THEIR OFFICERS, AGENTS AND EMPLOYEES AND OTHER THIRD PARTIES, INCLUDING TIME LIMITS AND FORUM FOR CLAIMS AND SUITS, APPLICABLE LAW, ARBITRATION, AND IN REM PROCEEDINGS.**

**GUESTS SAILING TO THE GALAPAGOS ISLANDS SHOULD REFER TO SECTIONS 5.b AND 13.e FOR NOTICES SPECIFIC TO GALAPAGOS CRUISES.**

**IF YOU ARE THE PERSON MAKING A BOOKING YOU ARE ALSO DIRECTED TO CAREFULLY READ AND UNDERSTAND SECTION 16.a TO UNDERSTAND YOUR RESPONSIBLITIES AS THE LEAD GUEST.**

1. INTRODUCTION:

This Cruise/CruiseTour Ticket Contract ("Ticket Contract" or "Agreement") describes the terms and conditions that will apply to the relationship between Guest and Carrier for the Cruise or CruiseTour covered by this Ticket Contract. The terms and conditions set forth in this Ticket Contract, together with the Cruise Fare due for Your Cruise or CruiseTour, constitutes the entire agreement between Carrier and Guest. Except as otherwise expressly provided herein, this Agreement supersedes any other representations or agreements that may have been made relating to the subject matter of this Agreement, the Cruise or the CruiseTour, including but not limited to anything stated in brochures, advertisements, and other promotional materials, by Carrier, its parent, subsidiary or affiliated companies, or any of their respective employees, or third persons such as travel agents, but excluding the terms of the Cruise Lines International Association ("CLIA") Passenger Bill of Rights that the Vessel's Operator has adopted as a requirement of being a member of CLIA. In the event of a direct conflict between a provision of this Ticket Contract and a provision of the CLIA Passenger Bill of Rights in effect at the time of booking (the "CLIA Passenger Bill of Rights"), the CLIA Passenger Bill of Rights controls.

Purchase or use of this Ticket Contract, whether or not signed by Guest, shall constitute the agreement by Guest, on behalf of himself and all other persons traveling under this Ticket Contract (including any accompanying minors or other persons for whom the Ticket Contract was purchased), to be bound by the terms and conditions of this Ticket Contract. In addition, Guest acknowledges the availability of and Guest agrees to abide by the terms and conditions, including but not limited to certain payment terms such as minimum deposit requirements and payment due dates, which appear in the applicable Carrier brochure or online at https://www.CelebrityCruises.com. In the event of any conflict between such other brochure or website materials and this Ticket Contract, the terms of this Ticket Contract shall prevail.

2. DEFINITIONS:

a. "Agreement" shall have the meaning given to it in Section 1 above.

b. "Carrier" shall include: (i) the Vessel, or any substituted ship; its launches or crafts; and (ii) the Vessel's Operator, owner, manager and charterer.

c. "Cruise" means the specific cruise covered by this Ticket Contract, as the same may be modified and shall include those periods during which Guest is embarking or disembarking the Vessel and those periods when Guest is on land while the Vessel is in port.

d. "CruiseTour" means the combined vacation package officially published and offered by Carrier, which includes the applicable Cruise and associated Land Tour.

e. "Operator" means the entity identified in Section 20 below.

f. "Guest" or "Your" means all persons traveling under this Ticket Contract and persons in their care, together with their respective heirs and representatives. "Guest" shall include the plural and the use of the masculine shall include the feminine. Notwithstanding, other policies referenced herein, communications from Carrier, and other posted notices may interchangeably use the term "Passengers" as well when referring to Guests.

g. "Land Tour" means the land tour component of a CruiseTour to be provided either prior to the initial embarkation on the Cruise or after the final debarkation from the Cruise. "LTO" means to operator of the Land Tour portion of any CruiseTour.

h. "Lead Guest" means the Guest who initiated the Cruise or Cruise Tour booking for themselves, and/or for one or more other Guests named on the booking, whether the booking was made by Lead Guest directly with Carrier or through a travel agent. The Lead Guest is usually the first Guest named on the booking.

i. "Primary Country of Residence" means the country where you primarily reside at the time of booking the Cruise. This should be indicated by you, the Lead Guest, or another agent or representative of yours at the time of booking the Cruise or at online check-in.

j. "Transport" means the railcars, buses and other modes of transportation or accommodation provided by a LTO in connection with a Land Tour.

k. "Vessel" means the ship owned or chartered or operated by Operator on which Guest may be traveling or against which Guest may assert a claim, as well as any substituted ship used in the performance of this Ticket Contract.

3. CRUISE FARE TERMS:

**a. Cruise Fare.** "Cruise Fare" means the amount paid and/or due from Guest for the Cruise or CruiseTour which includes carriage onboard the Vessel, full board, and ordinary Vessel food and entertainment. The Cruise Fare does not include alcoholic beverages, specialized tea and coffee beverages, fresh or cold press juices, energy drinks, spa treatments and salon services, exercise classes, select premium dining and entertainment, internet access, casino and gambling activities, shore excursions, photographs, video arcade, phone calls, laundry services, satellite connection for mobile phones, travel insurance, medical insurance, baggage insurance, medical services, shoreside expenses or transfers, airfare, or hotel accommodations (unless included in a CruiseTour), or any other incidental charge or expense that you incur. Also excluded from the Cruise Fare are: (i) Taxes and Fees; and (ii) any Fuel Supplement, which, subject to applicable law and the terms of this Agreement, Carrier expressly reserves the right to impose or pass along with no right of cancellation by Guest implied. This listing is not intended to be exhaustive and additional exclusions or fees may apply.

**b. Taxes, Fees, and Port Expenses.** Taxes, fees, and port expenses (collectively, "Taxes and Fees") include fees, charges, costs and taxes imposed on Carrier, by governmental or quasi-governmental authorities, as well as third party fees and charges relating to the Vessel's navigation, operations or presence in a port or harbor. By way of example, and not limitation, Taxes and Fees may include immigration-related fees, passenger head taxes, dockage fees, wharfage fees, inspection fees, pilotage, canal tolls, navigation fees, environmental impact fees, charges relating to the cost of acquiring government-mandated carbon emission allowances, or charges related to berthing, stevedoring, baggage handling or storage, and security services. Guest acknowledges that Taxes and Fees are estimated by Carrier at the time of booking and subject to change. Carrier may pass through any increases to applicable Taxes and Fees at any time after booking. Carrier may, in its sole discretion, require Guest to prepay such increase in Taxes and Fees prior to boarding the Vessel or apply such increase to Guest's onboard folio at the time of sailing. Guest's refusal or failure to prepay any such increase may be deemed a cancellation by Guest.

EXHIBIT "A"

**c. Fuel Supplement.** Subject to the terms of this Section, Carrier reserves the right, without prior notice to Guest, to impose a fuel supplement charge (the "Fuel Supplement"). Carrier may impose such Fuel Supplement either at the time of booking or thereafter at any time prior to sailing. If the Fuel Supplement is imposed at the time of booking, Carrier will display the amount and frequency (or a fixed price representing the same) together with the Cruise Fare, Taxes and Fees, and Gratuities on Carrier's website and Guest's booking confirmation. If at any time after booking, the closing price of: (i) West Texas Intermediate Fuel exceeds US$65.00 per barrel; or (ii) Henry Hub Natural Gas Spot Price exceeds US$3.00 per Metric Million British Thermal Unit on the New York Mercantile Stock Exchange, Carrier may impose a Fuel Supplement of up to US$12.00 (or its equivalent in the currency of the booking) per Guest, per day. Carrier may, in its sole discretion, require Guest to prepay the Fuel Supplement prior to boarding the Vessel or apply such charge to Guest's onboard folio at the time of sailing. Guest's refusal or failure to prepay any Fuel Supplement may be deemed as a cancellation by Guest.

**d. Gratuities.** For Guest's convenience, a discretionary service gratuity ("Gratuities") will be automatically added daily to the onboard account of each Guest, except as otherwise provided below. Gratuities are subject to adjustment, at Guest's discretion, onboard the Vessel until the morning of disembarkation. Gratuities will not be automatically added to the Guest's onboard account if they are included in the Cruise Fare, as reflected in the Guest's booking confirmation, if the Guest pre-pays them, or if the laws of the Guest's primary country of residence do not permit them to be added automatically.

**e. Correction of Errors.** In the event that a Cruise or CruiseTour is booked but the Cruise Fare listed, quoted or advertised through any website, Carrier sales person, travel agent or any other source is inaccurate or unavailable due to an electronic error, typographical error, human error or any other error causing the Cruise or CruiseTour to be sold, or listed for sale, quoted or advertised, in a quantity or for an amount not intended by Carrier, Carrier reserves the right to correct the erroneous fare by requesting Guest to pay the correct amount intended, re-berthing Guest in other accommodations onboard the Vessel, or by canceling this Agreement in exchange for a full refund. For the avoidance of doubt, in no event shall Carrier be obligated to honor any such booking resulting from the error or otherwise be liable in such circumstances.

**f. Promotional Cruise Fares.** Carrier offers promotional Cruise Fares (or other offers) that may modify the cancellation terms set forth in Section 8, impose a minimum stateroom occupancy requirement, require payment of a non-refundable deposit, or accelerate the Cruise Fare payment schedule. With respect to Cruise Fares which are contingent on minimum occupancy requirements, cancellation by one or more Guests in a stateroom may result an adjustment to the remaining Guests' Cruise Fare based on the prevailing rates at the time of cancellation, plus any single supplements (if applicable), with no right of cancellation by Guest(s) implied. With respect to Cruise Fares which require payment of a non-refundable deposit, such deposit shall be become immediately due and payable at the time of booking and will not be refunded at any time after paid by Guest. Change fees also apply.

**g. Payment and Refunds of the Cruise Fare.** Guest agrees to pay, and Carrier reserves the right to collect, the Cruise Fare due for the accommodations booked. Failure to make timely final payment in full of the Cruise Fares due for all Guests in a stateroom may result in cancellation of the reservation for the entire stateroom. Guest agrees that the Carrier shall not be liable to make any refund to Guest for Ticket Contracts that are wholly or partially unused by Guest except as otherwise expressly stated herein.

**h. Payment for Onboard Charges.** Guest further agrees to pay in full before the end of the Cruise, and Carrier reserves the right to collect, all charges for entertainment, goods and services incurred by Guest, or incurred by Carrier on Guest's behalf.

4. BAGGAGE, PROPERTY AND LIMITATIONS OF LIABILITY:

**a. Baggage Limits and Prohibited Items.** Each adult Guest is permitted to carry onboard the Vessel or check-in only the wearing apparel and personal effects reasonably necessary for the Cruise, including suitcases, trunks, valises, satchels, bags, hangers containing clothing, toiletries and similar items. In no event shall any Guest bring on board the Vessel or check-in, or in connection with the Land Tour, any illegal controlled substances (including medical marijuana), fireworks, live animals (except under the terms of Section 13.e below), weapons, firearms, explosives or other hazardous materials, or any other items prohibited by applicable law or Carrier policy. Marijuana possession and/or use, including medical marijuana, and possession or use of any illegal drugs, is strictly prohibited in many jurisdictions visited and on the Vessel at all times, as well as in terminals, during shore excursions or any other part of the Cruise, regardless of any local, state, or other laws which might permit use or possession of marijuana. Guests who violate the laws of any jurisdiction are subject to being reported to law enforcement or customs authorities, arrest and prosecution. Guests who bring on board dangerous items, marijuana in any form, or any illegal drugs or controlled substances are also subject to immediate disembarkation or denial of boarding. Guests shall have no claim for refund, loss, damage, inconvenience, or compensation whatsoever under any of these circumstances. Guest shall be responsible to notify Carrier in advance of the Cruise if there is any question as to the permissibility of taking any item or substance onboard the Vessel. Carrier reserves the right to refuse to permit any Guest to take on board the Vessel or on any mode of Transport any item Carrier deems inappropriate.

**b. Liability for Loss of or Damage to Baggage.** Unless negligent, Carrier is neither responsible nor liable for any loss of or damage to Guest's property, whether contained in luggage or otherwise. Liability for loss of or damage to Guest's property in connection with any air or ground transportation shall be the sole responsibility of the provider of the service and in accordance with applicable limitations.

**c. Limitation of Liability for Lost or Damaged Property.** Notwithstanding any other provision of law or this Agreement, Carrier's liability for loss or damage to property during the Land Tour portion of a CruiseTour is limited to $300.00 per Guest. Notwithstanding any other provision of law or this Agreement, Carrier's liability for loss or damage to property for the cruise (or for the cruise only portion of a CruiseTour) shall be limited to $300.00 per Guest, unless Guest declares the true value of such property in writing to the Carrier at the address specified below in Section 10.b.i, and pays Carrier within 10 days of final payment for the Cruise, a fee of five percent (5%) of the amount that such value exceeds $300.00. In such event, Carrier's liability shall be limited to its true declared value, but not exceeding $5,000.

**d. Limited Carriage.** Carrier does not undertake to carry as baggage any tools of trade, household goods (including but not limited to appliances and furniture) fragile or valuable items, precious metals, jewelry, documents, negotiable instruments or other valuables, including but not limited to those specified in Title 46 of the United States Code, Appendix Section 181. Each Guest warrants that no such item will be presented to Carrier within any receptacle or container as baggage, and hereby releases Carrier from any liability whatsoever for loss of or damage to such items when presented to Carrier in breach of this warranty. In no event shall Carrier be liable for normal wear or tear of luggage or property, or loss of or damage to jewelry, cash, negotiable paper, photographic/electronic, medical or recreational equipment, dental hardware, eyewear, medications or other valuables unless they are deposited with Carrier on the Vessel for safekeeping against receipt (LTOs do not accept valuables for deposit). Carrier's liability, if any, for loss of or damage to valuables so deposited shall not exceed the amounts indicated in Section 4.c above.

5. PUBLIC HEALTH; MEDICAL CARE; OTHER PERSONAL SERVICES; KNOWING ACCEPTANCE OF THE RISKS:

**a. Recommended Consultation with Personal Physician.** Guests are encouraged to discuss the advisability of travel and participation in onboard and shoreside activities with their personal physicians.

**b. Availability of Medical Care.** Due to the nature of travel by sea and the ports visited, the availability of medical care onboard the Vessel and in ports of call may be limited or delayed and medical evacuation may not be possible from the Vessel while at sea or from every location to which the Vessel sails. Medical facilities and physicians are not available on all vessels sailing to the Galapagos Islands.

**c. Relationship with Service Providers.** To the extent Guests retain the services of medical personnel or independent contractors on or off the Vessel, Guests do so at their sole risk. Any medical personnel attending to a Guest on or off the Vessel, if arranged by Carrier, are provided solely for the convenience of the Guest, work directly for the Guest, and shall not be deemed to be acting under the control or supervision of Carrier, as Carrier is not a medical provider. Likewise, any onboard concessions (including but not limited to the gift shops, spas, beauty salon, art program, photography, formalwear concessions) are either operated by or are independent contractors on board the Vessel, on Transport or elsewhere and are provided solely for the convenience of the Guest. Even though the Carrier shall be entitled to charge a fee and earn a profit for arranging such services, all such persons or entities shall be deemed independent contractors and not acting as agents or representatives of Carrier. Carrier assumes no liability whatsoever for any treatment, failure to treat, diagnosis, misdiagnosis, actual or alleged malpractice, advice, examination or other services provided by such persons or entities. Guest acknowledges that the Vessel's hairdresser, manicurist, art auctioneer, gift shop personnel, spa personnel, wedding planners and other providers of merchandise and personal services are employees of independent contractors and that Carrier is not responsible for their actions.

**d. Payment for Medical or Personal Care Services.** Guest shall pay for all medical care or other personal services requested or required, whether onboard or ashore, including the cost of any emergency medical care or transportation incurred by Carrier and any costs associated with the provision of medical services as referenced in the CLIA Passenger Bill of Rights. If Guest is unable to pay and the Carrier pays for such expenses, then Guest shall reimburse Carrier for those expenses.

**e. Health, Travel and Risk Acknowledgement.** GUEST ACKNOWLEDGES, UNDERSTANDS AND ACCEPTS THAT WHILE ABOARD THE VESSEL, IN TERMINALS AND BOARDING AREAS, OR DURING ACTIVITIES ASHORE AND/ OR WHILE TRAVELING TO OR FROM THE VESSEL, GUEST OR OTHER GUESTS MAY BE EXPOSED TO COMMUNICABLE ILLNESSES, INCLUDING BUT NOT LIMITED TO AIRBONE DISEASES LIKE INFLUENZA, COVID-19, COLDS AND NOROVIRUS. GUEST FURTHER UNDERSTANDS AND ACCEPTS THAT THE RISK OF EXPOSURES TO THESE COMMUNICABLE ILLNESSES AND OTHERS IS INHERENT IN MOST ACTIVITIES WHERE PEOPLE INTERACT OR SHARE COMMON FACILITIES, IS BEYOND CARRIER'S CONTROL, AND CANNOT BE ELIMINATED UNDER ANY CIRCUMSTANCES. GUEST KNOWINGLY AND VOLUNTARILY ACCEPTS THESE RISKS AS PART OF THIS TICKET CONTRACT, INCLUDING THE RISK OF SERIOUS ILLNESS OR DEATH ARISING FROM SUCH EXPOSURES, AND/OR ALL RELATED DAMAGES, LOSS, COSTS AND EXPENSES OF ANY NATURE WHATSOEVER.

6. SHORE EXCURSIONS, TOURS, FACILITIES OR OTHER TRANSPORTATION:

All arrangements made for or by Guest for transportation (other than on the Vessel) before, during or after the Cruise or CruiseTour of any kind whatsoever, as well as air arrangements, shore excursions, tours, hotels, restaurants, attractions and other similar activities or services, including all related conveyances, products or facilities, are made solely for Guest's convenience and are at Guest's risk. The providers, owners and operators of such services, conveyances, products and facilities are independent contractors and are not acting as agents or representatives of Carrier. Even though Carrier may collect a fee for, or otherwise profit from, making such arrangements and offers for sale shore excursions, tours, hotels, restaurants, attractions, the Land Tour and other similar activities or services taking place off the Vessel for a profit, Carrier does not undertake to supervise or control such independent contractors or their employees, nor maintain their conveyances or facilities, and makes no representation, whether express or implied, regarding their suitability or safety. In no event shall Carrier be liable for any loss, delay, disappointment, damage, injury, death or other harm whatsoever to Guest which occurs on or off the Vessel or the Transport as a result of any acts, omissions or negligence of any independent contractors. See also Section 19 below.

**EXHIBIT "A"**

Guest acknowledges that the Vessel will be sailing to foreign countries where the laws, regulations, customs and business practices may vary greatly from those of Guest's home country. As a result, there may be significant differences in modes of transportation mode and their quality, infrastructure (e.g., poorly maintained roads), regulations, and driving practices in the countries visited during the Cruise. Guests are responsible for familiarizing themselves with the associated risks and travel warnings at www.travel.state.gov, or the equivalent travel advisory system in Guest's country, prior to sailing.

7. CANCELLATION, DEVIATION, OR SUBSTITUTION BY CARRIER:

**a. Cancellation by Carrier Generally.** Carrier has the right, without prior to notice to Guest, to cancel all or any portion of this Agreement at any time prior to Guest boarding the Vessel for the Cruise or commencing a Land Tour, whichever occurs first. In such case, Guest's sole and exclusive remedy shall be for the issuance of a refund or future cruise credit for all or the proportionate value of the cancelled Cruise or CruiseTour. Unless otherwise provided herein, Guest agrees that a refund or future cruise credit shall be Guest's sole and exclusive remedy and Carrier shall have no further liability for damages or compensation of any kind. Carrier's right to cancel this Agreement shall be in addition to Carrier's right to cancel the Cruise or CruiseTour.

**b. Deviations by Carrier.** Carrier may for any reason at any time and without prior notice, cancel, advance, postpone or deviate from any scheduled sailing, port of call, destination, lodging or any activity on or off the Vessel, or substitute another vessel or port of call, destination, lodging or activity. Carrier shall not be liable for any claim whatsoever by Guest, including but not limited to loss, compensation or refund, by reason of such cancellation, advancement, postponement, or deviation, except as provided in Section 7.d below with respect to mechanical failures or as otherwise required by applicable law. For the avoidance of doubt, the terms of this Section 7.b apply equally with respect to either a Cruise or CruiseTour.

**c. Cancellation or Deviation by Carrier Caused by Circumstances Beyond Carrier's Control.** If Carrier's performance hereunder is, hindered or adversely affected, or in the opinion of Carrier or the Master is likely to be hindered or adversely affected, in whole or in part, as a result of war, hostilities, blockages, prevailing weather conditions (e.g., tropical cyclones or the presence of ice), labor conflicts, strikes onboard or ashore, breakdown of Vessel, congestion, docking difficulties, medical or lifesaving emergencies, declared pandemics, public health emergencies or outbreak of communicable disease, quarantines, national or regional emergencies, seizure under legal process or any other cause whatsoever, or if Carrier or the Master considers that for any reason whatsoever, proceeding to, attempting to enter, or entering or remaining at the port on an itinerary may expose the Vessel to risk or loss or damage or delay, Guest and her baggage may be landed at any port, or if the Guest has not embarked on the Cruise or commenced the Land Tour the entire Cruise may be canceled, at which time the responsibility of Carrier shall cease.

**d. Early Termination Due to Mechanical Failures.** In the event that a Cruise (or the cruise component of a CruiseTour) is canceled or terminated early due to mechanical failures, Guest shall have a right to: (i) a full refund of the Cruise Fare if the entire Cruise is canceled, or a partial refund if the Cruise is terminated early; (ii) transportation selected by Carrier to the Vessel's scheduled port of disembarkation or the Guest's home city (as determined by Carrier), if Guest has travelled to the Vessel; and (iii) lodging selected by Carrier, if disembarkation and an overnight stay in an unscheduled port are required due to the Cruise or cruise component of a CruiseTour being cancelled or terminated early because of such mechanical failures.

**e. Substitution and Transfers.** Carrier has the right to substitute the Vessel for any other vessel or means of transportation, regardless of whether owned or operated by the Carrier, and to re-berth Guest thereon, without liability or compensation to Guest of any kind. Carrier shall further have the right to transfer Guest and/or Guest's luggage to other carriers, whether by air, land or sea toward the final port of disembarkation. Transfers for the convenience of Guest, or in compliance with a government order pursuant to Section 7.f, shall be at the sole and exclusive cost to Guest.

**f. Compliance with Government Orders.** Carrier shall have the right to comply with any orders, recommendations, or directions whatsoever given by any governmental entity or by persons purporting to act with such authority, without liability for loss, compensation of any kind whatsoever or refund to Guest, unless otherwise required by applicable law.

8. CANCELLATION BY GUEST; EARLY DISEMBARKATION:

**a. General.** Except as otherwise provided in this Section 8, Guest is not entitled to any refund, payment, compensation or credit for any cancellation initiated by Guest.

**b. Cancellation of Cruise or CruiseTour Reservation**. Cruise reservations that are cancelled by Guest prior to the sail date, and CruiseTour reservations that are cancelled by Guest prior to the first day of the CruiseTour, may be subject to a cancellation charge. The amount of the cancellation charge shall be determined as shown in the table below and shall vary depending on how far in advance of the sail date (or first day of the CruiseTour) the Operator receives notice of cancellation.

| **Cruise Length:** | **Days to Sailing*:** | **Cancellation Charge (Per Guest):** |
|---|---|---|
| | 75+ days | No charge (except for non-refundable deposit amounts) |
| 1 – 4 nights | 74 – 61 days | 50% of total price |
| | 60 – 31 days | 75% of total price |
| | 30 days or less | 100% of total price |
| | 90+ days | No charge (except for non-refundable deposit amounts) |
| | 89 – 75 days | 25% of total price |
| 5 – 14 nights | 74 – 61 days | 50% of total price |
| | 60 – 31 days | 75% of total price |
| | 30 days or less | 100% of total price |
| | 120+ days | No charge (except for non-refundable deposit amounts) |
| | 119 – 75 days | 25% of total price |
| 15+ nights | 74 – 61 days | 50% of total price |
| | 60 – 31 days | 75% of total price |
| | 30 days or less | 100% of total price |
| **All Galapagos Cruises, regardless of length:** | | |
| | 150+ days | No charge |
| | 149 – 121 days | 10% of total price |
| | 120 – 91 days | 25% of total price |
| | 90 – 61 days | 50% of total price |
| | 60 – 31 days | 75% of total price |
| | 30 days or less | 100% of total price |

*Or number of days prior to the first day of the CruiseTour, if the associated Land Tour is scheduled to begin prior to the Cruise. For bookings made outside of Canada, a different cancellation policy may apply. Contact your local office or travel agent for details.

**c. Cancellation of a Land Tour.** For Guests who have booked a CruiseTour and desire to cancel their Land Tour segment while retaining the Cruise, refunds of the Cruise Fare (including any applicable Fuel Supplement) for the Land Tour segment shall be made in accordance with the following cancellation policy: Guests who convert their CruiseTour to a cruise-only booking within forty-two (42) days of the start date of the Land Tour segment will be subject to a cancellation charge. The amount of that charge varies depending on the location of the CruiseTour and/or its length. For the specific amount of the charge, visit https://www.CelebrityCruises.com.

**EXHIBIT "A"**

**d. Refunds.** If a Cruise or CruiseTour reservation is cancelled and all cancellation charges have been paid to Carrier, any prepaid Taxes and Fees, Gratuities and Fuel Supplement shall be refunded. Otherwise, the balance of any prepaid Taxes and Fees, Gratuities and Fuel Supplement shall be refunded, after deducting any cancellation charges that apply. Cancellation by Guest after the Cruise or CruiseTour has begun, early disembarkation of Guest for any reason, including pursuant to any provision of this Agreement, or "no-shows," shall be without refund, compensation, or liability on the part of Carrier whatsoever. If Carrier received payment via credit card and a refund is owed, the refund will be made to that credit card. If Carrier received payment from your travel agent and a refund is owed, the refund will be provided back to that travel agent.

**e. Cancellation Policy for Single and Higher Occupancy Staterooms.** The cancellation charges set forth above are based on double occupancy staterooms. Cancellation charges will be assessed on a per-Guest basis. Cancellation charges may vary for single occupancy staterooms, or for third, fourth or fifth Guests booked in a single stateroom. Consult your travel agent or call Celebrity Cruises for further details.

**f. Other Cancellation Charges.** For cancellations of air arrangements, shore excursions, tours, hotels, restaurants, attractions and other similar activities or services, travel insurance, pre-booked onboard services (e.g., spa, photography or wedding services) and pre-booked arrangements (e.g., specialty dining), see the applicable terms and conditions for any applicable cancellation charges.

9. GUEST'S OBLIGATION TO COMPLY WITH AGREEMENT, APPLICABLE LAWS, AND RULES OF CARRIER; INDEMNIFICATION:

a. Guest shall at all times comply with the provisions of this Agreement, all applicable laws, and rules, policies and regulations of Carrier, the Vessel and the Transport (as the same may be changed from time to time with or without notice). Guest agrees not to enter any areas of the Vessel designated for crew only, including crew quarters, under any circumstances whatsoever. Guest further agrees that Carrier may prohibit or restrict Guest from bringing any alcoholic beverages for consumption onboard the Vessel and agrees to comply with any Carrier policy covering such matters. Nothing in this Agreement shall grant to Guest any right to market, advertise, promote, provide or sell products or services to other guests onboard the Cruise or CruiseTour and Guest shall be prohibited from doing so.

b. Guests are solely responsible to maintain in their possession all passports, visas and other travel documents required for embarkation, travel and disembarkation at all ports of call. Guests assume full responsibility to determine through their travel agent or the appropriate government authority the necessary documents. Guest agrees to provide to Carrier (at Carrier's reasonable request) any travel documents. Carrier shall return such travel documents to Guest by no later than the end of the Cruise.

c. Guest understands and agrees that Carrier has a zero tolerance policy for illegal activity and shall report such activity to the appropriate authorities.

d. Each adult Guest undertakes and agrees to supervise at all times any accompanying minors to ensure compliance with the provisions of this Section 9.

e. Carrier may also change accommodations, alter or cancel any activities of, deny service of alcohol to, confine to a stateroom or quarantine, search the stateroom, property or baggage of any Guest, change a Guest's Land Tour, disembark or refuse to embark the Guest and/or any Guest responsible for any minor Guest, or restrain any Guest at any time, without liability, at the risk and expense of the Guest when, in the sole opinion of Carrier or the Master, the Guest's conduct or presence, or that of any minor for whom the Guest is responsible, is believed to present a possible danger, security risk or be detrimental to himself or the health, welfare, comfort or enjoyment of others, or is in violation of any provision of this Agreement.

f. Guest, or if a minor, his parent or guardian, shall be liable for and indemnify Carrier, the Vessel and the Transport from any civil liability, fines, penalties, costs or expenses incurred by or imposed on the Vessel, the Transport or Carrier arising from or related to Guest's conduct or failure to comply with any provisions of this Section 9, including but not limited to: (i) any purchases by or credit extended to the Guest; (ii) requirements relating to immigration, customs or excise; or (iii) any personal injury, death or damage to persons or property caused directly or indirectly, in whole or in part, by any willful or negligent act or omission on the part of the Guest.

g. Carrier shall not be required to refund any portion of the Cruise or CruiseTour Fare paid by any Guest who fails for any reason, to be onboard the Vessel or Transport by the embarkation cut-off time applicable to the specific Cruise or CruiseTour or the boarding cut-off time applicable at any port of call or destination or point of departure as the case may be, and shall not be responsible for lodging, meals, transportation or other expenses incurred by Guest as a result thereof. Embarkation procedures and cut-off times for cruises are available at https://www.CelebrityCruises.com. Boarding procedure cut-off times for any port of call or destination or point of departure are as announced on the applicable Cruise or CruiseTour. Carrier shall have no obligation to any Guest to deviate from any scheduled sailing or port of call or destination.

h. Guest acknowledges that for certain voyages, such as a round-trip voyage commencing in a United States port, the Guest must complete the entire voyage and that failure to do so may result in a fine or other penalty being assessed by one or more governmental agencies. Guest hereby agrees to pay any such fine or penalty imposed because Guest failed to complete the entire voyage and to reimburse Carrier in the event it pays such fine or penalty.

i. Carrier may refuse to transport any Guest, and may remove any Guest from the Vessel or Transport at any time, for any of the following reasons: (i) whenever such action is necessary to comply with any government regulations, directives or instructions; (ii) when a Guest refuses to permit search of his person or property for explosives, weapons, dangerous materials or other stolen, illegal or prohibited items; (iii) when a Guest refuses upon request to produce positive identification; or (iv) for failure to comply with Carrier's rules and procedures, including, for example, Carrier's Guest Health, Safety and Conduct Policy or Carrier's policies against fraternization with crew; or (v) Guest's passage is denied by Carrier pursuant to its Refusal to Transport Policy. Carrier's Guest Health, Safety and Conduct Policy and Refusal to Transport Policy are available online at https://www.CelebrityCruises.com.

j. In the interests of safety and security, Guests and their baggage are subject to inspection, including but not limited to monitoring electronically, with or without the Guest's consent or knowledge.

k. If Carrier exercises its rights under this Section 9, Guest shall have no claim against Carrier whatsoever and Carrier shall have no liability for refund, compensation, loss or damages of Guest, including but not limited to any expenses incurred by Guest for accommodations or repatriation, unless otherwise provided in Carrier's refund policy or provided herein.

10. FORUM SELECTION; GOVERNING LAW; TIME LIMITS TO BRING SUIT; ARBITRATION:

## a. FORUM SELECTION & GOVERNING LAW:

(i) EXCEPT AS PROVIDED IN SECTION 10.c. BELOW, ALL DISPUTES, CLAIMS OR OTHER MATTER OF ANY DESCRIPTION ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY RELATED OR INCIDENT TO THIS AGREEMENT, THE CRUISE, CRUISETOUR, LAND TOUR OR TRANSPORT (INCLUDING A CLAIM FOR PERSONAL INJURY, ILLNESS OR DEATH OF A GUEST) MUST BE LITIGATED, IF AT ALL, IN AND BEFORE THE COURTS OF ENGLAND AND WALES, TO THE EXCLUSION OF ALL OTHER COURTS OR TRIBUNALS. GUEST HEREBY CONSENTS TO JURISDICTION AND WAIVES ANY VENUE OR OTHER OBJECTION THAT GUEST MAY HAVE TO ANY SUCH ACTION OR PROCEEDING BEING BROUGHT IN THE COURTS OF ENGLAND AND WALES.

(ii) THIS AGREEMENT AND ALL DISPUTES OR CLAIMS WHATSOEVER BY GUEST ARISING FROM OR RELATED TO THIS AGREEMENT SHALL IN ALL RESPECTS, AND WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES, BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW. FOR THE AVOIDANCE OF DOUBT, THIS SECTION 10.a.ii APPLIES TO ALL DISPUTES AND CLAIMS WHETHER RESOLVED IN COURT OR IN ARBITRATION. EXCEPT AS OTHERWISE EXPRESSLY SPECIFIED IN THIS AGREEMENT, GUEST AGREES THIS CHOICE OF LAW SUPERSEDES AND PREEMPTS ANY PROVISION OF LAW OF ANY OTHER COUNTRY, STATE, OR TERRITORY.

**b. TIME LIMITS TO PROVIDE NOTICE AND FILE A CLAIM:**

**(i) FOR PERSONAL INJURY/ILLNESS/DEATH CLAIMS:** NO SUIT SHALL BE MAINTAINABLE AGAINST THE CARRIER, THE VESSEL OR THE TRANSPORT FOR PERSONAL INJURY, ILLNESS OR DEATH OF ANY GUEST UNLESS WRITTEN NOTICE OF THE CLAIM, WITH FULL PARTICULARS, IS DELIVERED TO CARRIER AT THE FOLLOWING ADDRESS, C/O RCL CRUISES LTD., BUILDING 7, THE HEIGHTS, BROOKLANDS, WEYBRIDGE, SURREY, ENGLAND, KT13 0XW OR VIA EMAIL TO claims.intl@rccl.com, WITHIN SIX (6) MONTHS FROM THE DATE OF THE INJURY, ILLNESS OR DEATH AND SUIT IS COMMENCED (FILED) WITHIN ONE (1) YEAR FROM THE DATE OF SUCH INJURY, ILLNESS OR DEATH AND PROCESS SERVED WITHIN 120 DAYS AFTER FILING, NOTWITHSTANDING ANY PROVISION OF LAW OF ANY STATE, TERRITORY OR COUNTRY TO THE CONTRARY.

**(ii) FOR ALL OTHER CLAIMS:** NO SUIT SHALL BE MAINTAINABLE AGAINST THE CARRIER, THE VESSEL OR THE TRANSPORT FOR ANY CAUSE OF ACTION ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE CRUISE, CRUISETOUR, LAND TOUR OR TRANSPORT, UNLESS ARBITRATION IS COMMENCED WITHIN ONE (1) YEAR FROM THE DATE SUCH CAUSE AROSE OR BE FOREVER BARRED, NOTWITHSTANDING ANY PROVISION OF LAW OF ANY STATE, TERRITORY OR COUNTRY TO THE CONTRARY.

**c. MANDATORY ARBITRATION OF CERTAIN CLAIMS:** PLEASE READ THIS SECTION 10.c CAREFULLY. IT AFFECTS YOUR AND OUR RIGHTS IF THERE IS A DISPUTE. It requires you and us to resolve most disputes in arbitration after first trying to work them out between you and us. Arbitration is less formal than a lawsuit in court and uses a neutral arbitrator instead of a judge or jury. Discovery is more limited in arbitration than in court. Arbitrators can award the same individualized remedies that a court can award. Their rulings are legally binding and subject to very limited review by courts. Arbitration will take place on an individual basis. Class and representative proceedings are not allowed, and you and we cannot seek, and arbitrators cannot award, relief on behalf of others.

In this Section 10.c only, references to "we" "us", and "our" include Carrier's and/or Operator's past, present, and future parents, subsidiaries, affiliates and joint venturers, as well as our and each of those entities' agents, employees, predecessors, successors, and assigns. In this Section 10.c only, references to "you" and "your" includes Guest, as well as your and each of those person's assignees, heirs, trustees, agents, or other representatives. This Section 10.c does not preclude you or us from bringing issues to the attention of federal, state, or local agencies. Such agencies can, if the law allows, seek relief against you or us on the other's behalf. BY AGREEING TO ARBITRATE, YOU AND WE EACH WAIVE THE RIGHT TO SUE IN COURT, TO TRIAL BY JURY, OR TO PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION. This Section 10.c shall survive termination of this Agreement or any other agreement between you and us.

**EXHIBIT "A"**

(i) **Claims Subject to Arbitration:** Except as otherwise provided in Section 10.c.ii below, any dispute or claim between you and us must be arbitrated. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:

· claims arising out of or relating to this Agreement and/or the Cruise, purchases of other goods or services, or any other aspect of the relationship between you and us, whether based in contract, tort, fraud, misrepresentation, or any other statutory or common-law legal theory;

· claims that arose before this Agreement or any prior agreement between you and us (including, but not limited to, claims relating to advertising or disclosures for any of our products or services);

· claims for mental or emotional distress or injury not arising out of bodily injury;

· claims relating to the retention, protection, use, or transfer of information about you or any of your reservations for any of our products or services;

· claims relating to communications with you, regardless of sender, concerning any of our products or services, including emails and automatically dialed telephone calls and text messages; and

· claims that may arise after the termination of this Agreement and/or the Cruise.

(ii) **Claims Not Subject to Arbitration:** You and we agree that the following disputes or claims cannot be arbitrated:

· claims arising from personal injury, illness or death; and

· disputes over the scope and enforceability of this Section 10.c, whether a dispute or claim can or must be brought in arbitration, or whether Sections 10.c.iv, 10.c.vii, or 10.c.viii have been violated.

These exclusions from arbitration are intended to be interpreted narrowly.

(iii) **Pre-Arbitration Notice of Disputes and Informal Resolution:** Before either you or we commence arbitration, the claimant must first send a written Notice of Dispute to the other ("Notice"). Any such Notice to Carrier must be sent by U.S. mail or professional courier service to Carrier c/o: Legal Department, Royal Caribbean Cruises Ltd., 1050 Caribbean Way, Miami, Florida 33132 ("Notice Address"). Any such Notice to you will be sent to your address on file with your reservation for the Cruise. The Notice must include: (a) the claimant's name, mailing address, email address, and phone number; (b) the claimant's loyalty number (if applicable); (c) reservation number for the Cruise; and (d) onboard folio number (if applicable); (e) a description of the nature and basis of the claim or dispute; and (f) the specific relief sought. The Notice must be personally signed by you (if you are the claimant) or by our business representative (if we are the claimant). Please be advised that we cannot disclose information about your reservation to anyone but you, the Lead Guest or your travel agent (if you or the Lead Guest used a travel agent to book or service your Cruise reservation), unless you provided us with signed, written permission to do so. Accordingly, if you retained an attorney to submit your Notice, please also provide signed written authorization for us to discuss your reservation and share our records regarding you with your attorney.

After the Notice containing all of the information above has been received, within 60 days, either you or we may request an individualized discussion (by telephone or videoconference) regarding settlement ("Informal Settlement Conference"). You and we must work together in good faith to select a mutually agreeable time during business hours for the Informal Settlement Conference (which can be after the 60-day period). You and our business representative must both personally participate in the Informal Settlement Conference, unless otherwise agreed in writing. Your and our lawyers (if any) may also participate.

Any applicable statute of limitations or contractual limitations periods will be tolled during the "Informal Resolution Period," which is the period between the date that a fully complete Notice is received by either you or us and the later of: (i) 60 days later; or (ii) the date an Informal Settlement Conference is completed, if timely requested.

(iv) **Commencing Arbitration:** An arbitration proceeding cannot be commenced until after the Informal Resolution Period has ended. Any court of competent jurisdiction will have authority to enforce this Section 10.c.iv, including the power to enjoin the filing or prosecution of arbitrations without first providing a fully complete Notice and participating in a timely requested Informal Settlement Conference. Any court of competent jurisdiction also may enjoin the assessment or collection of arbitration fees incurred as a result of such arbitrations. Further, unless prohibited by applicable law, the arbitrator shall not accept nor administer any arbitration unless the claimant has complied with the Notice and Informal Settlement Conference requirements of Section 10.c.iii.

(v) **Arbitration Procedure:** The arbitration will be governed by the Consumer Arbitration Rules ("AAA Rules") of the American Arbitration Association ("AAA"), as modified by Section 10.c.iv, and will be administered by the AAA. (If the AAA is unavailable or unwilling to administer arbitrations consistent with this Section 10.c, another arbitration provider shall be selected by mutual agreement or by the court.) The AAA Rules are available online at www.adr.org or by writing to the Notice Address. As in court, you and we agree that any counsel representing someone in arbitration certifies that they will comply with the requirements of Federal Rule of Civil Procedure 11(b), including a certification that the claim or the relief sought is neither frivolous nor brought for an improper purpose. The arbitrator is authorized to impose any sanctions available under that rule, the AAA Rules, or applicable federal or state law against all appropriate represented parties and counsel. The arbitrator may consider rulings in arbitrations involving different claimants against us, but an arbitrator's ruling is not binding in other proceedings. Except as provided in Section 10.c.vii below, the arbitrator shall apply the substantive law that governs this Agreement, set forth in Section 10.a.ii, and can award the same individualized remedies (including punitive and statutory damages and statutory attorney's fees and costs) that a court could award under applicable law. Unless you and we agree otherwise, the arbitration will be decided based on papers submitted by you and us. The arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based.

During the arbitration, the amount of any settlement offer shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which either you or we are entitled.

(vi) **Arbitration Fees:** We will pay all AAA filing, administration, case-management, hearing, and arbitrator fees ("AAA Fees") if we initiate an arbitration. If the aggregate value of your claims is US$750 or less, we will pay all AAA Fees, so long as you have fully complied with the Notice and Informal Settlement Conference requirements in Section 10.c.iii. In such cases, we will pay the filing fee directly to the AAA upon receiving a written request at the Notice Address that you have commenced arbitration or, if the AAA makes you pay the filing fee, we will send that amount to the AAA and request that the AAA reimburse you. If, however, the arbitrator finds that either the substance of your claim or the relief you seek is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the payment of all such fees will be governed by the AAA Rules. If the aggregate value of your claims is US$750 or more, you will pay all AAA Fees. In such cases, you agree to reimburse us for all monies previously disbursed that are otherwise your obligation to pay under the AAA Rules or this Section 10.c.vi. For mass arbitration filings, you agree to pay all administrative fees for AAA to initiate the mediation process for the mass arbitration filings.

(vii) **Requirement of Individual Arbitration:** The arbitrator may award declaratory or injunctive relief only in favor of the individual claimant seeking relief and only to the extent necessary to provide relief warranted by that claimant's individual claim. YOU AND WE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR OUR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING. Further, unless both you and we agree otherwise, the arbitrator may not consolidate the claims of more than one person, and may not otherwise preside over any form of a representative, class, or private attorney general proceeding. If, after exhaustion of all appeals, any of these prohibitions on non-individualized declaratory or injunctive relief; class, representative, and private attorney general proceedings; and consolidation are found to be unenforceable with respect to a particular claim or with respect to a particular request for relief (such as a request for injunctive relief), then that claim or request for relief shall be severed and decided by a court after all other claims and requests for relief have been arbitrated.

(viii) **Mass Arbitrations:** If 25 or more claimants submit Notices or seek to file arbitrations raising similar claims and are represented by the same or coordinated counsel (whether such cases are pursued simultaneously or not), all the cases must be resolved in staged proceedings. You agree to this process even though it may delay the arbitration of your claim. In the first stage, we and claimants' counsel will each select up to 25 cases (50 cases total) to be filed in arbitration and resolved individually by different arbitrators. In the meantime, no other cases may be filed or proceed in arbitration, and the AAA must not assess or demand payment of fees for the remaining cases or administer or accept them.

The arbitrators are encouraged to resolve the cases within 120 days of appointment or as swiftly as possible thereafter, consistent with fairness to the parties. After the first stage is completed, the claimants must engage in a single mediation of all remaining cases, and we will pay the mediation fee. If the remaining claimants and we cannot agree how to resolve the remaining cases after mediation, we and claimants' counsel will repeat the process of selecting and filing up to 50 cases to be resolved individually by different arbitrators, followed by mediation.

If any claims remain after the second stage, the process will be repeated until all claims are resolved, with four differences. First, a total of 100 cases may be filed in the third and later stages. Second, the cases will be randomly selected. Third, arbitrators who decided cases in the first two stages may be appointed in later stages if different arbitrators are not available. Fourth, mediation is optional at the election of counsel for the claimants.

Between stages, counsel will meet and confer regarding ways to improve the efficiency of the staged proceedings, including whether to increase the number of cases filed in each stage. Either party may also negotiate with AAA regarding the amount or timing of AAA fees.

If this Section 10.c.viii applies to a Notice, the Informal Resolution Period for the claims and relief set forth in that Notice will be extended (including the tolling of any applicable statute of limitations or contractual limitations period for the claims and requested relief) until that Notice is selected for a staged proceeding, withdrawn, or otherwise resolved. A court will have the authority to enforce this Section 10.c.viii, including by enjoining the mass filing, the prosecution or administration of arbitrations, or the assessment or collection of AAA fees.

**EXHIBIT "A"**

This Section 10.c.viii and each of its requirements are intended to be severable from the rest of Section 10.c.viii. If, after exhaustion of all appeals, a court decides that the staging process in this Section 10.c.viii is not enforceable, then the cases may be filed in arbitration and the payment of AAA filing, administration, case management, hearing, and arbitrator fees will be assessed as the arbitrations advance and arbitrators are appointed rather than when the arbitrations are initiated.

(ix) **Future Changes to this Section:** Notwithstanding any provision in this Agreement to the contrary, you and we agree that if we make any future change to this Section 10.c (other than a change to the Notice Address), you may reject that change by sending us written notice within thirty (30) days of the first notice of the change to the Notice Address provided above. To be effective, your rejection must include your name, mailing address, email address, phone number, booking reference, and a statement personally signed by you that you wish to reject the change to this Section 10.c. By rejecting that future change, you are agreeing that you will arbitrate any dispute or claim between you and us in accordance with the language of this provision, as amended by any changes that you did not timely reject.

11. SECURITY:

IN THE EVENT OF AN IN REM PROCEEDING AGAINST THE VESSEL, GUEST HEREBY IRREVOCABLY AGREES THAT THE POSTING OF A LETTER OF UNDERTAKING FROM ANY OF CARRIER'S INSURERS SHALL CONSTITUTE AN ADEQUATE AND APPROPRIATE FORM OF SECURITY FOR THE IMMEDIATE RELEASE OF THE VESSEL IN LIEU OF ARREST.

12. LIMITATIONS OF LIABILITY:

a. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, CARRIER SHALL NOT BE LIABLE FOR INJURY, DEATH, ILLNESS, DAMAGE, DELAY OR OTHER LOSS TO PERSON OR PROPERTY, OR ANY OTHER CLAIM BY ANY GUEST CAUSED BY ACT OF GOD, WAR, TERRORISM, CIVIL COMMOTION, LABOR TROUBLE, GOVERNMENT INTERFERENCE, PERILS OF THE SEA, FIRE, ORDERS BY GOVERNMENT AGENCIES RESTRICTING TRAVEL FOR ANY REASON, PUBLIC HEALTH EMERGENCY, OR OUTBREAKS OF COMMUNICABLE DISEASE, INFLUENZA, COVID-19, COLDS AND NOROVIRUS, QUARANTINES, NATIONAL OR REGIONAL EMERGENCIES, THEFTS OR ANY OTHER CAUSE BEYOND CARRIER'S REASONABLE CONTROL, OR ANY ACT NOT SHOWN TO BE CAUSED BY CARRIER'S NEGLIGENCE.

b. GUEST AGREES TO SOLELY ASSUME THE RISK OF INJURY, DEATH, ILLNESS OR OTHER LOSS, AND CARRIER IS NOT RESPONSIBLE FOR GUEST'S USE OF ANY ATHLETIC OR RECREATIONAL EQUIPMENT; OR FOR THE NEGLIGENCE OR WRONGDOING OF ANY INDEPENDENT CONTRACTORS, INCLUDING BUT NOT LIMITED TO PHOTOGRAPHERS, SPA PERSONNEL OR ENTERTAINERS; OR FOR EVENTS TAKING PLACE OFF THE CARRIER'S VESSELS, LAUNCHES OR TRANSPORTS, OR AS PART OF ANY SHORE EXCURSION, TOUR OR ACTIVITY.

c. CARRIER HEREBY DISCLAIMS ALL LIABILITY TO THE GUEST FOR DAMAGES FOR EMOTIONAL DISTRESS, MENTAL SUFFERING OR PSYCHOLOGICAL INJURY OF ANY KIND UNDER ANY CIRCUMSTANCES, WHEN SUCH DAMAGES WERE NEITHER THE RESULT OF A PHYSICAL INJURY TO THE GUEST, NOR THE RESULT OF GUEST HAVING BEEN AT ACTUAL RISK OF PHYSICAL INJURY, NOR WERE INTENTIONALLY INFLICTED BY THE CARRIER. WITHOUT LIMITING THE PRECEDING SENTENCE, IN NO EVENT WILL CARRIER BE LIABLE TO GUEST FOR ANY CONSEQUENTIAL, INCIDENTAL, EXEMPLARY OR PUNITIVE DAMAGES.

d. ON INTERNATIONAL VOYAGES THAT EMBARK OR DISEMBARK IN A PORT OF A EUROPEAN UNION MEMBER STATE AND DO NOT EMBARK, DISEMBARK OR CALL AT ANY U.S. PORT, CARRIER SHALL BE ENTITLED TO ANY AND ALL LIABILITY LIMITATIONS AND IMMUNITIES FOR DEATH AND/OR PERSONAL INJURY AS PROVIDED UNDER EU REGULATION 392/2009 ON THE LIABILITY OF CARRIERS TO GUESTS IN THE EVENT OF ACCIDENTS. ON INTERNATIONAL CRUISES THAT DO NOT EMBARK OR DISEMBARK IN EITHER A PORT IN A EUROPEAN UNION MEMBER STATE OR A U.S. PORT, AND WHICH DO NOT CALL AT ANY U.S. PORT, CARRIER SHALL BE ENTITLED TO ANY AND ALL LIABILITY LIMITATIONS AND IMMUNITIES FOR DEATH AND/OR PERSONAL INJURY AS PROVIDED IN THE ATHENS CONVENTION RELATING TO THE CARRIAGE OF GUESTS AND THEIR LUGGAGE BY SEA, 1974 AND THE PROTOCOL OF 2002 TO THAT CONVENTION (TOGETHER, THE "ATHENS CONVENTION") ON THE LIABILITY OF CARRIERS TO GUESTS IN THE EVENT OF ACCIDENTS. UNDER BOTH EU REGULATION 392/2009 AND THE ATHENS CONVENTION, CARRIER'S LIABILITY IS LIMITED TO NO MORE THAN 400,000 SPECIAL DRAWING RIGHTS ("SDR") PER GUEST (APPROXIMATELY U.S. $552,000) IF THE GUEST PROVES THAT THE INCIDENT WAS A RESULT OF CARRIER'S FAULT OR NEGLECT. AN SDR IS AN INTERNATIONALLY RECOGNIZED MONETARY MEASUREMENT WHOSE VALUE FLUCTUATES DEPENDING ON THE DAILY EXCHANGE RATE AS PUBLISHED BY THE INTERNATIONAL MONETARY FUND AT WWW.IMF.ORG OR IN THE WALL STREET JOURNAL. IF THE LOSS OR DAMAGE WAS CAUSED BY A SHIPPING INCIDENT, DEFINED AS A SHIPWRECK, CAPSIZING, COLLISION OR STRANDING OF THE SHIP, EXPLOSION OR FIRE IN THE SHIP, OR DEFECT IN THE SHIP (AS DEFINED BY THE EU REGULATION AND ATHENS CONVENTION), CARRIER'S LIABILITY IS LIMITED TO NO MORE THAN 250,000 SDRS PER GUEST (APPROXIMATELY U.S. $345,000). COMPENSATION FOR LOSS CAUSED BY A SHIPPING INCIDENT CAN INCREASE TO A MAXIMUM OF 400,000 SDRS PER GUEST (APPROXIMATELY U.S. $552,000) UNLESS CARRIER PROVES THAT THE SHIPPING INCIDENT OCCURRED WITHOUT CARRIER'S FAULT OR NEGLECT. SHIPPING INCIDENTS DO NOT INCLUDE ACTS OF WAR, HOSTILITIES, CIVIL WAR, INSURRECTION, NATURAL DISASTERS, OR INTENTIONAL ACTS OR OMISSIONS OF THIRD PARTIES. IN CASES WHERE THE LOSS OR DAMAGE WAS CAUSED IN CONNECTION WITH WAR OR TERRORISM, CARRIER'S LIABILITY FOR ANY PERSONAL INJURY OR DEATH (WHETHER OCCURRING DURING A SHIPPING INCIDENT OR A NON-SHIPPING INCIDENT) IS LIMITED TO THE LOWER OF 250,000 SDRS PER GUEST (APPROXIMATELY U.S. $345,000) OR 340 MILLION SDRS (APPROXIMATELY U.S. $469,200,000) PER SHIP PER INCIDENT. PUNITIVE DAMAGES ARE NOT RECOVERABLE FOR CRUISES COVERED BY EU REGULATION 392/2009 OR THE ATHENS CONVENTION.

UNDER BOTH EU REGULATION 392/2009 AND THE ATHENS CONVENTION, CARRIER'S LIABILITY FOR LOSS OR DAMAGE TO CABIN LUGGAGE IS LIMITED TO 2,250 SDR (APPROXIMATELY U.S. $3,181).

IN ADDITION, GUESTS EMBARKING A CRUISE IN A EUROPEAN MEMBER STATE PORT ARE AFFORDED RIGHTS UNDER EU REGULATION 1177/2010.

FOR A COPY OF EU REGULATION 392/2009, VISIT HTTPS://EUR-LEX.EUROPA.EU/LEGAL-CONTENT/EN/TXT/PDF/?URI=CELEX:32009R0392&FROM=EN . FOR A COPY OF THE ATHENS CONVENTION AND THE 2002 PROTOCOL THERETO, VISIT HTTPS://TREATIES.UN.ORG/DOC/PUBLICATION/UNTS/VOLUME%201463/VOLUME-1463-I-24817-ENGLISH.PDF AND HTTPS://TREATIES.UN.ORG/DOC/PUBLICATION/UNTS/NO%20VOLUME/24817/A-24817-080000028053BF55.PDF (FULL TEXT IN ENGLISH BEGINS AT PAGE 40). FOR A COPY OF EU REGULATION 1177/2010, VISIT HTTPS://EUR-LEX.EUROPA.EU/LEGAL-CONTENT/EN/TXT/PDF/?URI=CELEX:32010R1177&QID=1643770111876&FROM=EN.

e. INTENTIONALLY OMITTED.

f. EXCEPT IN THE CASE OF PERSONAL INJURY, ILLNESS OR DEATH OF A GUEST, OR WHERE THIS AGREEMENT EXPRESSLY PROVIDES OTHERWISE, GUEST AGREES THAT, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, CARRIER'S AGGREGATE LIABILTY TO GUEST SHALL BE LIMITED TO A FUTURE CRUISE CREDIT NOT TO EXCEED THE VALUE OF THE CRUISE FARE PAID TO CARRIER FOR THE CRUISE OR CRUISETOUR ASSOCIATED WITH SUCH CLAIM.

g. THIRD PARTY BENEFICIARIES

The exclusions and limitations of liability of Carrier set forth in the provisions of this Ticket Contract (including, but not limited to, those contained in this Section 12) as well as all rights, defenses and immunities set forth in this Agreement (including, but not limited to, the forum selection, time limitation, and governing law provisions contained in Section 10) shall also apply to and be for the benefit of certain designated third party beneficiaries which include the parent, subsidiary, affiliate, and successor companies and assigns of all the entities described in Section 2.b above or in this Section 12.g; the officers, directors, employees, agents, crew and pilots of all the entities described in Section 2.b above or in this Section 12.g, and all agents, independent contractors, suppliers, and concessionaires, physicians and medical personnel, retail shop personnel, health and beauty staff, fitness staff, shore excursion providers, tour operators (including, but not limited to, the LTO), shipbuilders, manufacturers and designers of the Vessel or Transport, and/or suppliers and installers of all component parts, launches, appurtenances, craft or facilities, whether provided at sea or on shore, belonging to the Vessel or any substituted ship or Transport, or owned or operated by its owners, operators, managers, agents, charterers, contractors, concessionaires or others; as well as owners and operators of all shoreside properties at which the Vessel or any substituted ship or the Transport may call.

13. FITNESS TO TRAVEL; DENIAL OF BOARDING; MINORS:

**a. Fitness to Travel.** Guest warrants that he and those traveling with him are fit for travel and that such travel will not endanger themselves or others.

**b. Minors.** Any Guest under the age of eighteen (18) shall be considered a minor and must travel with a parent or legal guardian or such other person as may be permitted by Carrier's policies.

**c. Minimum Age.** No Guest under the age of twenty-one (21) will consume any alcoholic beverages while on board the Vessel or Transport except as may be permitted by Carrier's policy. No Guest under the age of twenty-one (21) will be booked in a stateroom unless accompanied by an adult twenty-one (21) years of age or older, except for minors sailing with their parents or guardians in adjacent staterooms, or for under-aged married couples (proof of marriage is required) or except as otherwise permitted by Carrier's policy. Carrier reserves the right to request proof of age at any time and Guest's age on the date of sailing determines his or her status for the entire cruise vacation. The accompanying adult Guest also agrees that, under no circumstances will a minor be left aboard the Vessel, except in the supervision of a Vessel-organized minor care program, while the adult Guest leaves the Vessel.

**d. Pregnancy and Infants.** Pregnant women who will enter the twenty-fourth (24th) week or more of estimated fetal gestational age at any time during the Cruise or CruiseTour will be ineligible to sail, and agree not to book the cruise or board the Vessel or Transport under any circumstances. No infants under a specific age (at least six (6) months for most cruises but twelve (12) months for other cruises) shall be booked on a cruise or CruiseTour, nor brought onboard the Vessel or Transport by any Guest under any circumstances. The most current minimum age requirements are available online at https://www.CelebrityCruises.com.

**e. Special Needs.** Any Guest with mobility, communication or other impairments, or other special or medical needs that may require medical care or special accommodations during the cruise or CruiseTour, is strongly advised to notify Carrier of any such condition at the time of booking. Any Guest using a service animal must notify the Carrier at the time of booking. Guest agrees to accept responsibility and reimburse Carrier for any loss, damage or expense whatsoever related to the presence of any service animal brought on board the Vessel or Transport. Guests acknowledge and understand that certain international safety requirements, shipbuilding standards, and/or applicable regulations involving design, construction or operation of the Vessel may restrict access to facilities or activities for persons with mobility, communication or other impairments

EXHIBIT "A"

or special needs. Guests requiring the use of a wheelchair must provide their own wheelchair that must be of a size and type that can be accommodated on the Vessel, as wheelchairs carried on board are for emergency use only.

Carrier's ability to accommodate Guests with special needs or medical needs onboard Vessels sailing in the Galapagos Islands is very limited. These vessels do not offer accessible staterooms, they cannot accommodate wheelchair-bound Guests, and service animals are not permitted onboard. Animals, including service animals, are not permitted in the Galapagos Islands.

**f. Policy Violations.** Carrier shall have the right to deny boarding for violations of Carrier's Refusal to Transport Policy, Carrier's Guest Health, Safety and Conduct Policy or any of the policies set forth in this Section 13. If Carrier exercises its rights under this Section 13 for violations of policy, Guest shall have no claim against Carrier whatsoever and Carrier shall have no liability for refund, compensation loss or damages of Guest, including but not limited to any expenses incurred by Guest for accommodations or repatriation.

**g. Recreational Water Facilities.** Our recreational water facilities do not have a lifeguard on duty. Children must be supervised by a parent or legal guardian at all times while in the pools, whirlpools and other recreational water feature areas.

14. ONBOARD ACTIVITIES RISK DISCLOSURE AND ACKNOWLEDGMENT:

Guest agrees to read the descriptions below of activities onboard the Vessel before boarding the Vessel. Participation in the onboard activities is voluntary. Not all activities are available on all vessels. Guest agrees and acknowledges there may be a risk when participating in the activities described below. In addition to reading the warning and acknowledgement of risk below, Guest agrees to read warning signs onboard the Vessel and convey both the warning and acknowledgment of risk below and warning signs onboard to every Guest named in their booking, including minors.

Guests may engage in supervised or unsupervised sporting activities including but not limited to, basketball, volleyball, soccer, and pickleball. Guests must consider their own physical fitness and ability before participating. Guests must wear footwear and clothing appropriate for the activity and follow posted rules or direction of staff. Rules, equipment, and activity areas may not be regulation. Age restrictions may apply for certain activities or competitions.

<u>WARNING/ACKNOWLEDGMNENT OF RISK</u>: THE ACTIVITIES LISTED ABOVE ARE ALL VOLUNTARY AND ARE NOT SUITABLE FOR ALL GUESTS. YOU OR YOUR CHILDREN MAY SUFFER MINOR OR SERIOUS PHYSICAL INJUR(IES) OR DEATH. THE RISKS OF INJURY INCLUDE (BUT ARE NOT LIMITED TO): BROKEN BONES, FRACTURES, CONCUSSIONS, DIZZINESS, MOTION SICKNESS, DISLOCATIONS, CONTUSIONS, TORN LIGAMENTS AND TENDONS, SPRAINS AND STRAINS, CUTS TO THE HEAD, BODY AND/OR LIMBS, BUMPS AND BRUISES, PROPERTY LOSS OR DAMAGE, ABRASIONS AND/OR LACERATIONS. ALTHOUGH RARE, CATASTROPHIC INJURIES MAY OCCUR, AND COULD INCLUDE PERMANENT DISABILITY, SPINAL INJURY, PARALYSIS, OR DEATH. PARTICIPANTS ELECT TO VOLUNTARILY PARTICIPATE IN THE ACTIVITY(IES) WITH FULL KNOWLEDGE AND ACCEPTANCE OF ANY AND ALL RISKS ASSOCIATED WITH THE ACTIVITY AND IDENTIFIED ABOVE. PARENTS AND LEGAL GUARDIANS TRAVELLING WITH MINOR CHILDREN WHO ENGAGE IN THE ACTIVITY ARE DEEMED TO HAVE WARNED THE CHILDREN OF THESE RISKS AND ASSUMED THE RISK ON THE CHILD'S BEHALF.

15. USE OF PHOTOS, VIDEOS OR RECORDINGS:

**a. Capture and Use of Likeness.** Guest hereby grants to Carrier, and others working for Carrier or on its behalf, the unrestricted right and permission to visually and audiovisually record, capture, photograph Guest's name, likeness, silhouette, photograph, picture, voice, actions, conversations, statements, appearances, biographical data, monikers, signature, endorsement, social media handles, any performance of any musical compositions, and/or other distinctive attributes of any kind related to Guest and certain other intellectual property rights and characteristics and so-called publicity rights (collectively, "Likeness") and any result of Guest's appearance in any manner that Carrier desires, including but not limited to during or in connection with the Cruise or CruiseTour. Guest further grants Carrier, its parent, subsidiary and affiliated companies, and their respective agents, affiliates, legal representatives, and others working for them or on their behalf, and their respective licensors, licensees, successors or assigns (collectively with Carrier the "Grantees") the full, irrevocable, exclusive and unrestricted right to use, print, produce, publish, copy, display, perform, exhibit, transmit, broadcast, disseminate, market, advertise, sell, lease, license (with the right to sublicense), transfer, create derivative works from, publicly display and otherwise exploit Guest's Likeness, in whole or in part, severally or in connection with any and all photographs, films, and/or other recordings taken and/or made of or by me in connection with the Cruise or CruiseTour (the "Materials") on a perpetual, worldwide, royalty-free basis, in any and all media now known or hereinafter devised, for any lawful purpose whatsoever including but not limited to in connection with the advertising, promotion, marketing and publicity of the Grantees, and to permit others to do the same, which right shall include the full right and permission to edit, change or substitute any and all captions or photos Guest may use, take or post in connection with this Agreement.

**b. Ownership of Materials.** Carrier shall exclusively own all now known or hereafter existing intellectual property rights and interests (including the copyright, and all other allied and/or ancillary rights and interests) of every kind throughout the universe, in perpetuity and in all languages, pertaining to the Materials and any other results and proceeds hereunder (such "Results and Proceeds", including, without limitation, all copyrights and renewals and extensions thereof). If under applicable law the foregoing is not effective to place authorship and ownership thereof and all rights in the Results and Proceeds in Carrier, then by way of assignment and transfer of present and future copyright and otherwise, Guest hereby irrevocably grants, transfers, sells, and assigns to Carrier, all right, title and interest therein, whether now in existence or hereafter created, including, without limitation, all rights of ownership and authorship in and to the Results and Proceeds and all versions thereof throughout the universe and in perpetuity to Carrier (or its designee). Without limiting the generality of the foregoing, Guest hereby grants Carrier the right to change, add to, take from, translate, reformat, or reprocess the Results and Proceeds in any manner Carrier may in its sole discretion determine.

**c. Carrier Consent Required.** Guest hereby agrees that any recording (whether audio or video or otherwise) or photograph of Guest, other guests, crew or third parties created or made during or in connection with the Cruise or CruiseTour, or depicting the Vessel, its design, equipment or otherwise, shall not be used for any commercial purpose, in any media broadcast or for any other nonprivate use without the express prior written consent of Carrier in each instance.

16. LEAD GUEST; YOUR TRAVEL AGENT:

**a. Lead Guest.** Lead Guest shall be responsible for the administration of, and correspondence with respect to, the Cruise or CruiseTour booking for all purposes, whether communicating with Carrier directly or through a travel agent. Lead Guest represents and warrants to Cruise Line that they have the requisite authority to make the booking, including any amendments and/or cancellations thereto, on behalf of each Guest named in the booking. By making a Cruise or CruiseTour booking, Lead Guest is deemed to have read, understood and agreed to this Agreement on behalf of themselves and each Guest named in the booking. The Lead Guest shall be responsible and liable for the: (a) full payment of any deposits and balances due; (b) confirmation and provision of details for each Guest named in the booking (including anyone who is later added or substituted); and (c) the prompt communication to each Guest named in the booking of any information issued by Cruise Line, including, without limitation, a copy of any booking confirmations, invoices and this Agreement. If Lead Guest utilizes a travel agent in connection with the Cruise booking, Lead Guest's travel agent shall undertake the foregoing on Lead Guest's behalf.

**b. Travel Agent.** Guest acknowledges and confirms that any travel agent utilized by themselves or by the Lead Guest in connection with booking the Cruise and/or issuance of this Ticket Contract is, for all purposes, Guest's agent and Carrier shall not be liable for any representation made by said travel agent. Guest shall remain liable at all times to Carrier for the price of passage. Guest understands and agrees that receipt of this Ticket Contract or any other information or notices by Guest's travel agent or the Lead Guest shall be deemed receipt by Guest as of the date of receipt by the travel agent or Lead Guest. Guest acknowledges that Carrier is not responsible for the financial condition or integrity of any travel agent.

17. SEVERABILITY:

Any provision of this Agreement that is determined in any jurisdiction to be unenforceable for any reason shall be deemed severed from this Agreement in that jurisdiction only and all remaining provisions shall remain in full force and effect.

18. TRANSFERS AND ASSIGNMENTS:

This Ticket Contract may not be assigned, sold or otherwise transferred by the Guest. Among other things, this means that the Guest cannot sell or transfer this Ticket Contract to someone else, and Carrier shall not be liable to the Guest or any other person in possession of a Ticket Contract for honoring or refunding such Ticket Contract when presented by such other person. Carrier may assign, convey or transfer its rights in this Agreement to any parent, subsidiary or affiliate of Carrier who is scheduled to operate the Vessel at the time of the Cruise.

19. RELATIONSHIP TO OTHER PURCHASES; GLOBAL PURCHASE TERMS AND CONDITIONS:

To the extent permitted or required by law, this Agreement also covers Carrier's CruiseCare® travel protection products, and any shore excursions, land and hotel packages purchased through Celebrity Cruises Inc., or RCL Cruises Ltd.

Please note that the purchase of any goods or services, other than the Cruise or CruiseTour, whether purchased on the Vessel or off, made through Celebrity Cruises Inc., or RCL Cruises Ltd., are also subject to Celebrity Cruises' Global Purchase Terms and Conditions. Such goods and services include, but are not limited to, shore excursions, transportation, air arrangements, tours, hotels, restaurants, attractions and other similar activities or services. Any dispute or claim arising out of the purchase of, or participation in, such goods or services must be brought against the independent contractor providing, owning and/or operating such services, conveyances, products or facilities. For a copy of the Global Purchase Terms and Conditions please visit https://www.celebritycruises.com/guest-terms/. NOTWITHSTANDING ANY PROVISIONS OF THE GLOBAL PURCHASE TERMS AND CONDITIONS, ANY AND ALL DISPUTES OR CLAIMS MADE AGAINST CARRIER MUST BE BROUGHT IN ACCORDANCE WITH THE FORUM SELECTION, GOVERNING LAW, AND OTHER LIMITATION PROVISIONS SET FORTH IN THIS AGREEMENT.

**EXHIBIT "A"**

20. OPERATOR:

Depending upon the Cruise, the Operator for a Celebrity Cruises sailing shall be one of the following entities:

- Celebrity Cruises Inc., 1050 Caribbean Way, Miami, Florida, U.S.A., 33132
- RCL Cruises Ltd., Building 7, The Heights, Brooklands, Weybridge, Surrey, England, KT13 0XW
- Islas Galapagos Turismo y Vapores C.A., Av. Naciones Unidas E2-30 y Nuñez de Vela, edificio Metropolitan, Office 14-04, Quito, Ecuador
- Oceanadventures S.A., Av. Naciones Unidas E2-30 y Nuñez de Vela, edificio Metropolitan, Office 14-04, Quito, Ecuador

The Operator of your Cruise will be indicated on your booking invoice.

C(CAN)DEC2023

© 2025 Celebrity Cruises®

EXHIBIT "A"

# EXHIBIT "B"

Celebrity X Cruises

‹ Go Back

# Primary Country of Residence

The Cruise Ticket Contract and/or Booking Conditions applicable to your cruise with Celebrity Cruises is based on YOUR PRIMARY COUNTRY OF RESIDENCE. Your Primary Country of Residence for purposes of determining the applicable Cruise Ticket Contract and/or Booking Conditions means the country where you primarily reside at the time of booking the cruise as indicated by you, your agent, or other representative at the time of booking the cruise or at online check-in. This applies to each guest on a booking on an individual basis.

Please select your Primary Country of Residence below to view the applicable Cruise Ticket Contract or Booking Conditions. If your Primary Country of Residence is not listed, please use the "All Other Locations" option.

**Please Select Your Primary Country of Residence**

- United States
- United Kingdom
- Ireland
- Canada

**EXHIBIT "B"**

# EXHIBIT "C"

Celebrity Cruises

‹ Go Back

# Canada

## Cruise Ticket Contract

ENGLISH › FRENCH (COMING SOON) ›

## Resale Cruise Ticket Contract*

*For guests who: (1) purchased their cruise from an unrelated third party that arranged the cruise program and collected payment from the guest, per the third party's own terms and conditions of sale, or (2) received passage on the cruise from an unrelated third party that arranged the cruise program. These two scenarios are sometimes colloquially referred to as a "charter."

ENGLISH › FRENCH ›

**IMPORTANT NOTICE TO GUESTS:** The Cruise Ticket Contract or Booking Conditions contain important limitations on the rights of passengers, including provisions relating to limitation of liability, forum selection, governing law, and the use of alternative dispute resolution to resolve certain types of disputes. Any dispute or claim that is related to your cruise must be brought in the venue and under the law as stated in the Cruise Ticket Contract or Booking Conditions.

Please read the applicable Cruise Ticket Contract or Booking Conditions carefully and download and save a copy to retain for your records. If you have questions about which Cruise Ticket Contract or Booking Conditions apply to your booking or if you have questions about translations, please speak to your travel agent or your local RCG representative.

**EXHIBIT "C"**

# EXHIBIT "D"

Courts and
Tribunals Judiciary

Menu ▾



**September 15, 2021**

# Remote hearings guidance to help the Business and Property Courts

Chancery Division (https://www.judiciary.uk/subjects/chancery-division/)

Circuit Commercial Court (https://www.judiciary.uk/subjects/circuit-commercial-court/)

Commercial Court (https://www.judiciary.uk/subjects/commercial-court/)

News (https://www.judiciary.uk/news-types/news/)

The following practical measures will (with the authorisation and approval of the Chancellor of the High Court and the Judges in Charge of the Commercial Court and the Technology and Construction Courts) remain in place until further notice, to assist the courts of the Business and Property Courts to deal with their business as efficiently as possible:

**EXHIBIT "D"**

# Mode of hearing

While the mode of hearing is ultimately a judicial decision, the default position for all hearings under half a day will be for such hearings to take place remotely. The Court will consider a live hearing in such cases only if there is a particular reason why an in person hearing is more appropriate. Such hearings include:
– The Chancery Division's Applications Court
– The Commercial Court and Technology and Construction Court's Friday applications lists
– Adjudication enforcement in the Technology and Construction Court.

The approach in relation to longer application hearings and trials will be a matter for decision by a judge on the facts of each case.
– Parties will be asked by the Listing Office to express a preference (supported by reasons), with the final decision as to the appropriate mode of hearing being referred to a judge.
– The decision on whether to make any such direction will always be a discretionary judicial decision. The overall criterion must be the interests of justice in all the circumstances of the case. This criterion will produce a range of different answers in different cases.
– Remote and hybrid hearings may cover a full menu of options, from proceedings that are fully remote and accessible live to anyone who is in possession of a link, down to proceedings to which remote access is afforded to a single participant, everyone else being in court.

# Bundles

For the foreseeable future the default format for bundles will be electronic bundles. Hard copy bundles should not be lodged unless they have been requested by the judge

**EXHIBIT "D"**

hearing the case.
– Parties are reminded of the guidance online (PDF). This document sets out the Court's requirements as to default view, resolution and page numbering.
– Parties are particularly reminded that text on all pages must be selectable to facilitate comments and highlights to be imposed on the text by the judge.

**Did you find what you were looking for?**

## Help and information

Accessibility Statement (https://www.judiciary.uk/accessibility/)

Complaints (https://www.judiciary.uk/complaints/)

Contacts (https://www.judiciary.uk/contacts/)

Cookies (https://www.judiciary.uk/cookies/)

Copyright (https://www.judiciary.uk/copyright/)

Data Privacy Notices (https://www.judiciary.uk/data-privacy-notices/)

Terms and conditions (https://www.judiciary.uk/terms-conditions/)

## Related Bodies

Judicial Office (https://www.judiciary.uk/about-the-judiciary/training-support/judicial-office/)

Judicial Conduct Investigations Office (https://www.judiciary.uk/related-offices-and-bodies/judicial-conduct-investigations-office/)

Judicial Appointments Commission (https://www.judiciary.uk/judicial-appointments-commission/)

Representative bodies (https://www.judiciary.uk/related-offices-and-bodies/representative-bodies/)

Sentencing Council (external link) (https://www.sentencingcouncil.org.uk/)

## Follow

Facebook (https://www.facebook.com/judiciaryuk/)

Instagram (https://www.instagram.com/judicialoffice/)

Twitter (https://twitter.com/judiciaryUK)

## Sign up for email alerts

**EXHIBIT "D"**

Email

**Sign Up**

© Copyright Judiciary 2026

EXHIBIT "D"

# EXHIBIT "E"

# PART 32 – EVIDENCE

Contents of this Part



| Title | Number |
|---|---|
| Power of court to control evidence | Rule 32.1 |
| Evidence of witnesses – general rule | Rule 32.2 |
| Evidence by video link or other means | Rule 32.3 |



**EXHIBIT "E"**

| | |
|---|---|
| Requirement to serve witness statements for use at trial | Rule 32.4 |
| Use at trial of witness statements which have been served | Rule 32.5 |
| Evidence in proceedings other than at trial | Rule 32.6 |
| Order for cross-examination | Rule 32.7 |
| Form of witness statement | Rule 32.8 |
| Witness summaries | Rule 32.9 |
| Consequence of failure to serve witness statement or summary | Rule 32.10 |
| Cross-examination on a witness statement | Rule 32.11 |
| Use of witness statements for other purposes | Rule 32.12 |
| Availability of witness statements for inspection | Rule 32.13 |
| False statements | Rule 32.14 |
| Affidavit evidence | Rule 32.15 |
| Form of affidavit | Rule 32.16 |
| Affidavit made outside the jurisdiction | Rule 32.17 |
| Notice to admit facts | Rule 32.18 |
| Notice to admit or produce documents | Rule 32.19 |
| Notarial acts and instruments | Rule 32.20 |


## Power of court to control evidence

**32.1**

(1) The court may control the evidence by giving directions as to –

(a) the issues on which it requires evidence;

**EXHIBIT "E"**

(b) the nature of the evidence which it requires to decide those issues; and

(c) the way in which the evidence is to be placed before the court.

(2) The court may use its power under this rule to exclude evidence that would otherwise be admissible.

(3) The court may limit cross-examination(GL).

To the top ▲

## Evidence of witnesses – general rule

**32.2**

(1) The general rule is that any fact which needs to be proved by the evidence of witnesses is to be proved –

(a) at trial, by their oral evidence given in public; and

(b) at any other hearing, by their evidence in writing.

(2) This is subject –

(a) to any provision to the contrary contained in these Rules or elsewhere; or

(b) to any order of the court.

(3) The court may give directions –

(a) identifying or limiting the issues to which factual evidence may be directed;

(b) identifying the witnesses who may be called or whose evidence may be read; or

(c) limiting the length or format of witness statements.

To the top ▲

## Evidence by video link or other means

**32.3** The court may allow a witness to give evidence through a video link or by other means.

EXHIBIT "E"

To the top ▲

## Requirement to serve witness statements for use at trial

**32.4**

(1) A witness statement is a written statement signed by a person which contains the evidence which that person would be allowed to give orally.

(2) The court will order a party to serve on the other parties any witness statement of the oral evidence which the party serving the statement intends to rely on in relation to any issues of fact to be decided at the trial.

(3) The court may give directions as to –

(a) the order in which witness statements are to be served; and

(b) whether or not the witness statements are to be filed.

To the top ▲

## Use at trial of witness statements which have been served

**32.5**

(1) If –

(a) a party has served a witness statement; and

(b) he wishes to rely at trial on the evidence of the witness who made the statement,

he must call the witness to give oral evidence unless the court orders otherwise or he puts the statement in as hearsay evidence.

(Part 33 contains provisions about hearsay evidence)

(2) Where a witness is called to give oral evidence under paragraph (1), his witness statement shall stand as his evidence in chief(GL) unless the court orders otherwise.

(3) A witness giving oral evidence at trial may with the permission of the court –

**EXHIBIT "E"**

(a) amplify his witness statement; and

(b) give evidence in relation to new matters which have arisen since the witness statement was served on the other parties.

(4) The court will give permission under paragraph (3) only if it considers that there is good reason not to confine the evidence of the witness to the contents of his witness statement.

(5) If a party who has served a witness statement does not–

(a) call the witness to give evidence at trial; or

(b) put the witness statement in as hearsay evidence, any other party may put the witness statement in as hearsay evidence.

To the top ▲

## Evidence in proceedings other than at trial

**32.6**

(1) Subject to paragraph (2), the general rule is that evidence at hearings other than the trial is to be by witness statement unless the court, a practice direction or any other enactment requires otherwise.

(2) At hearings other than the trial, a party may, rely on the matters set out in –

(a) his statement of case; or

(b) his application notice, if the statement of case or application notice is verified by a statement of truth.

To the top ▲

## Order for cross-examination

**32.7**

(1) Where, at a hearing other than the trial, evidence is given in writing, any party may apply to the court for permission to cross-examine the person giving the evidence.

**EXHIBIT "E"**

(2) If the court gives permission under paragraph (1) but the person in question does not attend as required by the order, his evidence may not be used unless the court gives permission.

To the top ▲

## Form of witness statement

**32.8** A witness statement must comply with the requirements set out in Practice Direction 32.

(Part 22 requires a witness statement to be verified by a statement of truth)

To the top ▲

## Witness summaries

**32.9**

(1) A party who –

(a) is required to serve a witness statement for use at trial; but

(b) is unable to obtain one, may apply, without notice, for permission to serve a witness summary instead.

(2) A witness summary is a summary of –

(a) the evidence, if known, which would otherwise be included in a witness statement; or

(b) if the evidence is not known, the matters about which the party serving the witness summary proposes to question the witness.

(3) Unless the court orders otherwise, a witness summary must include the name and address of the intended witness.

(4) Unless the court orders otherwise, a witness summary must be served within the period in which a witness statement would have had to be served.

(5) Where a party serves a witness summary, so far as practicable rules 32.4 (requirement to serve witness statements for use at trial), 32.5(3) (amplifying witness statements), and 32.8 (form of witness statement) shall apply to the summary.

To the top ▲

**EXHIBIT "E"**

PART 32 – EVIDENCE – Civil Procedure Rules – Justice UK

## Consequence of failure to serve witness statement or summary

**32.10** If a witness statement or a witness summary for use at trial is not served in respect of an intended witness within the time specified by the court, then the witness may not be called to give oral evidence unless the court gives permission.

To the top ▲

## Cross-examination on a witness statement

**32.11** Where a witness is called to give evidence at trial, he may be cross-examined on his witness statement whether or not the statement or any part of it was referred to during the witness's evidence in chief(GL).

To the top ▲

## Use of witness statements for other purposes

**32.12**

(1) Except as provided by this rule, a witness statement may be used only for the purpose of the proceedings in which it is served.

(2) Paragraph (1) does not apply if and to the extent that–

(a) the witness gives consent in writing to some other use of it;

(b) the court gives permission for some other use; or

(c) the witness statement has been put in evidence at a hearing held in public.

(3) This rule applies to affidavits in the same way as it applies to witness statements.

To the top ▲

## Availability of witness statements for inspection

**32.13**

EXHIBIT "E"

(1) A witness statement which stands as evidence in chief(GL) is open to inspection during the course of the trial unless the court otherwise directs.

(2) Any person may ask for a direction that a witness statement is not open to inspection.

(3) The court will not make a direction under paragraph (2) unless it is satisfied that a witness statement should not be open to inspection because of –

(a) the interests of justice;

(b) the public interest;

(c) the nature of any expert medical evidence in the statement;

(d) the nature of any confidential information (including information relating to personal financial matters) in the statement; or

(e) the need to protect the interests of any child or protected party.

(4) The court may exclude from inspection words or passages in the statement.

To the top ▲

## False statements

**32.14**

Proceedings for contempt of court may be brought against a person who makes or causes to be made a false statement in a document, prepared in anticipation of or during proceedings and verified by a statement of truth, without an honest belief in its truth.

(Part 22 makes provision for statements of truth.)

(Part 81 contains provisions in relation to proceedings for contempt of court.)

To the top ▲

## Affidavit evidence

**32.15**

**EXHIBIT "E"**

(1) Evidence must be given by affidavit(GL) instead of or in addition to a witness statement if this is required by the court, a provision contained in any other rule, a practice direction or any other enactment.

(2) Nothing in these Rules prevents a witness giving evidence by affidavit at a hearing other than the trial if he chooses to do so in a case where paragraph (1) does not apply, but the party putting forward the affidavit may not recover the additional cost of making it from any other party unless the court orders otherwise.

(Rule 32.12 makes provision about the use of affidavits for purposes other than the proceedings in which they are served.)

To the top ▲

## Form of affidavit

**32.16** An affidavit(GL) must comply with the requirements set out in Practice Direction 32.

To the top ▲

## Affidavit made outside the jurisdiction

**32.17** A person may make an affidavit(GL) outside the jurisdiction in accordance with –

(a) this Part; or

(b) the law of the place where he makes the affidavit.

To the top ▲

## Notice to admit facts

**32.18**

(1) A party may serve notice on another party requiring him to admit the facts, or the part of the case of the serving party, specified in the notice.

(2) A notice to admit facts must be served no later than 21 days before the trial.

(3) Where the other party makes any admission in response to the notice, the admission may be used against him only –

(a) in the proceedings in which the notice to admit is served; and

**EXHIBIT "E"**

(b) by the party who served the notice.

(4) The court may allow a party to amend or withdraw any admission made by him on such terms as it thinks just.

To the top ▲

## Notice to admit or produce documents

**32.19**

(1) A party shall be deemed to admit the authenticity of a document disclosed to him under Part 31 (disclosure and inspection of documents) unless he serves notice that he wishes the document to be proved at trial.

(2) A notice to prove a document must be served –

(a) by the latest date for serving witness statements; or

(b) within 7 days of disclosure of the document, whichever is later.

To the top ▲

## Notarial acts and instruments

**32.20** A notarial act or instrument may be received in evidence without further proof as duly authenticated in accordance with the requirements of law unless the contrary is proved.

To the top ▲

Updated: Wednesday, 14 April 2021

Accessibility

Cookies

**EXHIBIT "E"**

Contacts

Copyright

Help

Privacy

Webchats

Website queries

## Citizen and business advice

For citizen and business advice on justice, rights and more visit GOV.UK

© Crown copyright

EXHIBIT "E"

# EXHIBIT "F"

# ANNEX 3

## VIDEO CONFERENCING GUIDANCE

This guidance is for the use of video conferencing (VCF) in civil proceedings. It is in part based, with permission, upon the protocol of the Federal Court of Australia. It is intended to provide a guide to all persons involved in the use of VCF, although it does not attempt to cover all the practical questions which might arise.

## Video conferencing generally

**1.** The guidance covers the use of VCF equipment both (a) in a courtroom, whether via equipment which is permanently placed there or via a mobile unit, and (b) in a separate studio or conference room. In either case, the location at which the judge sits is referred to as the 'local site'. The other site or sites to and from which transmission is made are referred to as 'the remote site' and in any particular case any such site may be another courtroom. The guidance applies to cases where VCF is used for the taking of evidence and also to its use for other parts of any legal proceedings (for example, interim applications, case management conferences, pre-trial reviews).

**2.** VCF may be a convenient way of dealing with any part of proceedings: it can involve considerable savings in time and cost. Its use for the taking of evidence from overseas witnesses will, in particular, be likely to achieve a material saving of costs, and such savings may also be achieved by its use for taking domestic evidence. It is, however, inevitably not as ideal as having the witness physically present in court. Its convenience should not therefore be allowed to dictate its use. A judgment must be made in every case in which the use of VCF is being considered not only as to whether it will achieve an overall cost saving but as to whether its use will be likely to be beneficial to the efficient, fair and economic disposal of the litigation. In particular, it needs to be recognised that the degree of control a court can exercise over a witness at the remote site is or may be more limited than it can exercise over a witness physically before it.

**3.** When used for the taking of evidence, the objective should be to make the VCF session as close as possible to the usual practice in a trial court where evidence is taken in open court. To gain the maximum benefit, several differences have to be taken into account. Some matters, which are taken for granted when evidence is taken in the conventional way, take on a different dimension when it is taken by VCF: for example, the administration of the oath, ensuring that the witness understands who is at the local site and what their various roles are, the raising of any objections to the evidence and the use of documents.

**4.** It should not be presumed that all foreign governments are willing to allow their nationals or others within their jurisdiction to be examined before a court in England or Wales by means of VCF. If there is any doubt about this, enquiries should be directed to the Foreign, Commonwealth and Development Office (Public Facing Services, Taking of Evidence Team) TOE.Enquiries@fcdo.gov.uk with a view to ensuring that the country from which the evidence is to be taken raises no objection

**EXHIBIT "F"**

to it at diplomatic level. The party who is directed to be responsible for arranging the VCF (see paragraph 8 below) will be required to make all necessary inquiries about this well in advance of the VCF and must be able to inform the court what those inquiries were and of their outcome.

**5.** Time zone differences need to be considered when a witness abroad is to be examined in England or Wales by VCF. The convenience of the witness, the parties, their representatives and the court must all be taken into account. The cost of the use of a commercial studio is usually greater outside normal business hours.

**6.** Those involved with VCF need to be aware that, even with the most advanced systems currently available, there are the briefest of delays between the receipt of the picture and that of the accompanying sound. If due allowance is not made for this, there will be a tendency to 'speak over' the witness, whose voice will continue to be heard for a millisecond or so after he or she appears on the screen to have finished speaking.

**7.** With current technology, picture quality is good, but not as good as a television picture. The quality of the picture is enhanced if those appearing on VCF monitors keep their movements to a minimum.

To the top

## Preliminary arrangements

**8.** The court's permission is required for any part of any proceedings to be dealt with by means of VCF. Before seeking a direction, the applicant should notify the listing officer, diary manager or other appropriate court officer of the intention to seek it, and should enquire as to the availability of court VCF equipment for the day or days of the proposed VCF. The application for a direction should be made to the Master, District Judge or Judge, as may be appropriate. If all parties consent to a direction, permission can be sought by letter, fax or e-mail, although the court may still require an oral hearing. All parties are entitled to be heard on whether or not such a direction should be given and as to its terms. If a witness at a remote site is to give evidence by an interpreter, consideration should be given at this stage as to whether the interpreter should be at the local site or the remote site. If a VCF direction is given, arrangements for the transmission will then need to be made. The court will ordinarily direct that the party seeking permission to use VCF is to be responsible for this. That party is hereafter referred to as 'the VCF arranging party'.

**9.** Subject to any order to the contrary, all costs of the transmission, including the costs of hiring equipment and technical personnel to operate it, will initially be the responsibility of, and must be met by, the VCF arranging party. All reasonable efforts should be made to keep the transmission to a minimum and so keep the costs down. All such costs will be considered to be part of the costs of the proceedings and the court will determine at such subsequent time as is convenient or appropriate who, as between the parties, should be responsible for them and (if appropriate) in what proportions.

**10.** The local site will, if practicable, be a courtroom but it may instead be an appropriate studio or conference room. The VCF arranging party must contact the listing officer, diary manager or other appropriate officer of the court which made the VCF direction and make arrangements for the VCF transmission. Details of the remote site, and of the equipment to be used both at the local site (if not being supplied by the court) and the remote site (including the number of ISDN lines and connection speed), together with all necessary contact names and telephone numbers, will have to be provided to the listing officer, diary manager or other court officer. The court will need to be satisfied that any equipment provided by the parties for use at the local site and also that at the remote site is of sufficient quality for a satisfactory transmission. The VCF arranging party must ensure that an appropriate person will be present at the local site to supervise the operation of the VCF throughout the transmission in order to deal with any technical problems. That party must also arrange for a technical assistant to be similarly present at the remote site for like purposes.

**11.** It is recommended that the judge, practitioners and witness should arrive at their respective VCF sites about 20 minutes prior to the scheduled commencement of the transmission.

**12.** If the local site is not a courtroom, but a conference room or studio, the judge will need to determine who is to sit where. The VCF arranging party must take care to ensure that the number of microphones is adequate for the speakers and that the panning of the camera for the practitioners' table encompasses all legal representatives so that the viewer can see everyone seated there.

**13.** The proceedings, wherever they may take place, form part of a trial to which the public is entitled to have access (unless the court has determined that they should be heard in private). If the local site is to be a studio or conference room, the VCF arranging party must ensure that it provides sufficient accommodation to enable a reasonable number of members of the public to attend.

**14.** In cases where the local site is a studio or conference room, the VCF arranging party should make arrangements, if practicable, for the royal coat of arms to be placed above the judge's seat.

**15.** In cases in which the VCF is to be used for the taking of evidence, the VCF arranging party must arrange for recording equipment to be provided by the court which made the VCF direction so that the evidence can be recorded. An associate will normally be present to operate the recording equipment when the local site is a courtroom. The VCF arranging party should take steps to ensure that an associate is present to do likewise when it is a studio or conference room. The equipment should be set up and tested before the VCF transmission. It will often be a valuable safeguard for the VCF arranging party also to arrange for the provision of recording equipment at the remote site. This will provide a useful back-up if there is any reduction in sound quality during the transmission. A direction from the court for the making of such a back-up recording must, however, be obtained first. This is because the proceedings are court proceedings and, save as directed by the court, no other recording of them must be made. The court will direct what is to happen to the back-up recording.

**16.** Some countries may require that any oath or affirmation to be taken by a witness accord with local custom rather than the usual form of oath or affirmation used in England and Wales. The VCF arranging party must make all appropriate prior inquiries and put in place all arrangements necessary to enable the oath or affirmation to be taken in accordance with any local custom. That party must be in a position to inform the court what those inquiries were, what their outcome was and what arrangements have been made. If the oath or affirmation can be administered in the manner normal in England and Wales, the VCF arranging party must arrange in advance to have the appropriate holy book at the remote site. The associate will normally administer the oath.

**17.** Consideration will need to be given in advance to the documents to which the witness is likely to be referred. The parties should endeavour to agree on this. It will usually be most convenient for a bundle of the copy documents to be prepared in advance, which the VCF arranging party should then send to the remote site.

**18.** Additional documents are sometimes quite properly introduced during the course of a witness's evidence. To cater for this, the VCF arranging party should ensure that equipment is available to enable documents to be transmitted between sites during the course of the VCF transmission. Consideration should be given to whether to use a document camera. If it is decided to use one, arrangements for its use will need to be established in advance. The panel operator will need to know the number and size of documents or objects if their images are to be sent by document camera. In many cases, a simpler and sufficient alternative will be to ensure that there are fax transmission and reception facilities at the participating sites.

To the top

## The hearing

**19.** The procedure for conducting the transmission will be determined by the judge. He will determine who is to control the cameras. In cases where the VCF is being used for an application in the course of the proceedings, the judge will ordinarily not enter the local site until both sites are on line. Similarly, at the conclusion of the hearing, he will ordinarily leave the local site while both sites are still on line. The following paragraphs apply primarily to cases where the VCF is being used for the taking of the evidence of a witness at a remote site. In all cases, the judge will need to decide whether court dress is appropriate when using VCF facilities. It might be appropriate when transmitting from courtroom to courtroom. It might not be when a commercial facility is being used.

**20.** At the beginning of the transmission, the judge will probably wish to introduce himself and the advocates to the witness. He will probably want to know who is at the remote site and will invite the witness to introduce himself and anyone else who is with him. He may wish to give directions as to the seating arrangements at the remote site so that those present are visible at the local site during the taking of the evidence. He will probably wish to explain to the witness the method of taking the oath or of affirming, the manner in which the evidence will be taken, and who will be conducting the examination and cross-examination. He will probably also wish to

inform the witness of the matters referred to in paragraphs 6 and 7 above (co-ordination of picture with sound, and picture quality).

**21.** The examination of the witness at the remote site should follow as closely as possible the practice adopted when a witness is in the courtroom. During examination, cross-examination and re-examination, the witness must be able to see the legal representative asking the question and also any other person (whether another legal representative or the judge) making any statements in regard to the witness's evidence. It will in practice be most convenient if everyone remains seated throughout the transmission.

To the top

# EXHIBIT "G"

# Case management information sheet

Click here to reset form

| In the County Court<br>High Court of Justice<br>Queen's Bench Division<br>Technology and Construction Court | |
|---|---|
| Claim No. | |
| Last date for filing with court office | |
| Assigned judge | |

To be completed by, or on behalf of,

who is [1st][2nd][3rd][ ][Claimant][Defendant]
[Part 20 claimant] in this claim

Please read the notes on page five before completing this form.

You should note the date by which it must be returned and the name of the court it should be returned to since this may be different from the court where the proceedings were issued.

If you have settled this claim (or if you settle it on a future date) and do not need to have it heard or tried, you must let the court know immediately.

## A Settlement

Do you wish there to be a one month stay to attempt to settle the claim, either by informal discussion or by alternative dispute resolution? ☐ Yes ☐ No

## B Location of trial

Is there any reason why your claim needs to be heard at a particular court? ☐ Yes ☐ No

If Yes, say which court and why?

## C Pre-action protocols

The Construction and Engineering Disputes protocol applies to this claim.

Have you complied with it? ☐ Yes ☐ No

If No, please explain the reasons why on a separate sheet and attach it to this form.

## D Case management information

What amount of the claim is in dispute? £

Is there a counterclaim to this claim? ☐ Yes ☐ No

If Yes, state value of counterclaim £

**EXHIBIT "G"**

## Applications

Have you made any application(s) in this claim? ☐ Yes ☐ No

If Yes, what for? ____ For hearing on ____
(e.g. summary judgment, add another party)

## Witnesses

So far as you know at this stage, what witnesses of fact do you intend to call at the trial or final hearing including, if appropriate, yourself?

| Witness name | Witness to which facts |
|---|---|
| | |

## Experts

Do you wish to use expert evidence at the trial or final hearing? ☐ Yes ☐ No

Have you already copied any experts' report(s) to the other party(ies)? ☐ None yet obtained ☐ Yes ☐ No

Do you consider the case suitable for a single joint expert in any field? ☐ Yes ☐ No

Please list any single joint experts you propose to use and any other experts you wish to rely on. Identify single joint experts with the initials 'SJ' after their name(s).

| Expert's name | Field of expertise (eg. orthopaedic surgeon, surveyor, engineer) |
|---|---|
| | |

Do you want your expert(s) to give evidence orally at the trial or final hearing? ☐ Yes ☐ No

If Yes, give the reasons why you think oral evidence is necessary:

## Disclosure

Are there any special considerations concerning disclosure of any documents that should be brought to the attention of the judge? ☐ Yes ☐ No

If Yes, please give details on a separate sheet and attach it to this form.

**EXHIBIT "G"**



continue over

Transfer

If you think your case is suitable for a transfer to another court or track, say which:

Court: Chancery Division/Queen's Bench Division/another TCC court/Commercial Court/ County Court

Track: Small claims/Fast track

Please give brief reasons for your choice:

## E Trial or final hearing

How long do you estimate the trial or final hearing will take? ____days ____hours ____ minutes

Are there any days when you, an expert or an essential witness will not be able to attend court for the trial or final hearing? ☐ Yes ☐ No

If Yes, please give details

| Name | Dates not available |
|---|---|

## F Proposed directions *(Parties should agree directions wherever possible)*

*See CPR Part 60 Practice Direction paras 8.4 and 8.6 and The Technology and Construction Court Guide*

Have you attached a list of the directions you think appropriate for the management of the claim? ☐ Yes ☐ No

If Yes, have they been agreed with the other party(ies)? ☐ Yes ☐ No

## G Costs

*Do **not** complete this section if you have suggested your case is suitable for the small claims track **or** you have suggested one of the other tracks and you do not have a solicitor acting for you.*

What is your estimate of your costs incurred to date? £

What do you estimate your overall costs are likely to be? £

*In substantial cases these questions should be answered in compliance with CPR Part 43*

**EXHIBIT "G"**

# H Other information

Have you attached documents to this form? ☐ Yes ☐ No

Have you sent these documents to the other party(ies)? ☐ Yes ☐ No

If Yes, when did they receive them?

Do you intend to make any applications in the immediate future? ☐ Yes ☐ No

If Yes, what for?

Are video link facilities required? ☐ Yes ☐ No

In the space below, set out any other information you consider will help the judge to manage the claim, including any details about IT being used before or at trial

Signed | | Date

[Counsel][Solicitor][for the][1st][2nd][3rd][ ]
[Claimant][Defendant][Part 20 claimant]

Please enter your firm's name, reference number and full postal address including (if appropriate) details of DX, fax or e-mail

| | | if applicable | |
|---|---|---|---|
| | | fax no. | |
| | | DX no. | |
| Tel. no. | Postcode | e-mail | |

Your reference no.

EXHIBIT "G"

# Notes for completing a case management information sheet

- If you fail to return the form by the date given, the judge may give directions or make any order he thinks fit.
- Use a separate sheet if you need more space for your answers marking clearly which section the information refers to. You should write the claim number and the name of the assigned judge on it, and on any other documents you send with the form. Please ensure they are firmly attached to it.

## A Settlement

If you think that you and the other party may be able to negotiate a settlement you should tick the 'Yes' box. The court may order a stay, whether or not all the other parties to the claim agree. You should still complete the rest of the form, even if you are requesting a stay. Where a stay is granted it will be for an initial period of one month. You may settle the claim either by informal discussion with the other party or by alternative dispute resolution (ADR). ADR covers a range of different processes which can help settle disputes. More information is available in the Legal Services Commission leaflet 'Alternatives to Court' free from the LSC leaflet line Phone: 0845 3000 343

## B Location of trial

Whenever possible the trial of a claim will be heard by the assigned TCC judge. A TCC claim may be tried at any place where there is a TCC judge available to try the claim.

## C Pre-action protocols

Before any claim is started, the court expects you to have exchanged information and documents relevant to the claim to assist in settling it, and to have complied with the construction and engineering disputes protocol

## D Case management information

Applications

It is important for the court to know if you have already made any applications in the claim, what they are for and when they will be heard. The outcome of the applications may affect the case management directions the court gives.

Witnesses

Remember to include yourself as a witness of fact, if you will be giving evidence.

Experts

Oral or written expert evidence will only be allowed at the trial or final hearing with the court's permission. The judge will decide what permission it seems appropriate to give when the claim is allocated to track. Permission in small claims track cases will only be given exceptionally.

## E Trial or final hearing

You should enter only those dates when you, your expert(s) or essential witness(es) will not be able to attend court because of holiday or other committments.

## F Proposed directions

Attach the list of directions, if any, you believe will be appropriate to be given for the management of the claim. Agreed directions on fast and multi-track cases should be based on the forms of standard directions set out in the practice direction to CPR Part 28 and form PF52.

## G Costs

Only complete this section if you are a solicitor and have suggested the claim is suitable for allocation to the fast or multi-track.

## H Other Information

Answer the questions in this section. Decide if there is any other information you consider will help the judge to manage the claim. Give details in the space provided referring to any documents you have attached to support what you are saying.

**EXHIBIT "G"**

# EXHIBIT "H"

Courts and Tribunals Judiciary

# The Business and Property Courts of England & Wales

## The Commercial Court Guide (incorporating The Admiralty Court Guide)

Edited by the Judges of the Commercial Court of England & Wales

Eleventh Edition 2022 (Revised July 2023)

EXHIBIT "H"

**EXHIBIT "H"**

Courts and Tribunals Judiciary

# The Business and Property Courts of England & Wales

## The Commercial Court Guide (incorporating The Admiralty Court Guide)

Edited by the Judges of the Commercial Court of England & Wales

Eleventh Edition 2022 (Revised July 2023)

EXHIBIT "H"

EXHIBIT "H"

# Contents

**Foreword** 11

**Introduction** 12

**A. Preliminary** 15
- A.1 The procedural framework 15
- A.2 The Admiralty & Commercial Registry; the Commercial Court Listing Office 16
- A.3 The Commercial Court Users Committee 16

**B. Commencement, Transfer and Removal** 18
- B.1 Commercial cases 18
- B.2 Starting a case in the Commercial Court, and Electronic Working (CE File) 18
- B.3 Pre-Action Protocols 19
- B.4 Part 7 claims 19
- B.5 Part 8 claims 21
- B.6 Part 20 claims 22
- B.7 Service of the claim form 22
- B.8 Service of the claim form out of the jurisdiction 23
- B.9 Acknowledgment of service 23
- B.10 Disputing the Court's jurisdiction 24
- B.11 Default judgment 26
- B.12 Admissions 26
- B.13 Transfer of cases into and out of the Commercial Court 26
- B.14 Location of hearings before the Commercial Court 27

**C. Particulars of Claim, Defence and Reply** 28
- C.1 Form and content 28
- C.2 Serving and filing particulars of claim 32
- C.3 Serving and filing a defence 33
- C.4 Serving and filing a reply; defences to counterclaims 34
- C.5 Amendment 34
- C.6 Use of Statements of Case for Case Management 35

**D. Case Management in the Commercial Court** 36
- D.1 Generally 36
- D.2 Key features of case management in the Commercial Court 37



EXHIBIT "H"

D.3 Fixing a Case Management Conference 39
D.4 Case memorandum 40
D.5 List of Common Ground and Issues 41
D.6 Case management bundle 43
D.7 Case Management Conference 45
D.8 Case Management Conference: Part 8 claims 51
D.9 Case Management Conference: Part 20 claims (third party and similar proceedings) 51
D.10 Management throughout the case 52
D.11 Progress monitoring 52
D.12 Reconvening the Case Management Conference 53
D.13 Pre-trial checklist 53
D.14 Further information 53
D.15 Fixed trial dates 54
D.16 Estimates of length of trial 54
D.17 Pre-Trial Review and trial timetable 55
D.18 Orders 55

**E. Disclosure 60**
E.1 Generally 60
E.2 Cases where PD 57AD applies 60
E.3 Cases not subject to PD57AD 62
E.4 Authenticity 62
E.5 Ongoing review of evidence 63
E.6 Translations 63

**F. Applications 65**
F.1 Generally 65
F.2 Applications without notice 66
F.3 Expedited applications 68
F.4 Applications on documents 69
F.5 Listing; time estimates; pre-reading 71
F.6 Ordinary applications 73
F.7 Heavy applications 74
F.8 Evidence 76
F.9 Applications disposed of by consent 78
F.10 Application bundles 79
F.11 Chronologies, indices and dramatis personae 79
F.12 Authorities 80
F.13 Costs 80



EXHIBIT "H"

| | | |
|---|---|---|
| F.14 | Interim injunctions | 81 |
| F.15 | Security for costs | 84 |
| **G.** | **Negotiated Dispute Resolution ("NDR")** | **85** |
| G.1 | Generally | 85 |
| G.2 | Early neutral evaluation | 86 |
| **H.** | **Evidence for Trial** | **87** |
| H.1 | Witnesses of fact | 87 |
| H.2 | Expert witnesses | 89 |
| H.3 | Expert evidence of foreign law | 94 |
| H.4 | Evidence by remote means | 96 |
| H.5 | Taking evidence abroad | 97 |
| **I.** | **[Intentionally left blank]** | **98** |
| **J.** | **Trial** | **99** |
| J.1 | Shorter Trials Scheme; Flexible Trials Scheme; Expedited trial; Trials of issues | 99 |
| J.2 | Information technology at trial, including paperless trials | 100 |
| J.3 | Start of trial | 100 |
| J.4 | Documents for trial | 100 |
| J.5 | Reading lists, authorities and trial timetable | 102 |
| J.6 | Skeleton arguments etc. at trial | 103 |
| J.7 | Trial sitting days and hearing trials in public | 104 |
| J.8 | Oral opening statements at trial | 105 |
| J.9 | Applications in the course of trial | 106 |
| J.10 | Written closing submissions at trial | 106 |
| J.11 | Oral closing speeches at trial | 107 |
| J.12 | Judgment | 107 |
| J.13 | Costs | 108 |
| **K.** | **After Trial** | **109** |
| K.1 | Continuation, variation and discharge of interim remedies and undertakings | 109 |
| K.2 | Accounts and enquiries | 109 |
| K.3 | Enforcement | 109 |
| K.4 | Assessment of damages or interest after a default judgment | 110 |


EXHIBIT "H"

**L. Multi-party Disputes** **111**
L.1 Early consideration 111
L.2 Available procedures 111

**M. Litigants in Person** **113**
M.1 The litigant in person 113
M.2 Represented parties 114
M.3 Companies without representation 114

**N. Admiralty** **115**
N.1 General 115
N.2 The Admiralty Court Users Committee 115
N.3 Commencement of proceedings, service of Statements of Case and associated matters 115
N.4 Commencement and early stages of a claim in rem 116
N.5 The early stages of a Collision Claim 116
N.6 The early stages of a Limitation Claim 117
N.7 E-filing 118
N.8 Case Management 118
N.9 Evidence 119
N.10 Split trials, accounts, enquiries and enforcement 120
N10A Arrest of vessels 121
N.11 Release of vessels out of hours 121
N.12 Sales of arrested property 122
N.13 Insurance of arrested property 122
N.14 Assessors 123
N.15 Merchant Shipping (Liner Conferences) Act 1982 123

**O. Arbitration** **124**
O.1 Arbitration claims 124
O.2 Starting an arbitration claim 124
O.3 The arbitration claim form 125
O.4 Service of the arbitration claim form 125
O.5 Acknowledgment of service 126
O.6 Standard directions 126
O.7 Interim remedies 127
O.8 Challenging the award 127
O.9 Time limits 132
O.10 Claims under the 1950-1979 Acts 132
O.11 Enforcement of awards 133


EXHIBIT "H"

O.12 Transfer of arbitration claims 134
O.13 Appointment of a Judge of the Commercial Court as sole arbitrator or umpire 134

**P. Miscellaneous** **135**
P.1 Vacation arrangements 135
P.2 Out of hours emergency arrangements 135

**Address and Contact Details** **137**

**Appendices** **138**
Appendix 1: Overriding Objective and Dedicated CPR Parts and Practice Directions 139
Appendix 2: Case Management Information Sheet, Progress Monitoring Information Sheet and Pre-Trial Checklist 146
Appendix 3: Draft NDR Order 154
Appendix 4: Standard Pre-Trial Timetable 155
Appendix 5: Preparation of Skeleton Arguments 157
Appendix 6: Preparation of Chronologies and Indices 159
Appendix 7: Preparation of Bundles 160
Appendix 8: Expert Evidence – Requirements of General Application 166
Appendix 9: Service Out of the Jurisdiction: Related Practice 167
Appendix 10: Security for Costs: Related Practice 176
Appendix 11: Form of Freezing Order 178
Appendix 12: Electronic Working 188
Appendix 13: Electronic Track Data in Collision Claims 189
Appendix 14: Guidance on location of hearing, and on transferring cases to/from Circuit Commercial Courts 192
Appendix 15: Guidance on disclosure where PD 57AD does not apply 196

EXHIBIT "H"

# Foreword

It is with great pleasure that I endorse the issue of this, the 11th Edition of the Commercial Court Guide (which of course incorporates the Admiralty Court Guide). The last iteration of the Guide was issued just a few days before I took office in October 2017. The new Guide reflects a range of significant changes in practice which have occurred since that date. Some have been the result of extensive consultation with users; others have, of course been the product of the experience of the pandemic. Together they represent another significant step in the Court's responsive approach to ensuring that it maintains its core mission: providing speedy, efficient, and high-quality dispute resolution for commercial users, so as to give them certainty when making transactions, and to let them get on with the business of doing business.

**The Rt. Hon. Lord Burnett of Maldon, Lord Chief Justice of England and Wales**



EXHIBIT "H"

# Introduction

The Commercial Court Guide is in practical terms the key point of reference for those litigating in the Commercial Court. It was first published in 1986, drafted principally by Nicholas Phillips QC (now Lord Phillips of Worth Matravers). When it was rewritten in 1999, following the advent of the CPR, those leading were Robin Knowles QC (now Mr Justice Robin Knowles) and Mr Justice Rix (later Lord Justice Rix). In the years since the Guide's advent many distinguished judges have contributed to its development. All the current judges of the Court have been familiar with it throughout their professional careers.

This new edition reflects the concern of the current judges to see the Guide continue to evolve in a way which maintains the Court's proud tradition of conducting its business efficiently and leading the way in the procedural developments needed to do that in changing times. It also reflects the steep learning curve of the past two years, in which the Covid-19 pandemic led to a *de facto* transformation of a number of the Court's processes. Some of the innovations brought about by the crisis can be welcomed without hesitation – a greater reliance on electronic bundles and a greater facility with technology on both sides of the Bench. Readers of this edition of the Guide will find those reflected in the text, with the default for all bundles becoming electronic and an emphasis on the need to consider the use of technology throughout the life of a case. Others, such as the ability and willingness to conduct business remotely, are also welcome but require a more nuanced approach depending on the circumstances of each case.

At the same time the Guide reflects more conventional forms of innovation, with the Disclosure section reflecting the latest changes to Disclosure in Practice Direction 57AD and the Witness Statements section harmonising with Practice Direction 57AC which now governs trial witness statements in most cases in the Business and Property Courts.

There are two other areas to which the judges of the Court would particularly draw attention. The first is the consideration which is given to the options available for proving foreign law, reflecting the fact that it is far from always the case that full expert reports and cross-examination of experts are necessary – particularly when the law in question is from a common law jurisdiction. The second is the encouragement which the Guide offers to parties to improve the efficiency of the trial preparation process by obtaining advice on evidence at an early stage. This harmonises with the central focus in both PD 57AD and PD57AC on the need to identify the key issues relevant to each of those stages and confine work and expenditure accordingly. Furthermore this harks back to the Court's origins where the Notice as to Commercial Causes identified the need for the judge to ensure the "speedy determination ... of the issues really in controversy between the parties".


EXHIBIT "H"

The updating which has been done in this edition of the Guide continues the tradition of reflecting suggestions for improvement made by users. The drafting process has been led by Mr Justice Andrew Baker, but much assisted by input from a team comprising a representative of the Bar, Conall Patton KC, a representative from the solicitors represented on the Court's User Group, Laura Feldman, and the Court's lawyer, Francesca Girardot. The final draft has also received the benefit of the consideration of (and comments by) the entirety of the Court's Judges and the Commercial and Admiralty Court Users Committees. The editorial team has received exemplary administrative assistance, through Laura Feldman, from the document support team at Freshfields Bruckhaus Deringer LLP.

As previous editions have noted, the Guide should not be understood to override the Civil Procedure Rules or Practice Directions made under them. Nor does it operate as any fetter on judicial discretion. The Guide sets out the way in which the Court normally expects business to be done, but it remains guidance which must be adopted flexibly and adapted to the exigencies of the particular case. It is not a complete code for litigation.

As was noted in the last edition of the Guide, the Commercial Court now forms part of the Business and Property Courts of England & Wales. The Business and Property Courts operate as an umbrella covering (amongst others) the Commercial Court, the Admiralty Court, and the Technology and Construction Court (all of which are parts of the King's Bench Division of the High Court) and the Chancery Division. Each court in the Business and Property Courts retains its distinctive personality.

Commercial Court cases – largely international in nature - continue to be tried by Commercial Court Judges. Their subject matter spans such subjects as banking and finance, shipping, aviation, insurance, trade, commerce and energy. The Commercial Court is also the supervisory Court supporting the many international arbitrations which are seated in England and Wales; and is thus key to the success of the arbitration business based in this jurisdiction.

But at the same time the Business and Property Courts umbrella adds to these individual strengths regionally, nationally and internationally. There is now greater co-operation across the Business and Property Courts. The Commercial Court and the Chancery Division work together to run the Financial List; and this Guide provides the base document for litigation in that list. This iteration of the Guide will see a move away from the Commercial Court Guide supplementing the Circuit Commercial Guide towards a paradigm where this Guide will also be the base document for Circuit Commercial Court practice, with exceptions and modifications relevant to Circuit Commercial Court practice being identified in the new Circuit Commercial Court Guide. It is hoped that further harmonisation of Guides can in future take place within the Business and Property Courts.

**The Hon Mrs Justice Cockerill,** Judge in Charge of the Commercial Court

**The Hon Mr Justice Andrew Baker,** Judge in Charge of the Admiralty Court

on behalf of the Judges of the Commercial and Admiralty Courts



EXHIBIT "H"

# A. Preliminary

## A.1 The procedural framework

**A.1.1** Proceedings in the Admiralty and Commercial Courts are governed by the Civil Procedure Rules ("CPR") and Practice Directions. References to a "Part", a "rule" or a "PD" are to the Parts and rules of the CPR and Practice Directions under the CPR. Cross-references within the Guide are given by section number, so for example "A1.1" would be a reference to this section A1.1 of the Guide. Unless otherwise stated, any reference to an Appendix is to an Appendix to the Guide. References to the "Judge in Charge" are to the Judge in Charge of the Commercial Court.

**A.1.2** Part 58 and PD58 deal specifically with the Commercial Court and extracts are reproduced in Appendix 1. Part 61 and PD61 deal with the Admiralty Court and Part 62 and PD62 deal with arbitration applications.

**A.1.3** Practitioners should treat the content of the Commercial Court Guide ("the Guide") as applicable to proceedings in the Admiralty Court unless the content of Part 61, PD61 or section N of the Guide ("Admiralty") requires otherwise.

**A.1.4** The Guide is published with the approval of the Lord Chief Justice and the Master of the Rolls as Head of Civil Justice, in consultation with the Judges of the Commercial Court and the Admiralty Court and with the advice and support of the Commercial Court and Admiralty Court Users Committees. It contains guidance about the conduct of proceedings in the Commercial Court and the Admiralty Court, within the framework of the CPR and Practice Directions.

**A.1.5** The Guide is designed to serve the overriding objective (rule 1, set out in Appendix 1) in the Commercial Court and the Admiralty Court. It does not constrain the scope of Judges' discretion under the CPR and Practice Directions, but it does include guidance on the approach commonly taken to the exercise of some of those discretions.

**A.1.6** Other Court Guides do not apply to proceedings in the Commercial Court or the Admiralty Court.

**A.1.7** Financial List cases are part of the business of the Commercial Court and the Chancery Division. For matters not dealt with in the Guide to the Financial List, the Guide applies to cases in the Financial List.


EXHIBIT "H"

**A.1.8** Pre-trial matters in the Commercial Court are dealt with by the Judges of the Court: PD58 §1.2, and not by Masters or Registrars. Pre-trial matters in the Admiralty Court are dealt with either by the Admiralty Judge or by the Admiralty Registrar: see PD61 §2.1 and the definitions in rule 61.1(2)(ba)/(bb).

**A.1.9** On matters for which specific provision is not made by the Guide, the parties, their solicitors and counsel will be expected to act reasonably and in accordance with the spirit of the Guide.

**A.1.10** The Court expects a high level of co-operation and realism from the legal representatives of the parties. This applies to dealings (including correspondence) between legal representatives as well as to dealings with the Court.

## A.2 The Admiralty & Commercial Registry; the Commercial Court Listing Office

**A.2.1** The administrative office for the Admiralty and Commercial Courts is the Admiralty and Commercial Registry ("the Registry") which is located in the Royal Courts of Justice, Rolls Building, Fetter Lane, London EC4A 1NL. The Commercial Court Listing Office ("the Listing Office") is located at the same address, and also operates as the Listing Office for the Admiralty Court.

**A.2.2** It is important that there is close liaison between parties, by their legal representatives or directly if unrepresented, and both the Registry and the Listing Office. All communications by one party with the Registry and/or Listing Office should be copied to other parties, except for communications concerning an application being made without notice or routine correspondence concerning the mechanics of filing a document or documents.

## A.3 The Commercial Court Users Committee

**A.3.1** The Court's ability to resolve commercial disputes in a way that serves well the interests of national and international commerce depends in part upon a steady flow of information and constructive suggestions between the Court, litigants and professional advisers.

**A.3.2** The Commercial Court Users Committee is the principal channel for such communication. Correspondence raising matters for the consideration of the Committee, including suggestions for changes or improvements to rules, Practice Directions or the Guide, should be addressed to the Secretary to the Commercial Court Users Committee, 7 Rolls Building, Fetter Lane, London, EC4A 1NL or sent by email to comct.listing@justice.gov.uk. Users of the Court may from time to be asked to assist the Court with information that will enable the Court to develop appropriate statistics

**A.3.3** There are separate Users Committees for the Admiralty Court and the Financial List.

# B. Commencement, Transfer and Removal

## B.1 Commercial cases

**B.1.1** Rule 58.1(2) describes a "commercial claim".

**B.1.2** Rule 63A.1 describes a "Financial List claim".

## B.2 Starting a case in the Commercial Court, and Electronic Working (CE File)

**B.2.1** The case will be begun by a claim form under Part 7 or Part 8. For arbitration claims, the claim form is issued under the Part 8 procedure (rule 62.3(1)), but with an adapted version of the Part 8 claim form: see PD62 §2.2. Save where otherwise specified, references in this Guide to a claim form are to a Part 7 claim form.

**B.2.2** Many documents requiring to be provided or filed are now required to be provided or filed electronically (e-filing) under the Electronic Working (CE File) arrangements which apply to the Commercial Court: see Appendix 12. An exception is available for litigants in person: see section M. The issue of any claim must be undertaken electronically.

**B.2.3** The Commercial Court may at an appropriate stage give a fixed date for trial (see D.15), but it does not give a fixed date for a hearing when it issues a claim.

**B.2.4** A claim in the Shorter Trials Scheme may be started in the Commercial Court: PD57AB §2.1; and the Flexible Trials Scheme applies to a claim started in the Commercial Court: PD57AB §3.1. These Schemes offer significant opportunities to streamline the proceedings and reduce costs. Parties should always give serious consideration to whether they might be appropriate for the case at hand.

# B.3 Pre-Action Protocols

**B.3.1** The Practice Direction - Pre-Action Conduct and Protocols applies to cases in the Commercial Court and should usually should be observed, although it is sometimes necessary or proper to start proceedings without following the procedures there contemplated: for example, where delays in starting proceedings might prompt forum-shopping in other jurisdictions. Cases in the Commercial Court are sometimes covered by an approved protocol because of the subject matter, such as the Professional Negligence Pre-Action Protocol.

**B.3.2** Subject to complying with the Practice Direction and any applicable approved protocol, the parties to proceedings in the Commercial Court are not required, or generally expected, to engage in elaborate or expensive pre-action procedures, and restraint is encouraged.

**B.3.3** Thus, the letter of claim should be concise and it is usually sufficient to explain the proposed claim(s), identifying key dates, so as to enable the potential defendant to understand and to investigate the allegations. Only essential documents need be supplied, and the period specified for a response should not be longer than one month without good reason.

**B.3.4** A potential defendant should respond to a letter of claim concisely and only essential documents need be supplied. It should often be possible to respond sufficiently within 21 days. A potential defendant who needs longer should explain the reasons when acknowledging the letter of claim.

# B.4 Part 7 claims

## The claim form

**B.4.1**

(a) A claimant starting proceedings in the Commercial Court must use practice form **N1(CC)** for Part 7 claims.

(b) In accordance with PD58 §2.3 the claim form must be marked in the top right hand corner with the words “King’s Bench Division, Commercial Court”, and on the issue of the claim form out of the Registry the case will be entered in the Commercial Court. Marking the claim form in this way complies sufficiently with PD7A §3.6. Reference should also be made to the “Business and Property Courts of England and Wales”, and if so that should appear above or before “King’s Bench Division, Commercial Court”.



EXHIBIT "H"

## Statement of value

**B.4.2** Rule 16.3, which provides for a statement of value to be included in the claim form, does not apply in the Commercial Court: rule 58.5(2); but if no statement of value is included, costs management under Section II of Part 3 and PD3E will apply to the claim unless the court otherwise orders even if the value of the claim is in fact £10 million or more.

## Particulars of claim and the claim form

**B.4.3** Although particulars of claim may be served with the claim form, this is not a requirement in the Commercial Court. However, if the particulars of claim are not contained in or served with the claim form, the claim form must contain a statement that if an acknowledgment of service is filed indicating an intention to defend the claim, particulars of claim will follow: rule 58.5(1)(a).

**B.4.4** If particulars of claim do not accompany the claim form they must be served within 28 days of the defendant filing an acknowledgment of service indicating an intention to defend the claim: rule 58.5(1)(c).

**B.4.5** The three forms specified in rule 7.8(1) must be served with the claim form. One of these is a form for acknowledging service: rule 58.5(1)(b).

## Statement of truth

**B.4.6**

(a) A claim form must be verified by a statement of truth: rule 22.1. Unless the Court otherwise orders, any amendment to a claim form must also be verified: rule 22.1(2).

(b) The required form of statement of truth is set out at PD7A §7.2.

(c) A claim form will remain effective, even where not verified by a statement of truth, unless it is struck out: PD22 §4.1.

(d) In certain cases the statement of truth may be signed by a person other than the party on whose behalf it is served or its legal representative: C1.7.



EXHIBIT "H"

### Trial without service of particulars of claim or a defence

**B.4.7** The attention of the parties and their legal representatives is drawn to rule 58.11 which allows the Court to order (before or after the issue of a claim form) that the case shall proceed without the filing or service of particulars of claim or defence or of any other statement of case. This facility is to be used with caution. It is unlikely to be appropriate unless all the issues have already been clearly defined in previous exchanges between the parties either in the course of an application before issue of claim form or in previous correspondence and then only when the issues are of law or construction.

### Interest

**B.4.8** The claim form (and not only the particulars of claim) must comply with the requirements of rules 16.4(1)(b) and 16.4(2) concerning interest: rule 58.5(3).

**B.4.9** References to particulars of claim in rule 12.6(1)(a) (referring to claims for interest where there is a default judgment) and rule 14.14(1)(a) (referring to claims for interest where there is a judgment on admissions) may be treated as references to the claim form: rules 58.8(2) and 58.9(3).

## B.5 Part 8 claims

### Claim Form

**B.5.1** A claimant who wishes to commence a claim under Part 8 must use practice form **N208(CC)**: PD58 §2.4; or in the case of an arbitration claim, practice form **N8**: PD62.3 §2.2.

**B.5.2** Attention is drawn to the requirement in rule 8.2(a) that where a claimant uses the Part 8 procedure the claim form must state that Part 8 applies. Similarly, PD7A §3.3 requires that the claim form state (if it be the case) that the claimant wishes the claim to proceed under Part 8 or that the claim is required to proceed under Part 8.

### Marking and statement of truth

**B.5.3** B4.1(b) (marking) and B4.6 (statement of truth) also apply to a claim form issued under Part 8.

### Time for filing evidence in opposition to a Part 8 claim

**B.5.4** A defendant to a Part 8 claim must file an acknowledgement of service. If the defendant wishes to rely on written evidence it must file and serve that evidence within 28 days after filing an acknowledgment of service: rule 58.12.

## B.6 Part 20 claims

### Claim Form

**B.6.1** Adapted versions of the Part 20 claim form and acknowledgment of service (Practice Forms no. **N211(CC)** and **N213(CC)**) and of the related Notes for Part 20 defendant have been approved for use in the Commercial Court.

## B.7 Service of the claim form

### Service by the parties

**B.7.1** Claim forms issued in the Commercial Court are to be served by the parties, not by the Registry: PD58 §9.

### Methods of service

**B.7.2** Methods of service are set out in Part 6, which is supplemented by Practice Directions.

**B.7.3** PD6A concerns service by document exchange and other means, including electronic means. There are specific provisions about when a solicitor acting for a party may be served.

### Applications for extension of time

**B.7.4** Applications for an extension of time in which to serve a claim form are governed by rule 7.6. Rule 7.6(3)(a), which refers to service of the claim form by the Court, does not apply in the Commercial Court.

**B.7.5** The evidence required on an application for an extension of time is set out in PD7A §8.2. In an appropriate case it may be presented by an application notice verified by a statement of truth and without a separate witness statement: rule 32.6(2).



EXHIBIT "H"

### Certificate of service

**B.7.6** When the claimant has served the claim form the claimant must file a certificate of service: rule 6.17(2). Satisfaction of this requirement is relevant, in particular, to the claimant's ability to obtain judgment in default (see Part 12).

## B.8 Service of the claim form out of the jurisdiction

**B.8.1** Service of claim forms outside the jurisdiction without permission is governed by rules 6.32 - 6.35, and (where rule 6.35(5) applies) by PD6B.

**B.8.2** Applications for permission to serve a claim form out of the jurisdiction are governed by rules 6.36 and 6.37, and PD6B. Guidance is given in Appendix 9.

**B.8.3** Service of process in some foreign countries may take a long time to complete; it is therefore important that solicitors take prompt steps to effect service. An application to extend time for service should be made promptly as soon as it is apparent that service is likely not to be effected within time, and should not be left until the end of the period of validity for service.

## B.9 Acknowledgment of service

### Part 7 claims

**B.9.1**

(a) A defendant must file an acknowledgment of service in every case: rule 58.6(1). An adapted version of practice form **N9(CC)** (which includes the acknowledgment of service) has been approved for use in the Commercial Court.

(b) The period for filing an acknowledgment of service is calculated from the service of the claim form, whether or not particulars of claim are contained in or accompany the claim form or are to follow service of the claim form. Rule 9.1(2), which provides that in certain circumstances the defendant need not respond to the claim until particulars of claim have been served, does not apply: rule 58.6(1).


EXHIBIT "H"

### Part 8 claims

**B.9.2**

(a) A defendant must file an acknowledgment of service in every case: rule 58.6(1). An adapted version of practice form **N210(CC)** (acknowledgment of service of a Part 8 claim form) has been approved for use in the Commercial Court.

(b) The time for filing an acknowledgment of service is calculated from the service of the claim form.

### Acknowledgment of service in a claim against a firm

**B.9.3** Rule 10.5(5) addresses acknowledgment of service where a claim is brought against a partnership.

### Time for filing acknowledgment of service

**B.9.4**

(a) Except in the circumstances described below, or as otherwise ordered by the Court, the period for filing an acknowledgment of service is 14 days after service of the claim form.

(b) If the claim form has been served out of the jurisdiction without the permission of the Court under rules 6.32 and 33, the time for filing an acknowledgment of service is governed by rule 6.35 and by PD6B if rule 6.35(5) applies, save that in all cases time runs from the service of the claim form: rule 58.6(3).

(c) If the claim form has been served out of the jurisdiction with the permission of the Court under rule 6.36 the time for filing an acknowledgment of service is governed by rule 6.37(5) and PD6B, save that in all cases time runs from the service of the claim form: rule 58.6(3).

## B.10 Disputing the Court's jurisdiction

### Part 7 claims

**B.10.1**

(a) If the defendant intends to dispute the Court's jurisdiction or contend that the Court should not exercise its jurisdiction it must:

(i) file an acknowledgment of service: rule 11(2); and

(ii) issue an application notice seeking the appropriate relief.



EXHIBIT "H"

(b) An application to dispute the Court's jurisdiction must be made within 28 days after filing an acknowledgment of service: rule 58.7(2).

(c) The parties to an application to dispute the Court's jurisdiction or contending that the Court should not exercise its jurisdiction should consider at or before the time of the issue of the application or as soon as possible thereafter whether the application is a 'heavy application' within F6.1 likely to last more than half a day but for which, for any reason, the automatic timetable provisions in PD58 §13.2 and F6.3 - F6.5 will not be appropriate. If any party considers that special timetabling is required different from those automatic provisions it should at once inform all other parties and the Listing Office. Unless a timetable for those matters covered by F6.3-F6.5 can be agreed forthwith, the applicant must without delay inform the Listing Office that a directions hearing will be required. For the purposes of such a directions hearing all parties must by 1 pm on the day before that hearing provide to the Listing Office a brief summary of the issues of fact and law likely to arise on the application, a list of witness statements or affidavits likely to be relied upon, a list of expert evidence sought to be adduced, an estimate of how long the hearing of the substantive application will take and how much prehearing reading will be required by the Judge, and a proposed timetable for directions or steps leading to the hearing of the substantive application.

(d) If the defendant makes an application under rule 11(1), the claimant is not bound to serve particulars of claim until that application has been disposed of: rule 58.7(3).

## Part 8 claims

### B.10.2

(a) The provisions of B10.1(a)-B10.1(c) also apply in the case of Part 8 claims.

(b) If the defendant makes an application under rule 11, it is not bound to serve any written evidence on which it wishes to rely in opposition to the substantive claim until that application has been disposed of: rule 11(9).

## Effect of an application challenging the jurisdiction

**B.10.3** An acknowledgment of service of a Part 7 or Part 8 claim form which is followed by an application challenging the jurisdiction under Part 11 does not constitute a submission by the defendant to the jurisdiction: rules 11(3)/(7)/(8).

**B.10.4** If an application under Part 11 is unsuccessful, and the Court then considers giving directions for filing and serving statements of case (in the case of a Part 7 claim) or evidence (in the case of a Part 8 claim), a defendant does not submit to the jurisdiction merely by asking for time to serve and file a statement of case or evidence, as the case may be. In the event of an appeal, a stay may be ordered pending the appeal but is not automatic: see *Conversant v Huawei* [2018] EWHC 1216.

## B.11 Default judgment

**B.11.1** Default judgment is governed by Part 12.

## B.12 Admissions

**B.12.1** Admissions are governed by Part 14, and PD14, except that the references to "particulars of claim" in PD14 §§2.1, 3.1 and 3.2 should be read as referring to the claim form: PD58 §6(2).

## B.13 Transfer of cases into and out of the Commercial Court

**B.13.1** The procedure for transfer and removal is set out in PD58 §4. All such applications must be made to the Commercial Court: rule 30.5(3).

**B.13.2** Although an order to transfer a case to the Commercial Court may be made at any stage, any application for such an order should normally be made at an early stage in the proceedings. The Court aims to review every case of its own motion before a first Case Management Conference is listed, to assess whether it is suitable to be retained in the Commercial Court. If the provisional view is formed that the case should be transferred out, the parties will be given an opportunity to make representations in writing before any order is made.

**B.13.3** Transfer to the Commercial Court may be ordered for limited purposes only, but a transferred case will normally remain in the Commercial Court until its conclusion.

**B.13.4** An order transferring a case out of the Commercial Court may be made at any stage, but will not usually be made after a pre-trial timetable has been fixed at the Case Management Conference (see D.8), unless the transfer is to a Circuit Commercial Court or the London Commercial Court and the Judge at the Case Management Conference is applying paragraph 3 of Appendix 14, or to the Competition Appeal Tribunal (see B13.6).

**B.13.5** Some commercial cases may more suitably, or as suitably, be dealt with in one of the Circuit Commercial Courts or the London Circuit Commercial Court. Parties should consider whether it would be more appropriate to begin proceedings in one of those Courts and any Judge of the Commercial Court may on their own initiative order the case to be transferred there. Please see further Appendix 14. In particular, all international road, sea and air carriage claims not suitable for commencement in the Commercial Court by reason of their financial value and/or the nature of the factual, technical or legal issues that arise should be commenced in the London Circuit Commercial Court.

**B.13.6** Cases that involve competition issues to any significant extent should be considered for transfer to the Competition Appeal Tribunal: see *Sainsbury v Mastercard* [2018] EWCA Civ at [357]-[358]. Any such transfer will normally be considered at the Case Management Conference and the Court may be willing to set a procedural timetable for the case even if transfer is ordered.

## B.14 Location of hearings before the Commercial Court

**B.14.1** Cases before the Commercial Court will generally be heard in the Rolls Building in London. However, if a Commercial Court hearing is more suitably held outside London the Commercial Court will aim to achieve that; and if a hearing outside London (in any Court) needs a Commercial Court Judge the Commercial Court will aim to provide one. Please see further Appendix 14.

# C. Particulars of Claim, Defence and Reply

## C.1 Form and content

**C.1.1** The following principles apply to all statements of case. They should, as far as possible, also be observed when drafting a Part 8 claim form.

(a) The document must be as concise as possible.

(b) The document must be set out in separate consecutively numbered paragraphs and sub-paragraphs.

(c) The document must deal with the case on a point by point basis to allow a point by point response. In particular, each separate cause of action, or defence, should be pleaded separately wherever possible.

(d) So far as possible each paragraph or sub-paragraph should contain no more than one allegation.

(e) Special care should be taken to set out (with proper particulars) only those factual allegations which are necessary to establish the cause of action, defence, or point of reply being advanced ("primary allegations"), to enable the other party to know what case it has to meet. Evidence should not be included, and a general factual narrative is neither required nor helpful (and is likely to contravene paragraphs (f), (h) and/or (k) below).

(f) Particulars of primary allegations should be stated as particulars and not appear as if they are primary allegations.

(g) A party wishing to advance a positive case must set that case out; and reasons must be set out for any denial of an allegation.

(h) Where particulars are given of any allegation or reasons are given for a denial, the allegation or denial should be stated first and the particulars or reasons for it listed one by one in separate numbered sub-paragraphs.

(i) Where they will assist:

(i) headings should be used; and

(ii) abbreviations and definitions should be established and used, and a glossary annexed.


EXHIBIT "H"

(j) Contentious headings, abbreviations and definitions should not be used. Every effort should be made to ensure that headings, abbreviations and definitions are in a form that will enable them to be adopted without issue by the other parties.

(k) In rare cases where it is necessary to give lengthy particulars of an allegation, these should be set out in schedules or appendices.

(l) A response to particulars set out in a schedule should be set out in a corresponding schedule.

(m) In a rare case where it is necessary for the proper understanding of the statement of case to include substantial parts of a lengthy document the passages in question should be set out in a schedule rather than in the body of the statement of case.

(n) Contentious paraphrasing should be avoided.

(o) The document must be signed by the individual person or persons who drafted it, not, in the case of a solicitor, in the name of the firm alone.

**C.1.2**

(a) A statement of case (including schedules or appendices) should generally not exceed 25 pages (font minimum 12 point; 1.5 line spacing) and must never exceed 40 pages unless the Court has given permission for a longer document, in which case it must not be longer than the increased length for which permission has been given.

(b) The Court will only exceptionally give permission for a longer statement of case to be served; and will do so only where a party shows good reasons for doing so.

(c) Where permission is given the Court will generally require that a summary of the statement of case is also served.

(d) Any application to serve a statement of case longer than 40 pages should be made on documents (i.e. without a hearing) briefly stating the reasons for exceeding the 40 page limit, specifying the length of statement of case said to be necessary, but should not attach the draft statement of case for which permission is sought (unless there is some specific reason for doing so, which should then be explained). The application may be made without notice. It is not sufficient reason for a lengthy statement of case that the case is complex or of high value.


EXHIBIT "H"

**C.1.3**

(a) Particulars of claim, the defence and any reply must comply with the provisions of rules 16.4 and 16.5, save that rules 16.5(6) and 16.5(8) do not apply.

(b) The requirements of PD16 §7.4-8.1 (which relate to claims based upon oral agreements, agreements by conduct and Consumer Credit Agreements and to reliance upon evidence of certain matters under the Civil Evidence Act 1968) should be treated as applying to the defence and reply as well as to the particulars of claim.

(c)

(i) Full and specific details should be given of any allegation of fraud, dishonesty, malice or illegality; and

(ii) where an inference of fraud or dishonesty is alleged, the facts on the basis of which the inference is alleged must be fully set out.

(d) Any legislative provision upon which an allegation is based must be clearly identified and the basis of its application explained.

(e) Any provision of The Human Rights Act 1998 (including the Convention) on which a party relies in support of its case must be clearly identified and the basis of its application explained.

(f) Any principle of foreign law or foreign legislative provision upon which a party's case is based must be clearly identified and the basis of its application explained. Parties raising issues which are or may be governed by foreign law should consider the judgment of Lord Leggatt JSC in *Brownlie v FS Cairo (Nile Plaza)* LLC [2021] UKSC 45, at [161]-[166].

(g) It is important that if a defendant or Part 20 defendant wishes to advance by way of defence or defence to counterclaim a positive case on causation, mitigation or quantification of damages, proper details of that case should be included in the defence or Part 20 defence at the outset or, if not then available, as early as possible thereafter.

(h) Where proceedings involve issues of construction of a document in relation to which a party wishes to contend that there is a relevant factual matrix that party should set out in its statement of case each feature of the matrix which is alleged to be of relevance, following the approach identified in C1.1(e)-(h) and (k). The "factual matrix" means the background knowledge which would reasonably have been available to the parties in the situation in which they found themselves at the time of the contract/document.



EXHIBIT "H"

**C.1.4**

(a) PD16 §7.3 relating to a claim based upon a written agreement should be treated as also applying to the defence, unless the claim and the defence are based on the same agreement.

(b) Where PD 57AD applies (see E2.1), Initial Disclosure must accompany each statement of case in accordance with PD 57AD §5.1 unless the parties have agreed to dispense with it or the court has ordered that it is not required: PD 57AD §5.3.

(c) If PD 57A does not apply or Initial Disclosure under it has been dispensed with by agreement or order, then:

(i) If any documents are to be served at the same time as a statement of case they should normally be served separately from rather than attached to the statement of case.

(ii) Only those documents which are of central importance and necessary for a proper understanding of the statement of case should be attached to or served with it.

(iii) The statement of case must itself refer to the fact that documents are attached to or served with it.

(d) An expert's report should not be attached to the statement of case and should not be filed with the statement of case. A party must obtain permission from the Court in order to adduce expert evidence at trial and therefore any party who serves an expert's report without obtaining such permission does so at risk as to costs.

## Statement of truth

**C.1.5** Particulars of claim, a defence and any reply must be verified by a statement of truth: rule 22.1. So too must any amendment, unless the Court otherwise orders: rule 22.1(2); see also C5.2.

**C.1.6** The required form of statement of truth is as follows:

(a) for particulars of claim, as set out in PD7A §10.1 or PD16 §10.1;

(b) for a defence, as set out in PD16 §10.1;

(c) for a reply the statement of truth should follow the form for the particulars of claim, but substituting the word "reply" for the words "particulars of claim" (see PD22 §2.1).

**C.1.7** Rule 22.1 (6) and (8) and PD22 §3 state who may sign a statement of truth. For example, if insurers are conducting proceedings on behalf of many claimants or defendants a statement of truth may be signed by a senior person responsible for the case at a lead insurer, but

(a) the person signing must specify the capacity in which that person signs;

(b) the statement of truth must be a statement that the lead insurer believes that the facts stated in the document are true; and

(c) the Court may order that a statement of truth also be signed by one or more of the parties.

See PD22 §3.6B.

**C.1.8** A statement of case remains effective (although it may not be relied on as evidence) even where it is not verified by a statement of truth, unless it is struck out: PD22 §§4.1-4.3.

### Service

**C.1.9** All statements of case are served by the parties, not by the Court: PD58 §9.

### Filing

**C.1.10** The statements of case filed with the Court form part of the permanent record of the Court.

## C.2 Serving and filing particulars of claim

**C.2.1** Subject to any contrary order of the Court and unless particulars of claim are contained in or accompany the claim form:

(a) the period for serving particulars of claim is 28 days after filing an acknowledgment of service: rule 58.5(1)(c);

(b) the parties may agree extensions of the period for serving the particulars of claim. However, any such agreement and brief reasons must be evidenced in writing and notified to the Court: PD58 §7.1.

**C.2.2** The Court may make an order overriding any agreement by the parties varying a time limit: PD58 §7.2.


EXHIBIT "H"

**C.2.3** The claimant must serve the particulars of claim on all other parties. A copy of the claim form will be filed on CE File on issue. If the claimant serves particulars of claim separately from the claim form the claimant must file a copy within 7 days of service together with a certificate of service: rule 7.4(3).

## C.3 Serving and filing a defence

**C.3.1** The defendant must serve the defence on all other parties and must at the same time file a copy with the Court.

**C.3.2**

(a)

(i) If the defendant files an acknowledgment of service which indicates an intention to defend, the period for serving and filing a defence is 28 days after service of the particulars of claim, subject to the provisions of rule 15.4(2). (See also Appendix 9 for cases where the claim form has been served out of the jurisdiction.)

(ii) If the defendant files an acknowledgement of service stating an intention to dispute the Court's jurisdiction and makes an application to challenge the jurisdiction within 28 days after that filing, any written evidence in support must be filed and served with the application notice but no defence need be served before the hearing of the application: see rule 11(9).

(b) The defendant and the claimant may agree that the period for serving and filing a defence shall be extended by up to 28 days: rule 15.5(1). The claimant must notify the Court in writing.

(c) An application to the Court is required for any further extension. If the parties are able to agree that a further extension should be granted, a draft consent order should be provided together with a brief explanation of the reasons for the extension, so that the matter may be dealt with on the documents.

## C.4 Serving and filing a reply; defences to counterclaims

**C.4.1** The period for serving and filing a reply is 21 days after service of the defence, and any reply must be served by the claimant on all other parties: rule 58.10(1). The period for a claimant to serve a defence to a counterclaim is 14 days after service of the counterclaim: rule 15.4(1)(a). Where a counterclaim against a claimant is included in or served with a defence, the Court will expect the defendant to consent to any defence to counterclaim being included in or served with a reply that is served within the 21 days required by rule 58.10(1) (or within any extension of time for reply that may be agreed or ordered).

**C.4.2** A claimant who does not file a reply does not admit what is pleaded in the defence and a claimant who files a reply that does not deal with something pleaded in the defence is not taken to admit it. A reply should be served only when necessary and then should plead only what is necessary: it should not repeat what is pleaded in the particulars of claim.

**C.4.3** A reply must be filed at the same time as it is served: rule 15.8(b); rule 15.8(a) does not apply in proceedings in the Commercial Court.

**C.4.4** In some cases, more than 21 days may be needed for the preparation, service and filing of a reply. In such cases:

(a) If the parties agree in writing to vary the time limit, the claimant must notify the Court in writing, giving brief reasons for the agreed variation: PD58 §7.1.

(b) If the parties do not agree, an application should ordinarily be made on documents for an extension of time. The procedure to be followed when making an application on documents is set out in F.4.

(c) In either case, any relevant forthcoming hearing date(s) should be identified to the Court. If the extension sought will or may put any such hearing date at risk, that must be made clear, as the Judge may wish to give further directions on documents or at a hearing. If the extension sought will not put any such hearing date at risk, the application should contain an express statement to that effect.

## C.5 Amendment

**C.5.1**

(a) Amendments to a statement of case must show the original text, unless the Court orders otherwise: PD58 §8.


EXHIBIT "H"

(b) Amendments may be shown by using footnotes or marginal notes, provided they identify precisely where and when an amendment has been made.

(c) Unless the Court so orders, there is no need to show amendments by colourcoding (but the use of colour-coding is permissible).

(d) If there have been extensive amendments it may be desirable to prepare a fresh copy of the statement of case that does not distinguish between original and amended text and omits deleted text. However, a copy of the statement of case showing where and when amendments have been made must also be made available.

**C.5.2** All amendments to any statement of case must be verified by a statement of truth unless the Court orders otherwise: rule 22.1(2).

**C.5.3** Questions of amendment, and consequential amendment, should wherever possible be dealt with by consent. A party should consent to a proposed amendment unless it has substantial grounds for objecting to it; and if it claims to have substantial grounds for objecting to an amendment, a party should identify those grounds concisely in writing promptly in reply to the provision to it of the proposed amendment with a request for consent.

**C.5.4** Late amendments should be avoided and may be disallowed, even if they do not imperil a trial date.

## C.6 Use of Statements of Case for Case Management

**C.6.1** Once statements of case have been served, parties should promptly identify (whether by formal advice or otherwise) the significant matters in dispute on the cases as pleaded, which will inform the contents of the List of Common Ground and Issues and the List of Issues for Disclosure (where applicable).

**C.6.2** Parties should examine closely which disputes of fact raised by the cases as pleaded are significant and are likely reasonably to require disclosure (if so how extensive), factual witness evidence or expert evidence. See further D2.1 and E.5.


EXHIBIT "H"

# D. Case Management in the Commercial Court

## D.1 Generally

**D.1.1** All proceedings in the Commercial Court will be subject to management by the Court.

**D.1.2** All proceedings in the Commercial Court are automatically allocated to the multi-track. Part 26 and the rules relating to allocation do not apply: rule 58.13(1).

**D.1.3** Except for rule 29.3(2) (legal representatives to attend Case Management Conferences and pre-trial reviews) and rule 29.5 (variation of case management timetable), Part 29 does not apply to proceedings in the Commercial Court: rule 58.13(2).

**D.1.4** Cases are not generally allocated to a particular Judge or Judges, but the Judge in Charge may appoint a designated Judge to a case, upon application or of the Court's own motion, where any or all of the following factors make it appropriate:

(a) the particular size of or complexity of the case,

(b) the fact that the case has the potential to give rise to numerous pre-trial applications,

(c) there is a likelihood that specific assignment will give rise to a substantial saving in costs,

(d) the same or similar issues arise in other cases,

(e) other case management considerations indicate that assignment to a specific Judge at the start of the case, or at some subsequent date, is appropriate.

**D.1.5** An application for the appointment of a designated Judge must be made in writing to the Judge in Charge. Any such application should be made when first fixing a Case Management Conference, or (if later) promptly upon the grounds for the application becoming apparent.

**D.1.6** If an order is made for appointment of a designated Judge:


EXHIBIT "H"

(a) it may be for the appointment of a single designated Judge or a (primary) designated Judge and an identified alternate designated Judge;

(b) the designated Judge will preside at all subsequent pre-trial Case Management Conferences and other hearings, unless that Judge directs otherwise; and

(c) normally all applications in the case, other than an application for an interim payment or other application the hearing of which would require the Judge not to be the trial Judge, will be determined by the designated Judge, and that Judge will be the trial Judge.

**D.1.7** In deciding whether to appoint a designated Judge, the Judge in Charge will consider, in accordance with the overriding objective, the implications for other users in other cases as well as the interests of the immediate parties.

**D.1.8** Proceedings in the Financial List will have a designated Judge assigned to them at the time of the first Case Management Conference, unless otherwise ordered.

## D.2 Key features of case management in the Commercial Court

**D.2.1** Case management is governed by rule 58.13 and PD58 §10. For case management to be effective, it is important that parties consider carefully from an early stage, and throughout, what reasonable steps will be sufficient for a fair trial of the case (see E.5). In a normal commercial case commenced by a Part 7 claim form, case management will include the following key features:

(a) statements of case will be exchanged within fixed or monitored time periods;

(b) a case memorandum, a List of Common Ground and Issues and a case management bundle will be produced at an early point in the case. The parties will be expected to agree the case memorandum and the List of Common Ground and Issues;

(c) the case memorandum, List of Common Ground and Issues and case management bundle will be amended and updated or revised on a running basis throughout the life of the case and will be used by the Court at every stage of the case. In particular the List of Common Ground and Issues will be used as a tool to consider what factual and expert evidence is necessary and the scope of disclosure;


EXHIBIT "H"

(d) the Court will approve the List of Common Ground and Issues and may require the further assistance of the parties and their legal representatives in order to do so;

(e) a mandatory Case Management Conference will be held shortly after statements of case have been served, if not before (and preceded by the parties filing case management information sheets identifying their views on the requirements of the case);

(f) at the Case Management Conference the Court will (as necessary) discuss the issues in the case and the requirements of the case with the advocates retained in the case. In a case where expert evidence is proposed the Court will consider whether to grant permission for that evidence and how that evidence should be controlled. The Court will set a pre-trial timetable and give any other directions as may be appropriate, including as to the use of information technology;

(g) at the first Case Management Conference, the Court will review and approve, amend or reject as may be appropriate the parties' proposals for disclosure;

(h) before the progress monitoring date the parties will report to the Court, using a progress monitoring information sheet, the extent of their compliance with the pre-trial timetable;

(i) on or shortly after the progress monitoring date a Judge may (without a hearing) consider progress and give such further directions as she or he thinks appropriate;

(j) if at the progress monitoring date all parties have indicated that they will be ready for trial, all parties will complete a pre-trial checklist;

(k) in appropriate cases the Case Management Conference will be restored and/or there will be a pre-trial review;

(l) the parties will be required to prepare a trial timetable for consideration by the Court;

(m) throughout the case there must be regular reviews of the estimated length (including reading time) of trial.


EXHIBIT "H"

**D.2.2** The Costs Management section of Part 3, with PD3D, applies in the Commercial Court (unless the claim was commenced before 22 April 2014) except where the claim is stated or valued in the claim form at £10 million or more or where the Court otherwise orders. Save in such cases the parties will be required to file and exchange costs budgets in accordance with rules 3.12 and 3.13. If there is a disagreement between the parties as to the value of the claim, the matter should be discussed between the parties with a view to resolving the point by agreement and otherwise raised with the Court at the first opportunity (which may be the first Case Management Conference); the requirements for filing and exchanging costs budgets will not apply until the matter is resolved.

**D.2.3** Where Costs Management applies:

(a) unless an earlier costs management conference has been convened the issue of costs budgeting and whether a costs management order should be made will be considered at the first Case Management Conference;

(b) where costs budgets cannot be determined in advance of directions at the Case Management Conference, then a separate Costs Management Conference may be scheduled if the parties cannot agree a budget in the light of the Court's directions.

## D.3 Fixing a Case Management Conference

**D.3.1** A mandatory Case Management Conference should be fixed as mentioned in paragraphs (a) to (c) below (but see also D3.4), to be heard as promptly as possible while allowing time for the necessary preparatory steps, particularly as regards the directions to be sought in relation to disclosure. This will allow time for the preparation and service of any reply (see C.4).

(a) If proceedings have been started by service of a Part 7 claim form, the claimant must take steps to fix the date for the Case Management Conference with the Listing Office in co-operation with the other parties within 14 days of the date when all defendants who intend to file and serve a defence have done so: PD58 §10.2(a).

(b) If proceedings have been begun by service of a Part 8 claim form, the claimant must take steps to fix a date for the Case Management Conference with the Listing Office in co-operation with the other parties within 14 days of the date when all defendants who wish to serve evidence have done so: PD58 §10.2(b).

(c) If the proceedings have been transferred to the Commercial Court, the claimant must apply for a Case Management Conference within 14 days


EXHIBIT "H"

of the date of the order transferring them, unless the Judge held, or gave directions for, a Case Management Conference when the Judge made the order transferring the proceedings: PD58 §10.3.

**D.3.2** If the claimant fails to make an application as required by the rules, any other party may apply for a Case Management Conference: PD58 §10.5.

**D.3.3** If the parties have not taken steps to fix the Case Management Conference as required, the Listing Office may inform the Judge in Charge, who may direct the Listing Office to fix a date without further reference to the parties.

**D.3.4** Any party may apply to the Court in writing for an earlier Case Management Conference: PD58 §10.4. A request for an early Case Management Conference should be made in writing to the Judge in Charge, on notice to all other parties, giving reasons why it is said that an early case management hearing is necessary or would be appropriate.

**D.3.5** The Court may fix a Case Management Conference at any time on its own initiative. If it does so, the Court will normally give at least 7 days' notice to the parties: PD58 §10.6. It may also consider, whenever there is a hearing in the case, whether some or all of the business that would normally be conducted at the Case Management Conference may fairly be dealt with at that hearing, to save costs.

**D.3.6** A Case Management Conference may not be postponed or adjourned without an order of the Court.

## D.4 Case memorandum

**D.4.1** In order that the Judge conducting the Case Management Conference may be informed of the general nature of the case and the issues which are expected to arise, after service of the defence and any reply the solicitors and counsel for each party shall draft an agreed case memorandum. Experience has shown that this document is very useful to the Court.

**D.4.2** The case memorandum should contain:

(a) a short and uncontroversial description of what the case is about; and

(b) a very short and uncontroversial summary of the material procedural history of the case.

**D.4.3** Unless otherwise ordered, the solicitors for the claimant are to be responsible for producing and filing the case memorandum, and where appropriate for revising it.


EXHIBIT "H"

**D.4.4** The case memorandum should not refer to any application for an interim payment, to any order for an interim payment, to any voluntary interim payment, or to any payment or offer under Part 36 or Part 37.

(a) The purpose of the case memorandum is to help the Judge understand broadly what the case is about. It does not play any part in deciding issues at the trial. It is unnecessary, therefore, for parties to be unduly concerned about the precise terms in which it is drafted, provided it contains a reasonably fair and balanced description of the case. The parties must do their best to spend as little time as practicable in drafting and negotiating the wording of the memorandum and keep clearly in mind the need to limit costs.

(b) Accordingly, in most cases it should be possible for the parties to draft an agreed case memorandum. However, if it proves impossible to do so, the claimant must draft the case memorandum and send a copy to the defendant. The defendant may provide its comments to the Court (with a copy to the claimant) separately.

(c) The failure of the parties to agree a case memorandum is a matter which the Court may wish to take into account when dealing with the costs of the Case Management Conference.

## D.5 List of Common Ground and Issues

**D.5.1**

(a) After service of the defence (and any reply), the solicitors and counsel for each party shall produce a list of the key issues in the case. The list should include the main issues of both fact and law. The list should identify the principal issues in a structured manner, such as by reference to headings or chapters. Long lists of detailed issues should be avoided, and sub-issues should be identified only when there is a specific purpose in doing so.

(b) The beginning section of the document must specify what is common ground between the parties. This is an important part of the process, intended to cut down the areas in dispute and save costs.

(c) The common ground section should include features of the factual matrix which are agreed to be relevant. Any disagreements as to the relevant features of the factual matrix should be addressed in the List of Common Ground and Issues.


EXHIBIT "H"

**D.5.2**

(a) The List of Common Ground and Issues is intended to be a neutral document for use as a case management tool at all stages of the case by the parties and the Court. Neither party should attempt to draft the list in terms which advance one party's case over that of another.

(b) It is unnecessary, therefore, for parties to be unduly concerned about the precise terms in which the List of Common Ground and Issues is drafted, provided it presents the structure of the case in a reasonably fair and balanced way. Above all the parties must do their best to spend as little time as practicable in drafting and negotiating the wording of the List of Common Ground and Issues and keep clearly in mind the need to limit costs.

(c) Accordingly, in most cases it should be possible for the parties to draft an agreed List of Common Ground and Issues, and for that list to be concise. However, if it proves impossible to draft an agreed list, the claimant must draft the list and send a copy to the defendant. The defendant may provide its comments or mark amendments to the list and send a copy to the claimant.

**D.5.3**

(a) The List of Common Ground and Issues, at least in draft, is to be available to the Court prior to the first Case Management Conference.

(b) At the first Case Management Conference and any subsequent Case Management Conferences which take place, the Court will review the draft List of Common Ground and Issues with a view to its being refined and identifying the importance of any sub-issues and as required in order to manage the case. Accordingly, the List of Common Ground and Issues may be developed, by expansion or reduction as the case progresses.

**D.5.4** The List of Common Ground and Issues will be used by the Court and the parties as a case management tool as the case progresses to determine such matters as the scope of disclosure and of factual and expert evidence and to consider whether issues should be determined summarily or preliminary issues should be determined.



EXHIBIT "H"

**D.5.5** The List of Common Ground and Issues is a tool for case management purposes and is not intended to supersede the pleadings which remain the primary source for each party's case. If at any stage of the proceedings, any question arises as to the accuracy of the List of Common Ground and Issues, it will be necessary to consult the statements of case, in order to determine what issues arise.

# D.6 Case management bundle

## Preparation

**D.6.1** Before the Case Management Conference (see D.3 and D.7), a case management bundle should be prepared by the solicitors for the claimant: PD58 §10.8. It should be prepared in accordance with the guidance in Appendix 7.

## Contents

**D.6.2** The case management bundle should contain the documents listed below (where the documents have been created by the relevant time):

(a) the claim form;

(b) all statements of case (excluding schedules), except that, if a summary has been prepared, the bundle should contain the summary, not the full statement of case;

(c) the case memorandum (see D.4);

(d) the List of Common Ground and Issues (see D.5);

(e) the case management information sheets and the pre-trial timetable if one has already been established;

(f) the principal orders in the case;

(g) any agreement in writing made by the parties to disclose documents without making a list or any agreement in writing that disclosure (or inspection or both) shall take place in stages.

See generally PD58 §10.8.

**D.6.3** Where PD 57AD applies (see E2.1), the case management bundle should also include the Disclosure Review Document, as completed by the parties for consideration at the Case Management Conference or (at later stages in the case) as approved by the Court at an earlier stage.


EXHIBIT "H"

**D.6.4** The case management bundle should not include a copy of any order for an interim payment.

## Providing the case management bundle

**D.6.5**

(a) The case management bundle should be provided to the Listing Office at least 7 days before the (first) Case Management Conference (or earlier hearing at which the parties are represented and at which the business of the Case Management Conference may be transacted: see D3.5): see PD58 §10.8.

(b) The case management bundle (including the Case Memorandum and the List of Common Ground and Issues) must thereafter be provided at all subsequent hearings in the case and in accordance with the timetable requirements for providing bundles set out in this Guide.

(c) In a case in which costs management applies, budgets in the form of Precedent H under the CPR, and responses in the form of Precedent R, should be provided at the same time as the case management bundle and as part of it, or be added to it as soon as they become available.

(d) If exceptionally a hard copy case management bundle is used by the Court (see Appendix 7), then in general (unless the Court otherwise orders) it will be returned to the claimant's solicitors after each hearing.

## Preparation and upkeep

**D.6.6** The claimant (or other party responsible for the preparation and upkeep of the case management bundle), in consultation with the other parties, must revise and update the case management bundle as the case proceeds: PD58 §10.9.

# D.7 Case Management Conference

## Attendance at the Case Management Conference

**D.7.1** Clients need not attend a Case Management Conference unless the Court otherwise orders. A representative who has conduct of the case must attend from each firm of solicitors instructed in the case. At least one of the advocates retained in the case on behalf of each party should also attend. Where a party has retained more than one advocate (e.g. leading and junior counsel), there is no requirement that all attend (e.g. if only limited matters remain in issue). The experience of the Court is that on many case management issues, junior advocates within a team may be well placed to assist the Court. Parties should consider in every case (a) whether attendance by the more (or most) senior advocates instructed in the case is reasonably required, and (b) whether, even where that is the position, at least some of the matters arising may appropriately be dealt with by the more (or most) junior advocates.

**D.7.2**

(a) The Case Management Conference is a very significant stage in the case. Although parties are encouraged to agree proposals for directions for the consideration of the Court, attendance may still be required even where all proposed directions are agreed. Where all proposed directions have been agreed, a proposed Consent Order should be filed as soon as possible, with an agreed covering letter setting out any particular reasons why the parties propose that attendance should not be required.

(b) Where all proposed directions are not agreed, the general rule in the Commercial Court is that there must be an oral hearing of the Case Management Conference.

(c) Exceptionally, it may be possible to dispense with an oral hearing even where all directions are not agreed if the issues are straightforward and the costs of an oral hearing cannot be justified.

(d) In such a case, if the parties wish to ask the Court to consider holding the Case Management Conference on documents, they must provide all the appropriate documents (see D7.2(e)) by no later than 12 noon on the Tuesday of the week in which the Case Management Conference is fixed for the Friday. That timing will be strictly enforced. If all the documents are not provided by that time, the Case Management Conference must be expected to go forward to an oral hearing. If the failure to provide the documents is due to the fault of one party and it is


EXHIBIT "H"

for that reason an oral Case Management Conference takes place, that party will be at risk as to costs.

(e) Where a Case Management Conference is sought on documents the parties must provide the documents (which will include the case management bundle with the information sheets fully completed by each party), a draft Order and draft List of Common Ground and Issues (both agreed by the parties) for consideration by the Judge and a statement signed by each advocate:

(i) confirming that the parties have considered and discussed all the relevant issues and brought to the Court's attention anything that was unusual; and

(ii) setting out information about any steps that had been taken to resolve the dispute by NDR, any future plans for NDR or an explanation as to why NDR would not be appropriate.

(iii) giving a time estimate for the trial, inclusive of reading time likely to be required by the Judge.

(f) In the ordinary course of things it would be unlikely that any case involving expert evidence or preliminary issues would be suitable for a Case Management Conference on documents. In cases involving expert evidence, the Court is anxious to give particular scrutiny to that evidence, given the cost such evidence usually involves and the need to focus that evidence. In cases where preliminary issues are sought, the Court will need to examine the formulation of those issues and discuss whether they are appropriately taken separately.

## Applications

### D.7.3

(a) If by the time of the Case Management Conference a party wishes to apply for an order in respect of a matter not covered by the Questions on the case management information sheet, the application should be made at the Case Management Conference.

(b) In some cases notice of such an application may be given in the case management information sheet itself: see D7.4(c).

(c) In all other cases the applicant should ensure that an application notice and any supporting evidence are filed and served in time to enable the application to be heard at the Case Management Conference.



EXHIBIT "H"

(d) Where one or more applications are heavy applications (as described in F.7) the preparation, timetabling and other arrangements for heavy applications will also apply.

## Materials: case management information sheet, case management bundle, skeleton arguments and draft Order

**D.7.4**

(a) All parties attending a Case Management Conference must complete a case management information sheet: PD58 §10.7. A standard form of case management information sheet is set out in Appendix 2. The information sheet is intended to include reference to all applications which the parties would wish to make at a Case Management Conference.

(b) A completed case management information sheet must be provided by each party to the Court (and copied to all other parties) at least 7 days before the Case Management Conference.

(c) Applications not covered by the standard questions raised in the case management information sheet should be entered on the sheet. No other application notice is necessary if written evidence will not be involved and the 7 day notice given by entering the application on the information sheet will in all the circumstances be sufficient to enable all other parties to deal with the application.

**D.7.5** The case management bundle must be provided to the Court at least 7 days before the Case Management Conference.

**D.7.6** Skeleton arguments must be provided by all parties attending the Case Management Conference:

(a) Where the Case Management Conference will require oral argument of half a day (i.e. 2 hours 30 minutes) or less, skeleton arguments should be filed in accordance with the rules for ordinary applications in F6.5.

(b) Where the Case Management Conference (in its own right, ignoring any applications) will require oral argument lasting more than half a day, skeleton arguments should be filed in accordance with the rules for heavy applications in F7.5, with the Claimant's skeleton argument being served first followed by the Defendant's skeleton argument.

(c) Where only ordinary applications are to be heard at the Case Management Conference, the timetable in F6.5 should be adopted, even if the overall time required for oral argument exceeds half a day

but is less than a day. If the overall time required for oral argument on the ordinary applications and the Case Management Conference exceeds a day, the parties should seek to agree a bespoke timetable for filing of skeleton arguments and obtain the approval of the Court.

(d) Where a heavy application is to be heard at the Case Management Conference, skeleton arguments should be filed in accordance with the rules for heavy applications in F7.5.

(e) Where one or more applications are to be heard at the Case Management Conference, each party should normally serve a single skeleton argument which addresses both the applications and the general case management issues that are to be determined. Where applications and cross-applications have been made, judgment should be exercised to avoid a proliferation of skeleton arguments. In case of doubt, a bespoke timetable should be agreed and the approval of the Court sought for it.

**D.7.7** J7.3 (provision of skeleton arguments to reporters and members of the public) applies to skeleton arguments for the Case Management Conference.

**D.7.8** By 4 pm on the working day before any Case Management Conference is to be heard, the Claimant shall file with the Court an updated draft order setting out: (a) all orders and directions that are agreed, subject to the Court; and (b) all orders or directions proposed but not agreed, showing (where applicable) rival proposed wordings, with colour-coding, highlighting, footnotes or other convenient formatting to indicate which party or parties is or are contending for what.

## The hearing

**D.7.9** The Court's power to give directions at the Case Management Conference is to be found in rules 3.1 and 58.13(4). At the Case Management Conference the Judge will:

(a) discuss the issues in the case by reference to the draft List of Common Ground and Issues, and approve a List of Common Ground and Issues;

(b) discuss the requirements of the case (including disclosure), with the advocates retained in the case;

(c) fix the entire pre-trial timetable, or, if that is not practicable, fix as much of the pre-trial timetable as possible;



EXHIBIT "H"

(d) give a direction for the trial date to be fixed promptly after the hearing, unless there is good reason to defer the fixing of the trial to a later stage in the case. That includes setting a time estimate for the trial (see D.16);

(e) consider with the parties their proposals for the use of information technology in the case, including its use at trial. In deciding whether and to what extent IT should be used in the case, including at trial, the Court will have regard to the financial resources of the parties and where those resources are unequal it will consider whether it is appropriate that one or more but not all of the parties should initially bear the cost subject to the Court's ultimate orders as to the overall costs of the case following judgment. Unless the Court can be satisfied that no unfairness would result from a party being excluded, or a party requests that it be excluded, all parties must have access to and an ability to use any IT systems proposed to be used in the case, including at trial;

(f) consider with the parties the question of document translation (see E.6), if there is likely to be a significant volume of documentary material not in English;

(g) in appropriate cases make an NDR order;

(h) in appropriate cases, consider whether the case should be retained in or be transferred out of the Commercial Court, and if retained whether it is suitable for the Shorter Trials Scheme or the Flexible Trials Scheme in the interests of reducing the length and cost of trial;

(i) expect to be informed, if known, whether there are or are likely to be other cases raising the same or similar issues, so that the potential for coordinated case management, if appropriate, can be considered.

**D.7.10** At the Case Management Conference active consideration may be given, by reference to the List of Common Ground and Issues, to the possibility of the trial or summary determination of a preliminary issue or issues the resolution of which is likely to shorten the proceedings. An example is a relatively short question of law which can be tried without significant delay (though the implications of a possible appeal for the remainder of the case cannot be lost sight of). The Court may suggest the trial of a preliminary issue, but it will rarely make an order without the concurrence of at least one of the parties. Active consideration will also be given to whether any issues are suitable for summary determination pursuant to Part 24.


EXHIBIT "H"

**D.7.11**

(a) Rules 3.1(2) and 58.13(4) enable the Court at the Case Management Conference to stay the proceedings while the parties try to settle the case by alternative means, including by a process of negotiated dispute resolution ("NDR"). The case management information sheet requires the parties to indicate whether a stay for such purposes is sought.

(b) In an appropriate case an NDR order may be made without a stay of proceedings. The parties should consider carefully whether it may be possible to provide for NDR in the pre-trial timetable without affecting the date of trial.

(c) Where a stay has been granted for a fixed period for the purposes of NDR the Court has power to extend it. If an extension of the stay is desired by all parties, a Judge will normally be prepared to deal with an application for such an extension if it is made before the expiry of the stay by letter from the legal representatives of one of the parties. The letter should confirm that all parties consent to the application.

(d) An extension will not normally be granted for more than four weeks unless clear reasons are given to justify a longer period, but more than one extension may be granted.

## The pre-trial timetable

**D.7.12** The pre-trial timetable will normally include:

(a) a progress monitoring date (see D.12); and

(b) a direction that the parties attend upon the Commercial Court Listing Office to obtain a fixed date for trial.

## Variations to the pre-trial timetable

**D.7.13**

(a) The parties may agree minor variations to the time periods set out in the pre- trial timetable without the case needing to be brought back to the Court provided that the variation

(i) will not jeopardise the date fixed for trial;

(ii) does not relate to the progress monitoring date; and

(iii) does not provide for the completion after the progress monitoring date of any step which was previously scheduled to have been completed by that date.



EXHIBIT "H"

(b) The Court should be informed in writing of any such agreement, together with a draft Consent Order for approval by the Court.

**D.7.14** If in any case it becomes apparent that variations to the pre-trial timetable are required which do not fall within D7.13, the parties should apply to have the Case Management Conference reconvened immediately. The parties should not wait until the progress monitoring date.

## D.8 Case Management Conference: Part 8 claims

**D.8.1** In a case commenced by the issue of a Part 8 claim form, a Case Management Conference will normally take place on the first available date 6 weeks after service and filing of the defendant's evidence. At that Case Management Conference the Court will make such pre-trial directions as are necessary, adapting (where useful in the context of the particular claim) those of the case management procedures used for a claim commenced by the issue of a Part 7 claim form.

## D.9 Case Management Conference: Part 20 claims (third party and similar proceedings)

**D.9.1** Wherever possible, any party who intends to make a Part 20 claim should do so before the hearing of the Case Management Conference dealing with the main claim.

**D.9.2** Where permission to make a Part 20 claim is required it should be sought at the Case Management Conference in the main claim.

**D.9.3** If the Part 20 claim is confined to a counterclaim by a defendant against a claimant alone, the Court will give directions in the Part 20 claim at the Case Management Conference in the main claim.

**D.9.4** If the Part 20 claim is not confined to a counterclaim by a defendant against a claimant alone, the Case Management Conference in the main claim will be reconvened on the first available date 6 weeks after service by the defendant of the new party or parties to the proceedings.

**D.9.5** All parties to the proceedings (i.e. the parties to the main claim and the parties to the Part 20 claim) must attend the reconvened Case Management Conference. There will not be a separate Case Management Conference for the Part 20 claim alone.

**D.9.6** In any case involving a Part 20 claim the Court will give case management directions at the same Case Management Conferences as it gives directions for the main claim: PD58 §12. The Court will therefore normally only give case management directions at hearings attended by all parties to the proceedings.

**D.9.7** Where there is a prospect that a party to existing litigation may seek in due course to bring a related claim against other persons, but no Part 20 claim is begun by the party, the matter must be raised with the Court in order that the Court can express its view as to the proper use of its resources and on the efficient and economical conduct of the litigation.

# D.10 Management throughout the case

**D.10.1** The Court will continue to take an active role in the management of the case throughout its progress to trial. Parties should be ready at all times to provide the Court with such information and assistance as it may require for that purpose.

# D.11 Progress monitoring

## Fixing the progress monitoring date

**D.11.1** The progress monitoring date will be fixed at the Case Management Conference and will normally be after the date in the pre-trial timetable for exchange of witness statements and expert reports.

## Progress monitoring information sheet

**D.11.2** At least 3 days (i.e. three clear days) before the progress monitoring date the parties must each send to the Court (with a copy to all other parties) a progress monitoring information sheet to inform the Court:

(a) whether they have complied with the pre-trial timetable, and if they have not, the respects in which they have not;

(b) whether they will be ready for a trial commencing on the fixed date specified in the pre-trial timetable, and if they will not be ready, why they will not be ready; and

(c) whether the length of trial as currently fixed is appropriate, too long, or not long enough, and if not long enough what solution is proposed.

**D.11.3** A standard form of progress monitoring information sheet is set out in Appendix 2.



EXHIBIT "H"

**D.11.4** The progress monitoring information sheets are, where appropriate, referred to the Judge in Charge.

**D.11.5** Upon considering the progress monitoring information sheets, the Court may, particularly if there has been significant non-compliance with the pre-trial timetable, direct that the Case Management Conference be reconvened or require further information to be sent to the Court.

## D.12 Reconvening the Case Management Conference

**D.12.1** In a complex case the pre-trial timetable may include provision for the Case Management Conference to be reconvened at an appropriate point. Further, if in the view of the Court the information given in the progress monitoring sheets justifies this course, the Court may direct that the Case Management Conference be reconvened.

**D.12.2** At a reconvened hearing of the Case Management Conference the Court may make such orders and give such directions as it considers appropriate. Where there has been non-compliance with the pre-trial timetable, it may make such order for costs as is appropriate.

**D.12.3** In advance of any reconvened Case Management Conference, an updated case management bundle should be provided in accordance with D7.5 and updated case management information sheets should be completed in accordance with D7.4 (unless the parties agree that there have been no material changes since case management information sheets were last filed).

## D.13 Pre-trial checklist

**D.13.1** Not later than three weeks before the date fixed for trial each party must send to the Listing Office (with a copy to all other parties) a completed checklist confirming final details for trial (a “pre-trial checklist”) in the form set out in Appendix 2.

## D.14 Further information

**D.14.1**

(a) If a party declines to provide further information requested under Part 18, the advocates who are to appear at the application for the parties concerned must communicate directly with each other in an attempt to reach agreement before any application is made to the Court.


EXHIBIT "H"

(b) No application for an order that a party provide further information will normally be listed for hearing without prior written confirmation from the applicant that the above requirements have been complied with.

(c) The Court will only order further information to be provided if satisfied that the information requested is strictly necessary to understand another party's case.

**D.14.2** Because it falls within the definition of a statement of case (see rule 2.3(1)) a response providing further information under Part 18 must be verified by a statement of truth.

## D.15 Fixed trial dates

**D.15.1** Most cases will be given fixed trial dates immediately after the pre-trial timetable has been set at the Case Management Conference.

**D.15.2** A fixed date for trial is given on the understanding that if previous fixtures have been substantially underestimated or other urgent matters need to be heard, the trial may be delayed. Where such delay might cause particular inconvenience to witnesses or others involved in the trial, the Commercial Court Listing Office should be informed well in advance of the fixed date.

## D.16 Estimates of length of trial

**D.16.1** At the Case Management Conference an estimate will be made of the minimum and maximum lengths of the trial (inclusive of reading time). The estimate should be set having regard to the requirements of a trial timetable (J5.4(b)). The trial estimate will appear in the pre-trial timetable and will be the basis on which a date for trial will be fixed.

**D.16.2** The Court examines with particular care longer estimates, and will wish to consider with the assistance of advocates whether in the case of particularly long trials all the issues in the trial should be heard at the same hearing: see J1.4.

**D.16.3** A confirmed estimate of the minimum and maximum lengths of the trial, signed by the advocates who are to appear at the trial, should be attached to the pre-trial checklist.

**D.16.4** The provisional estimate and (after it is given) the confirmed estimate must be kept under review by the advocates who are to appear at the trial. If at any stage an estimate needs to be revised, a signed revised estimate (whether agreed or not) should be submitted by the advocates to the Commercial Court Listing Office.


EXHIBIT "H"

**D.16.5** Accurate estimation of trial length is of great importance to the efficient functioning of the Court. The Court will be guided by, but will not necessarily accept, the estimates given by the parties.

## D.17 Pre-Trial Review and trial timetable

**D.17.1** The Court will order a pre-trial review in any case in which it considers that such a review will assist in ensuring that the parties are ready for trial and in planning the trial hearing itself.

**D.17.2** A pre-trial review will normally take place between 8 and 2 weeks before the date fixed for trial, but might be earlier in particularly long or complex cases.

**D.17.3** Whenever possible the pre-trial review will be conducted by the trial Judge. It should be attended by the advocates who are to appear at the trial: PD58 §11.2.

**D.17.4** Before the pre-trial review or, if there is not to be one, before the start of the trial (see J.3), the parties must attempt to agree a timetable for the trial: see PD58 §11.3 and J5.4(b). The claimant must file a copy of the draft timetable at least two days before the date fixed for the pre-trial review or at least 7 days before the start of the trial if there is no pre-trial review; any differences of view should be clearly identified and briefly explained: PD58 §11.4. At the pre-trial review or before or at the beginning of the trial itself if there is no pre-trial review, the Judge may set a timetable for the trial and give such other directions for the conduct of the trial as they consider appropriate.

**D.17.5** F7.2 applies also to pre-trial reviews.

## D.18 Orders

**D.18.1**

(a) Except for orders made by the Court on its own initiative, and unless the Court otherwise orders, every judgment or order will be drawn up by the parties and rule 40.3 is modified accordingly: rule 58.15(1).

(b) Consent orders are to be drawn up in accordance with the procedure described in F.9.

(c) All other orders are to be drawn up in draft by the parties and should, as well as being marked clearly with the word “draft”:

(i) be dated in the draft with the date of the Judge’s decision;


EXHIBIT "H"

(ii) bear the name of the Judge who made the order (after the designation “King’s Bench Division, Commercial Court”);

(iii) state (after the name of the Judge) whether the order was made in public, in private (see F1.6), or on paper.

The claimant is to have responsibility for drafting the order, unless it was made on the application of another party in which case that other party is to have the responsibility.

Orders for submission to Judges, or for sealing, will not be accepted without the information set out in sub-paragraphs (c)(i) to (iii) above.

(d) A copy of the draft must be provided to the Registry **within five days** of the decision of the Court reflected in the draft, together with a further copy in Word format. The party providing the draft must make clear whether it is agreed, identifying and explaining briefly (and neutrally) any points not agreed.

**D.18.2** If the Court orders that an act be done by a certain date without specifying a time for compliance, the latest time for compliance is 4.30 p.m. on the day in question.

**D.18.3** Orders that are required to be served must be served by the parties, unless the Court otherwise directs.

**D.18.4** Where the Court makes an order under rule 5.4C(4) (limiting access to a copy of a statement of case) that fact should be displayed prominently on the front of the order and all parties must inform the Commercial Court Listing Office in writing of the fact and terms of the order forthwith. It is the responsibility of the parties to obtain confirmation that the order is properly entered in the Court’s filing system, and fully to bring the order to the attention of a sufficiently senior member of the Court’s staff. Thereafter whenever a party files with the Court a document which is subject to such order this should be stated on the front of the document and brought to the attention of the Commercial Court Listing Office at the time of filing.



**EXHIBIT "H"**

**D.18.5** Where the parties reach agreement that a case should be settled on the basis that the Court makes an Order for the proceedings to be stayed save for the purposes of enforcing agreed terms that are set out in a schedule or held separately (a "Tomlin" order), a copy of the agreed terms must be provided to the Court with the draft of the Order that a Judge is invited to make. If the Order will provide that the settlement terms will be held separately, a copy of those terms must be provided to the Court in confidence and, once a Judge has reached a decision on whether to make the Order, will be returned to the solicitors for the parties and/or removed from CE File. If the Order provides that the settlement terms are set out in a schedule to the Order or otherwise appended to or included in the Order, a copy of those terms must be kept with, and will form part of, the sealed Order (including on CE File, where they can be filed and marked as confidential if appropriate). The draft of the Order must be filed in two versions, neither dated: one must be signed on behalf of all parties; the other must be in Word format.

**D.18.6** Where the parties seek to discontinue proceedings the following should be noted:

(a) It is not appropriate for orders to state that proceedings against one or more defendants are discontinued. The general position is that the Court has no power to order discontinuance: rule 38. Instead a claimant, in certain circumstances, is entitled to discontinue all or part of the claim.

(b) Parties considering a settlement under which use is made of that entitlement should give careful consideration to the whole of rule 38. Some, but not all, of the matters calling for consideration are referred to below.

(c) Rule 38.2(2) identifies circumstances where the Court's permission for discontinuance is required, including (a) where an interim injunction has been granted/undertakings have been given, (b) where a claimant has received an interim payment and the defendant that made the payment does not consent to discontinuance, and (c) where there is more than one claimant and the other claimants do not give written consent to discontinuance.

(d) Rule 38.6 is a default rule that the discontinuing claimant is liable for costs of the relevant defendant incurred on or before service of the notice of discontinuance. This will apply unless the Court orders otherwise.

(e) If agreement cannot be reached, applications under rule 38 should be made at a hearing unless the procedure for determination on documents in F.4 is followed.

(f) If permission to discontinue is needed and the relevant defendant consents to the grant of permission:

(i) A joint letter from both sides should explain why permission is needed, and why it is appropriate to grant permission. The letter should deal with all relevant matters including, but not limited to, identification of the specific factors which make it necessary to apply for permission, and confirmation that the parties have satisfied themselves that no other factors arise under rule 38.2. It should identify with precision what steps the parties propose to take, or what additional orders the parties seek, in order to ensure that those specific factors are adequately catered for. Thus, for example, if an injunction has been granted or an undertaking given, the proposed order might make additional provision for relevant injunction(s) and undertaking(s) to be discharged with effect from the date of the order.

(ii) If the parties consider that no additional provision is needed (for example because relevant injunctions or undertakings have already been discharged), an appropriate order might be along the following lines:

"Permission is granted to the claimant to discontinue the whole of the claim against the [relevant] defendant under [if appropriate] CPR 38.2(2)(a)(i) (claims in relation to which the Court has granted an interim injunction) [and/or] CPR 38.2(2)(a)(ii) (claims in relation to which a party has given an undertaking to the Court)."

(g) Where, rather than the default rule as to costs, the parties seek a consent order under which different provision would be made:

(i) If permission to discontinue is sought, then the joint letter sent for that purpose should draw the Court's attention to the precise order as to costs which is sought in the draft order accompanying the application.

(ii) If permission to discontinue is not sought, a joint letter from both sides should confirm that they have considered whether permission to discontinue is needed under rule 38.2 and have satisfied themselves that it is not.



EXHIBIT "H"

(iii) If previous costs orders have been made, the parties should specifically discuss and agree what is to happen in relation to those orders. It will help to avoid problems later if the proposed order specifically identifies what is agreed upon.

(iv) Depending upon the circumstances, an appropriate order might be along the following lines:

“Upon the claimant giving notice of discontinuance [pursuant to the permission granted in paragraph [x] above] [as regards its claim against the [relevant] defendant], CPR 38.6(1) shall not apply. Instead [IF SO AGREED: the costs order(s) dated [•] shall not be enforced and] OR [, without prejudice to costs orders already made,] there shall be no order as to the remaining costs of these proceedings.”

(h) The parties should also bear in mind that if there is a counterclaim or any other type of additional claim, and it is sought to bring this to an end by discontinuance, then notice of discontinuance would need to be given by the party making the additional claim, and any order sought from the Court may need modification to take account of this.

# E. Disclosure

## E.1 Generally

**E.1.1** The purpose of disclosure is to assist in achieving the fair disposal and trial of a claim. Regard must be had to the overriding objective and the need to limit disclosure to that which is necessary to deal with the case justly: rule 31.5(7).

**E.1.2** The Court will have regard to the List of Issues for Disclosure (where applicable) and the List of Common Ground and Issues (D.5).

**E.1.3** The obligations imposed by an order for disclosure continue until the proceedings come to an end. If, after disclosure has been given, the existence (present or past) of further documents to which the order applies comes to the attention of the disclosing party, that party must prepare and serve a supplemental list of those documents.

**E.1.4** Disclosure issues, where they arise at a Case Management Conference, are a good example of issues on which it may be appropriate and helpful for the argument to be prepared and undertaken by a junior advocate (D7.1), and a legal representative who has had direct responsibility for the preparation of the Disclosure Review Document (or the Electronic Documents Questionnaire in cases to which PD 57AD does not apply) should attend.

## E.2 Cases where PD 57AD applies

**E.2.1** PD 57AD applies to most proceedings in the Commercial Court, and where it applies parties should comply with its provisions, including the deadlines for disclosure prior to the CMC. PD 57AD does not apply in the Admiralty Court and does not apply to proceedings within the Shorter Trials Scheme or the Flexible Trials Scheme (unless ordered to apply in the particular case).

**E.2.2** The Disclosure Review Document (where applicable) should be kept simple and concise. In particular, the Issues for Disclosure should be limited by the definition contained in PD 57AD (E2.3), and a proliferation of different Models for Extended Disclosure should be avoided where possible and kept to a minimum where it cannot reasonably be avoided. In most cases, the List of Issues for Disclosure should be shorter, and may be much shorter, than the list of issues in the List of Common Ground and Issues prepared under D.5; and the Court may disallow the costs of unnecessarily lengthy or complex Disclosure Review Documents.



EXHIBIT "H"

**E.2.3** Under PD 57AD, a List of Issues for Disclosure:

(a) is not required unless one or more of the parties has stated that they are likely to request Extended Disclosure including the use of Model C, D or E; and

(b) if required should then contain only the key issues in dispute which the parties consider will need to be determined by the court with some reference to contemporaneous documents that have not been included in Initial Disclosure in order for there to be a fair resolution of the proceedings.

**E.2.4** The Issues for Disclosure should be drafted in simple, concise terms designed to make it easy for persons reviewing documents to assess whether they ought to be disclosed.

**E.2.5** Parties should give careful consideration in every case, whatever its financial value or general complexity, to whether it may properly be treated as a Less Complex Claim for the purpose of disclosure so as to be dealt with pursuant to Appendices 5, 6 and 7 of PD 57AD.

**E.2.6** Parties are obliged to cooperate: PD 57AD §3.2; they should not allow the settling of the Disclosure Review Document to become contentious, time-consuming, or expensive. They should seek Disclosure Guidance wherever practicable to address differences in respect of disclosure and for guidance, including in respect of agreeing the Disclosure Review Document and especially the settling of any List of Issues for Disclosure and the selection of Extended Disclosure Models. These issues should be addressed prior to the CMC in accordance with the requirements in PD 57AD.

**E.2.7** Normally, with the assistance of the parties, the Court will expect to approve the Disclosure Review Document in no more than 1 hour within the first Case Management Conference. If the parties consider that more than 1 hour will be required:

(a) they should consider whether a separate hearing should be sought to deal with the Disclosure Review Document, but

(b) the Court will typically not list such a hearing until after the parties have sought Disclosure Guidance with a view to fostering agreement, and

(c) where possible, any Disclosure Review Document hearing under (a) above will be listed before the Judge who provided Disclosure Guidance under (b) above.

# E.3 Cases not subject to PD57AD

**E.3.1** Guidance for cases not subject to PD 57AD is given in Appendix 15.

# E.4 Authenticity

**E.4.1**

(a) Where the authenticity of any document disclosed to a party is not admitted, that party must serve notice that the document must be proved at trial in accordance with rule 32.19. That rule requires notice to be served within 7 days of disclosure of the document or, if later, by the latest date for serving witness statements. The latter time limit will typically apply, unless the document is disclosed late, but as a matter of proper practice notice under rule 32.19 should normally be served well before the deadline for witness statements so that the party required to prove the document can take that into account when considering what witness statement evidence to obtain.

(b) Where, apart from the authenticity of the document itself, the date upon which a document or an entry in it is stated to have been made, or the person by whom the document states that it or any entry in it was made, or any other feature of the document, is to be challenged at the trial on grounds which may require a witness to be called at the trial to support the contents of the document,

(i) such challenge must be notified in writing to all other parties by the party raising it in good time prior to the exchange of witness statements to enable evidence from such witness or witnesses to be obtained;

(ii) the grounds of challenge, if it is to be pursued at trial, must be explicitly identified in the skeleton argument or written opening submissions for trial.

(c) Where, due to the late disclosure of a document, it or its contents or character cannot practicably be challenged within the time limits prescribed in (a) or (b), the document may only be relied on by the party disclosing it with the permission of the Court and having regard to the overriding objective: rule 1.1.


EXHIBIT "H"

## E.5 Ongoing review of evidence

**E.5.1** Parties should give careful consideration, at all stages of the proceedings, to how they will prove their factual case at trial or refute the disputed factual case of another party. Depending on the nature of the case, this may require ongoing advice and consultation with any advocate instructed for trial.

**E.5.2** Such consideration should inform a party's approach to seeking and giving disclosure. Once disclosure has been given, parties should consider:

(a) how much of the disclosed material will be required at trial,

(b) how the disclosed material is to be introduced into evidence at trial (J8.6);

(c) whether their case for trial will reasonably require any factual witness evidence, and if so on what matters from which witnesses,

(d) whether any directions previously given for expert evidence remain appropriate, and

(e) whether the estimated length of trial remains appropriate.

**E.5.3** Where costs management applies (D2.2), adequate allowance should be included in the parties' costs budgets for the costs of any advice they are likely to require on these matters following disclosure.

## E.6 Translations

**E.6.1** Unless a different order is made in a particular case:

**E.6.2** there is no obligation on a party giving disclosure of documents to obtain translations of documents wholly or partially not in English, but

**E.6.3** any translations a party has in fact obtained of documents it discloses will require to be disclosed.

**E.6.4** Parties should consider the question of document translation prior to any first Case Management Conference in the case so as to make proposals to the Court in any case where there is likely to be a substantial volume of documentary material not in English.

**E.6.5** It may often be appropriate for there to be a timetable for parties to:



**EXHIBIT "H"**

(a) identify to each other any other disclosed documents (whichever party has given the disclosure) they wish to have translated into English for the purpose of the proceedings,

(b) provide translations of documents thus identified,

(c) notify each other of any disagreement with a translation that has been provided (with a direction that except to the extent of any such notified disagreement, translations are to be treated as agreed), and

(d) take steps to resolve any notified disagreement over translations.

# F. Applications

## F.1 Generally

### F.1.1

(a) Applications are governed by Part 23 and PD23A as modified by rule 58 and PD58. As a result

(i) PD23A §§1 and 2.3-2.6 do not apply;

(ii) PD23A §§2.8 and 2.10 apply only if the proposed (additional) application will not increase the time estimate (including the estimate for the Judge's prehearing reading time) already given for the hearing for which a date has been fixed; and

(iii) PD23A §3 is subject in all cases to the Judge agreeing that the application may proceed without an application notice being served.

(b) An adapted version of practice form **N244(CC)** (application notice) has been approved for use in the Commercial Court.

### Service

**F.1.2** Application notices are served by the parties, not by the Court: PD58 §9.

### Evidence

### F.1.3

(a) Attention is drawn to PD23A §9.1 which points out that even where no specific requirement for evidence is set out in the Rules or Practice Directions the Court will in practice often need to be satisfied by evidence of the facts that are relied on in support of, or in opposition to, the application.

(b) Where convenient the written evidence relied on in support of an application may be included in the application notice, which may be lengthened for this purpose, without serving a separate witness statement: rule 32.6(2).

### Time for service of evidence

**F.1.4** The time allowed for the service of evidence in relation to applications is governed by PD58 §13. In relation to summary judgment applications, rule 24.5 does not apply in the Commercial Court and PD24 §2(5) should therefore be read as requiring an applicant for summary judgment to draw the attention of the respondent to PD58 §13.

### Hearings

**F.1.5**

(a) Applications (other than arbitration applications) will be heard in public in accordance with rule 39.2, save where otherwise ordered.

(b) With certain exceptions, arbitration applications will normally be heard in private: rule 62.10(3). See section O.

(c) An application without notice for a freezing injunction or a search order will often need to be heard in private in the interests of justice and therefore be heard in private: see rule 39.2(3).

**F.1.6** Parties should pay particular attention to PD23A §2.9 which warns of the need to anticipate the Court's wish to review the conduct of the case and give further management directions. The parties should be ready to give the Court their assistance and to answer any questions the Court may ask for this purpose.

**F.1.7** PD23A §§6.1-6.11 and §7 deal with the hearing of applications by telephone (other than an urgent application out of Court hours) and the hearing of applications using video-conferencing facilities. Regard should now also be had in particular to guidance issued from time to time as to the Court's approach to remote or hybrid hearings.

## F.2 Applications without notice

**F.2.1** All applications should be made on notice, unless

(a) any rule or Practice Direction or this Guide provides that the application may be made without notice; or

(b) there are good reasons for making the application without notice, for example, because notice would or might defeat the object of the application.



EXHIBIT "H"

**F.2.2** If the application is urgent, the Commercial Court Listing Office should be given a clear explanation in writing, certified by the legal representatives of the applicant if they are represented, of the degree of and reasons for the urgency. It is important to remember that urgency is separate from, and additional to, the question whether it is appropriate to make the application without notice. Once the application documents have been submitted, the application and the explanation for urgency will go before a Judge who will decide if the application is urgent, and if so the degree of urgency.

**F.2.3** Where an application without notice does not involve the giving of undertakings to the Court, it will normally be dealt with on documents. Where undertakings to the Court will be involved, the Court may be willing to proceed on documents if the party giving the undertakings is represented and its legal representatives provide the undertakings in writing, with an express confirmation that they are authorised to give them and that the party giving them submits irrevocably to the jurisdiction of the Court for the purpose of enforcing the undertakings if required.

**F.2.4** Any application for an interim injunction or similar remedy will generally require an oral hearing, although in the following cases the Court is likely to be willing to deal with the matter on documents:

(a) an application without notice to vary an interim injunction granted or continued at an oral hearing, although in such a case, within the reasons given for seeking to have the application determined without notice, the applicant should draw particular attention to any aspect of the proposed variation that will involve the enlargement in substance of the scope of the injunction, the undertakings that have been or ought to be given to the Court, or the matters requiring full and frank disclosure;

(b) an application on full notice, including return day applications for interim injunctions initially granted without notice, where each respondent affected by the application has in writing either consented to or stated that it does not oppose the order sought, having had sight of the form of order proposed by the applicant.

**F.2.5**

(a) A party wishing to make an application without notice which requires an oral hearing before a Judge should contact the Commercial Court Listing Office at the earliest opportunity.

(b) If it is essential to make an application without notice at a time when no Judge of the Commercial Court is available the party wishing to make


EXHIBIT "H"

the application should apply to the King's Bench Judge in Chambers (see P1.1).

**F.2.6** On all applications without notice it is the duty of the applicant and those representing the applicant:

(a) to make full and frank disclosure of all matters relevant to the application;

(b) to ensure that a note or transcript of any oral hearing of the without notice application, together with the evidence and skeleton argument in support of it, all be served on the other party or parties with any order made or as soon as possible thereafter.

**F.2.7** The documents provided for the application should include a draft of the order sought. In accordance with CPR 23.9, the draft order should refer to the right of the respondent to set aside or vary the order, as follows: *"This Order having been made without hearing the [ respondent party(ies) ] or giving them an opportunity to make representations, any party affected may apply to vary or set aside this order providing any such application is issued by no later than 4pm 7 days after service of this order on the party making the application."*

**F.2.8** Save in exceptional circumstances where time does not permit, all the evidence relied upon in support of the application and any other relevant documents must be provided in advance to the Commercial Court Listing Office.

**F.2.9** Practitioners should provide an accurate time estimate not only for the hearing but also for reading. The time estimate must account for all material that may need to be brought to the Judge's attention.

**F.2.10** Practitioners should provide realistic reading lists. In cases of real urgency, it may be better to allow in the time estimate for the hearing for taking the Judge to the relevant documents rather than asking the Judge to read a lot of material in advance.

## F.3 Expedited applications

**F.3.1** The Court will expedite the hearing of an application on notice in cases of sufficient urgency and importance. Any request for an application to be heard sooner than in accordance with the hearing lead times published at the time of the request is a request for an expedited hearing.


EXHIBIT "H"

**F.3.2** If one or more of the parties requests an expedited hearing, that request must be made prior to any listing appointment. Any such request should be made in writing, addressed to the Judge in Charge, setting out why an expedited hearing is said to be required. The approach of the Court will be similar to that taken to requests for an expedited trial (see J1.3), and parties should understand that any expedition request has to be properly justified by reference to the relevant factors.

# F.4 Applications on documents

**F.4.1**

(a) Applications may be suitable for determination on documents. However, only in exceptional cases (or where a rule or Practice Direction specifically so provides) will the Court dispose of a contested application without a hearing in the absence of the consent of all respondents to a determination on documents. Applications to set or vary case management directions, if to be determined on documents, may be made by letter with supporting materials, without issuing an application notice, although all appropriate court fees must still be paid.

(b) On any application to be determined on documents, all documents required to determine the matter must be provided. In particular:

(i) a copy of any relevant previous order must be provided;

(ii) an undated copy of the draft order sought should be filed in Word format. If exceptionally the Court is being asked to determine the application on documents without all parties' consent to such a determination, the draft order must include a statement of the right to apply for it to be set aside, varied or discharged (see rule 3.3(5), as applied by PD23A §11 and rule 23.8(c));

(iii) any order proposing to amend a directions timetable must be accompanied by a note of the trial date (or hearing date for a relevant substantive application) and confirmation that the amendment will not affect the trial date (including any date for a pre-trial review) or hearing date for the relevant substantive application.

(c) Any filing pursuant to paragraph (b) above must be by a single electronic filing of (a copy of) every document required to determine the application, whether or not any particular document will already have been filed at an earlier stage. If an application seeking a determination on documents fails to comply with this requirement it may be rejected for that reason alone and/or the applicant may be penalised in costs.

(d) An applicant must state in its application if a determination on documents is sought. In that case, unless the application is being made without notice, the applicant must not file any documents with the Court until:

(i) the application notice together with any supporting evidence has been served on the respondent;

(ii) the respondent has been allowed at least three clear days to serve written submissions and evidence in opposition;

(iii) any evidence in reply has been served on the respondent; and

(iv) there are included in the documents filed

(1) one of the following:

a) the written consent of the respondent to the disposal of the application without a hearing,

b) the written objection from the respondent to the disposal of the application without a hearing, or

c) confirmation by the applicant that the application, including the grounds for disposing of it without a hearing, were served on the respondent not less than three clear days before filing and there has been no response; and

(2) confirmation by the applicant that it has elected not to serve any evidence in reply (if none is filed).

(e) If an application seeking determination on documents does not comply with paragraph (c) or (d) above, it may be rejected for that reason alone and/or the applicant may be penalised in costs.

(f) A respondent served with an application notice seeking a determination on documents should respond by letter within three clear days of the date of service of the application. If the respondent consents to the application being determined without a hearing, it should state that consent and either serve any written submissions and evidence in opposition or, if further time is needed, state how much further time is required and the grounds upon which further time is required. If the respondent does not consent to the application being determined without a hearing, it should state that objection and give reasons for it. The letter should be sent (by email, where possible) to the applicant and



EXHIBIT "H"

any other parties concerned in the application, so that it may be filed by the applicant with the Court pursuant to paragraph (b) above.

(g) If the Court concludes, exceptionally, that it is appropriate to dispose of an application without a hearing where the respondent has provided reasoned objection to that course, the Court will give directions for the immediate service by the respondent of any written submissions or evidence in opposition to the application.

## F.5 Listing; time estimates; pre-reading

**F.5.1** Dates for the hearing of applications to be attended by advocates are normally fixed after discussion with the counsel's clerks or with the solicitor concerned. For a heavy application (F.7), the Listing Office should identify the date that will be the first day of reading time for the Judge. If it does not do so, the parties should check (and see F7.5).

**F.5.2** Parties must provide time estimates for (i) required pre-reading time for the Judge and (ii) required hearing time, agreed if possible, whenever seeking a hearing date from the Listing Office, and:

(a) unless (b) below applies, a separate estimate must be given for each application, including any application issued after, but to be heard at the same time as, another application;

(b) a separate estimate need not be given for any application issued after, but to be heard at the same time as, another application where the advocate in the case certifies in writing that the determination of the application issued earlier will necessarily determine the application issued subsequently or the matters raised in the application issued subsequently are not contested.

**F.5.3** Parties need to be realistic about the length of time required to determine applications. The Court's experience is that parties under-estimate the time required for pre-reading, for the hearing, or both, far more often than they over-estimate time. Where pre-reading or hearing time is under-estimated, the hearing may be adjourned and/or the parties may be penalised in costs

**F.5.4** The time required for a hearing should be estimated on the basis that the Judge will aim to give immediate judgment at the hearing on any application listed for a hearing of no more than half a day. Therefore:

(a) a hearing of more than half a day must be sought when an application is listed unless the parties are confident that their hearing estimate of half a day or less will be sufficient for (i) the argument of the application,


EXHIBIT "H"

(ii) judgment on the application, and (iii) argument and rulings on costs and other consequential matters arising out of the judgment;

(b) an application should not be treated or listed as an ordinary application (F7.6) unless the parties reasonably expect to require no more than one and a half hours to argue the application.

**F.5.5**

(a) Unless permission has been granted for a longer hearing, the Commercial Court Listing Office will not list an oral hearing with an estimate exceeding an applicable maximum in the following list:

Application to challenge jurisdiction/service: 4 hours

Application for summary judgment: 4 hours

Application to set aside/vary interim remedy: 4 hours

Hearing to settle and approve Disclosure Review Document (when not dealt with as part of the Case Management Conference): ½-day

Application concerning disclosure*: 2 hours

(* i.e. under paragraph 17 and/or paragraph 18 of PD 57AD, for specific disclosure under rule 31.12, or for pre-action disclosure under rule 31.16 or disclosure against a non-party under rule 31.17)

Application to set aside default judgment: 2 hours

Application for further information (Part 18) or to amend a statement of case: 1 hour

Application for security for costs: 1 hour

Hearing to seek Disclosure Guidance: 1 hour

(b) An application for a longer oral hearing than a maximum in the list above should be made in writing specifying the additional time required and giving reasons why it is required. The written application (which may be by letter, and should be agreed where possible) should be filed on CE File as an Application to a Judge – Application to Judiciary on Paper, and sent to the advocates for all other parties in the case at the same time as it is filed on CE File as an application for a judge on paper.


EXHIBIT "H"

**F.5.6**

(a) Not later than five days before the date fixed for the hearing the applicant must provide the Listing Office with the applicant's current estimate of the reading and hearing time required to dispose of the application.

(b) If at any time either party considers that there is a material risk that the hearing of the application will exceed the time currently allowed it must inform the Listing Office immediately.

## F.6 Ordinary applications

**F.6.1** Applications to be listed for a hearing of half a day or less are regarded as "ordinary" applications (and see F5.4). Half a day means two and a half hours.

**F.6.2** An ordinary application will generally be listed to be heard on a Friday if there is no urgency requiring it to be heard on a different day (and see F7.3).

**F.6.3**

(a) The timetable for ordinary applications is set out in PD58 §13.1.

(b) This timetable may be abridged or extended by agreement between the parties provided that any date fixed for the hearing of the application is not affected: PD58 §13.4. In appropriate cases, this timetable may be abridged by the Court.

**F.6.4** An application bundle (see F.11) and the case management bundle must be provided to the Listing Office by 12 pm one clear day before the date fixed for the hearing together with a letter from the applicant's solicitors confirming or updating the time estimate for the hearing and the reading time required for the Judge. A "clear day" is explained by rule 2.8(3). The applicant must be willing to provide a copy of the application bundle and the case management bundle (and not simply an index) to other parties, at the cost (if there is a cost) of the receiving party, at the same time as those bundles are provided to the Court.

**F.6.5** Skeleton arguments must be provided by all parties. These must be provided to the Listing Office and served on the advocates for all other parties to the application by 12 pm on the working day before the date fixed for the hearing. Advocates should note:

(a) Guidelines on the preparation of skeleton arguments are set out in Appendix 5.


EXHIBIT "H"

(b) The skeleton should include an estimate of the reading time likely to be required by the Court and a suggested reading list, preferably agreed.

(c) Skeletons should not be more than 15 pages in length (font minimum 12 point; 1.5 line spacing). Any application to serve a longer skeleton should be made on documents to the Court briefly stating the reasons for exceeding the page limit and stating what number of pages is said to be necessary. Such application should be made sufficiently in advance of the deadline for service to enable the Court to rule on it before that deadline. The provisions as to the length of skeletons reflect the experience of the Court over time as to what is most useful.

**F.6.6** Thus, for an application estimated for a hearing of half a day or less and due to be heard on a Friday:

(a) the application bundle and case management bundle must be provided by 12 pm on Wednesday; and

(b) skeleton arguments must be provided by 12 pm on Thursday.

**F.6.7** If, exceptionally, and for reasons outside the reasonable control of the advocate a skeleton argument cannot be delivered to the Listing Office by 12 pm, the Clerk of the Judge hearing the application should be informed **before 12 pm**, and with accompanying reasons, and the skeleton argument should be delivered direct to that Clerk as soon as possible and in any event not later than 4 pm the day before the hearing.

**F.6.8** Problems with providing bundles or skeleton arguments should be notified to the Commercial Court Listing Office as far in advance as possible. **If the application bundle, case management bundle or skeleton argument is not provided by the time specified, the application may be stood out of the list without further warning and there may be costs consequences.**

**F.6.9** J7.3 (provision of skeleton arguments to reporters and members of the public) applies to skeleton arguments for an ordinary application.

## F.7 Heavy applications

**F.7.1** Applications to be listed for a hearing longer than half a day are regarded as "heavy" applications and will not be listed for hearing on a Friday.

**F.7.2** The timetable for heavy applications is set out in PD58 §13.2.

**F.7.3** An application bundle (see F.10) and case management bundle must be provided to the Listing Office by 4 pm two clear days before:



EXHIBIT "H"

(a) the date fixed for the hearing; or

(b) the first day of the required reading period (F5.1).

A "clear day" is explained by rule 2.8(3).

The bundles should be provided together with a reading list and an estimate for the reading time likely to be required by the Court and a letter from the applicant's solicitors confirming or updating the time estimate for the hearing. The applicant must be willing to provide a copy of the application bundle and the case management bundle (and not simply an index) to other parties, at the cost (if there is a cost) of the receiving party, at the same time as those bundles are provided to the Court.

**F.7.4** If (despite F5.1) the Listing Office has not identified the first day of reading time, parties should assume that the Judge's reading time for the hearing of a heavy application will be taken on the last working day prior to the hearing that is not a Friday. So, for example, unless the Listing Office has notified the parties otherwise, reading for a hearing on a Monday, or on a Tuesday after a Bank Holiday Monday, will be on the preceding Thursday (assuming that is a working day), not the preceding Friday.

**F.7.5**

(a) Guidelines on the preparation of skeleton arguments are set out in Appendix 5.

(b) Skeleton arguments must be provided to the Listing Office and served on the advocates for all other parties to the application as follows:

(i) applicant's skeleton argument by the same date and time as the bundles (F7.3);

(ii) respondent's skeleton argument by 4 pm on the next working day. If a longer interval is needed between the applicant's and respondent's skeleton arguments, the parties should propose a bespoke timetable for approval by the Court.

(c) Skeletons should not be more than 25 pages in length (font minimum 12 point; 1.5 line spacing). Any application to serve a longer skeleton should be made as described in F6.5(c).

(d) Both skeleton arguments should include a reading list and time estimate for the hearing, preferably agreed. The applicant's skeleton should also provide a chronology and dramatis personae, if warranted.

**F.7.6** Problems with providing bundles or skeleton arguments should be notified to the Commercial Court Listing Office as far in advance as possible. **If the application bundle, case management bundle or skeleton argument is not provided by the time specified, the application may be stood out of the list without further warning.**

**F.7.7** J7.3 (provision of skeleton arguments to reporters and members of the public) applies to skeleton arguments for a heavy application.

# F.8 Evidence

## Generally

**F.8.1** Although evidence may be given by affidavit, it should generally be given by witness statement, except where it can conveniently be given in the application notice (see rule 32.6(2)) or where PD32 requires evidence to be given on affidavit (for example, in an application for a freezing injunction: PD32 §1.4). In other cases the Court may order that evidence be given by affidavit: PD32 §1.4(1) and 1.6.

**F.8.2** Witness statements and affidavits must comply with the requirements of PD32, save that photocopy documents should be used unless the Court orders otherwise. Witness statements must not be used to argue the application. They should be confined to (a) matters of fact to be relied on in support of, or in resisting, the application, and (b) satisfying any specific requirements under a rule or Practice Direction stipulating that certain matters have to be stated in a witness statement. Argument should be left to be outlined in skeleton arguments and developed orally at the hearing. If the relevance or importance of the evidence set out in or exhibited to the witness statement(s) may not be obvious, consideration should be given to providing with the statement(s) an explanatory covering letter or provisional written submission. Costs of non-compliant witness statements or affidavits may be disallowed.

**F.8.3** Statements of case, previous orders and previous witness statements or affidavits, in the claim in which the application is made, should not be exhibited, even if referred to in a witness statement or affidavit in the application.

**F.8.4**

(a) Witness statements must be verified by a statement of truth signed by the maker of the statement: rule 22.1.

(b) At hearings other than trial an applicant may rely on the application notice itself, and a party may rely on its statement of case, if the



EXHIBIT "H"

application notice or statement of case (as the case may be) is verified by a statement of truth: rule 32.6(2).

(c) A statement of truth in an application notice may also be signed as indicated in C1.6 and C1.7.

**F.8.5** Proceedings for contempt of Court may be brought against a person who makes, or causes to be made, a false statement in a witness statement (or any other document verified by a statement of truth) without an honest belief in its truth: rule 32.14.

## Expert evidence

**F.8.6** Where a party wishes to rely on expert evidence at a hearing other than a trial, the permission of the Court should still be obtained to ensure that expert evidence is only placed before the Court when it is reasonably required to resolve the application, to enable the nature, scope and sequence of any expert evidence to be managed by the court, and to avoid the difficulties which can occur when one party to an application seeks to adduce expert evidence at a late stage or different parties identify different issues on which it may be relevant to consider expert opinion.

**F.8.7** For the avoidance of doubt, a party relies on expert evidence whenever they put before the court, so as to invite the Court to take its substance into account when judging the application, evidence of opinion on a matter calling for expertise, whether the opinion is given in writing or orally and whether directly (from the source) or indirectly (as where a solicitor's witness statement reports an opinion communicated to them).

**F.8.8** In applications on notice, a party wishing to adduce expert evidence, or identifying that another party appears to be relying on expert evidence, should raise the issue with the Court as soon as possible after the application has been issued and served. The question should not be left to be dealt with only when the application is heard or determined on paper, as the case may be.

**F.8.9** Where a party wishes to rely on expert evidence as part of a without notice application, they may and normally should ask the Court to consider the question of permission to do so when it deals with the application at a hearing or on paper, as the case may be.

**F.8.10** Any party wishing to rely on expert evidence of foreign law in particular should have regard to H.3. When considering permission pursuant to F8.5, it will frequently be satisfactory for expert evidence of foreign law for an interim application:


EXHIBIT "H"

(a) to take the form of evidence in a witness statement or affidavit reporting the content of an opinion communicated to the deponent by an appropriately qualified foreign lawyer, without requiring an expert report;

(b) for the opinion relied on to be that of an appropriately qualified lawyer who acts for the party; or

(c) in a suitable case, to be provided by the exhibiting of foreign law source materials.

# F.9 Applications disposed of by consent

**F.9.1**

(a) Consent orders may be submitted to the Court in draft for approval without the need for attendance.

(b) Two copies of the draft, one signed on behalf of all parties to whom it relates, and one in clean Word format, should be filed at the Registry. The copies should be undated. The order will be dated with the date of the Judge's approval.

(c) The parties should act promptly in filing the copies at the Registry. If it is important that the orders are made by a particular date, that fact (and the reasons for it) should be notified in writing to the Registry.

(d) Where the order relates to or proposes to amend an earlier order a copy of that earlier order should be filed at the same time (see F4.1(a)/ (F4.1(c)).

(e) Any consent order submitted in draft and proposing to amend a directions timetable for a trial or other hearing that has been listed must be accompanied, unless the proposal by consent is to vacate the trial or hearing date and re-list, by a note of the trial date or hearing date and confirmation that the amendment will not put that date at risk.

**F.9.2** For the use of consent orders in relation to a Case Management Conference or pre-trial review, see D7.2(a), D17.5.

**F.9.3** Where an order provides a deadline by which something is to be done the order should wherever possible state the particular date by which the thing is to be done rather than specify a period of time from a date or event: rule 2.9.


EXHIBIT "H"

# F.10 Application bundles

**F.10.1**

(a) Appendix 7 should be followed in preparing all application bundles including bundles of authorities.

(b) Bundles for use on applications may be compiled in any convenient manner but must contain the following documents (preferably in separate sections in the following order):

(i) a copy of the application notice;

(ii) a draft of the order sought;

(iii) a copy of the statements of case, if the application precedes the first Case Management Conference;

(iv) copies of any relevant previous orders;

(v) copies of the witness statements and affidavits filed in the application, together with any exhibits.

(c) If it is likely to be necessary for the Court to read in chronological order correspondence or other documents exhibited across different affidavits or witness statements, copies of the documents in question should be organised and paginated in chronological order in a separate composite bundle or bundles which should be agreed between the parties. If time does not permit agreement, the applicant should prepare the composite bundle and provide it as one of the hearing bundles.

# F.11 Chronologies, indices and dramatis personae

**F.11.1** Applicants should provide a chronology, cross-referenced to the documents, and a dramatis personae where that will assist.

**F.11.2** Guidelines on the preparation of chronologies and indices are set out in Appendix 6.



EXHIBIT "H"

# F.12 Authorities

**F.12.1** Authorities should only be cited when they contain a principle of law relevant to an issue arising on their application and where their substance is not to be found in a decision of a Court of higher authority. Practitioners should comply with the Practice Note on Citation of Authorities dated 23 March 2012. In particular, where a judgment is reported in the Official Law Reports that report must be cited. Other series of reports and official transcripts should only be used when a case is not reported in the Official Law Reports. Unreported cases should normally be cited only where they are authority for some principle of law of which the substance (as distinct from mere choice of phraseology) is not to be found in any reported judgment. In all cases where an authority is cited, the proposition of law demonstrated by the particular authority should be stated and the specific passage(s) in the judgment supporting the proposition should be identified.

**F.12.2** Any key authorities that it would be useful for the Judge to read before the hearing of the application should be provided with the skeleton arguments.

**F.12.3** Bundles of authorities should be provided as soon as possible after skeleton arguments have been exchanged. For heavy applications, a joint bundle of authorities should be prepared by the applicant. For ordinary applications, each party should provide their own bundle of authorities.

**F.12.4** Any authorities bundle should include only those authorities the Judge is likely to be taken to at the hearing or asked to read. Where authorities have been cited in the skeleton arguments for propositions that are uncontentious, they should not be included in the authorities bundle.

# F.13 Costs

**F.13.1** The rules governing the award and assessment of costs are contained in Parts 44 to 48.

**F.13.2** The Court will generally look to assess costs summarily in all ordinary applications and in all cases where the schedule of costs of the successful party is no more than £250,000, but the parties should be prepared for the Court to assess costs summarily even for a heavy application where the costs exceed that amount.

**F.13.3** A payment on account of costs will generally be ordered, absent good reason, where costs are not assessed summarily.


EXHIBIT "H"

# F.14 Interim injunctions

## Generally

### F.14.1

(a) Applications for interim injunctions are governed by Part 25.

(b) Applications must be made on notice in accordance with Part 23 unless there are good reasons for proceeding without notice (see F.2).

(c) A party who wishes to make an application for an interim injunction must give the Commercial Court Listing Office as much notice as possible, indicating the type of application likely to be made, the anticipated time requirement for reading and a hearing, and when it is expected that papers will be ready for submission to a Judge.

### F.14.2

(a) Except when there is such urgency as to make this impracticable, the applicant

(i) must issue a claim form and obtain the evidence on which it wishes to rely before making the application,

(ii) should provide the Court with a skeleton argument in good time for the Judge to read it before any hearing.

(b) An affidavit, and not a witness statement, is required on an application for a freezing order: PD25A §3.1.

## Fortification of undertakings

### F.14.3

(a) Where the applicant for an interim remedy is not able to show sufficient assets within the jurisdiction of the Court to provide substance to any undertakings given, it may be required to provide security.

(b) Security will be ordered in such form as the Judge decides is appropriate. Forms of security commonly used are:

(i) a payment into Court,

(ii) a bond issued by an insurance company,

(iii) a first demand guarantee or standby credit issued by a first-class bank,

(iv) a payment to the applicant's solicitors to be held by them, as officers of the Court, to the Court's order,

(v) the guarantee or undertaking of a parent company with substantial assets within the jurisdiction of the Court.

## Form of order

**F.14.4** An interim remedy expressed to remain in force until judgment (or further order) remains in force until the delivery of a final judgment (unless some other order is made in the meantime). If an interim remedy after judgment is required, an application to that effect must be made (K.1).

**F.14.5** An order for an interim remedy should generally provide that acts which would otherwise be a breach of the order are permitted if done with the written consent of the solicitor of the other party or parties, to reduce the need to come back to the Court with further applications.

## Freezing injunctions

**F.14.6** Standard forms of wording for freezing injunctions for use in the Commercial Court, with important explanatory footnotes, are set out in Appendix 11. The standard wording may be modified, but any modifications proposed by an applicant should be:

(a) shown using tracked changes on a copy of the draft Order provided to the Court,

(b) identified and explained individually in any skeleton argument for the application, and

(c) drawn to the Judge's attention expressly at the application hearing.

**F.14.7**

(a) Freezing injunctions made on an application without notice will provide for a return date unless the Judge otherwise orders: PD25 §5.1(3).

(b) If, after service or notification of the injunction, one or more of the parties considers that the time allowed for the return date hearing will be insufficient to deal with the matter, the Listing Office should be informed forthwith and in any event not later than 4 pm one clear day before the return date (so, for example, by 4 pm on Wednesday for a return date on a Friday).

(c) If the parties agree to postpone the return date to a later date, an agreed form of order continuing the injunction to the postponed return



EXHIBIT "H"

date should be submitted for consideration by a Judge and if the proposed order is approved, the parties do not need to attend on the original return date and the defendant, and any other interested party, will continue to have liberty to apply to vary or set aside the order.

**F.14.8** A provision for the defendant to give notice of any application to discharge or vary the order is usually included as a matter of convenience but it is not proper to attempt to fetter the right of the defendant to apply without notice or on short notice if need be.

**F.14.9** Any bank or third party served with, notified of, or affected by a freezing injunction may apply to the Court without notice to any party for directions, or notify the Court in writing without notice to any party, in the event that the order affects or may affect the position of the bank or third party under legislation, regulations or procedures aimed to prevent money laundering.

## Search orders

**F.14.10** Search orders are rare. Attention is drawn to the detailed requirements in respect of search orders set out in PD25A §7. The applicant for the search order will normally be required to undertake not to inform any third party of the search order or of the case until after a specified date.

## Applications to discharge or vary freezing injunctions and search orders

**F.14.11** Applications to discharge or vary freezing injunctions and search orders are treated as matters of urgency for listing purposes. Those representing applicants for discharge or variation should ascertain before a date is fixed for the hearing whether, having regard to the evidence which they wish to adduce, the claimant would wish to adduce further evidence. If so, all reasonable steps must be taken to agree the earliest practicable date at which the parties can be ready for a hearing, to avoid vacating a fixed date at the last minute. In cases of difficulty the matter should be referred to a Judge.

**F.14.12** If a freezing injunction or a search order is discharged on an application to discharge or vary, or on the return date, the Judge will consider whether it is appropriate to assess damages at once and direct immediate payment by the applicant. Where a hearing in connection with the cross undertaking of damages or the assessment of damages is directed but postponed to a future date, case management directions will be given.

### Applications under section 25 of the Civil Jurisdiction and Judgments Act 1982

**F.14.13** A Part 8 claim form (rather than an application notice: cf. rule 25.4(2)) must be used for an application under section 25 of the Civil Jurisdiction and Judgments Act 1982 ("Interim relief in England and Wales and Northern Ireland in the absence of substantive proceedings"). The modified Part 8 procedure used in the Commercial Court is referred to at B.5.

## F.15 Security for costs

**F.15.1** Applications for security for costs are governed by rules 25.12-14.

**F.15.2** Related practice is set out in Appendix 10.


EXHIBIT "H"

# G. Negotiated Dispute Resolution ("NDR")

## G.1 Generally

**G.1.1** Parties who consider that NDR (referred to in previous editions of the Guide as 'ADR') might be an appropriate means of resolving the dispute or particular issues in the dispute may apply for directions at any stage.

**G.1.2** Legal representatives in all cases should consider with their clients and the other parties concerned the possibility of attempting to resolve the dispute or particular issues by NDR and should ensure that their clients are fully informed as to the most cost effective means of resolving their dispute.

**G.1.3** The Judges will in appropriate cases invite the parties to consider whether their dispute, or particular issues in it, could be resolved through NDR procedures (such as, but not confined to, mediation and conciliation). Where that is done, if appropriate, a hearing may be adjourned, or the proceedings may be stayed, for a specified period of time to allow for NDR, extending time as may be required for the taking of other steps in the case, including under existing orders. In an appropriate case, an NDR Order as set out in Appendix 3 may be made.

**G.1.4** Where the Court seeks to assist the parties in agreeing an individual, panel or body to act as mediator, conciliator or other neutral NDR service provider, for example under paragraph 3 of an NDR Order in Appendix 3 form, that will not and must not be taken as involving recommendation.

**G.1.5** Any order providing for NDR should include an order as to the costs that the parties may incur in using or attempting to use NDR, if the case is not settled. The order as to such costs is normally either (a) an order for costs in the case or (b) an order that each side shall bear its own costs.

**G.1.6** In some cases it may be appropriate for an NDR order to be made following judgment if an application is made for permission to appeal, in which case the application for permission to appeal may be adjourned, to be restored if the matter is not settled through NDR procedures by a specified date.

**G.1.7** If the Court considers that bilateral negotiations between the parties' respective legal representatives is likely to be a more cost-effective and productive route to settlement than other forms of NDR, the Court may set a date by which there is to be a meeting between the solicitors and representatives of their respective clients with authority to settle the case.


EXHIBIT "H"

## G.2 Early neutral evaluation

**G.2.1** Early neutral evaluation ("ENE") is a without-prejudice, non-binding, evaluation of the merits of a dispute or of particular issues in dispute, given after time-limited consideration of core materials and having read or listened to concise argument. It is designed to take place in private at an early stage in a dispute.

**G.2.2** At a Case Management Conference, the Court may explore whether ENE may assist in resolving the dispute.

**G.2.3** ENE may be provided by appropriate third parties or, in an appropriate case if agreed by all parties, by one of the Judges of the Court. The approval of the Judge in Charge must be obtained before any ENE is undertaken by a Judge.

**G.2.4** Where the evaluation is undertaken by a Judge, only brief, informal reasons will be provided, usually expressed orally.

**G.2.5** Where ENE by a Judge of the Court is sought by the parties and approved by the Judge in Charge:

(a) The Judge in Charge will nominate the Judge who will conduct the ENE.

(b) The nominated Judge will give directions for the preparation and conduct of the ENE.

(c) The Judge who conducts the ENE will take no further part in the case, at any stage, unless the parties agree otherwise.


EXHIBIT "H"

# H. Evidence for Trial

## H.1 Witnesses of fact

### Preparation and form of witness statements

**H.1.1** Unless the Court directs otherwise, witness statements must comply with the requirements of PD32 and PD57AC and should be prepared in accordance with the Appendix to PD57AC.

**H.1.2** Where a case management direction is made permitting supplemental or reply witness statements, that permission is limited, unless otherwise specified, to witnesses from whom witness statements have already been served.

### Witness statement as evidence in chief

**H.1.3** Where a witness is called to give oral evidence, the witness statement of that witness is to stand as the witness's evidence in chief unless the Court orders otherwise: rule 32.5(2).

(a) The trial Judge may direct that the whole or any part of a witness's evidence in chief is to be given orally, either on the Judge's own initiative or on application by a party. Any application for such an order should normally be notified in good time before, and made at, the pre-trial review if there is one. Where no pre-trial review has been ordered, any such application should normally be notified in the progress monitoring information sheet.

(b) Any objection to the Court treating some or all of the content of a witness statement as evidence in chief at trial should be raised when the case is first before the Court for a Case Management Conference following service of the statement in question. If there is no such Case Management Conference then the objection should be raised at the pre-trial review if there is one, otherwise in the skeleton argument for trial of the party raising the objection.



EXHIBIT "H"

## Additional evidence from a witness

**H.1.4** A witness giving oral evidence at trial may with the permission of the Court (i) amplify the witness statement or (ii) give evidence in relation to new matters which have arisen since the witness statement was served: rule 32.5(3). Permission will be given only if the Court considers that there is good reason not to confine the evidence of the witness to the contents of the witness statement: rule 32.5(4). Any proposal for amplification or new evidence should be discussed between advocates for each party before the witness is called.

(a) A supplemental witness statement should be served where the witness proposes materially to add to, alter, correct or retract from what is in their original statement(s), permission for which will be required and should be sought at the pre-trial review or, if there is no pre-trial review, as early as possible before the start of the trial (see J.3). If application is made at any later stage, the applicant must provide compelling evidence explaining the delay.

(b) Witnesses additional to those whose statements have been served pursuant to the Court's case management directions may only be called with the permission of the Court which will not normally be given without prompt application supported by compelling evidence explaining the late introduction of that witness.

## Notice of decision not to call a witness

**H.1.5** If a party decides not to call to give oral evidence at trial a witness whose statement has been served, but wishes to rely upon their evidence, the party must put in the statement as hearsay evidence unless the Court otherwise orders: rule 32.5. If the party proposes to put the evidence in as hearsay evidence, reference should be made to Part 33.

(a) If the party who has served the statement does not put it in as hearsay evidence, any other party may do so: rule 32.5(5).

## Witness summonses

**H.1.6**

(a) Part 34 deals with witness summonses, including a summons for a witness to attend Court or to produce documents in advance of the date fixed for trial.

(b) Witness summonses are served by the parties, not the Court.

# H.2 Expert witnesses

## Application for permission to call an expert witness

**H.2.1** The Court will restrict expert evidence to that which is reasonably required to resolve the proceedings: rule 35.1. The Court will consider whether expert evidence is necessary at all, and, where it is necessary, how it may make the best contribution and how its length and cost may best be controlled.

**H.2.2** Any application for permission to call an expert witness or serve an expert's report should normally be made at the Case Management Conference.

**H.2.3** A party applying for such permission will be expected to provide an estimate of the costs of the proposed expert evidence.

**H.2.4** A party applying for permission to call an expert witness will be expected to identify the issue(s) in the List of Common Ground and Issues to which the proposed expert evidence relates.

**H.2.5** The Court will generally wish to specify in any order granting permission for expert evidence the particular question(s), within their expertise, upon which the expert is to be instructed to provide an opinion, and may limit the length of an expert report.

**H.2.6** Parties should be prepared to consider the use of single joint experts in appropriate cases, but the Court recognises that in many cases it will be appropriate for each party to be given permission to call one expert in each field requiring expert evidence.

**H.2.7** Whether permission is sought for a single joint expert or for separate experts, the Court will expect the parties to co-operate in developing, and agreeing to the greatest possible extent, the detailed terms of reference for the expert(s).

**H.2.8** In most cases the terms of reference will (in particular) identify in detail what the expert is asked to do, identify any documentary materials the expert is asked to consider and specify any assumptions the expert is asked to make.

## Provisions of general application in relation to expert evidence

**H.2.9** The provisions set out in Appendix 8 apply to all aspects of expert evidence (including expert reports, meetings of experts and expert evidence given orally) unless the Court orders otherwise. Parties should ensure that they are drawn to the attention of any expert(s) they instruct at the earliest opportunity.


EXHIBIT "H"

## Form and content of expert's reports

**H.2.10** Expert's reports must comply with the requirements of PD35. The following particular points are emphasised:

(a) In stating the substance of all material instructions (written or oral) on the basis of which their report is written as required by rule 35.10(3) and PD35 §3.2(3) an expert witness should state (i) the facts and (ii) the assumptions upon which their opinion is based.

(b) The expert must make it clear which, if any, of the facts stated are within the expert's own direct knowledge.

(c) If a stated assumption is, in the opinion of the expert witness, unreasonable or unlikely they should state that clearly.

(d) The expert's report must be limited to matters relevant to the issue or issues in the List of Common Ground and Issues to which the relevant expert evidence relates and for which permission to call such expert evidence has been given.

(e) The report of an expert should be as concise as possible.

(f) It is useful if a report contains a glossary of significant technical terms.

**H.2.11** If an expert witness is not sufficiently fluent in English to give evidence in English, their expert report should be in the witness's own language and a translation provided.

**H.2.12** Where the evidence of an expert is to be relied on for the purpose of establishing primary facts, as well as for the purpose of providing their opinion to the Court on a matter within their expertise, as for example where a surveyor, assessor, adjuster, or other investigator instructed as an expert witness will (also) give evidence about the condition of a ship or other property as found by the expert at a particular time, that part of the expert's evidence which is to be relied upon to establish the primary facts is to be treated as factual evidence and should be put into a factual witness statement from the expert, to be exchanged in accordance with the order for the exchange of factual witness statements. It is not proper practice to postpone disclosure of a party's factual evidence by including it in or serving it with expert reports.

## Statement of truth

**H.2.13** The report must be signed by the expert and must contain a statement of truth in accordance with Part 35.


EXHIBIT "H"

(a) Proceedings for contempt of Court may be brought against a person who makes, or causes to be made, without an honest belief in its truth, a false statement in an expert's report verified in the manner set out in this section.

## Request by an expert to the Court for directions

**H.2.14** An expert may provide to the Court a written request for directions to assist in carrying out the function of expert, but

(a) at least 7 days before the expert does so (or such shorter period as the Court may direct) the expert should provide a copy of the proposed request to the party instructing them; and

(b) at least 4 days before the expert provides the request to the Court (or such shorter period as the Court may direct) the expert should provide a copy of the proposed request to all other parties.

## Exchange of reports

**H.2.15** Whether the reports of expert witnesses of like disciplines should be exchanged simultaneously or sequentially should always be considered at the Case Management Conference or other hearing at which the question of permission for expert evidence is being examined.

**H.2.16** The sequential exchange of expert reports may in many cases save time and costs by helping to focus the contents of responsive reports upon actual rather than assumed issues of expert evidence and by avoiding repetition of detailed introductory or explanatory material. On the other hand, it may encourage the expert whose report is served to focus to excess on seeking to challenge the report served first rather than on assisting the Court.

**H.2.17** The experience of the Court is that sequential exchange is often particularly effective for expert evidence of foreign law or from forensic accountants.

## Meetings of expert witnesses

**H.2.18** The Court will normally direct a meeting or meetings of expert witnesses before trial, and it may be useful for there to be further meetings during the trial.

**H.2.19** Consideration should also be given, when permission is being sought, to whether experts should meet before they prepare their expert reports.

**H.2.20** The purpose of a meeting of experts is to give the experts the opportunity:

(a) to discuss the expert issues; and

(b) to decide, with the benefit of that discussion, on which expert issues they share or can come to share the same expert opinion and on which expert issues there remains a difference of expert opinion between them (and what that difference is).

**H.2.21** Subject to H2.25, the content of the discussion between the experts at or in connection with a meeting is without prejudice and shall not be referred to at the trial unless the parties agree: rule 35.12(4).

**H.2.22** Subject to any directions of the Court, the procedure to be adopted at a meeting of experts is a matter for the experts themselves, not the parties or their legal representatives.

**H.2.23** Neither the parties nor their legal representatives should seek to restrict the freedom of experts to identify and acknowledge the expert issues on which they agree at, or following further consideration after, meetings of experts.

**H.2.24** Unless the Court orders otherwise, at or following any meeting the experts should prepare a joint memorandum for the Court recording

(a) the fact that they have met and discussed the expert issues;

(b) the issues on which they agree;

(c) the issues on which they disagree; and

(d) a brief summary of the reasons for their disagreement.

**H.2.25** If the joint memorandum is done well, further (reply) expert reports will often not be required, even if permission has been given for them. It is generally inappropriate for an expert to decline to reveal, or provide a summary for inclusion in the joint memorandum of, their reasons for maintaining some point of disagreement, in order to set it out instead in a further (reply) report. If time does not allow the joint memorandum to do justice to some area of disagreement, for example if further modelling, calculations or research may need to be conducted, that fact, and the nature of any further work to be done by either expert, should be explained in the joint memorandum.

**H.2.26** If experts reach agreement on an issue that agreement shall not bind the parties unless the parties expressly agree to be bound by it.


EXHIBIT "H"

## Written questions to experts

**H.2.27** Under rule 35.6 a party may, without the permission of the Court, put proportionate written questions to an expert instructed by another party (or to a single joint expert) about that expert's report. Unless the Court gives permission or the other party agrees, such questions must be for the purpose only of clarifying the report.

(a) The Court will pay close attention to the use of this procedure (especially where separate experts are instructed) to ensure that it remains an instrument for the helpful exchange of information. The Court will not allow it to interfere with the procedure for an exchange of professional opinion at a meeting of experts, or to inhibit that exchange of professional opinion. The Court will not hesitate, where appropriate, to disallow questions with an order for costs against the party putting them.

## Documents referred to in experts' reports

**H.2.28** Unless they have already been provided on inspection of documents at the stage of disclosure, copies of any photographs, plans, analyses, measurements, survey reports or other similar documents relied on by an expert witness as well as copies of any unpublished sources must be provided to all parties at the same time as the report.

**H.2.29**

(a) Rule 31.14(2) (para 21 of PD 57AD) provides that (subject to rule 35.10(4)) a party may inspect a document mentioned in an expert's report. In a commercial case an expert's report will frequently, and helpfully, list all or many of the relevant previous documents (published or unpublished) or books written by the expert or to which the expert has contributed. Requiring inspection of this material may often be unrealistic, and the collating and copying burden could be huge.

(b) Accordingly, a party wishing to inspect a document in an expert report that does not fall within H2.29 (which documents are to be provided as there specified) should (failing agreement) make an application to the Court. The Court will not permit inspection unless it is satisfied that it is necessary for the just disposal of the case and that the document is not reasonably available without ordering inspection.

### Trial

**H.2.30** The Court will consider at the Case Management Conference with the parties whether there should be a direction that the reading list for trial must:

(a) identify the issues that the Court will be asked to decide with the assistance of expert evidence;

(b) in respect of each such issue, briefly state each party's case;

(c) in respect of each such issue, identify the pages of the expert evidence that need in the opinion of the trial advocates to be read.

**H.2.31** At trial the evidence of expert witnesses is usually taken as a block, after the evidence of witnesses of fact has been given.

**H.2.32** The introduction of additional expert evidence after the commencement of the trial can have a severely disruptive effect. Accordingly, experts' supplementary reports (if required at all: see H2.25) must be completed and exchanged by the date ordered for such reports or, where no date is ordered, not later than the progress monitoring date. The introduction of additional expert evidence after the relevant date will only be permitted upon application to the trial Judge and if there are very strong grounds for admitting it.

**H.2.33** The Court may direct that some or all of the experts from like disciplines shall give their evidence concurrently: PD35 §11.1. The Court may require this of its own initiative, or the parties may propose it. The matter should be discussed between advocates. The Court may modify the procedure at PD35 §11 and will consider whether itself to initiate the questioning of the experts or to invite the parties' representatives to do so.

## H.3 Expert evidence of foreign law

**H.3.1** Expert evidence of foreign law features in a significant proportion of Commercial Court trials. Foreign law is a matter of fact to be proved by evidence, but CPR 32.1(b)/(c), 35.1, 35.4(1) and 35.5(1) give the Court flexibility in determining how the content of foreign law is proved at trial (see *FS Cairo (Nile Plaza) LLC v Lady Brownlie* [2021] UKSC 45 at [148]).

**H.3.2** As part of their preparations for any Case Management Conference at which directions for the filing of evidence are to be given, the parties should consider the approach to invite the Court to take to the proof of foreign law where disputed issues of foreign law will or may arise for determination at trial and be ready to discuss that question with the Court.


EXHIBIT "H"

**H.3.3** In particular (and without limitation):

(a) The Court can direct an exchange (simultaneous or sequential) of expert reports, an experts' meeting and joint memorandum, and (if strictly required) supplemental reports following the joint memorandum, from experts to be called to give oral evidence at trial if their evidence is not agreed.

(b) The Court can direct such an exchange of reports (etc), but on the basis that the experts will not give evidence at trial although their evidence is not agreed, or do so only on some of the matters covered by their reports although their evidence on other matters is also not agreed, with the advocates making submissions at trial by reference to the reports and foreign law materials filed.

(c) The Court can limit the expert evidence to identification of the relevant sources of foreign law, and of any legal principles as to the interpretation and status of those sources, with the advocates making submissions at trial as to the relevant content of foreign law by reference to the sources thus identified.

(d) In some cases, the Court may be prepared to take judicial notice, or accept the agreement of the parties, as to the nature and importance of sources of foreign law, and have the advocates make submissions at trial as to the relevant content of foreign law by reference to the sources thus identified, providing the source materials from their own researches.

**H.3.4** In determining the approach to adopt, factors relevant to the Court's decision include:

(a) How much of the content of the relevant foreign law is in issue (as distinct from its application to the facts of the case, which is for argument not evidence).

(b) How important those points of difference are to the issues to be determined at trial.

(c) The time and cost efficiency of different approaches (particularly having regard to the amount in issue in the proceedings which is affected by the issues of foreign law).

(d) The nature of the issues and the legal sources in issue. For example, the approach in H3.3(c) or H3.3(d) may be more appropriate when the foreign law issues relate to a common law system or a system of law with which the Court has familiarity from other cases.


EXHIBIT "H"

(e) Whether there is already an English law decision on the relevant point of foreign law (which is admissible under s.4 CEA 1972).

**H.3.5** The parties will often have retained foreign lawyers to advise them on the issues of foreign law which arise. It will not always be necessary to instruct a separate foreign law expert to provide the expert evidence. The parties should consider this when considering with each other how foreign law is to be proved, and be ready to discuss the issue with the Court at the Case Management Conference.

**H.3.6** It will be open to the Court at the Case Management Conference to defer any decision on whether, and on what issues, the experts are to give evidence at trial to a later hearing.

**H.3.7** Where there is a Pre-Trial Review, and directions have previously been given for there to be oral expert evidence of foreign law at trial, the parties should consider and be ready to discuss with the Court whether such evidence is still reasonably required.

# H.4 Evidence by remote means

## Generally

**H.4.1** The Court may grant permission for witness evidence to be given by remote means, including by video link (which includes the use of internet video conferencing) or telephone. This should always be at least considered for a witness who will have to travel a substantial distance, including from abroad, whose evidence is expected to last no more than half a day.

**H.4.2** A party proposing to call evidence by video link should prepare and serve on all parties and provide to the Court a memorandum dealing with the matters outlined in the Video Conferencing Guidance contained in Annex 3 to PD32 and setting out precisely what arrangements are proposed. If remote means other than a video link are proposed, a suitably adapted version of such a memorandum should be used.

**H.4.3** An application for permission to call evidence by remote means should be made, if possible, at a Case Management Conference or, at the latest, at any Pre-Trial Review. However, an application may be made at a later stage if necessary.


EXHIBIT "H"

### From abroad

**H.4.4** Where it is proposed that a witness will give evidence by remote means from a location outside England & Wales, the party proposing to call that witness must obtain any permission required from a court or other authority in the jurisdiction where the witness will be and must confirm in their pre-trial checklist either that no such permission is required or that any required permission has been obtained.

## H.5 Taking evidence abroad

**H.5.1** In an appropriate case permission may be given for the evidence of a witness to be taken abroad. Part 34 contains provisions for the taking of evidence by deposition, and the issue of letters of request.

**H.5.2** In a very exceptional case, and subject in particular to all necessary approvals being obtained and any diplomatic requirements being satisfied, the Court may be willing to conduct part of the proceedings abroad. The Court will not take that course if the evidence in question may satisfactorily be given by remote means: see H.4.

# I. [Intentionally left blank]

# J. Trial

## J.1 Shorter Trials Scheme; Flexible Trials Scheme; Expedited trial; Trials of issues

**J.1.1** The parties should always consider whether a case is suitable for the Shorter Trials Scheme or the Flexible Trials Scheme (see B2.4, D2.2 and D7.9(h)).

**J.1.2** The Commercial Court is able to provide an expedited trial outside those schemes in a case of sufficient urgency and importance.

**J.1.3** A party seeking an expedited trial should apply to the Judge in Charge on notice to all parties at the earliest possible opportunity. The application should normally be made after issue and service of the claim form but before service of particulars of claim (if they are not served with the claim form). In any such application the Court will always have regard to the nature and degree of urgency, and the importance, of the case, the state of the list, the procedural history (including the pre-action history), and especially (unless the application is agreed by all parties) the question whether the expedited trial proposed by the applicant will be fair to each respondent.

**J.1.4** The Court may direct a separate trial of any issue under rule 3.1(2)(i). It will sometimes be advantageous to have a separate trial of particular issues with other issues being heard either by the same Judge or by another Judge of the Court or in another Court or tribunal. For example, where liability is tried first in the Commercial Court, the parties may choose to ask an arbitrator to decide questions of damages.

**J.1.5** Under rule 3.1(2)(j), (k) and (l) the Court may decide the order in which issues are to be tried, may exclude an issue from consideration, and may dismiss or give judgment on a claim after a decision on a preliminary issue. The Court is likely to consider the application of those rules by reference to the List of Common Ground and Issues. Particularly in long trials, it may be advantageous to exercise these powers so as to hear the evidence relevant to some issues, and also to decide those issues, before moving on to hear evidence relevant to others.

## J.2 Information technology at trial, including paperless trials

**J.2.1** Parties and their legal representatives should seek to minimise the use of paper at trial. In any event, no hard copy trial bundle, only electronic trial bundles, should be lodged for use by the Court unless specifically requested. See generally Appendix 7.

**J.2.2** Parties are strongly encouraged to consider the use of information technology at trial beyond just the use of electronic rather than paper bundles. The Court will expect proposals to be made, or an explanation given why it is not proposed to make any wider use of IT at trial, at the pre-trial review, if there is one, and in the parties' pre-trial checklists. This will not be necessary if directions for the use of IT in the case, including at trial, have been made at an earlier stage (see D2.3(e)) and there is no proposal to alter those directions.

**J.2.3** Where IT is to be used in presenting the case at trial the same system must be used by all parties and must be made available to the Court.

## J.3 Start of trial

**J.3.1** Various steps are to be taken by, or by a defined period prior to, the start of the trial. For those purposes, the start of the trial is the first date of the trial listing unless J3.2 applies.

**J.3.2** If the trial was fixed with allocated pre-trial reading time prior to the first date of the trial listing, then the start of the trial is the first date of that pre-trial reading time.

**J.3.3** From January 2022, the practice of listing trials to commence on a given date with allocated pre-reading time prior to that date will generally no longer be followed, so that if there is to be any reading time prior to the first sitting day of the trial, that reading time will start on the first date of the trial listing and not before.

## J.4 Documents for trial

**J.4.1** Bundles of documents for the trial, including bundles of authorities, must be prepared in accordance with Appendix 7.

**J.4.2** The number, content and organisation of the trial bundles must be approved by the advocates with the conduct of the trial.



EXHIBIT "H"

**J.4.3** Apart from certain specified documents, trial bundles should include only documents that the trial Judge will be asked to read or that it is expected will be shown to the Court at trial (including when witnesses are giving evidence). In many cases only a very small proportion of the documents that have been disclosed in the proceedings need to be referred to at trial. The preparation of trial bundles should be more than an exercise in collating the disclosed documents and sorting them into bundles. Where a document has been included in the trial bundle unnecessarily, the party responsible may be required to explain its inclusion to the Judge, and may be penalised in costs if there is no satisfactory explanation.

**J.4.4** The trial bundles should be agreed as follows, unless otherwise directed:

(a) the claimant must submit proposals to all other parties at least 6 weeks before the start of the trial (see J.3); and

(b) the other parties must submit to the claimant details of any additions they require or revisions they suggest at least 4 weeks before the start of the trial.

Information under (a) and (b) above should be supplied in a form that will be convenient for the recipient to understand, use and respond to. The form to be used should be discussed between the parties in advance.

**J.4.5**

(a) It is the responsibility of the claimant's legal representative to prepare and provide the agreed trial bundles.

(b) If another party wishes to put before the Court a bundle that the claimant regards as unnecessary the other party must prepare and provide it.

**J.4.6**

(a) Preparation of the trial bundles must be completed not later than 10 days before the start of the trial (see J.3) unless the Court orders otherwise.

(b) Any party preparing a trial bundle should provide all other parties who are to take part in the trial with a copy, at the cost of the receiving party (if any cost is involved). Further copies should be supplied on request, again at the cost (if there is a cost) of the receiving party.

**J.4.7** Unless the Court orders otherwise, a full set of the trial bundles must be provided with the Listing Office at least 7 days before the start of the trial (see J.3). If a core bundle is to be prepared in advance of trial, it should be provided by 4 pm on the last working day prior to the start of the trial.

**J.4.8** If bundles are provided late, this may result in the trial not commencing on the date fixed, at the expense of the party in default. An order for immediate payment of costs may be made.

**J.4.9** If oral evidence is to be given at trial, and if hard copy trial bundles are being used, the claimant should provide a clean unmarked set of all relevant trial bundles for use in the witness box. The claimant is responsible for ensuring that these bundles are kept up to date throughout the trial.

## J.5 Reading lists, authorities and trial timetable

**J.5.1** Unless the Court orders otherwise, a single reading list approved by all advocates must be filed and provided to the Clerk to the trial Judge by 4 pm on the last working day prior to the start of the trial (see J.3). The reading list should identify separately (and bearing in mind J8.6):

(a) what the Judge should read prior to oral opening statements,

(b) what, if anything, the Judge should read after oral opening statements and before the first witness is called, and

(c) what, if anything, the Judge should read at later stages during the trial.

The Judge will not read prior to oral openings anything that is not included in part (a) of the agreed reading list. For the avoidance of doubt, anything that any party proposes that the Judge should read prior to oral openings should be included in part (a) of the agreed reading list, subject (if applicable) to J5.2.

**J.5.2**

(a) If any party objects to the Judge reading prior to oral openings a document, witness statement or expert report included in part (a) of the agreed reading list, the objection and its grounds should be identified in notes within or sent with the reading list.

(b) Where paragraph (a) above applies, the parties may agree that the Judge should read the material in question on the basis that if the objection is upheld the Judge will decide the case without taking that material into account. Unless the contrary is stated in the reading list, it will be assumed that the parties do so agree. If the reading list states


EXHIBIT "H"

the contrary, the material in question will not be read prior to oral openings.

**J.5.3**

(a) F12.1 and F12.4 apply as regards the citation of authorities in skeleton arguments, and bundles of authorities, for trial.

(b) A composite bundle of authorities cited in the skeleton arguments (but subject to F12.4) should be provided to the Listing Office as soon as possible after skeleton arguments have been exchanged, but in any event by 4 pm on the last working day prior to the start of the trial (see J.3).

(c) Unless otherwise agreed, the preparation of the bundle of authorities is the responsibility of the claimant, who should provide copies to all other parties. Advocates should liaise to ensure that the same authority does not appear in more than one bundle.

**J.5.4**

(a) When providing the reading list the claimant should also provide an updated trial timetable (see D17.4).

(b) The trial timetable should provide for reading time (before oral openings and/or at other stages during the trial), oral opening submissions (J.8), witness evidence, expert evidence and closing submissions (including time for any written closings or outlines) (J.10, J.11). On the first day of the trial the Judge may fix the trial timetable, subject to any further order.

(c) The parties must comply with the trial timetable. The Court may restrict evidence or submissions to ensure compliance with the trial timetable.

## J.6 Skeleton arguments etc. at trial

**J.6.1** Written skeleton arguments should be prepared by each party. Guidelines on the preparation of skeleton arguments are set out in Appendix 5.

**J.6.2** Unless otherwise ordered, the skeleton arguments should be served on all other parties and provided to the Court as follows

(a) by the claimant, not later than 12 pm two clear days before the start of the trial (see J.3);

(b) by each defendant, not later than 12 pm the working day after the day on which the applicant's skeleton argument is required to be served


EXHIBIT "H"

and provided. Where a longer interval is needed, the parties should try to agree a bespoke timetable and seek the Court's approval.

**J.6.3** The claimant should provide a chronology with its skeleton argument. Indices and dramatis personae, agreed if possible, should also be provided if they are likely to be useful. Guidelines on the preparation of chronologies and indices are set out in Appendix 6.

**J.6.4** So far as possible trial skeleton arguments should be limited in length to 50 pages (font minimum 12 point; 1.5 line spacing). Where the advocate or advocates for trial consider that it is not possible to comply with that limit, the matter should be discussed with the trial Judge at the pre-trial review or in correspondence and permission sought for a specified higher page limit. The provisions as to the length of skeleton arguments reflect the experience of the Judges of the Commercial Court over time as to what is most useful to the Court.

**J.6.5** The parties should consider with each other, and with the Court at the Pre-Trial Review if there is one, whether, prior to the exchange of skeleton arguments, an agreed detailed narrative should be prepared of uncontentious, relevant facts, set out chronologically, or in a logical structure of chapters (each chapter to be set out chronologically). If the parties agree or are directed to create such a document:

(a) they should be constructive and realistic about it, bearing in mind that the fuller such a document can be the more helpful it will be to the Court;

(b) the process of agreeing the document should not become a substantial additional burden, or involve argument over whether content should be treated as agreed;

(c) all skeleton arguments for trial should take the agreed detailed narrative as read and focus on (i) the law, (ii) contentious matters of fact, and (iii) how the relevant party's case will therefore be put at trial.

## J.7 Trial sitting days and hearing trials in public

**J.7.1** Trial sitting days will not normally include Fridays.

**J.7.2** Where it is necessary in order to accommodate hearing evidence from certain witnesses or types of witness, the Court may agree to sit outside normal hours.



EXHIBIT "H"

**J.7.3** The general rule is that a hearing is to be in public: rule 39.2(1). In consequence, parties and their legal representatives should be prepared to provide a copy of that party's skeleton argument for the hearing, by email, to any law reporter, media reporter or member of the public who requests it. Unless a party has solid grounds for declining to provide a copy, a party should comply with the request voluntarily, without the need for intervention by the Court. Where a skeleton argument contains information which is subject to a confidentiality order or which is to be referred to at a hearing in private, a suitably redacted version of the skeleton argument can be made available.

## J.8 Oral opening statements at trial

**J.8.1** Oral opening statements should be uncontroversial, and in shorter trials may not be required. The parties' respective contentious cases will have been outlined in their skeleton arguments, which should not be repeated orally. The purpose of oral opening statements at trial is to introduce the trial Judge, through the important documents, to the significant facts of the case and to identify the points of contention expected to arise, not to argue those points. It is not necessary and may be unhelpful to use cross-examination of factual witnesses merely as a vehicle for taking the Court through the significant documents in the case.

**J.8.2** At the conclusion of the opening statement for the claimant the advocates for each of the other parties will usually each be invited to make a short opening statement. If the opening statement for the claimant has been done well, it may be unnecessary for anything to be said.

**J.8.3** Sufficient time for a neutral documentary opening as described in J8.1 (and any opening statements under J8.2) should be allowed for in time estimates for trial, and built into trial timetables. Additional reading time between opening statements and the first witness may be useful.

**J.8.4** Where a trial is to be listed with a length of 8 weeks or more, consideration may be given to whether opening statements should take place before the end of the previous legal term.

**J.8.5** Pursuant to the Civil Evidence Act 1995 and rules 32.19 (notice requiring proof of authenticity) and 33.2(2) (hearsay notices), all documents in the trial bundle will be admissible as evidence of the truth of their contents except for documents that are the subject of a timely notice to prove authenticity.


EXHIBIT "H"

**J.8.6** The fact that documents in the trial bundle are admissible in evidence does not mean that all such documents have been adduced in evidence so as to form part of the evidence in the trial. For this to happen either the parties must agree that the document in question is to be treated as put in evidence by one or other of them and the Judge so informed or they must have adduced the document in evidence by some other means. What means are used requires the exercise of judgment by the advocates in each case and should be raised with the trial Judge during oral opening submissions if it has not been considered at a Pre-Trial Review. It is a responsibility of trial advocates to indicate clearly to the Court before closing their case what written evidence forms part of that case, and it will not normally be appropriate for reliance to be placed in final speeches on a document not previously adduced in evidence at the trial.

**J.8.7** Where a party is represented by more than one advocate at the trial, the advocates may share the oral advocacy, although the Court's permission is required for more than one advocate for a party to cross-examine the same witness. The Court encourages oral advocacy to be undertaken by junior advocates.

## J.9 Applications in the course of trial

**J.9.1** It will not normally be necessary for an application notice to be issued for an application to be made during the course of the trial, but all other parties should be given adequate notice of the intention to apply.

**J.9.2** Unless the Judge directs otherwise the parties should prepare skeleton arguments for the hearing of the application.

## J.10 Written closing submissions at trial

**J.10.1**

(a) The Court will often require written outlines at least of closing submissions, and time to read them, before oral closing submissions. This should be allowed for in time estimates for trial, and built into trial timetables.

(b) Advocates should be ready to discuss with the Court, in advance of preparation, the form, scope and length of any written submissions for closing.

# J.11 Oral closing speeches at trial

**J.11.1** All parties will be expected to make oral closing speeches, whether or not there is a direction for written closing submissions. Sufficient time should be allowed for development of the parties' respective arguments, including dialogue with the Judge. The Judge will expect to be taken, during oral closing arguments, to evidence or authorities relied on in support, and not to be given references to read later.

**J.11.2** Unless the trial Judge directs otherwise, the claimant will make an oral closing speech first, followed by the defendant(s) in the order in which they appear on the claim form, with the claimant having a right of reply.

# J.12 Judgment

**J.12.1**

(a) When judgment is reserved the Judge may deliver judgment orally or by handing down a written judgment. If the Judge delivers judgment orally and a transcript of the judgment is required, a draft of the transcript will initially be provided to the Judge alone for approval. It is the responsibility of the parties to make available to the transcribers any copies of documents or authorities they require to complete the transcript. The parties may also be asked by the transcribers to check the accuracy of quotations before the draft of the transcript is provided to the Judge for approval, and for this purpose the relevant extracts only (not the whole draft transcript) may be provided to the parties.

(b) If the Judge intends to hand down a written judgment, the procedure set out in PD40E will be followed. That includes, unless otherwise directed in a particular case, the provision to the parties in confidence of a draft of the judgment proposed to be handed down.

(c) Advocates should inform the Judge's Clerk within the time specified or (where no time is specified) not later than 12 noon on the day before judgment is to be handed down of any typographical or other obvious errors of a similar nature which the Judge might wish to correct. This facility is confined to the correction of textual mistakes and is not to be used as the occasion for attempting to persuade the Judge to change the decision on matters of substance.

(d) The requirement to treat the text as confidential must be strictly observed. Failure to do so amounts to a contempt of Court.


EXHIBIT "H"

**J.12.2**

(a) Judgment is not delivered until it is pronounced or handed down in open Court, unless it is marked as having been handed down remotely by being circulated to the parties and released to Bailii.

(b) Whether the judgment is pronounced or handed down in open Court or is handed down remotely, copies of the approved judgment will be made available to the parties, to law reporters and to any other person on request.

**J.12.3** If at the time judgment is given any party wishes to apply for permission to appeal to the Court of Appeal, that application should be supported by written draft grounds of appeal.

**J.12.4** Orders on a judgment should be drawn up in accordance with, and contain the information referred to, in D18.1(c). A draft, agreed so far as possible and identifying points of disagreement, should be provided by the parties to the Judge's Clerk by the time specified for providing suggested typographical and other corrections as referred to in J12.1(c).

## J.13 Costs

**J.13.1** The rules governing the award and assessment of costs are contained in Parts 44 to 48.

**J.13.2** The summary assessment procedure provided for in Part 44 and PD44 also applies to trials lasting one day or less.

**J.13.3** It may be appropriate for oral argument about costs or other consequential matters to be undertaken by a junior advocate.



EXHIBIT "H"

# K. After Trial

## K.1 Continuation, variation and discharge of interim remedies and undertakings

**K.1.1**

(a) Applications to continue, vary or discharge interim remedies or undertakings should be made to a Judge of the Commercial Court, even after trial.

(b) If a party wishes to continue a freezing injunction after trial or judgment, the application should be made before the existing freezing injunction expires.

## K.2 Accounts and enquiries

**K.2.1** The Court may order that accounts and inquiries be retained by the Court, referred to the Judge of another Court, or referred to the Admiralty Registrar or another of the King's Bench Masters. Alternatively, the parties may choose to refer the matter to arbitration.

## K.3 Enforcement

**K.3.1** Unless the Court orders otherwise, and save for matters in the Financial List:

(a) all proceedings for the enforcement of any judgment or order for the payment of money given or made in the Commercial Court will be referred automatically to a Master of the King's Bench Division or a District Judge: PD58 §1.2(2).

(b) applications in connection with the enforcement of a judgment or order for the payment of money will be allocated by the Registry to the Admiralty Registrar or to another of the King's Bench Masters.

**K.3.2** Any application for enforcement matters to be retained by the Judges of the Court should be made when judgment is pronounced or at any later hearing then directed for the consideration of consequential matters.


EXHIBIT "H"

## K.4 Assessment of damages or interest after a default judgment

**K.4.1** Unless the Court orders otherwise, the assessment of damages or interest following the entry of a default judgment for damages or interest to be assessed will be carried out by the Admiralty Registrar or one of the King's Bench Masters to whom the case is allocated by the Registry


EXHIBIT "H"

# L. Multi-party Disputes

## L.1 Early consideration

**L.1.1** Cases which involve, or are expected to involve, a large number of claimants or defendants require close case management from the earliest point. The same is true where there are, or are likely to be, a large number of separate cases involving the same or similar issues. Both classes of case are referred to as "multi-party" disputes.

**L.1.2**

(a) The Judge in Charge should be informed as soon as it becomes apparent that a multi-party dispute exists or is likely to exist and an early application for directions should be made.

(b) In an appropriate case an application for directions may be made before issue of a claim form. In some cases it may be appropriate for an application to be made without notice in the first instance.

## L.2 Available procedures

**L.2.1** In some cases it may be appropriate for the Court to make a Group Litigation Order under Part 19 and PD19B. In other cases it may be more convenient for the Court to exercise its general powers of management. These include powers

(a) to dispense with statements of case;

(b) to direct parties to serve outline statements of case;

(c) to direct that cases be consolidated or managed and tried together;

(d) to direct that certain cases or issues be determined before others and to stay other proceedings in the meantime;

(e) to advance or put back the usual time for pre-trial steps to be taken (for example the disclosure of documents by one or more parties or a payment into Court).



EXHIBIT "H"

**L.2.2** Attention is drawn to the provisions of Section III of Part 19, rules 19.10-19.15 and PD19B. Practitioners should note that the provisions of Section III of Part 19 give the Court additional powers to manage disputes involving multiple claimants or defendants. They should also note that a Group Litigation Order in the Commercial Court (as part of the King's Bench Division) may not be made without the consent of the President of the King's Bench Division: PD19B §3.3(1).

**L.2.3** An application for a Group Litigation Order should be made in the first instance to the Judge in Charge: PD19B §3.5.



EXHIBIT "H"

# M. Litigants in Person

## M.1 The litigant in person

**M.1.1** Litigants in person (parties representing themselves and without separate legal representation) appear less often in the Commercial Court than in some other Courts. Notwithstanding, their position requires special consideration.

**M.1.2** Litigants in person are not required to file or provide documents electronically. Enquiry should be made of the Listing Office for convenient alternative arrangements for filing or providing documents.

**M.1.3** When at least one party is unrepresented the Court, in exercising its powers of case management, will have regard to that fact: rule 3.1A(2). It will adopt at any hearing such procedure as it considers appropriate to further the overriding objective of dealing with the case justly and at proportionate cost: rule 3.1A(4). In relation to taking evidence see also rule 3.1A(5).

**M.1.4** The Court may encourage an unrepresented party to seek pro bono or other assistance. The Commercial Court and the London Circuit Commercial Court, in conjunction with COMBAR and Advocate, operate a scheme to provide assistance and representation free of charge for litigants in person who are parties to applications with a time estimate of one day or less. Full details of the scheme can be found at

Pro bono legal work being extended to the Commercial Court | Courts and Tribunals Judiciary
and
https://www.combar.com/news/lcc-pro-bono-scheme.

Any request for assistance must be submitted to Advocate no later than 24 hours after service on the litigant of the court application for which assistance is sought. The Application Form by which assistance can be requested is available at: https://weareadvocate.org.uk/apply-for-help.html

**M.1.5** The Bar Council of England and Wales publishes online, free of charge, a "Guide to Representing Yourself in Court". The RCJ Advice Bureau publishes, free of charge, a series of "Going to Court" Guides available online through the Advicenow website (www.advicenow.org.uk).


EXHIBIT "H"

## M.2 Represented parties

**M.2.1** Where a litigant in person is involved in a case the Court will expect solicitors and counsel for other parties to do what they reasonably can to ensure that the litigant in person has a fair opportunity to prepare and put her or his case. The Court will expect solicitors and counsel for other parties to have regard to the "Litigants in Person: Guidelines for Lawyers" published jointly by the Bar Council, the Law Society and the Chartered Institute of Legal Executives in June 2015.

**M.2.2** The duty of an advocate to ensure that the Court is informed of all relevant decisions and legislative provisions of which they are aware (whether favourable to the case of their client or not) and to bring any procedural irregularity to the attention of the Court during the hearing is of particular importance in a case where a litigant in person is involved.

**M.2.3** Further, the Court will expect solicitors and counsel appearing for other parties to ensure that the case memorandum, the List of Common Ground and Issues and all necessary bundles are prepared and provided to the Court in accordance with the Guide, even where the litigant in person is unwilling or unable to participate.

**M.2.4** If the claimant is a litigant in person the Judge at the Case Management Conference will normally direct which of the parties is to have responsibility for the preparation and upkeep of the case management bundle.

**M.2.5** At the Case Management Conference the Court may give directions relating to the costs of providing application bundles, trial bundles and, if applicable, transcripts of hearings to the litigant in person.

## M.3 Companies without representation

**M.3.1** Although rule 39.6 allows a company or other corporation with the permission of the Court to be represented at trial by an employee, the complexity of most cases in the Commercial Court generally makes that unsuitable. Accordingly, permission is likely to be given only in unusual circumstances, and is likely to require, at a minimum, clear evidence that the company or other corporation reasonably could not have been legally represented and that the employee has both the ability and familiarity with the case to be able to assist the court and also unfettered and unqualified authority to represent and bind the company or other corporation in dealings with the other parties to the litigation or with the Court.



EXHIBIT "H"

# N. Admiralty

## N.1 General

**N.1.1** Proceedings in the Admiralty Court are dealt with in Part 61 and PD61; but Part 58 (Commercial Court) also applies where Part 61 does not provide otherwise: rule 61.1(3).

**N.1.2** The Commercial Court Guide has been prepared in consultation with the Admiralty Judge. It has been adopted to provide guidance about the conduct of proceedings in the Admiralty Court. The Guide must be followed in the Admiralty Court unless the content of Part 61, PD61 or the terms of this section N require otherwise.

**N.1.3** One significant area of difference between practice in the Commercial Court and practice in the Admiralty Court is that many interlocutory applications are heard by the Admiralty Registrar who has all the powers of the Admiralty Judge save as provided otherwise: rule 61.1(4). Another is that, as stated at E2.1, disclosure of documents in the Admiralty Court is not governed by PD57AD. Therefore, Part 31 applies in full, unless PD57AD is ordered to apply in a given case: see PD57AD, §1.4(4).

## N.2 The Admiralty Court Users Committee

**N.2.1** The Admiralty Court Users Committee provides a specific forum for contact and consultation between the Admiralty Court and its users. Any correspondence should be addressed to the Clerk to the Admiralty Registrar or the Deputy Admiralty Marshal at 7 Rolls Building, Fetter Lane, London, EC4A 1NL.

## N.3 Commencement of proceedings, service of Statements of Case and associated matters

**N.3.1** Sections B and C of the Guide do not apply in:

(a) a collision claim; and

(b) a limitation claim.

**N.3.2** In a claim in rem:

(a) Section B of the Guide generally does not apply, but B4.3, B4.7- B4.9 and B7.4-B7.6 do apply;

(b) C2.1(b) does not apply; and



EXHIBIT "H"

(c) C1.9 applies, but subject to PD61 §3.7 (service of in rem claim form by the Admiralty Marshal, upon request, if the property is to be arrested or is already under arrest).

## N.4 Commencement and early stages of a claim in rem

**N.4.1** The early stages of a claim in rem are governed generally by rule 61.3 and PD61 §§3.1-3.11.

**N.4.2** After an acknowledgement of service has been filed a claim in rem follows the procedure applicable to a claim proceeding in the Commercial Court, save that the Claimant is allowed 75 days in which to serve particulars of claim: PD61 §3.10.

**N.4.3** PD61 §6.2 provides that the Admiralty Registrar will issue a direction allocating a claim form to the Admiralty Judge or to the Admiralty Registrar or to another Court, taking into account, among other things, the sums in dispute. As a general but not inflexible rule, claims in excess of about £1 million are allocated to the Judge, and personal injury claims which involve no Admiralty expertise (which generally should not be issued in the Admiralty Court anyway: see rule 61.2(2) and PD61 §§2.6-2.8) are transferred to the Claimant's County Court or, if appropriate, to the King's Bench Division.

## N.5 The early stages of a Collision Claim

**N.5.1** Any party, or potential party, to a collision claim, that has in its control any electronic track data (as defined in rule 61.1(2)(m)) recording the tracks of the vessels involved leading up to the collision, should have regard to Appendix 13 ('Electronic Track Data in Collision Claims'), which contains provisions relating to (i) the preservation, pre-action disclosure and inspection, and early disclosure and inspection, of electronic track data, and (ii) the case management of collision claims where electronic track data is available. (See also rule 61.4(4A) and PD61 §§4.1-4.7.)

**N.5.2** Where a collision claim is commenced in rem, the general procedure applicable to claims in rem applies subject to rule 61.4 and PD61 §§4.1-4.7.

**N.5.3** Where a collision claim is not commenced in rem the general procedure applicable to claims proceeding in the Commercial Court applies subject to rule 61.4 and PD61 §§4.1-4.7.


EXHIBIT "H"

**N.5.4** Service of a claim form out of the jurisdiction in a collision claim (other than a claim in rem) is permitted in the circumstances identified in rule 61.4(7) only and the guidance set out in Appendix 9 should be read subject to that limitation.

**N.5.5** Each party must prepare and file a Collision Statement of Case, if there has been an acknowledgment of service stating an intention to defend. A Collision Statement of Case was previously known as a Preliminary Act and the law relating to Preliminary Acts applies to Collision Statements of Case: PD61 §4.5.

**N.5.6** The provisions at C1.1 apply to part 2 of a Collision Statement of Case (but not to part 1).

**N.5.7** Every party is required, so far as it is able, to provide full and complete answers to the questions contained in part 1 of the Collision Statement of Case. The answers should descend to a reasonable level of particularity. Attention is also drawn to PD 61 §4.2(2) which sets out the level of particularity required in part 2 of the Collision Statement of Case.

**N.5.8** The answers to the questions contained in part 1, formerly known as the Preliminary Act, are treated as admissions made by the party answering the questions. Leave to amend such answers can be sought but such leave will not lightly be granted and any such application will be subjected to close scrutiny; see The Topaz [2003] 2 Lloyd's Rep. 19. Amendments which would undermine the principles underpinning the answers to the questions contained in part 1 are likely to be refused otherwise than under the most special or exceptional circumstances; see Nautical Challenge v Evergreen Marine [2016] EWHC 1093 (QB).

**N.5.9** Each party must prepare and file a collision defence in respect of each Collision Statement of Case filed by another party (see rule 61.4(6A) and (6B), and PD61 §§4.5A-4.5C). Attention is drawn to PD 61 §4.5A, which sets out what must be stated in a collision defence and the consequences of failing to deal with an allegation in part 2 of another party's Collision Statement of Case.

**N.5.10** Each party also has the option of filing a collision reply (see rule 61.4(6C)-(6D), and PD 61 §4.5D).

## N.6 The early stages of a Limitation Claim

**N.6.1** The procedure governing the early stages of a limitation claim is contained in rule 61.11 and PD61 §10.1.

**N.6.2** Service of a limitation claim form out of the jurisdiction is permitted in the circumstances identified in rule 61.11(5) only and the guidance set out in Appendix 9 should be read subject to that limitation.

## N.7 E-filing

**N.7.1** The issue of an Admiralty claim form, the issue of a notice requiring a caution against release and the issue of any other document must, since 25 April 2017, be done electronically.

**N.7.2** The electronic filing of such documents takes effect from the time at which the document was filed.

## N.8 Case Management

**N.8.1** The case management provisions of the Guide apply to Admiralty claims save that

(a) In Admiralty claims the case management provisions of the Guide are supplemented by PD61 §§2.1-2.3 which make provision for the early classification and streaming of cases;

(b) In a collision case the claimant should apply for a Case Management Conference within 7 days after the last collision defence is filed: PD61 §4.6;

(c) In a limitation claim where the right to limit is not admitted and the claimant seeks a general limitation decree, the claimant must, within 7 days after the date of the filing of the defence of the defendant last served or the expiry of the time for doing so, apply to the Admiralty Registrar for a Case Management Conference: PD61 §10.7;

(d) In a collision claim (PD61 §4.6) or a limitation claim a mandatory Case Management Conference will normally take place on the first available date 6 weeks after the date when the claimant is required to take steps to fix a date for the Case Management Conference. In a collision claim, the parties should liaise with each other, before the Case Management Conference is listed, as to whether any party intends to serve a collision reply, and the listing of the Case Management Conference should take any such intention into account;

(e) In a limitation claim, case management directions are initially given by the Registrar: PD61 §10.8;


EXHIBIT "H"

(f) In the Admiralty Court, the case management information sheet should be in the form in Appendix 2 of this Guide but should also include the following questions

(i) Do any of the issues contained in the List of Common Ground and Issues involve questions of navigation or other particular matters of an essentially Admiralty nature which require the trial to be before the Admiralty Judge?

(ii) Is the case suitable to be tried before a Deputy Judge nominated by the Admiralty Judge?

(iii) Do you consider that the Court should sit with nautical or other assessors? If you intend to ask that the Court sit with one or more assessors who is not a Trinity Master, please state the reasons for such an application.

(g) In a collision claim where electronic track data is available the Court will seek to adopt fast track procedures for the determination of issues of liability as part of its duty actively to manage cases in accordance with the overriding objective, which may include making one or more of the directions listed in PD61 §4.7: see also N.5 and Appendix 13;

(h) In a collision claim, the case management information sheet should also include the following question:

(i) Do you or any other party have in their control electronic track data (as defined in rule 61.1(2)(m)) recording the tracks of the vessels involved leading up to the collision? If so, would it be appropriate for the Court to make one or more of the directions listed in PD61 §4.7 (or other similar directions)? Please state reasons.

(ii) Please state your proposed date for the filing of an agreed plot, or else the exchange of each party's plot or plots, as to the navigation of vessels during and leading to the collision. (*NB* All plots, whenever they are filed or exchanged, must contain a sufficient indication of the assumptions used in their preparation.)

## N.9 Evidence

**N.9.1** As regards H1.6 and Appendix 4, experience has shown that it is often desirable for the main elements of the evidence in chief of witnesses of fact to be adduced orally. In collision claims where electronic track data is available it may be appropriate to (i) limit witnesses to those most closely involved with the collision, (ii) dispense with oral evidence, and/or (iii) dispense with an oral hearing: PD61 §4.7(b), (e) and (g).


EXHIBIT "H"

**N.9.2** Applications, if they arise, under paragraph 4.2 or 4.4 of PD57AC, will be judged on their individual merits, but Admiralty Court litigants and their advisers may proceed on the basis that the Court is familiar with the realities of collecting evidence concerning a maritime casualty or incident. First-hand accounts collected at the time of or immediately after a maritime casualty or incident, taken from ship's crew, engineering staff and/or officers where there may have been language or other difficulties, stressful conditions and/or significant time pressure, if taken and recorded sensibly, will tend to be valuable evidence by nature apt for dispensation to be given under paragraph 4.2 or 4.4 of PD57AC (if required) to allow those accounts to be used as witness statements for trial. Where an application for dispensation under paragraph 4.2 or 4.4 is founded upon such realities, it should be supported by evidence showing how full adherence to all the requirements of PD57AC would have been impractical and that steps were taken to try to ensure, so far as practicable, that the evidence obtained was no more than the witness's own honest account, set out as they would give it. If an application supported by such evidence is made prior to the date on which trial witness statements are to be served, the Court will generally seek to determine the application without requiring the statement, or its detailed contents, to be disclosed.

### Authenticity

**N.9.3** E4.1 applies and should be followed in Admiralty claims.

### Skeleton arguments in Collision Claims

**N.9.4** In collision claims, unless plots have been agreed between all parties, the skeleton argument of each party must be accompanied by a plot or plots of that party's case or alternative cases as to the navigation of vessels during and leading to the collision. All plots must contain a sufficient indication of the assumptions used in the preparation of the plot.

## N.10 Split trials, accounts, enquiries and enforcement

**N.10.1** In collision claims it is usual for liability to be tried first and for the assessment of damages and interest to be referred to the Admiralty Registrar.

**N.10.2** Where the Admiralty Court refers an account, enquiry or enforcement, it will usually refer the matter to the Admiralty Registrar.


EXHIBIT "H"

# N10A Arrest of vessels

N10A.1 Arrest of a vessel is an administrative act, which is the responsibility of the Admiralty Marshal. The claimant must file forms ADM4 (the application and undertaking for arrest), ADM5 (the declaration in support of the application for warrant of arrest) and a completed ADM9 (the warrant of arrest) with the Admiralty Marshal. This must be done during normal court office hours. There is no out-of-hours Admiralty Marshal service. If approved, the Admiralty Marshal will make arrangements to effect the arrest, which is normally carried out by UK Border Force acting as his agent. (The arrest itself may be, and often is, effected outside of normal office hours.) A party considering an arrest should contact the Admiralty Marshal as soon as possible (during court office hours) to discuss practicalities. The earlier such contact is made, the more likely it is that a warrant can be issued quickly if and when applied for. In particular, a party considering an arrest should take into account the need for the Admiralty Marshal to make arrangements for his agent to effect the arrest and that these arrangements must be made during normal office hours.

# N.11 Release of vessels out of hours

**N.11.1** When the Registry is closed, an application for release under rule 61.8(4)(c) or (d) may be made in, and only in, the following manner:

(a) The solicitor for the party applying must telephone the security staff at the Royal Courts of Justice (020 7947 6260) and ask to be contacted by the Admiralty Marshal, who will then respond as soon as practically possible;

(b) The solicitor for the party applying must also file electronically their instructions for release and undertaking to pay the fees and expenses of the Admiralty Marshal as required in Form No.ADM12;

(c) The solicitor must also file electronically written consent to the release from all persons who have entered cautions against release (and from the arrestor if the arrestor is not the party applying);

(d) Upon being contacted by the Admiralty Marshal the solicitor must confirm that they have filed the documents in (b) and (c) above;

(e) Upon the Admiralty Marshal being satisfied that no cautions against release are in force, or that all persons who have entered cautions against release, and if necessary the arrestor, have given their written consent to the release, the Admiralty Marshal shall effect the release as soon as is practicable.

**N.11.2** Practitioners should note that the Admiralty Marshal is not formally on call and therefore at times may not be available to assist. Similarly the practicalities of releasing a ship in some localities may involve the services of others who may not be available outside Court hours.

**N.11.3** This service is offered to practitioners for use during reasonable hours and on the basis that if the Admiralty Marshal is available and can be contacted the Marshal will use best endeavours to effect instructions to release but without guarantee as to their success.

## N.12 Sales of arrested property

**N.12.1** The sale of property that has been arrested is dealt with by CPR rule 61.10, PD61 §9 and Form ADM14. The Court will expect an applicant for an order for sale to have liaised with the Marshal as to how and where notice of the time limit for making claims against the proceeds should be published.

**N.12.2** The Court has power to order the sale of arrested property prior to any final judgment in the case ("sale *pendente lite*"), not only after judgment as part of enforcement. An order for sale pendente lite can be made by either the Admiralty Judge or the Admiralty Registrar. Applications will be allocated by the Admiralty Registrar taking into account, among other things, the anticipated sale value of the property. As a general but not inflexible rule, applications for sale pendente lite of a ship or other property expected to attract a sale price of at least about £1 million will be allocated to the Admiralty Judge.

## N.13 Insurance of arrested property

**N.13.1** The Marshal will not insure any arrested property for the benefit of parties at any time during the period of arrest (whether before or after the filing of an application for sale, if any).

**N.13.2** The Marshal will use best endeavours (but without any legal liability for failure to do so) to advise all parties known to the Marshal as being on the record in actions in rem against the arrested property, including those who have filed cautions against release of that property, before any such property moves or is moved beyond the area covered by the usual port risks policy.


EXHIBIT "H"

**N.13.3** In these circumstances, practitioners' attention is drawn to the necessity of considering the questions of insuring against port risks for the amount of their clients' interest in any property arrested in an Admiralty action and the inclusion in any policy of a "Held Covered" clause in case the ship moves or is moved outside the area covered by the usual port risks policy. The usual port risks policy provides, among other things, for a ship to be moved or towed from one berth to another up to a distance of five miles within the port where she is lying.

## N.14 Assessors

**N.14.1** In collision claims and other cases involving issues of navigation and seamanship, the Admiralty Court usually sits with assessors. The parties are not permitted to call expert evidence on such matters without the leave of the Court: rule 61.13. In collision claims where electronic track data is available it may be appropriate to limit the assistance to that of a single assessor, or to dispense with the assistance of assessors entirely: PD61 §4.7(f).

**N.14.2** Parties are reminded of the practice with regard to the disclosure of any answers to the Court's questions and the opportunity for comment on them as set out in the Judgment of Gross J. in The Global Mariner [2005] 1 Lloyd's Rep 699 at p702.

**N.14.3** Provision is made in rule 35.15 for assessors' remuneration. The usual practice is for the Court to seek an undertaking from the claimant to pay the remuneration on demand after the case has concluded. Guidance as to rates of remuneration normally to be paid is provided by the Admiralty Judge by Practice Note. The current Practice Note dated 30 July 2021 was issued by Andrew Baker J and applies to all actions and appeals the hearing of which began on or after 1 September 2021.

## N.15 Merchant Shipping (Liner Conferences) Act 1982

**N.15.1** The Merchant Shipping (Liner Conferences) Act 1982 provides, by section 9, for the registration of recommendations, determinations or awards as referred to in the Act. It is thought that this is a moribund provision and Section II of PD74A that dealt with it has been deleted. If a request were to be made for a section 9 registration, it should be addressed to the Admiralty Registrar.


EXHIBIT "H"

# O. Arbitration

## O.1 Arbitration claims

**O.1.1** Applications to the Court under the Arbitration Acts 1950 - 1996 and other applications relating to arbitrations are known as "arbitration claims".

(a) The procedure applicable to arbitration claims is to be found in Part 62 and PD62 direction. Separate provision is made:

(i) by Section I for claims relating to arbitrations to which the Arbitration Act 1996 applies;

(ii) by Section II for claims relating to arbitrations to which the Arbitration Acts 1950 - 1979 ("the old law") apply; and

(iii) by Section III for enforcement proceedings.

(b) For a full definition of the expression "arbitration claim" see rule 62.2(1) (claims under the 1996 Act) and rule 62.11(2) (claims under the old law).

(c) Part 58 applies to arbitration claims in the Commercial Court insofar as no specific provision is made by Part 62: rule 62.1(3).

### Claims under the Arbitration Act 1996

## O.2 Starting an arbitration claim

**O.2.1** Subject to O2.3 an arbitration claim must be started by the issue of an arbitration claim form in accordance with the Part 8 procedure: rule 62.3(1).

**O.2.2** The claim form must be substantially in the form set out in Appendix A to practice direction 62: PD62 §2.2.

**O.2.3** An application to stay proceedings under section 9 of the Arbitration Act 1996 must be made by application notice in the proceedings: rule 62.3(2).

**O.2.4** Where a question arises as to whether an arbitration agreement is null and void, inoperative or incapable of being performed the Court may deal with it in the same way as provided by rule 62.8(3)) which applies where a question arises as to whether an arbitration agreement has been concluded or the dispute which is the subject matter of the proceedings falls within the terms of such an agreement.



EXHIBIT "H"

# O.3 The arbitration claim form

**O.3.1** The arbitration claim form must contain, among other things, a concise statement of the remedy claimed and, if an award is challenged, the grounds for that challenge: rule 62.4(1).

**O.3.2** Reference in the arbitration claim form to a witness statement or affidavit filed in support of the claim is not sufficient to comply with the requirements of rule 62.4(1). While the details of the claim under rule 62.4(1) should be kept concise (O3.1), they should nonetheless represent a complete, particularised statement of the case to be advanced. Any witness statement or affidavit filed in support should not be used to plead or argue the case.

# O.4 Service of the arbitration claim form

**O.4.1** An arbitration claim form issued in the Admiralty & Commercial Registry must be served by the claimant.

**O.4.2**

(a) The rules governing service of the claim form are set out in Part 6.

(b) Unless the Court orders otherwise an arbitration claim form must be served on the defendant within 1 month from the date of issue: rule 62.4(2). An application for an extension of this period will generally be considered without a hearing.

**O.4.3**

(a) An arbitration claim form may be served out of the jurisdiction with the permission of the Court: rule 62.5(1).

(b) Rules 6.40 - 6.46 apply to the service of an arbitration claim form out of the jurisdiction with permission granted under rule 62.5(1): rule 62.5(3).

(c) It may also be that rule 6.33(2B)(b) will apply, in which case the arbitration claim form may be served outside the United Kingdom without permission, and rules 6.40 - 6.46 would apply to any such service.

**O.4.4** The Court may exercise its power under rules 6.15 to permit service of an arbitration claim form on a party at the address of the solicitor or other representative acting for the party in the arbitration: PD62 §3.1. See also the Court's power under rule 6.37(5)(b).

**O.4.5** The claimant must file a certificate of service within 7 days of serving the arbitration claim form: PD62 §3.2.

## O.5 Acknowledgment of service

**O.5.1** A defendant must file an acknowledgment of service of the arbitration claim form in every case: rule 58.6(1).

(a) An adapted version of practice form **N210(CC)** (acknowledgment of service of a Part 8 claim form) has been approved for use in the Commercial Court.

**O.5.2** The time for filing an acknowledgment of service is calculated from the service of the arbitration claim form.

## O.6 Standard directions

**O.6.1** The directions set out in PD62 §6.2-6.7 apply unless the Court orders otherwise.

**O.6.2** An arbitration claim will be case managed, where necessary adapting the case management procedures provided throughout this Guide.

**O.6.3** The claimant should apply for a hearing date as soon as possible after issuing an arbitration claim form or (in the case of an appeal) obtaining permission to appeal.

**O.6.4** A defendant who wishes to rely on evidence in opposition to the claim must file and serve its evidence within 21 days after the date by which it was required to acknowledge service: PD62 §6.2.

**O.6.5** A claimant who wishes to rely on evidence in response to evidence served by the defendant must file and serve its evidence within 7 days after the service of the defendant's evidence: PD62 §6.3.


EXHIBIT "H"

**O.6.6** An application for directions in a pending arbitration claim should be made by application notice under Part 23. The timetable requirements for evidence in relation to an application notice under Part 23 are those provided in section F. Where an arbitration application involves recognition and/or enforcement of an agreement to arbitrate and that application is challenged on the grounds that the parties to the application were not bound by an agreement to arbitrate, it will usually be necessary for the Court to resolve that issue in order to determine the application. For this purpose it may be necessary for there to be disclosure of documents and/or factual and/or expert evidence. In that event, it is the responsibility of those advising the applicant to liaise with the other party and to arrange with the Listing Office for a Case Management Conference to be listed as early as possible to enable the Court to give directions as to the steps to be taken before the hearing of the application.

**O.6.7** PD62 §6.6 and 6.7 provide for the Claimant's skeleton argument to be served not later than 2 days before the hearing date and the Respondent's skeleton argument to be served not later than the day before the hearing date. However:

(a) In relation to hearings of appeals in which permission to appeal has been granted, see O8.2, and in relation to applications under section 67 or section 68, see O8.6;

(b) Where the hearing of an application (other than one mentioned in (a) above) is likely to last more than half a day the Respondent's skeleton should be served one clear day before the hearing date, consistently with the Commercial Court practice for heavy applications. The parties should liaise to ensure this is possible.

# O.7 Interim remedies

**O.7.1** An application for an interim remedy under section 44 of the Arbitration Act 1996 must be made in an arbitration claim form: PD62 §8.1.

# O.8 Challenging the award

## Challenge by way of appeal

**O.8.1** All applications for permission to appeal should comply with PD62 §12 which requires that:

(a) Where a party seeks permission to appeal to the Court on a question of law arising out of an arbitration award, the arbitration claim form must, in addition to complying with rule 62.4(1)—


EXHIBIT "H"

(i) identify the question of law;

(ii) state the grounds (but not the argument) on which the party challenges the award and contends that permission should be given;

(iii) be accompanied by a skeleton argument in support of the application in accordance with PD62 §12.2; and

(iv) append the award.

(b) Subject to paragraph (c), the skeleton argument—

(i) must be printed in minimum 12 point font, with 1.5 line spacing,

(ii) should not exceed 15 pages in length and

(iii) must contain an estimate of how long the Court is likely to need to deal with the application on the documents.

(c) If the skeleton argument exceeds 15 pages in length the author must write to the Court explaining why that is necessary, and what increased length is required.

(d) Written evidence may be filed in support of the application only if it is necessary to show (insofar as that is not apparent from the award itself):

(i) that the determination of the question raised by the appeal will substantially affect the rights of one or more of the parties;

(ii) that the question is one which the tribunal was asked to determine;

(iii) that the question is one of general public importance;

(iv) that it is just and proper in all the circumstances for the Court to determine the question raised by the appeal.

Any such evidence must be filed and served with the arbitration claim form.

(e) Unless there is a dispute whether the question raised by the appeal is one which the tribunal was asked to determine, no arbitration documents may be put before the Court other than:

(i) the award; and


EXHIBIT "H"

(ii) any document (such as the contract or the relevant parts thereof) which is referred to in the award and which the Court needs to read to determine a question of law arising out of the award.

("arbitration documents" means documents adduced in or produced for the purposes of the arbitration.)

(f) A respondent who wishes to oppose an application for permission to appeal must file a respondent's notice which:

(i) sets out the grounds (but not the argument) on which the respondent opposes the application; and

(ii) states whether the respondent wishes to contend that the award should be upheld for reasons not expressed (or not fully expressed) in the award and, if so, states those reasons (but not the argument).

(g) The respondent's notice must be filed and served within 21 days after the date on which the respondent was required to acknowledge service and must be accompanied by a skeleton argument in support which complies with paragraph (b) above.

(h) Written evidence in opposition to the application should be filed only if it complies with the requirements of paragraph (d) above. Any such evidence must be filed and served with the respondent's notice.

(i) The applicant may file and serve evidence or argument in reply only if it is necessary to do so. Any such evidence or argument must be as brief as possible and must be filed and served within 7 days after service of the respondent's notice.

(j) If either party wishes to invite the Court to consider arbitration documents other than those specified in paragraph (e) above the counsel or solicitor responsible for settling the application documents must write to the Court explaining why that is necessary.

(k) If a party or its representative fails to comply with the requirements of paragraphs (a) to (i) the Court may penalise that party or representative in costs.

(l) The Court will normally determine applications for permission to appeal without an oral hearing but may direct otherwise, particularly with a view to saving time (including Court time) or costs.

(m) Where the Court considers that an oral hearing is required, it may give such further directions as are necessary.


EXHIBIT "H"

(n) Where the Court refuses an application for permission to appeal without an oral hearing, it will provide brief reasons.

(o) The bundle for the hearing of any appeal should contain only the claim form, the respondent's notice, the arbitration documents referred to in paragraph (e), the order granting permission to appeal and the skeleton arguments.

**O.8.2** If permission to appeal is granted, skeleton arguments should be served in accordance with the timetable for applications in section F.

## Challenging an award for serious irregularity or want of jurisdiction

**O.8.3**

(a) An arbitration claim challenging an award on the ground of serious irregularity under section 68 of the 1996 Act is appropriate only in cases where there are serious grounds for thinking:

(i) that an irregularity has occurred which

(ii) has caused or will cause substantial injustice to the party making the challenge.

(b) An application challenging an award on the ground of serious irregularity should therefore not be regarded as an alternative to, or a means of supporting, an application for permission to appeal, or as a means by which to secure that an application for permission to appeal is dealt with at an oral hearing rather than on the documents.

**O.8.4** An arbitration claim challenging an award as to the arbitral tribunal's substantive jurisdiction, or challenging an award on the merits on the ground that the tribunal did not have substantive jurisdiction, under section 67 of the 1996 Act is appropriate only in cases where there are serious grounds for a contention that the matters relied on do affect the substantive jurisdiction of the tribunal as referred to in section 30 of the 1996 Act rather than being matters to be raised (if at all) under section 68 or section 69 of the Act.

**O.8.5** A challenge to the award for serious irregularity must be supported by evidence of the circumstances on which the claimant relies as giving rise to the irregularity complained of and the nature of the injustice which has been or will be caused to the claimant. A challenge to the award for want of jurisdiction must be supported by evidence of the facts said to give rise to the absence of substantive jurisdiction. In relation to all such applications, the case to be advanced must be set out in the claim form: see O3.1-O3.2.


EXHIBIT "H"

**O.8.6** The Court has power under rule 3.3(4) and/or rule 23.8(c) to dismiss any claim without a hearing. It is astute to do so in the case of challenges to awards under section 67 or 68 of the Act where the nature of the challenge or the evidence filed in support of it leads the Court to consider that the claim has no real prospect of success. If a respondent to such a challenge considers that the case is one in which the Court should dismiss the claim on that basis:

(a) the respondent should file a respondent's notice to that effect, together with a skeleton argument (not exceeding 15 pages) and any evidence relied upon, within 21 days of service of the proceedings on it;

(b) the applicant may file a skeleton and/or evidence in reply within 7 days of service of the respondent's notice.

**O.8.7** Where the Court makes an order dismissing a section 67 or section 68 claim without a hearing pursuant to O8.6, whether of its own motion or upon a respondent's notice inviting it to do so, the applicant will have the right to apply to the Court to set aside the order and to seek directions for the hearing of the application. If such application is made and dismissed after a hearing the Court may consider whether it is appropriate to award costs on an indemnity basis.

**O.8.8** Unless the challenge has been dismissed without a hearing pursuant to O8.6, skeleton arguments for the hearing of the challenge should be served in accordance with the timetable for applications in section F.

## Multiple claims

**O.8.9** If the arbitration claim form includes challenges to an award of more than one type, the types being by way of appeal under section 69 of the Act, on the ground of serious irregularity under section 68 of the Act, or in respect of jurisdiction under section 67 of the Act, the applications of each type should be set out in separate sections of the arbitration claim form and the grounds on which they are made separately identified.

**O.8.10** In such cases the documents will be placed before a Judge to consider how, in particular in what order, the applications may most appropriately be disposed of.


EXHIBIT "H"

### Security for costs or for the award

**O.8.11** The Court has power under section 70(6)/(7) of the Act to order in an appropriate case that the party challenging an award provide security for costs (section 70(6)) or security for the award (section 70(7)) as a condition of being able to pursue the challenge. For that power to be of practical value, any such application needs to be dealt with very promptly. Save in exceptional circumstances, any such application should be marked with a time estimate of 1 hour or less and listed to be heard on the first available Friday after issue.

## O.9 Time limits

**O.9.1** An application to challenge an award under sections 67 or 68 of the 1996 Act or to appeal under section 69 of the Act must be brought within 28 days of the date of the award: see section 70(3).

**O.9.2** The Court has power to vary the period of 28 days fixed by section 70(3) of the 1996 Act : rule 62.9(1). However, it is important that any challenge to an award be pursued without delay and the Court will require cogent reasons for extending time.

**O.9.3** An application to extend time made **before** the expiry of the period of 28 days must be made in a Part 23 application notice, but the application notice need not be served on any other party: rule 62.9(2) and PD62 §11.1(1).

**O.9.4** An application to extend time made **after** the expiry of the period of 28 days must be made in the arbitration claim form in which the applicant is seeking substantive relief: rule 62.9(3)(a) and PD62 §11.1(2).

**O.9.5** An application to vary the period of 28 days will normally be determined without a hearing and prior to the consideration of the substantive application: PD62 §10.2.

### Claims under the Arbitration Acts 1950-1979

## O.10 Claims under the 1950-1979 Acts

**O.10.1** Guidance may be found in the 10th Edition of this Guide in respect of claims under the Arbitration Acts 1950-1979.


EXHIBIT "H"

### Provisions applicable to all arbitrations

## O.11 Enforcement of awards

**O.11.1** All applications for permission to enforce awards in this jurisdiction are governed by Section III of Part 62, rule 62.17.

**O.11.2** An application for permission to enforce an award in the same manner as a judgment may be made without notice, but the Court may direct that the arbitration claim form be served, in which case the application will continue as an arbitration claim in accordance with the procedure set out in Section I of Part 62: rule 62.18(1) - (3).

**O.11.3** An application for permission to enforce an award in the same manner as a judgment must be supported by written evidence in accordance with rule 62.18(6).

**O.11.4** Two copies of the draft order must accompany the application; one in Word format.

(a) If the claimant wishes to enter judgment, the form of the judgment must correspond to the terms of the award.

(b) The defendant has the right to apply to the Court to set aside an order made without notice giving permission to enforce the award and the order itself must state in terms:

(i) that the defendant may apply to set it aside within 14 days after service of the order or, if the order is to be served out of the jurisdiction, within such other period as the Court may set; and

(ii) that it may not be enforced until after the end of that period or any application by the defendant to set it aside has been finally disposed of: rule 62.18(9) and (10).

**O.11.5** Where an order has been made permitting enforcement of an award and part (only) of an award is later the subject of a challenge, an application (if made) to amend the previous enforcement order so as to make clear that the unchallenged part of the award may still be enforced will normally be determined without a hearing. The procedure under F4.1 should be used.



EXHIBIT "H"

### Certifying finality for enforcement abroad

**O.11.6** Practice Form 166 ("PF166") exists for the certification by the High Court of the finality between the parties of an arbitration award where the seat of the arbitration was in this jurisdiction and certification is sought in connection with the possibility of enforcing the award abroad. A request for PF166 certification of an award should be made in writing, addressed to the Registry for the attention of the Admiralty Registrar, who as a Master of the High Court will grant the request if appropriate.

**O.11.7** Any request under O11.6 for PF166 certification of an award should be supported by a witness statement exhibiting the award and providing such verification concerning it as will enable the certification sought to be granted.

## O.12 Transfer of arbitration claims

**O.12.1** An arbitration claim which raises no significant point of arbitration law or practice will normally be transferred:

(a) in a landlord and tenant dispute (including a rent review arbitration) or partnership dispute, to the Chancery Division;

(b) if it relates to a construction or engineering arbitration, to the Technology and Construction Court;

(c) if it relates to a salvage arbitration, to the Admiralty Court.

## O.13 Appointment of a Judge of the Commercial Court as sole arbitrator or umpire

**O.13.1** Section 93 of the Arbitration Act 1996 provides for the appointment of a Judge of the Commercial Court as sole arbitrator or umpire. The Act limits the circumstances in which a Judge may accept such an appointment.

**O.13.2** Enquiries should be directed to the Judge in Charge or the Commercial Court Listing Office.



EXHIBIT "H"

# P. Miscellaneous

## P.1 Vacation arrangements

**P.1.1** During the long vacation (August and September each year), the Listing Office is open and a duty rota of Judges of the Commercial Court is operated. For urgent business that can be dealt with during Listing Office hours, parties may contact the Listing Office and/or file applications via CE File as during the Court term. Out of hours, P2.1 apply.

**P.1.2** During the short vacations (Christmas, Easter and Whitsun), if an application cannot wait until the following term, parties must make the application to the King's Bench Duty Judge sitting in the Interim Applications Court ('Court 37') or, if justified, out of hours, under P2.1. There may be a Judge of the Commercial Court available to assist that Judge, if required, but parties must not assume that will be the case. Where an application is filed for consideration by the King's Bench Duty Judge during a short vacation as referred to in this paragraph, the party making the application should explain within the application both

(a) why it is said that the application needs to be dealt with during vacation; and

(b) why it is said that it was not possible to file the application in the Commercial Court in time for it to be dealt with before the end of the preceding term.

**P.1.3** If a deadline is set to expire during a short vacation, any application for an extension of time should be filed via CE File, wherever possible, at least a week before the end of the preceding term, so it may be dealt with before the start of the vacation and an application to the King's Bench Duty Judge pursuant to P1.2 may be avoided.

## P.2 Out of hours emergency arrangements

**P.2.1**

(a) When the Listing Office is closed, represented parties may by their solicitors or counsel's clerks in an emergency contact the Clerk to the King's Bench Duty Judge by telephone through the security desk at the Royal Courts of Justice.

(b) The telephone number of the security desk is included in the list of addresses and contact details at the end of the Guide.


EXHIBIT "H"

**P.2.2** If an urgent application is made to the King's Bench Duty Judge out of hours under P2.1, the applicant will be required to demonstrate extreme urgency. This will require an explanation both of why the application was not made any earlier **and** why it cannot wait until the next sitting day so as to be dealt with in the Commercial Court (during term or during the long vacation) or by the King's Bench Duty Judge but within normal hours (during a short vacation). Reference should be made to the King's Bench Guide (paragraphs 11.18 to 11.21) and the King's Bench Out of Hours Form must be used: QBD OHA. Practitioners should be aware that:

(a) the Out of Hours Form must be completed personally by the practitioner instructed to make the application;

(b) all questions on the Out of Hours Form must be answered on the Form, not by cross-reference to the application materials. The application will not be considered by the Duty Judge until a properly completed Out of Hours Form has been submitted and may not be considered at all if the Form does not on its face appear to justify the making of the application out of hours;

(c) the duty of full and frank disclosure assumes added significance when a judge is asked to make an order in a short time frame and without any (or any substantial) opportunity for the defendant to make representations;

(d) the *Hamid* jurisdiction is not limited to immigration cases (see *R (Hamid) v Secretary of State for the Home Department* [2012] EWHC 3070 (Admin) and subsequent cases, and the summary in section 18 of the Administrative Court Judicial Review Guide).

**P.2.3** When an urgent application is made to the King's Bench Duty Judge out of hours under P2.1, or during Cåourt hours in a short vacation under P1.2, that Judge may dispose of the application as if sitting as a Judge of the Commercial Court or may make an order, on such terms including as to interim relief in the meantime as may be judged appropriate, for the matter to come before a Judge of the Commercial Court at the first available opportunity.


EXHIBIT "H"

# Address and Contact Details

The Admiralty and Commercial Registry and Listing Offices and the Admiralty Marshal are at the following address:

7 Rolls Building, Fetter Lane, London EC4A 1NL

**E-mail:** comct.listing@justice.gov.uk

DX 160040 Strand 4

**The Admiralty Marshal:**
Tel: +44 20 7 947 7111

**The Clerk to the Admiralty Registrar:**
admiralty.registrar@justice.gov.uk

**The Admiralty & Commercial Registry:**
Tel: +44 20 7 947 7783

**The Admiralty & Commercial Court Listing Office:**
Tel: +44 20 7 947 7156 / 7357

**The Secretary to the Commercial Court Users Committee:**
Mr Michael Tame
Tel: +44 20 7 947 7921

**Out of hours emergency number:** (Security Office at Royal Courts of Justice):
+44 20 7 947 6260



**EXHIBIT "H"**

# Appendices

Appendix 1: Overriding Objective and Dedicated CPR Parts and Practice Directions

Appendix 2: Case Management Information Sheet, Progress Monitoring Information Sheet and Pre-Trial Checklist

Appendix 3: Draft NDR Order

Appendix 4: Standard Pre-Trial Timetable

Appendix 5: Preparation of Skeleton Arguments

Appendix 6: Preparation of chronologies and indices

Appendix 7: Preparation of Bundles

Appendix 8: Expert Evidence – Requirements of General Application

Appendix 9: Service Out of the Jurisdiction: Related Practice

Appendix 10: Security for Costs: Related Practice

Appendix 11: Form of Freezing Order

Appendix 12: Electronic Working

Appendix 13: Electronic Track Data in Collision Claims

Appendix 14: Guidance on location of hearing, and on transferring cases to/from Circuit Commercial Courts

Appendix 15: Guidance on disclosure where PD 57AD does not apply



EXHIBIT "H"

# Appendix 1: Overriding Objective and Dedicated CPR Parts and Practice Directions

## Rules 1.1 and 1.3:

"1.1 (1) These Rules are a new procedural code with the overriding objective of enabling the court to deal with cases justly and at proportionate cost.

(2) Dealing with a case justly and at proportionate cost includes, so far as is practicable –

(a) ensuring that the parties are on an equal footing and can participate fully in the proceedings, and that parties and witnesses can give their best evidence;

(b) saving expense;

(c) dealing with the case in ways which are proportionate –

(i) to the amount of money involved;

(ii) to the importance of the case;

(iii) to the complexity of the issues; and

(iv) to the financial position of each party;

(d) ensuring that it is dealt with expeditiously and fairly;

(e) allotting to it an appropriate share of the court's resources, while taking into account the need to allot resources to other cases; and

(f) enforcing compliance with rules, practice directions and orders.

...

1.3 The parties are required to help the court to further the overriding objective."



EXHIBIT "H"

# Part 58 (extracts)

## Scope of this Part and interpretation

58.1

(1) This Part applies to claims in the Commercial Court of the King's Bench Division.

(2) In this Part and Practice Direction 58, 'commercial claim' means any claim arising out of the transaction of trade and commerce and includes any claim relating to –

(a) a business document or contract;

(b) the export or import of goods;

(c) the carriage of goods by land, sea, air or pipeline;

(d) the exploitation of oil and gas reserves or other natural resources;

(e) insurance and re-insurance;

(f) banking and financial services;

(g) the operation of markets and exchanges;

(h) the purchase and sale of commodities;

(i) the construction of ships;

(j) business agency; and

(k) arbitration.

## Specialist list

58.2

(1) The commercial list is a specialist list for claims proceeding in the Commercial Court.

(2) One of the judges of the Commercial Court shall be in charge of the commercial list.



EXHIBIT "H"

## Application of the Civil Procedure Rules

58.3 These Rules and their practice directions apply to claims in the commercial list unless this Part or a practice direction provides otherwise.

...

## PD58 (extracts)

## General

...

1.2 All proceedings in the commercial list, including any appeal from a judgment, order or decision of a master or district judge before the proceedings were transferred to the Commercial Court, will be heard or determined by a Commercial Court judge, except that –

(1) another judge of the King's Bench Division or Chancery Division may hear urgent applications if no Commercial Court judge is available; and

(2) unless the court otherwise orders, any application relating to the enforcement of a Commercial Court judgment or order for the payment of money will be dealt with by a master of the King's Bench Division or a district judge.

1.3 Provisions in other practice directions which refer to a master or district judge are to be read, in relation to claims in the commercial list, as if they referred to a Commercial Court judge.

...

## Starting proceedings in the Commercial Court

2.1 Claims in the Commercial Court must be issued in the Admiralty and Commercial Registry [**Note:** now in the Rolls Building].

...

2.3 The claim form must be marked in the top right hand corner 'King's Bench Division, Commercial Court'.

2.4 A claimant starting proceedings in the commercial list, other than an arbitration claim, must use practice form N1(CC) for Part 7 claims or practice form N208(CC) for Part 8 claims.

...



**EXHIBIT "H"**

## Transferring proceedings to or from the Commercial Court

4.1 If an application is made to a court other than the Commercial Court to transfer proceedings to the commercial list, the other court may –

(1) adjourn the application to be heard by a Commercial Court judge; or

(2) dismiss the application.

4.2 If the Commercial Court orders proceedings to be transferred to the commercial list –

(1) it will order them to be transferred to the Royal Courts of Justice [**Note:** more specifically, to the Rolls Building]; and

(2) it may give case management directions.

...

## Acknowledgment of service

5.1 For Part 7 claims, a defendant must file an acknowledgment of service using practice form N9 (CC).

5.2 For Part 8 claims, a defendant must file an acknowledgment of service using practice form N210 (CC).

...

## Service of documents

9. Unless the court orders otherwise, the Commercial Court will not serve documents or orders and service must be effected by the parties.

## Case management

10.1 The following parts only of Practice Direction 29 apply –

(1) paragraph 5 (case management conferences), excluding paragraph 5.9 and modified so far as is made necessary by other specific provisions of this practice direction; and

(2) paragraph 7 (failure to comply with case management directions).

10.2 If the proceedings are started in the commercial list, the claimant must apply for a case management conference –

(a) for a Part 7 claim, within 14 days of the date when all defendants who intend to file and serve a defence have done so; and


EXHIBIT "H"

(b) for a Part 8 claim, within 14 days of the date when all defendants who intend to serve evidence have done so.

10.3 If the proceedings are transferred to the commercial list, the claimant must apply for a case management conference within 14 days of the date of the order transferring them, unless the judge held, or gave directions for, a case management conference when he made the order transferring the proceedings.

10.4 Any party may, at a time earlier than that provided in paragraphs 10.2 or 10.3, apply in writing to the court to fix a case management conference.

10.5 If the claimant does not make an application in accordance with paragraphs 10.2 or 10.3, any other party may apply for a case management conference.

10.6 The court may fix a case management conference at any time on its own initiative. If it does so, the court will give at least 7 days' notice to the parties, unless there are compelling reasons for a shorter period of notice.

10.7 Not less than 7 days before a case management conference, each party must file and serve –

(1) a completed case management information sheet; and

(2) an application notice for any order which that party intends to seek at the case management conference, other than directions referred to in the case management information sheet.

10.8 Unless the court orders otherwise, the claimant, in consultation with the other parties, must prepare –

(1) a case memorandum, containing a short and uncontroversial summary of what the case is about and of its material case history;

(2) a list of issues, with a section listing important matters which are not in dispute; and

(3) a case management bundle containing –

(a) the claim form;

(b) all statements of case (excluding schedules), except that, if a summary of a statement of case has been filed, the bundle should contain the summary, and not the full statement of case;

(c) the case memorandum;

(d) the list of issues;


EXHIBIT "H"

(e) the case management information sheets and, if a pre-trial timetable has been agreed or ordered, that timetable;

(f) the principal orders of the court; and

(g) any agreement in writing made by the parties as to disclosure,

and provide copies of the case management bundle for the court and the other parties at least 7 days before the first case management conference or any earlier hearing at which the court may give case management directions.

10.9 The claimant, in consultation with the other parties, must revise and update the documents referred to in paragraph 10.8 appropriately as the case proceeds. This must include making all necessary revisions and additions at least 7 days before any subsequent hearing at which the court may give case management directions.

...

## Evidence for applications

13.1 The general requirement is that, unless the court orders otherwise –

(1) evidence in support of an application must be filed and served with the application (see rule 23.7(3));

(2) evidence in answer must be filed and served within 14 days after the application is served; and

(3) evidence in reply must be filed and served within 7 days of the service of evidence in answer.

13.2 In any case in which the application is likely to require an oral hearing of more than half a day the periods set out in paragraphs 13.1(2) and (3) will be 28 days and 14 days respectively.

13.3 If the date fixed for the hearing of an application means that the times in paragraphs 13.1(2) and (3) cannot both be achieved, the evidence must be filed and served –

(1) as soon as possible; and

(2) in sufficient time to ensure that the application may fairly proceed on the date fixed.


EXHIBIT "H"

13.4 The parties may, in accordance with rule 2.11, agree different periods from those in paragraphs 13.1(2) and (3) provided that the agreement does not affect the date fixed for the hearing of the application.

...

## Other Dedicated CPR Parts and Practice Directions:

Business and Property Courts: CPR Part 57A and PD57AA

Admiralty Court: CPR Part 61 and PD61

Arbitration: CPR Part 62 and PD62

Financial List: CPR Part 63A and PD63A

Shorter and Flexible Trials Scheme: PD57AB

Electronic Working: PD51O

Disclosure: PD 57AD

Trial Witness Statements: PD57AC

Video Conferencing Guidance: Annex 3 of PD32



EXHIBIT "H"

# Appendix 2: Case Management Information Sheet, Progress Monitoring Information Sheet and Pre-Trial Checklist

## Case Management Information Sheet

**The information supplied should be printed in bold characters**

Party filing information sheet:

Name of solicitors:

Name(s) of advocates for trial:

[Note: This Sheet should normally be completed with the involvement of the advocate(s) instructed for trial. If the claimant is a litigant in person this fact should be noted at the foot of the sheet and proposals made as to which party is to have responsibility for the preparation and upkeep of the case management bundle.]

### Preliminary:

(1) (a) Is the case suitable for retention in the Commercial Court or should it be transferred to a different Court or List?

(b) If the case is retained in the Commercial Court, is it suitable for the Shorter Trials Scheme or the Flexible Trials Scheme in the interest of reducing the length and cost of trial?

(c) Are there, or are there likely in due course to be, any related proceedings between some or all of the parties to this Claim (e.g. a Part 20 claim)? Please give brief details.

(d) Are there, or are there likely to be, other cases in the Commercial Court or in any different Court or List in this jurisdiction raising the same or similar issues during the currency of this case?

(2) Please state whether the Case Management Conference (CMC) requires a High Court Judge or whether it is suitable for hearing by a Deputy High Court Judge.

(3) If costs budgeting and costs management is applicable, do you consider that this CMC is an appropriate time to deal with those questions? Is this agreed between the parties?

(4) Do you propose that IT is used (a) during the course of the proceedings prior to trial, (b) at trial? If so, what proposals do you make and are they agreed? If not, why not?



EXHIBIT "H"

(5) Please indicate whether it is considered that the case should be allocated to a designated Judge. If so please give reasons for this view and write to the Judge in Charge of the Commercial Court in accordance with section D1.5 of the Commercial Court Guide.

## Issues:

(6) Are amendments to or is information about any statement of case required? If yes, please give brief details of what is required.

(7) Can you make any additional admissions? If yes, please give brief details of the additional admissions.

(8) Are any of the issues in the case suitable for trial as preliminary issues, or should the trial of the case be split into separate parts?

## Disclosure:

(9) Are you satisfied that proper Initial Disclosure has been given by all parties? If not, what are the concerns and what directions are sought from the Court?

(10) Do you, or does any other party, propose that there should be search-based Extended Disclosure (that is, Extended Disclosure using Model C, Model D or Model E) by one or more of the parties for one of more of the Issues for Disclosure? If so, has the Disclosure Review Document been completed and agreed, and, if not, why not?

(11) By what date can you give (a) Model B Extended Disclosure, if ordered, and/or (c) search-based Extended Disclosure, if ordered?

(12) What timing and method is appropriate for inspection of documents? Is this agreed?

## Evidence:

(13) (a) On the evidence of how many witnesses of fact do you intend to rely at trial (subject to the directions of the Court)? Please give their names, or explain why this is not being done.

(b) By what date can you serve signed witness statements?

(c) How many of these witnesses of fact do you intend to call to give oral evidence at trial (subject to the directions of the Court)? Please give their names, or explain why this is not being done.

(d) Will interpreters be required for any witness? What arrangements may be necessary for the translation of witness statements?

(e) Do you wish any witness to give oral evidence remotely? Please give their name, or explain why this is not being done. Please state the country and city from which the witness will be asked to give evidence by remote means.

(14) (a) On what issues may expert evidence be required? Please identify both (i) the issue or issues in the case to resolve which will reasonably require there to be expert evidence (see rule 35.1) and (ii) for each proposed expert, the issue or issues within their field of expertise it is proposed they should be instructed to address.

(b) What is the estimated cost of the proposed expert evidence?

(c) Is this a case in which the use of a single joint expert might be suitable (see rule 35.7), or in which consideration should be given to what type of directions should be made in relation to proof of foreign law (see section H.3 of the Commercial Court Guide)?

(d) On the evidence of how many expert witnesses do you intend to rely at trial (subject to the directions of the Court)? Please give their names, or explain why this is not being done. Please identify each expert's field of expertise.

(e) By what date can you serve signed expert reports? Is this a case for sequential exchange of expert reports?

(f) When will the experts be available for a meeting or meetings of experts? Is this a case for the experts to meet before reports?

(g) How many of these expert witnesses do you intend to call to give oral evidence at trial (subject to the directions of the Court)? Please give their names, or explain why this is not being done.

(h) Will interpreters be required for any expert witness? What arrangements may be necessary for the translation of reports?

(i) Do you wish any expert witness to give oral evidence by remote means? Please give his or her name, or explain why this is not being done. Please state the country and city from which the witness will be asked to give evidence by remote means.

(j) Might this be a case for any expert evidence to be taken concurrently at trial?



EXHIBIT "H"

## Trial:

(15) What are the advocates' present estimates of the minimum and maximum lengths of the trial, including reading time (see section D16.1 and J5.4(c)) of the Commercial Court Guide)?

(16) What is the earliest date by which you believe you can be ready for trial?

(17) Is this a case in which a pre-trial review is likely to be useful?

(18) Please indicate whether it is considered that the case is unsuitable for trial by a Deputy High Court Judge rather than a High Court Judge. If the case is considered to be unsuitable for trial by a Deputy High Court Judge please give reasons for this view.

## Resolution without trial:

(19) Is there any way in which the Court can assist the parties to resolve their dispute or particular issues in it without the need for a trial or a full trial?

(20) (a) Might some form of Negotiated Dispute Resolution ("NDR") procedure assist to resolve or narrow the dispute or particular issues in it?

(b) Has the question at (a) been considered between the client and legal representatives (including the advocate(s) retained)?

(c) Has the question at (a) been explored with the other parties in the case?

(d) Do you request that the case is adjourned while the parties try to settle the case by NDR or other means?

(e) Would an NDR order in the form of Appendix 3 to the Commercial Court Guide be appropriate?

(f) Are any other special directions needed to allow for NDR?

(21) Has Early Neutral Evaluation been considered?

## Other matters:

(22) What other applications will you wish to make at the CMC?

(23) Should provision be made in the pre-trial timetable for any application or procedural step not otherwise dealt with above? If yes, please specify the application or procedural step. An application issued later that should have been, but was not, anticipated and mentioned here may be refused on that ground.

[Signature of solicitors]

Note: This information sheet must be filed with the Commercial Court Listing Office at least 7 days before the Case Management Conference (with a copy to all other parties): see section D7.4 of the Commercial Court Guide.



EXHIBIT "H"

## Progress Monitoring Information Sheet

**The information supplied should be printed in bold characters**

[SHORT TITLE OF CASE and FOLIO NUMBER]

Fixed trial date/provisional range of dates for trial specified in the pre-trial timetable:

Party filing information sheet:

Name of solicitors:

Name(s) of advocates for trial:

[Note: this information sheet should normally be completed with the involvement of the advocate(s) instructed for trial]

(1) Have you complied with the pre-trial timetable in all respects?

(2) If you have not complied, in what respects have you not complied?

(3) Will you be ready for a trial commencing on the fixed date (or, where applicable, within the provisional range of dates) specified in the pre-trial timetable?

(4) If you will not be ready, why will you not be ready?

(5) Is any application outstanding, or is any to be made, for directions in relation to the conduct of the trial? If so, provide brief details.

(6) What are the parties' current estimates of the minimum and maximum lengths of the trial (including reading time)? If the estimated maximum length of trial exceeds the current trial listing, what solution is proposed?

[Signature of solicitors]

**Note:** This information sheet must be filed with the Listing Office at least 3 days before the progress monitoring date (with a copy to all other parties): see D11.2 of the Commercial Court Guide.



EXHIBIT "H"

## Pre-Trial Checklist

**The information supplied should be printed in bold characters**

[SHORT TITLE OF CASE and FOLIO NUMBER]

a. Trial date:

b. Party filing checklist:

c. Name of solicitors:

d. Name(s) of advocates for trial:

[**Note:** this checklist should normally be completed with the involvement of the advocate(s) instructed for trial.]

1. Have you completed preparation of trial bundles in accordance with Appendix 7 to the Commercial Court Guide?

2. If not, when will the preparation of the trial bundles be completed?

3. Have directions previously been made for the use of IT at trial? If so, do they remain appropriate, or do you propose any departure from or amendment of those directions? If not, what (if any) directions do you propose should now be made, or why do you make no such proposal?

4. Which witnesses of fact do you intend to call?

5. (a) Which expert witness(es) do you intend to call (if directions for expert evidence have been given)?

   (b) Have the experts narrowed the areas of disputed expert opinion as far as possible?

   (c) If directions for expert evidence to be taken concurrently have not been made, will they be sought from the Judge at trial?

   (d) If this is or may be a case for expert evidence to be taken concurrently has there been a discussion between advocates as to the most suitable procedure: see H2.15 in the Commercial Court Guide?

6. Will an interpreter be required for any witness and if so, have any necessary directions already been given?

7. Have directions been given for any witness to give evidence by remote means? If so, have all necessary arrangements been made? If any witness of fact or expert witness you are calling will give evidence by remote means from a location outside England and Wales has any permission been


EXHIBIT "H"

obtained that is required from a court or other authority in the jurisdiction where the witness will be, or is there no requirement for such permission in that jurisdiction?

8. What are the advocates' confirmed estimates of (i) the minimum and maximum lengths of the trial, including reading time and (ii) the reading time likely to be required for the Judge before any first sitting day? (A confirmed estimate of length signed by the advocates should be attached)?

9. What is your estimate of costs (i) already incurred and (ii) to be incurred up to the conclusion of trial?

[Signature of solicitors]

# Appendix 3: Draft NDR Order

1. On or before [*] the parties shall exchange lists of 3 neutral individuals who are available to conduct Negotiated Dispute Resolution ("NDR") procedures in this case prior to [*]. Each party may [in addition] [in the alternative] provide a list identifying the constitution of one or more panels of neutral individuals who are available to conduct NDR procedures in this case prior to [*].

2. On or before [*] the parties shall in good faith endeavour to agree a neutral individual or panel from the lists so exchanged and provided.

3. Failing such agreement by [*] the Case Management Conference will be restored to enable the Court to facilitate agreement on a neutral individual or panel.

4. The parties shall take such serious steps as they may be advised to resolve their disputes by NDR procedures before the neutral individual or panel so chosen by no later than [*].

5. If the case is not finally settled, the parties shall inform the Court by letter prior to [disclosure of documents/exchange of witness statements/exchange of experts' reports] what steps towards NDR have been taken and (without prejudice to matters of privilege) why such steps have failed. If the parties have failed to initiate NDR procedures the Case Management Conference is to be restored for further consideration of the case.

6. [Costs].

Note: The term "NDR procedures" is used in the draft order to emphasise that (save where otherwise provided) the parties are free to use the type of procedure they regard as most suitable, be it conciliation, mediation, early neutral evaluation, non-binding arbitration etc.


EXHIBIT "H"

# Appendix 4: Standard Pre-Trial Timetable

1. [Form of disclosure, divided by issues] is to be made by [*], with inspection [*] days after notice. [Detail different forms of disclosure for different groups of issues where appropriate].

2. Signed statements of witnesses of fact, and hearsay notices where required by rule 33.2, are to be exchanged not later than [*].

3. Unless otherwise ordered, witness statements are to stand as the evidence in chief of the witness at trial.

4. Signed reports of experts

   (i) are to be confined to one expert for each party from each of the following fields of expertise: [*];

   (ii) are to be confined to the following issues: [*];

   (iii) are to be exchanged [sequentially/simultaneously];

   (iv) are to be exchanged not later than [date or dates for each report in each field of expertise].

5. Meeting of experts

   (i) The experts are to meet [before and] after reports by [*] [and by *];

   (ii) The joint memorandum of the experts is to be completed by [*];

   (iii) Any short supplemental expert reports are to be exchanged [sequentially/simultaneously] by not later than [date or dates for each supplemental report].

6. [If the experts' reports cannot be agreed, the parties are to be at liberty to call expert witnesses at the trial, limited to those experts whose reports have been exchanged pursuant to paragraph 4 above.]

   [Or: The parties are to be at liberty to apply to call as expert witnesses at the trial those experts whose reports they have exchanged pursuant to paragraph 4 above, such application to be made not earlier than [*] and not later than [*].]

7. [The trial reading list for the Judge is to:

   (i) identify the issues that the Court will be asked to decide with the assistance of expert evidence;

   (ii) in respect of each such issue, briefly state each party's case;

(iii) in respect of each such issue, identify the pages of the expert evidence that need to be read.]

8. The proposed use of IT at trial is as follows: []

9. Preparation of trial bundles in electronic or hard copy form (or part electronic, part hard copy) to be completed in accordance with Appendix 7 to the Commercial Court Guide by not later than [*].

10. The estimated length of the trial is [*]. This includes [*] pre-trial reading time.

11. Within [*] days the parties are to attend on the Commercial Court Listing Office to fix the date for trial which shall be not before [*].

12. The progress monitoring date is [*]. Each party is to provide a completed progress monitoring information sheet to the Commercial Court Listing Office at least 3 days before the progress monitoring date (with a copy to all other parties).

13. Each party is to provide a completed pre-trial checklist not later than 3 weeks before the date fixed for trial.

14. [There is to be a pre-trial review not earlier than [*] and not later than [*]].

15. Save as varied by this order or further order, the practice and procedures set out in the Admiralty & Commercial Courts Guide are to be followed.

16. Costs in the case.

17. Liberty to restore the Case Management Conference.



EXHIBIT "H"

# Appendix 5: Preparation of Skeleton Arguments

1. Where this Appendix is not complied with the costs of preparation of the skeleton argument may be disallowed in whole or in part.

2. A skeleton argument is intended to identify both for the parties and the Court those points which are, and are not, in issue and the nature of the argument in relation to those points that are in issue.

3. A skeleton argument is not a speaking note or a substitute for oral argument.

4. Skeleton arguments must therefore

    (i) make clear what is sought;

    (ii) identify concisely:

        (a) the nature of the case generally and the background facts only insofar as they are relevant to the particular matter before the Court;

        (b) the propositions of law relied on with references only to the necessary relevant authorities. More than one authority should not be cited for any proposition;

        (c) the submissions of fact to be made with references to the evidence.

5. The following should be avoided in all skeleton arguments:

    (i) arguing the case at length;

    (ii) lengthy quotation from, or other duplication of, the evidence;

    (iii) lengthy quotation from authorities, citations from which should be (i) as brief as possible and (ii) confined to passages to which it is intended to take the Court in oral argument to establish the proposition(s) for which the authority in question has been cited.

6. As regards format and presentation, a skeleton argument must:

    (i) be in numbered paragraphs and state the name of the advocate(s) who prepared it;

    (ii) be prepared in a format which is easily legible - no skeleton should be served in a font smaller than 12 point and with line spacing of less than 1.5;

(iii) comply with the limits on length to be found in this Guide or as ordered;

(iv) be provided to the Court as a Word document (whether or not also provided in any other format, for example as a .pdf file).

# Appendix 6: Preparation of Chronologies and Indices

1. As far as possible chronologies and indices should not be prepared in a tendentious form and should be agreed.

2. The ideal is that the Court and the parties should have a single point of reference that all find useful and are happy to work with.

3. Common ground from the List of Common Ground and Issues should be included as appropriate.

4. Where there is disagreement about a particular event or description, it is useful if that fact is indicated in neutral terms and the competing versions shortly stated.

5. Chronologies and indices once prepared can be easily updated and are of continuing usefulness throughout the life of the case.

6. Chronologies and indices should be no longer than is necessary and should be cross referenced to the bundles.

# Appendix 7: Preparation of Bundles

1. No hard copy bundles, only electronic bundles, should be filed with the Court unless requested by the Judge; and the parties should seek to minimise their own and other participants' use of hard copy bundles and documents.

2. The preparation of bundles requires a high level of co-operation between legal representatives for all parties. It is the duty of all legal representatives to co-operate to this high level.

## Core Bundles

3. For any trial, and for any heavy application where it would be useful, a core bundle should be provided containing the most important documents in the case. The core bundle should be separately paginated, but each page should also bear its main bundle and page number reference. The core bundle should be prepared in .pdf form and lodged with the Court, or provided directly to the Judge's Clerk, at the latest by 4 pm on the working day before the (first) reading day for the trial or application hearing.

## General Guidance on Bundles

4. So far as possible, bundles for all hearings should be prepared in accordance with the principles set out in this section.

5. Bundles should contain only documents and authorities that are necessary for the hearing. Large electronic files can be slow to transmit and unwieldy to use and therefore should be avoided. The sensible selection (limitation) of the material reproduced in hearing bundles is as important as the quality of bundle preparation.

6. Each bundle should be given a concise title (file name for an electronic bundle, front cover and spine label name on any hard copy bundle) identifying its contents by type, which should be prominent and prior to any element identifying the case.

7. As regards bundle format:

    (i) where possible, the hearing bundles other than the core bundle and the authorities bundle(s) should be combined into one .pdf file, but in larger cases it may be sensible to combine separate categories of bundle into separate .pdf files;

    (ii) any authorities bundle(s) should always be provided separately, where possible combined as a single .pdf file;


EXHIBIT "H"

(iii) the file name for each .pdf file containing or constituting a bundle or bundles should contain the Claim No., a short version of the name of the case, and an indication of the number/letter of the bundle(s), e.g. "Bundle A (CL-2022-000111, Smith v Bloggs)";

(iv) all significant documents and all sections in bundles should be bookmarked for ease of navigation, with an appropriate description as the bookmark. The bookmark should contain the page number of the document;

(v) individual bundles should be indexed, and the index should if possible be searchable, save that chronological bundles of contemporaneous correspondence need not be indexed if an index is unlikely to be useful;

(vi) a separate index or table of contents for the hearing bundles should also be provided, if possible hyperlinked to the indexed documents;

(vii) no more than one copy of any one document should be included, unless there is good reason for doing otherwise;

(viii) contemporaneous documents, and correspondence, should be included in chronological order;

(ix) where a contract or similar document is central to the case it may be included in a separate place but a page should be inserted in the chronological run of documents to indicate:

(a) the place the contract or similar document would have appeared had it appeared chronologically; and

(b) where it may be found instead;

(x) bundles should be paginated in the bottom right-hand corner in a form that can be distinguished easily from any other pagination on the document; the pagination should begin afresh at the beginning of each bundle and should correspond to the pages of the .pdf file (meaning that the page numbering should include any title page and/or index/ contents pages). Pagination should be computer-generated, if possible, or at least in typed form, not done by hand, to facilitate searching, and must not mask relevant document content;

(xi) where possible, page numbers should be preceded by the letter or number of the bundle to aid searching.

8. As regards document format:

(i) documents, where possible, should be the subject of OCR (optical character recognition) to ensure that the text in the documents can be read as text and the document is word-searchable;

(ii) documents should generally appear in portrait mode (with documents that in the original were in landscape being oriented in the bundle so as to be read with 90-degree rotation clockwise), save where the bundle in question contains only landscape-format documents, for example a separate DRD or costs budgeting bundle for CMCs, or a bundle of spreadsheets or plans;

(iii) the default view for all pages should be 100 per cent;

(iv) personal and meta data should be removed;

(v) if practicable, scanned document resolution should not be greater than 300 dpi to avoid slow scrolling or rendering.

(vi) documents in manuscript, or not fully legible, should be transcribed. The transcription should be marked and placed adjacent to the document transcribed;

(vii) documents in a foreign language should be translated; the translation should be marked and placed adjacent to the document transcribed; the translation should be agreed, or, if it cannot be agreed, each party's proposed translation should be included;

(viii) in bundles of authorities, (a) a .pdf copy of the original report, with headnote, should be included for reported decisions (and see F12.1 on the correct sources to use), and (b) a .pdf copy of the official transcript should be used, where available, for unreported decisions.

9. As regards cross-referencing:

(i) when copy documents from exhibits are included, then unless clearly unnecessary, the copy of the affidavit or witness statement to which the documents were exhibited should be marked in a convenient way to show where the document referred to may be found;

(ii) where copy documents are taken from the disclosure of more than one party, then unless clearly unnecessary, the documents should be marked in a convenient way to show from which party's disclosure the copy document has been taken;

(iii) where there is a reference in a statement of case, affidavit or witness statement to a document which is contained in the bundles, any copy of the statement of case, affidavit or witness statement in a bundle

should be marked in a convenient way to identify where the document is to be found. Unless otherwise agreed it is the responsibility of the party that served the statement of case or witness statement to provide a cross-referenced copy for this purpose as part of its co-operation in the preparation of the hearing bundles; and

(iv) where the method of cross-referencing used in (i) or (iii) above has the effect of altering the format or length of the statement of case, affidavit or witness statement as compared to the signed originals to which a statement of truth was applied, then a solicitor responsible for the production of the bundles should add to the cross-referenced copy a short, signed certification that the content is unaltered from the signed originals except for the addition of the cross-referencing.

## Delivery of Bundles for Hearings

10. All bundles should be delivered:

(i) by upload to CE File, if possible (which may depend on file sizes);

(ii) by email to the Judge's Clerk either (a) attaching the bundle(s) or (b) giving access to a secure download site;

(iii) by using the Document Upload Centre by prior arrangement with the Court, for instructions on which see the Professional Users Guide; or

(iv) by providing the Judge with personal secure and confidential access to a shared digital workspace hosting the case materials, if such a workspace is being used by the parties.

Where file sizes are large, the temptation to break sensibly bundled documents into smaller bundles just for ease of transmission should be avoided and parties should consider (ii)(b), (iii) or (iv) above as preferred methods. In relation to delivery by email, the maximum aggregate size of attached files capable of being received is 36Mb (justice.gov email addresses) or 150Mb (ejudiciary.net email addresses).

11. Where an original document is required to be filed, by order of the Court or by provision of the CPR or the Insolvency Regulations 1986 or 2016, **such original document cannot be filed electronically** and must instead be physically filed with the Court.

12. If bundles are transmitted by email the email subject line should provide the following detail:

(i) Case number;

(ii) Case name (shortest comprehensible version);

(iii) Hearing date;

(iv) Judge Name (if known); and

(v) The words in capitals "REMOTE HEARING" where applicable.

13. If pages are to be added to or removed from a bundle after it has been transmitted to the Judge it should not be assumed that a substitute bundle will be accepted, because the Judge may have started to mark up the original. Absent a particular direction, a substitute bundle should be made available, but any pages to be added should also be provided separately, in a separate file, as well, with pages appropriately sub-numbered, or a separate list should be provided of the pages to be removed (as the case may be). This does not apply if a shared digital workspace is being used to host the bundles on which they may be amended without disturbing the Judge's markings or notes.

## Hard Copy Bundles

14. As indicated above, only electronic bundles should be filed with the Court unless one or more hard copy bundles are specifically requested, and the parties are encouraged to minimise their own use of hard copy bundles. Where hard copy bundles are used, the following also apply:

(i) bundles should be printed/copied double-sided;

(ii) bundles should not be overfilled, and should allow sufficient room for later insertions. Subject to this and to (iii) below, the size of file used should not be a size that is larger than necessary for the present and anticipated contents;

(iii) in any event, each bundle should not contain more than 300 sheets of paper (600 double-sided pages);

(iv) dividers or tabs within bundles may assist in the organisation and use of a bundle, but they should not be overused (for example to divide each individual page or piece of correspondence);

(v) bundles should be numbered electronically and not by hand, and should be named on the outside and on the inside front cover, the label to include the short title of the case, and a description of the bundle (including its number, where relevant);



EXHIBIT "H"

(vi) if a document has to be read across rather than down the page, it should be so placed in the bundle as to ensure that the top of the text is nearest the spine;

(vii) large documents, such as plans, should be placed in an easily accessible file.

15. If it is not possible for a litigant in person to comply with the requirements on e-bundles, a brief explanation of the reasons for this should be provided to the court as far in advance of the hearing as possible. The legal representatives for any represented party or parties should consider offering to prepare the e-bundle, providing the litigant in person with a reasonable opportunity to identify what documents they consider should be included and to comment on a draft index.

# Appendix 8: Expert Evidence – Requirements of General Application

1. It is the duty of an expert to help the Court on the matters within the expert's expertise: rule 35.3(1). This duty is paramount and overrides any obligation to the person from whom the expert has received instructions or by whom the expert is paid: rule 35.3(2).

2. Expert evidence presented to the Court should be, and should be seen to be, the independent product of the expert uninfluenced by the pressures of litigation.

3. An expert witness should provide independent assistance to the Court by way of objective unbiased opinion in relation to matters within the expert's expertise. An expert witness should never assume the role of an advocate.

4. An expert witness should identify clearly any factual assumptions on the basis of which any opinions are expressed, explaining why the assumptions are important, and should not omit to consider material facts which could detract from the expert's opinion.

5. An expert witness should make it clear when a particular question or issue falls outside their expertise.

6. If an opinion is not properly researched because the expert considers that insufficient data is available, this must be stated in the expert's report with an indication that the opinion is no more than a provisional one.

7. In a case where an expert witness who has prepared a report is unable to confirm that the report contains the truth, the whole truth and nothing but the truth without some qualification, that qualification must be stated in the report.

8. If, after exchange of reports, an expert witness changes view on a material matter having read another expert's report, or for any other reason, such change of view should be communicated in writing (through the party's legal representatives) to the other side without delay, and when appropriate to the Court.

9. All expert evidence – written or oral – should be as concise as possible.

10. An expert witness should be ready to take the initiative to narrow the areas of disputed expert opinion as far as possible, including by initiating further dialogue between experts.

Please see also section H of the Commercial Court Guide.


EXHIBIT "H"

# Appendix 9: Service Out of the Jurisdiction: Related Practice

## Service out of the jurisdiction without permission

1. With effect from 31 December 2020, a claim form can only be served out of the jurisdiction without first having obtained permission from the court:

   (i) where service is effected in Scotland or Northern Ireland and the requirements of rule 6.32(1) or (2) and rule 6.34 are satisfied;

   (ii) where proceedings are brought by a consumer or employee under a consumer contract or individual contract of employment in accordance with ss.15A to 15E of the Civil Jurisdiction and Judgments Act 1982 and the requirements of rule 6.33(2) and rule 6.34 are satisfied;

   (iii) where service is effected under the 2005 Hague Convention or where there is otherwise a contractual choice of jurisdiction in favour of the English courts and the requirements of rule 6.33(2B) and rule 6.34 are satisfied;

   (iv) where the claim is one which the court has power to determine notwithstanding that the person against whom the claim is made is not within the jurisdiction or the facts giving rise to the claim did not occur within the jurisdiction and the requirements of rule 6.33(3) and rule 6.34 are satisfied (generally where such jurisdiction is expressly conferred by a statute giving effect to an international convention); and

   (v) (for a claim form issued before 31 December 2020), where Regulation 18 (3A) of the Civil Procedure Rules 1998 (Amendment) (EU Exit) Regulations 2019 (SI/2019/521) applies ("Regulation 18(3A)"), i.e. the court has jurisdiction under the Judgments Regulation (recast), and the requirements of rule 6.33(2) (as it was in force immediately prior to 31 December 2020) and rule 6.34 are satisfied.

2. The requirements referred to above include the following:

   (i) Each claim made against the defendant to be served and included within the claim form must fall within rule 6.32 or the relevant section of rule 6.33 as appropriate.

   (ii) A notice containing a statement of the grounds on which the claimant is entitled to serve the claim form out of the jurisdiction must be filed with the claim form and a copy of that notice must be served with the claim form.


EXHIBIT "H"

(iii) PD6B §2.1 requires the notice to be in the form of practice form N510 in order to comply with rule 6.34.

(iv) Rule 6.34(2) provides that if the claimant fails to file such a notice, the consequence is that the claim form may only be served once the claimant has filed the requisite notice or if the Court gives permission.

3. It is very important that the statement as to the grounds upon which the claimant is entitled to serve the claim form out of the jurisdiction is accurate and made with care. If entitlement to serve out of the jurisdiction without leave is wrongly asserted, a claimant may be ordered to pay the costs of a defendant's application to strike out the claim or set aside service of the claim form on an indemnity basis.

4. Rule 6.35 and PD6B §6 set out the time periods during which a defendant must respond to a claim form where permission was not required for service, depending on whether the defendant is:

(i) in Scotland or Northern Ireland;

(ii) elsewhere.

5. PD 6B §6 sets out the periods for responding in the case of defendants served elsewhere. These provisions are subject to the modifications set out in Part 58 in relation to Commercial Court cases, including, but not limited to (i) that a defendant must file an acknowledgement of service in every case; and (ii) that the time periods provided by rule 6.35 apply after service of the claim form (rather than the particulars of claim).

## Application for permission: statement in support

6.

(i) The grounds upon which a claimant may apply for the Court's permission to serve a claim form out of the jurisdiction pursuant to rule 6.36 (in circumstances where neither rule 6.32 nor rule 6.33 applies) are set out in PD6B §3.1.

(ii) An application for permission under rule 6.36 must set out:

(a) the ground in PD 6B relied on as giving the Court jurisdiction to order service out, together with a summary of the facts relied on as bringing the case within each such paragraph;

(b) where the application is made in respect of a claim referred to in PD 6B §3.1(3), the grounds on which the claimant believes that



EXHIBIT "H"

there is between the claimant and the defendant a real issue which it is reasonable for the Court to try;

(c) the belief of the claimant that the claim has a reasonable prospect of success; and

(d) the defendant's address or, if not known, in what place the defendant is or is likely to be found.

(iii) The claimant should also present evidence of the considerations relied upon as showing that the case is a proper one in which to subject a party outside the jurisdiction to proceedings within it (stating the grounds of belief and sources of information); exhibit copies of the documents referred to and any other significant documents; draw attention to any features which might reasonably be thought to weigh against the making of the order sought; and otherwise comply with the duty of full and frank disclosure to the Court. Where convenient the written evidence should be included in the form of application notice, rather than in a separate witness statement. The form of application notice may be extended for this purpose.

## Application for permission: copies of draft order

7. The application must be accompanied by a draft order in Word format, and that draft must:

(i) specify the periods within which the defendant must:

(a) file an acknowledgement of service;

(b) serve or file an admission;

(c) file a defence; and

(ii) set out any other directions sought by the claimant as to:

(a) the method of service;

(b) the terms of any order sought giving permission to serve other documents out of the jurisdiction.

The relevant periods referred to in sub-paragraphs (a)(i) - (iii) above are specified in PD6B §6.1-6.6, and in the Table at the end of PD6B.

## Application for permission: copy or draft of claim form

8. A copy or draft of the claim form which the applicant intends to issue and serve must be provided to the Judge. The endorsement to the claim form


EXHIBIT "H"

must not include causes of action or claims not covered by the grounds on which permission to serve out of the jurisdiction can properly be granted. Where the application is for the issue of a concurrent claim form, the documents submitted must also include a copy of the original claim form.

## Application for permission: checklist

9. In the overwhelming majority of cases, applications for permission to serve a claim form out of the jurisdiction are resolved on paper. To assist the Court in dealing with such applications, and to reduce the number of applications in which it is necessary for the Court to seek further information from the applicant before determining the application, an applicant seeking permission to serve out should file a completed copy of the checklist at the end of this appendix when lodging the application.

## Application for permission: skeleton arguments

10. It is very often unnecessary for an application made without notice to serve proceedings out of the jurisdiction to be supported by a skeleton argument, because what needs to be said by way of submission in support can be set out in the Application Notice (remembering that witness statements are for evidence, not argument). However, the judge considering the application may sometimes request a skeleton addressing particular issues, and if the applicant considers that their application will require the court to grapple with a difficult or novel issue of law, they should file a skeleton or note of argument addressing that issue, together with copies of any key authorities, without waiting to be asked.

## Arbitration matters

11. Grounds for granting permission to serve an arbitration claim form out of the jurisdiction are provided by rule 62.5(1), and rule 62.5(3) applies rules 6.40 to 6.46 to the service of an arbitration claim form out of the jurisdiction under that rule. In any given case, it may be that the arbitration claim form can be served out of the United Kingdom without permission under rule 6.33(2B)(b), and rules 6.40 to 6.46 will apply to any such service.

## Practice under rules 6.32 and 6.33 (service out of the jurisdiction without permission)

12.

(i) Although a CPR Part 7 claim form may contain or be accompanied by particulars of claim, there is no need for it to do so and in many cases particulars of claim will be served after the claim form: rule 58.5.


EXHIBIT "H"

(ii) A defendant should acknowledge service in every case: rule 58.6(1).

(iii) The period for filing an acknowledgment of service will be calculated from the service of the claim form, whether or not particulars of claim are to follow: rule 58.6.

(iv) The periods for filing an acknowledgement of service and a defence (where the particulars of claim are served with the claim form) are set out respectively:

(a) in rule 6.35(2) (in relation to claim forms served in Scotland and Northern Ireland);

(b) where Regulation 18(3A) applies, (aa) in rule 6.35(3) (in relation to claim forms served pursuant to rule 6.33 on a defendant in a Convention Territory within Europe or a Member State) and (bb) in rule 6.35(4) (in relation to claim forms served pursuant to rule 6.33 on a defendant in a Convention Territory outside Europe); and

(c) in rule 6.35(5)/PD6B §§6.1, 6.3, 6.4 and the Table in PD 6B in relation to claim forms served pursuant to rule 6.33 which do not fall within Regulation 18(3A).

(v) However, where the particulars of claim are served after the acknowledgement of service, the period for filing a defence is 28 days from the service of the particulars of claim: rule 58.10(2).

## Practice under rule 6.36 (service out of the jurisdiction where permission is required)

13.

(i) Although a Part 7 claim form may contain or be accompanied by particulars of claim, there is no need for it to do so and in many cases particulars of claim will be served after the claim form: rule 58.5. If the claim form states that particulars of claim are to follow, there is no need to obtain further permission to serve out of the jurisdiction: rule 6.38(2). However, permission must be obtained to serve any other document out of the jurisdiction: rule 6.38(1); other than in cases where the defendant has given an address for service in Scotland and Northern Ireland: rule 6.38(3).

(ii) A defendant should acknowledge service in every case: rule 58.6(1).


EXHIBIT "H"

(iii) The periods for filing an acknowledgment of service will be calculated from the service of the claim form, whether or not particulars of claim are to follow: rule 58.6.

(iv) The period for serving, and filing, particulars of claim (where they were not contained in the claim form and did not accompany the claim form) will be calculated from acknowledgment of service: rule 58.5(1)(c).

(v) The period for serving and filing the defence will be calculated from service of the particulars of claim.

14. Time for serving and filing a defence is calculated:

(i) where the particulars of claim are served with the claim form, to be calculated by reference to the number of days listed in the Table in PD 6B plus an additional 14 days: PD 6B §6.4; or

(ii) where the particulars of claim are served after the acknowledgement of service, 28 days from the service of the particulars of claim.

## Practice under rules 6.40 to 6.44

15. Where rules 6.40 to 6.44 refer to the Senior Master

(i) if permission is required for service out of the jurisdiction this must be obtained first before documents are forwarded to the Senior Master;

(ii) it is for the party to forward the documents to the Senior Master; and

(iii) once documents have been forwarded to the Senior Master any questions about the progress of service should be directed to the Senior Master

## Other

16. Attention is also drawn to the use of rule 6.15 (service of the claim form by an alternative method or at an alternative place) in an appropriate case.


EXHIBIT "H"

## Commercial Court Checklist for Applications for Permission to Serve a Claim Form out of the Jurisdiction

| | |
|---|---|
| **GENERAL** | |
| Party seeking permission | |
| Applicant's solicitor (and reference) | |
| Party to be served | |
| Place where service is to be effected | |
| Date checklist completed | |
| **NATURE OF THE APPLICATION** | |
| Is this a precautionary application in which the applicant claims an entitlement to serve out of the jurisdiction without permission? | |
| **GROUNDS** | |
| **Question** | **Answer and identification of relevant paragraphs in supporting witness statement or other document** |
| Which grounds under Part 6.36/PD6B §3.1 or CPR 62.5 are relied upon? | |
| If application is made under PD 6B §3.1(3), has paragraph 6(b)(ii) of Appendix 9 to the Commercial Court Guide / CPR 6.37(2) been satisfied? | |
| **SERIOUS ISSUE TO BE TRIED** | |
| **Question** | **Answer and identification of relevant paragraphs in supporting witness statement or other document** |
| Does the application set out the belief the claim has a reasonable prospect of success, and the basis for that belief as required by CPR 6.37(1)(b)? | |
| **PROPER CASE FOR SERVICE OUT / FORUM CONVENIENS** | |
| **Question** | **Answer and identification of relevant paragraphs in supporting witness statement or other document** |

| | |
|---|---|
| Does the application set out the considerations relied upon as showing that the case is a proper one for service out? | |
| **THE ADDRESS OF THE PARTY TO BE SERVED?** | |
| **Question** | **Answer and identification of relevant paragraphs in supporting witness statement or other document** |
| Does the application set out the address of the party to be served, or, if not known, in what place that party is or is likely to be found as required by CPR 6.37(1)(c)? | |
| **FULL AND FRANK DISCLOSURE** | |
| **Question** | **Answer and identification of relevant paragraphs in supporting witness statement or other document** |
| Does the application identify those matters of which the court should be made aware pursuant to the duty of full and frank disclosure? | |
| **SERVICE** | |
| **Question** | **Answer and identification of relevant paragraphs in supporting witness statement or other document** |
| Is there an application for alternative service under CPR 6.15 or to dispense with service under CPR 6.16 (read with CPR 6.37(5)(b)) and, if so, have the grounds of the application been set out? | |
| Is service to be effected in a Hague Convention state and, if so, does any application under CPR 6.15 or 6.16 address this factor? | |


EXHIBIT "H"

| | |
|---|---|
| If the application is for permission to serve an arbitration claim form, is an order for alternative service being sought to serve the solicitor or representative acting for the party in the arbitration? | |
| Where permission is sought to effect service by a particular method, is service by that method legal under the law of the place of service? | |
| If the application is for permission to serve an arbitration claim form, has the application been brought within the time limit in CPR 62.4(2), and if an extension of time is sought, have the grounds for such an extension been sent out? | |
| **DOCUMENTS TO ACCOMPANY THE APPLICATION** | |
| Has a draft order complying with paragraph 7 of Appendix 9 to the Commercial Guide been supplied? | |
| Has a copy of the claim form, arbitration claim form or a draft thereof been provided? | |
| Does the claim form or arbitration claim form comply with paragraph 8 of Appendix 9 to the Commercial Court or CPR 62.5(1) (as appropriate)? | |
| Has a skeleton argument been filed (cf. paragraph 10 of Appendix 9 to the Commercial Court Guide) | |

# Appendix 10: Security for Costs: Related Practice

## First applications

1. First applications for security for costs should not be made later than at the Case Management Conference and in any event any application should not be left until close to the trial date. Delay to the prejudice of the other party or the administration of justice might well cause the application to fail, as will any use of the application to harass the other party. Where it is intended to make an application for security at the Case Management Conference:

    (i) the procedure, and timetable for evidence, for applications must be followed (see section F of the Guide); and

    (ii) the time estimate for the Case Management Conference must be reviewed. A separate hearing date for the security for costs application should be obtained if there is any concern that there will not be enough time at the Case Management Conference to deal with the application. The experience of the Court is that contested applications for security for costs frequently become time-consuming so as not to be capable of being dealt with at the Case Management Conference.

## Successive applications

2. Successive applications for security can be granted where the circumstances warrant. If a claimant wishes to seek to preclude any further application, it is incumbent on the claimant to make that clear.

## Evidence

3. An affidavit or witness statement in support of an application for security for costs should deal not only with the residence of the claimant (or other respondent to the application) and the location of its assets but also with the practical difficulties (if any) of enforcing an order for costs against it.

## Investigation of the merits of the case

4. Investigation of the merits of the case on an application for security is strongly discouraged. It is usually only in those cases where it can be shown without detailed investigation of evidence or law that the claim is certain or almost certain to succeed or fail that the merits will be taken into consideration.

## Undertaking by the applicant

5. The Court is entitled to order security for costs on terms requiring that the applicant give an undertaking to comply with any order that the Court may


EXHIBIT "H"

make if it later finds that putting up security for costs as ordered has caused loss to the claimant for which the claimant should be compensated. However, such terms will only be imposed in a rare and exceptional case: see *Rowe et al v Ingenious Media Holdings plc et al* [2021] EWCA Civ 29.

## Stay of proceedings

6. It is not usually convenient or appropriate to order an automatic stay of proceedings pending the provision of security for costs. It leads to delay and may disrupt the preparation of the case for trial, or other hearing. Experience has shown that it is usually better to give the claimant (or other relevant party) a reasonable time within which to provide the security and liberty to apply to the Court in the event of default. This enables the Court to put the claimant to its election and then, if appropriate, to dismiss the case.



EXHIBIT "H"

# Appendix 11: Form of Freezing Order

Important Note: A freezing injunction is an exceptional order, and applicants are reminded of their duty of full and frank disclosure to the Court. Failure to comply with that duty may lead to the discharge of the order with all attendant consequences.

Any departures from the following form in any draft order provided to the Court should be drawn to the Court's attention, and the reasons for the proposed departures explained. The draft order presented to the Court should represent a realistic assessment of what is required to meet the purposes of the application, having regard to its without notice context. The draft order should not be presented as an "opening offer", leaving it to the Court to amend it down. The Court has noted an increasingly prevalent practice of draft orders being presented to the Court which include wide definitions of some of the terms which appear in the Commercial Court form, thereby considerably adding to its scope: for example of the terms "assets" or "details". These definitions constitute departures from the standard form, which should not be sought on a routine basis, and the existence and scope of any suggested definitions in those cases where they are sought must be highlighted and justified.



EXHIBIT "H"

**** FREEZING INJUNCTION ****

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
KING'S BENCH DIVISION
COMMERCIAL COURT

Before The Honourable Mrs/Mr Justice [ ] (sitting in private)

Claim No.

BETWEEN

Claimant(s)/Applicant(s)

– and –

Defendant(s)/Respondent(s)

PENAL NOTICE

If you [ ][1] disobey this order you may be held to be in contempt of Court and may be imprisoned, fined or have your assets seized.

Any other person who knows of this order and does anything which helps or permits the Respondent to breach the terms of this order may also be held to be in contempt of Court and may be imprisoned, fined or have their assets seized.

**THIS ORDER**

1. This is a Freezing Injunction made against [ ] ("the Respondent") on [ ] by Mrs/Mr Justice [ ] on the application of [ ]("the Applicant"). The Judge read the Affidavits listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order.

2. This order was made at a hearing without notice to the Respondent, at which the Court was satisfied that it was in the interests of justice to sit in private. Pursuant to CPR rule 39.2(5), in the interests of justice this order is not to be published on the judiciary website. The Respondent has a right to apply to the Court to vary or discharge the order—see paragraph 13 below.

1 Insert name of Respondent(s)


EXHIBIT "H"

3. There will be a further hearing in respect of this order on [ ] ("the return date"[1]).

[4. If there is more than one Respondent—

1. unless otherwise stated, references in this order to "the Respondent" mean both or all of them; and

2. this order is effective against any Respondent on whom it is served or who is given notice of it.]

**FREEZING INJUNCTION**

[For injunction limited to assets in England and Wales]

5. Until after the return date or further order of the Court, the Respondent must not remove from England and Wales or in any way dispose of, deal with or diminish the value of any of its, her or his assets which are in England and Wales up to the value of £

[For worldwide injunction]

6. Until the return date or further order of the Court, the Respondent must not—

1. remove from England and Wales any of its, her or his assets which are in England and Wales up to the value of £ ; or

2 in any way dispose of, deal with or diminish the value of any of its, her or his assets whether they are in or outside England and Wales up to the same value.

[For either form of injunction]

7. Paragraph 5 applies to all the Respondent's assets whether or not they are in its, her or his own name, whether they are solely or jointly owned [and whether the Respondent is interested in them legally, beneficially or otherwise][2]. For the purpose of this order the Respondent's assets include any asset which it, she or he has the power, directly or indirectly, to dispose of or deal with as if it were its, her or his own. The Respondent is to be regarded as having such power if a third party holds or controls the asset in accordance with its, her or his direct or indirect instructions.

1 In the Commercial Court, usually 14 days after the injunction was granted, particularly where parties are outside the jurisdiction, and a Friday in the first instance.

2 Whether this wider wording should be included in relation to the Order and/or the provision of information will be considered on a case by case basis. The wider form of Order should not be sought as a matter of course, and its inclusion must be justified


EXHIBIT "H"

8. This prohibition includes the following assets in particular—

   1. the property known as [title/address] or the net sale money after payment of any mortgages if it has been sold;

   2. the property and assets of the Respondent's business[1] [known as [name]] [carried on at [address]] or the sale money if any of them have been sold; and

   3. any money in the account numbered [account number] at [title/ address].

   4. any interest under any trust or similar entity including any interest which can arise by virtue of the exercise of any power of appointment, discretion or otherwise howsoever.

[For injunction limited to assets in England and Wales]

9. If the total value free of charges or other securities ("unencumbered value") of the Respondent's assets in England and Wales exceeds £ , the Respondent may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of its, her or his assets still in England and Wales remains above £ .

[For worldwide injunction]

10.

   1. If the total value free of charges or other securities ("unencumbered value") of the Respondent's assets in England and Wales exceeds £ , the Respondent may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of the Respondent's assets still in England and Wales remains above £ .

   2. If the total unencumbered value of the Respondent's assets in England and Wales does not exceed £ , the Respondent must not remove any of those assets from England and Wales and must not dispose of or deal with any of them. If the Respondent has other assets outside England and Wales, she, he or it may dispose of or deal with those assets outside England and Wales so long as the total

1 This sub paragraph is designed for the business that is the business of the Respondent itself/ herself/himself but carried on under a trading or business name. It is not designed for the business of a company with separate legal personality that is owned by a Respondent, and where the Respondent's property and assets comprise its/her/his interest in the company rather than the property and assets of the company.

unencumbered value of all its, her or his assets whether in or outside England and Wales remains above £ .

**PROVISION OF INFORMATION**

11.

1. Unless paragraph (2) applies, the Respondent must [within [ ] hours/days] of service of this order] and to the best of its, her or his ability inform the Applicant's solicitors of all its, her or his assets [in England and Wales] [worldwide] [exceeding £ in value[1]] whether in its, her or his own name or not and whether solely or jointly owned, giving the value, location and details of all such assets.[2]

2. If the provision of any of this information is likely to incriminate the Respondent, it, she or he may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of Court and may render the Respondent liable to be imprisoned, fined or have its, her or his assets seized.

12. Within [ ] working days[3] after being served with this order, the Respondent must swear and serve on the Applicant's solicitors an affidavit setting out the above information.[4]

**EXCEPTIONS TO THIS ORDER**

13.

(1) This order does not prohibit the Respondent from spending £ a week towards its, her or his ordinary living expenses and also £ [or a reasonable sum] on legal advice and representation. [But before spending any money the Respondent must tell the Applicant's legal representatives where the money is to come from[5].]

1 Careful consideration must be given to inserting a realistic lower limit below which value assets need not be disclosed.

2 Careful consideration should be given to ensuring that this period is realistic having regard to the nature and volume of information that may be involved. It is not acceptable to invite the Court to impose unrealistic time limits, and costs orders may be made where this results in the party subject to the order having to bring the matter back before a Judge.

3 See the preceding footnote.

4 Consideration should also be given to amalgamating paragraphs 9 and 10 of the draft Order, so as to require only one disclosure exercise, verified by Affidavit.

5 The proviso requiring advance notice should only be included where really necessary. It is not to be included otherwise. It will often be a form of order better sought on the return date.

(2) [This order does not prohibit the Respondent from dealing with or disposing of any of its, her or his assets in the ordinary and proper course of business, [but before doing so the Respondent must tell the Applicant's legal representatives[1]].]

14. The Respondent may agree with the Applicant's legal representatives that the above spending limits should be increased or that this order should be varied in any other respect, but any agreement must be in writing.

15. The order will cease to have effect if the Respondent—

(a) provides security by paying the sum of £ into Court, to be held to the order of the Court; or

(b) makes provision for security in that sum by another method agreed with the Applicant's legal representatives.

## COSTS

16. The costs of this application are reserved to the Judge hearing the application on the return date.

## VARIATION OR DISCHARGE OF THIS ORDER

17. Anyone served with or notified of this order may apply to the Court at any time to vary or discharge this order (or so much of it as affects that person), but they must first inform the Applicant's solicitors. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicant's solicitors in advance.

## INTERPRETATION OF THIS ORDER

18. A Respondent who is an individual who is ordered not to do something must not do it herself or himself or in any other way. She or he must not do it through others acting on her or his behalf or on her or his instructions or with her or his encouragement.

19. A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

1 The proviso requiring advance notice should only be included where really necessary. It is not to be included otherwise. It will often be a form of order better sought on the return date.

**PARTIES OTHER THAN THE APPLICANT AND RESPONDENT**

**20. Effect of this order**

It is a contempt of Court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

**21. Set off by banks**

This injunction does not prevent any bank from exercising any right of set of it may have in respect of any facility which it gave to the respondent before it was notified of this order.

**22. Withdrawals by the Respondent**

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondent if the withdrawal appears to be permitted by this order.

[For worldwide injunction]

**23. Persons outside England and Wales**

1. Except as provided in paragraph (2) below, the terms of this order do not affect or concern anyone outside the jurisdiction of this Court.

2. The terms of this order will affect the following persons in a country or state outside the jurisdiction of this Court—

(a) the Respondent or its officer or its, her or his agent appointed by power of attorney;

(b) any person who–

1. is subject to the jurisdiction of this Court;

2. has been given written notice of this order at its, her or his residence or place of business within the jurisdiction of this Court; and

3. is able to prevent acts or omissions outside the jurisdiction of this Court which constitute or assist in a breach of the terms of this order; and

(c) any other person, only to the extent that this order is declared enforceable by or is enforced by a Court in that country or state.

[For worldwide injunction]


EXHIBIT "H"

**24. Assets located outside England and Wales**

Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party from complying with—

1. what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

2. any orders of the Courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicant's solicitors.

**COMMUNICATIONS WITH THE COURT**

All communications to the Court about this order should be sent to the Admiralty and Commercial Court Listing Office, 7 Rolls Building, Fetter Lane, London, EC4A 1NL quoting the case number. The telephone number is 020 7947 6826.

The offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.

**SCHEDULE A—AFFIDAVITS**

The Applicant relied on the following affidavits—

| | | | |
|---|---|---|---|
| [name] | [number of affidavit] | [date sworn] | [filed on behalf of] |
| (1) | | | |
| (2) | | | |

**SCHEDULE B—UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT**

(1) If the Court later finds that this order has caused loss to the Respondent, and decides that the Respondent should be compensated for that loss, the Applicant will comply with any order the Court may make.

[(2) The Applicant will—

1. on or before [date] cause a written guarantee in a form satisfactory to the Court in the sum of £ to be issued from a bank with a place of business within England or Wales, in respect of any order the Court may make pursuant to paragraph (1) above [and (7) below]; and

2. immediately upon issue of the guarantee, cause a copy of it to be served on the Respondent.]

(3) As soon as practicable the Applicant will issue and serve a claim form [in the form of the draft produced to the Court] [claiming the appropriate relief].

(4) The Applicant will [swear and file an affidavit] [cause an affidavit to be sworn and filed] [substantially in the terms of the draft affidavit produced to the Court] [confirming the substance of what was said to the Court by the Applicant's advocate].

(5) The Applicant will serve upon the Respondent [together with this order] [as soon as practicable]—

1. copies of the affidavits and exhibits containing the evidence relied upon by the Applicant, and any other documents provided to the Court on the making of the application;

2. the claim form; and

3. an application notice for continuation of the order.

[(6) Anyone notified of this order will be given a copy of it by the Applicant's legal representatives.]

(7) The Applicant will pay the reasonable costs of anyone other than the Respondent which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondent's assets and if the Court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant will comply with any order the Court may make.

(8) If this order ceases to have effect (for example, if the Respondent provides security or the Applicant does not provide a bank guarantee as provided for above) the Applicant will immediately take all reasonable steps to inform in writing anyone to whom he has given notice of this order, or who she, he or it has reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

[9) The Applicant will not without the permission of the Court use any information obtained as a result of this order for the purpose of any civil or criminal proceedings, either in England and Wales or in any other jurisdiction, other than this claim.]

[(10) The Applicant will not without the permission of the Court seek to enforce this order in any country outside England and Wales [or seek an order of a similar

nature including orders conferring a charge or other security against the Respondent or the Respondent's assets].][1]

## NAME AND ADDRESS OF APPLICANT'S LEGAL REPRESENTATIVES

The Applicant's legal representatives are—

[Name, address, reference, and telephone numbers both in and out of office hours and email]

1 Unless the Court directs otherwise this paragraph should be included in Orders for worldwide freezing injunctions.

# Appendix 12: Electronic Working

**The Electronic Working Scheme (CE-File) is in operation in the Commercial Court and the Admiralty Court. The Scheme is set out in Practice Direction 51O.**

**Please go to:** PD 51O

See also Practice Note to PD 51O – Paragraph 3.4(2)

When filing electronically, the following categories should be used. This will particularly help the Court deal with applications on the documents:

1. Application.
2. Witness Statement.
3. Exhibit to Witness Statement (separate for each exhibit).
4. Signed Consent Order (PDF).
5. Draft Consent Order (Word).
6. Draft Order (if not by consent) (Word).
7. Correspondence.
8. Other (only to be used if none of the above).

Email communication with the Judge through her or his Clerk is permitted where used responsibly but any such communication must always be copied to the other parties, and also (unless clearly unnecessary) copied to the Listing Office.


EXHIBIT "H"

# Appendix 13: Electronic Track Data in Collision Claims

## Introduction

1. In many collision cases, the tracks of the vessels involved leading up to the collision(s) are captured electronically or digitally by, for example, ship or shore-based AIS, ECDIS, or voyage data recorders (such track data, and any associated visual or audio recordings, being referred to herein as “Electronic Track Data”; see rule 61.1(2)(m)). The availability of such Electronic Track Data can greatly aid the quick and efficient disposal of disputes over liability for the collision.

2. Where such Electronic Track Data is available, it may therefore be possible, and desirable, to modify or dispense with various aspects of the normal procedure in a Collision Claim. (The normal procedure in a Collision Claim is set out in rule 61.4, PD 61 §§4.1-4.6, and sections N.5, N.8, N.9 and N.14 of the Guide.)

## Preservation of Electronic Track Data

3. Electronic Track Data will almost certainly be of great importance in any Collision Claim in which liability might be in dispute. A party to an anticipated Collision Claim should therefore take all reasonable steps promptly to preserve and/or procure the original and/or copies of any Electronic Track Data in its control. (Rule 31.8(2) provides that a party has a document “in his control” if (a) the document is in its physical possession, (b) it has a right to possession of the document, or (c) it has a right to inspect or take copies of the document.)

## Pre-Action Disclosure & Inspection of Electronic Track Data

4. It is to be expected that the early disclosure, and provision or inspection, of Electronic Track Data will enable the rapid and cost-effective resolution of many disputes, or potential disputes, concerning liability for collisions without recourse to formal proceedings.

5. Therefore, each party to an anticipated Collision Claim will generally be expected to

   (a) disclose to one another any Electronic Track Data, which is or has been in its control, and

   (b) provide copies, or permit inspection, of that electronic track data

   during the course of pre-action correspondence. A failure by one party so to disclose or permit inspection of Electronic Track Data at the request of


EXHIBIT "H"

another party to an anticipated Collision Claim prior to the commencement of proceedings without good reason is likely to attract a costs sanction from the Court.

6. Furthermore, an application under rule 31.16 by a person likely to be a party to a subsequent Collision Claim for disclosure and/or inspection of Electronic Track Data by another person likely to be a party to that action before proceedings have started is likely to be considered favourably by the Court.

## Early Disclosure & Inspection of Electronic Track Data

7. Rule 61.4(4A) requires every party in a collision claim to give early disclosure of any electronic track data, which is or has been in their control, within either (a) 21 days after the defendant files their acknowledgment of service, or (b) where the defendant makes an unsuccessful application under CPR Part 11, within 21 days after the defendant files their further acknowledgment of service. Each party must provide copies, or permit inspection of, that electronic track data within 7 days of a request by another party to do so: rule 61.4(4A).

8. The parties should then file at Court completed Collision Statements of Case in the usual way in accordance with rule 61.4. The time limits set out in rule 61.4 should not normally require extension because of the provision of Electronic Track Data pursuant to the paragraph above. (Rule 61.4 requires the parties to file at Court completed Collision Statements of Case (a) within 2 months after the defendant files its acknowledgment of service, or (b) where the defendant unsuccessfully applies under CPR Part 11 to dispute the Court's jurisdiction, within 2 months after the defendant files its further acknowledgment of service.)

## Case Management when Electronic Track Data is available

9. In accordance with PD 61 §4.6, and paragraphs N8.1(ii) and (iv) of the Guide, the claimant should apply for a mandatory Case Management Conference within 7 days after the last collision defence is filed, which mandatory Case Management Conference will normally take place on the first available date 6 weeks thereafter. Enquiries should if necessary be made as to whether any party intends to serve a collision reply before the Case Management Conference is listed, and that the timing of the Case Management Conference should take into account the results of such enquiries.

10. The availability of Electronic Track Data is likely to enable the Court to adopt fast track procedures for the determination of issues of liability in a Collision Claim. The Court will seek to adopt such fast track procedures as part of its duty actively to manage cases in accordance with the overriding objective, and will give due consideration to making one or more of the directions listed in PD 61 §4.7. (See also paragraphs N8.1(vii), N9.1 and N14.1 of the Guide.)


EXHIBIT "H"

11. The parties should give careful consideration to the possibility of adopting such (or other) fast track procedures when completing their case management information sheets prior to the Case Management Conference: see paragraph N8.1(viii). Parties are reminded of their obligation to help the Court to further the overriding objective. While the Court will always be astute to manage each particular Collision Claim to meet the demands of justice and the overriding objective, in making directions for the proper management of the case, the Court will give due consideration to any agreement made by the parties designed to dispose of the claim in a swift and cost-efficient manner. (For example, reference is made to the Fast Track Procedure form of agreement prepared by the Admiralty Solicitors Group for use in Collision Claims where Electronic Track Data is available).

# Appendix 14: Guidance on location of hearing, and on transferring cases to/from Circuit Commercial Courts

If a case remains in the Commercial Court but a hearing is more suitably held outside London, the Commercial Court will aim to enable a Commercial Judge to conduct the hearing outside London.

Further if a hearing outside London (in any Court, including a Circuit Commercial Court) needs a Commercial Judge, the Commercial Court will aim to provide a Commercial Judge to conduct the hearing.

If appropriate in the particular case, the case itself can be transferred to the Commercial Court. Where appropriate this may be on the basis that the substantive hearing or trial should be conducted outside London.

Enquiries should be directed to the Senior Listing Officer at the Commercial Court Listing Office. Where appropriate the matter can be discussed between the Judge in Charge of the Commercial Court and the relevant Designated Civil Judge or Circuit Commercial Judge.

Permission to transfer any case from the Commercial Court to a Circuit Commercial Court or vice versa may be granted only by a Judge of the Commercial Court.

In the case of a proposed transfer from a Circuit Commercial Court to the Commercial Court the parties should first inform the relevant Circuit Commercial Judge who can express a view; and an application should then be made to the Judge in Charge of the Commercial Court.

As to transferring cases from the Commercial Court to a Circuit Commercial Court:

1. If a case is suitable for transfer to a Circuit Commercial Court, either party can apply to the Commercial Judge prior to the CMC for transfer.

2. If the case is one that is suitable for transfer and a decision is made to transfer prior to the CMC, the Commercial Judge will order that the case be transferred to a Circuit Commercial Court and the CMC will take place at the Circuit Commercial Court.

3. If the case is one that is suitable for transfer and a decision is made to transfer at the CMC, then to save the costs of a further hearing in the Circuit Commercial Court, the Commercial Judge will usually make all the directions with the appropriate timetable down to trial in the same way as if the case were to remain in the Commercial Court, including a direction to fix the trial date through the appropriate listing officer (see paragraph 8 below) within a specified period of time. If, as is usually the case, it is thought desirable to give



EXHIBIT "H"

the parties time to try and settle the case through direct negotiation or NDR, this will be built into the timetable.

4. The Commercial Judge will consider the time at which transfer is to take place and this must be specified in the Order. The Commercial Judge will decide whether a PTR or further CMC appears necessary.

5. The Order must be drafted by the parties in the usual way and filed with the Commercial Registry.

6. Once the Order is sealed, the transfer from the Commercial Court is during normal circumstances effected by the Registry within one week; the transfer is effected by the Registry sending the Order to the Circuit Commercial Court. The Registry will also inform all parties on record once the case has been transferred.

7. The Circuit Commercial Court will then receive all the documents which were on the Commercial Court file and they will give the case one of their own numbers and inform the parties.

8. The case will then continue in the same way as if it had been issued in the Circuit Commercial Court in question. Future hearing dates, including any trial date, must be fixed with the listing office at the Circuit Commercial Court within the time limit specified in the Order, for which the parties must contact the specialist listing officer at the Court to which the case has been transferred. The telephone numbers and email addresses of the specialist listing officers for the Circuit Commercial Courts are:

**London:**

Email: comct.listing@Justice.gov.uk

Telephone: 020 7947 6826

**Birmingham:**

Email: bpc.birmingham@justice.gov.uk

Telephone: 0121 681 3043

**Bristol:**

Email: BristolCircuitComm@justice.gov.uk

Telephone: 0117 366 4860

**Leeds:**

Email: BPC.Leeds@justice.gov.uk

Telephone: 0113 306 2461

Specialist Judges' Listing Section:

Telephone: 0113 306 2450

**Liverpool:**

Email: liverpoolbpc@justice.gov.uk

Telephone: 0151 296 2444

**Manchester:**

Email: BPC.manchester@justice.gov.uk

Telephone: 0161 240 5307

**Newcastle:**

Email: Helen.Tait@justice.gov.uk

Telephone: 0191 205 8751 or 0191 205 8755

**Wales:**

**Cardiff**

Email: BPC.Cardiff@justice.gov.uk

Telephone: 029 2037 6412

**Mold**

Clerk: Barry Sharples

Email: barry.sharples@justice.gov.uk

Telephone: 029 2037 6411

Listing Officer: Amanda Barrago

Email: amanda.barrago@justice.gov.uk

Telephone: 029 2037 6412

General enquiries: BPC.Cardiff@justice.gov.uk

North Wales Civil Listing only:

Email: northwalescivillisting@justice.gov.uk

Telephone: 01978 317400

Parties are asked to speak to the specialist listing officers who will tell them of the facilities available at other Courts.

9. The Commercial Court monitors compliance with its Orders through progress monitoring information sheets which have to be provided by the Progress Monitoring Date specified in the Order. The standard directions for the Circuit Commercial Courts provide for a Progress Monitoring Date; such a date should therefore be provided for in any Order. The Circuit Commercial Courts monitor progress in accordance with paragraph 8 of PD 59. A Pre Trial Review (either in Court or by telephone conference) may be held in the Circuit Commercial Courts if the parties make a request or the Circuit Commercial Judge so directs.



EXHIBIT "H"

10. The parties are expected to keep the listing officer of the Court to which the case is transferred apprised of any settlement of the case. Where the Commercial Judge has not made all the directions or the parties need to make an application either orally or in writing, then the appropriate directions will be considered and made by the Circuit Commercial Judge.

# Appendix 15: Guidance on disclosure where PD 57AD does not apply

## Disclosure obligations

1. Whenever litigation is contemplated, parties must take all reasonable steps to preserve disclosable documents. Legal representatives must notify their clients of the need to preserve documents as soon as litigation is contemplated. The duty to preserve documents includes electronic documents which would otherwise be subject to deletion in the ordinary course of business, for example under a party's ordinary document retention policies.

2. The parties and their legal representatives must co-operate with each other to ensure that disclosure appropriate to the needs of the case will be given and that the process of making disclosure will be efficient and effective, particularly in relation to electronic documents. In some cases, for example heavy and complex matters, it may be appropriate for discussions to begin before proceedings are commenced. They should in all cases begin well in advance of the first Case Management Conference in the case.

3. A party should always make a disclosure statement, verified by a statement of truth, to confirm it has carried out the disclosure ordered. When a party is required to make a reasonable search for documents, the party should state in its disclosure statement any limits it placed upon the search on the grounds that otherwise the search would be unreasonable.

## Forms of disclosure order

4. Under rule 31.5(7), the Court will consider, normally at the first Case Management Conference, what orders to make in relation to disclosure. The Court may:

   (a) use a combination of orders;

   (b) order a mixture of forms of disclosure;

   (c) order sample disclosure;

   (d) order disclosure in stages; or

   (e) order that disclosure is dispensed with, either generally or in relation to certain issues, or is to be given only in relation to certain issues.



EXHIBIT "H"

5. Where the form or scope of disclosure is not agreed, the party seeking the more extensive form or scope of disclosure should justify the order by reference to the overriding objective.

6. An order for standard disclosure should be sought only where it is the most appropriate form of order, and if it can appropriately be confined to particular issues it should be so confined.

## Procedure in advance of the making of a disclosure order

7. The provisions of rule 31.5(3)-(9) apply.

8. The parties should indicate the form of disclosure in the case management information sheets. A party who contends that to search for a category or class of document would be unreasonable should also indicate this. If required, parties should assist the court with estimates of the costs of forms of disclosure order agreed or contended for.

## Electronic documents

9. Disclosure of electronic documents is governed by PD31B. This contains the detailed provisions as to the Court's approach in matters regarding electronic disclosure and the requirements of searching and listing electronic documents. The Court recognises that the technology is constantly changing, and the parties are encouraged to discuss and wherever possible agree how the process is to be managed efficiently.

## Lists and disclosure statements (standard disclosure)

10. To comply with rule 31.10(3) it may be necessary to list the documents in date order, to number them consecutively, to give each a concise description or to use a "Bates number" system. Where there is a large number of documents all within a particular category, the disclosing party may list those documents as a category, unless otherwise ordered.

11. Each party to the proceedings must serve a separate list of documents.

12. If the structure of a (physical or digital) document collection or database may be of evidential value, solicitors should ensure that at least one complete copy of it is made available for inspection, if required.

13. The disclosure statement for standard disclosure should begin with the following words:

    (a) "[I/we], [name(s)] state that [I/we] have carried out a reasonable and proportionate search to locate all the documents which [I am/here name the party is] required to disclose under [the order made by the

Court or the agreement in writing made between the parties] on the [] day of [] 20[]."

14. The disclosure statement for standard disclosure should end with the following certificate:

"[I/we] certify that [I/we] understand the duty of disclosure and to the best of [my/our] knowledge [I have/here name the party has] carried out that duty. [I/we] certify that the list above is a complete list of all documents which are or have been in [my/here name the party's] control and which [I am/here name the party is] obliged under [the said order or the said agreement in writing] to disclose."

15. An adapted version of practice form **N265(CC)** (list of documents: standard disclosure) has been approved for use in the Commercial Court. The Court may at any stage order that a disclosure statement be verified by affidavit.

16.

(a) For PD 31A § 4.3, the Court will normally regard any person who is in a position responsibly and authoritatively to search for the documents to be disclosed and to make the statements contained in the disclosure statement concerning the documents to be disclosed as an appropriate person.

(b) A legal representative may in certain cases be an appropriate person.

(c) An explanation as to why the person is considered an appropriate person must be given in the disclosure statement.

(d) A person holding an office or position but who is not in a position responsibly and authoritatively to make the statements contained in the disclosure statement will not be regarded as an appropriate person.

(e) The Court may require that a disclosure statement also be signed by another appropriate person.

## Specific disclosure

17. Specific disclosure is defined by rule 31.12(2).

18. The Court may at any stage order that specific disclosure be verified by affidavit or witness statement.


EXHIBIT "H"

**EXHIBIT "H"**

© Crown copyright 2023

This publication is licensed under the terms of the Open Government Licence v3.0 except where otherwise stated. To view this licence, visit nationalarchives.gov.uk/doc/open-government-licence/version/3.

Where we have identified any third party copyright material you will need to obtain permission from the copyright holders concerned.

Any enquiries regarding this publication should be sent to comctlisting@justice.gov.uk, or call+44 20 7 947 7156 / 7357

This publication is available for download at www.justice.gov.uk

**EXHIBIT "H"**